**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SKINCURE ONCOLOGY, LLC ) | |
| 200 S. Frontage Road ) | |
| Suite 200 ) | |
| Burr Ridge, Illinois 60527 ) | |
| ) | |
| PATIENTSACT.ORG INC. ) | Civil Action No. _____ |
| 4422 N Ravenswood Avenue ) | |
| Suite 1053 ) | |
| Chicago, Illinois 60640 ) | |
| ) | |
| BRET R. ALLARD ) | |
| 1017 Van Place ) | |
| Powell, Wyoming 82935 ) | |
| ) | |
| MICHAEL P. CARNEY ) | |
| 37 White Oak Road ) | |
| Springfield, Massachusetts 01128 ) | |
| ) | |
| BRENDA CRUM ) | |
| 8 High Camp Court ) | |
| Washoe Valley, Nevada 89704 ) | |
| ) | |
| JULIEN DEBACKER JR. ) | |
| 22400 Huran Riven Drive ) | |
| New Boston, Michigan 48164 ) | |
| ) | |
| CARL D. PHELPS ) | |
| 16769 Monroe Road ) | |
| West Frankfort, Illinois 62896 ) | |
| ) | |
| L. PETER SMITH ) | |
| 2636 Ocean Drive, Apt. 204 ) | |
| Vero Beach, Florida 32963 ) | |
| ) | |
| *Plaintiffs,* ) | |
| v. ) | |
| ) | |
| ROBERT F. KENNEDY JR., Secretary, United ) | |
| States Department of Health and Human Services ) | |
| 200 Independence Avenue, S.W. ) | |
| Washington, D.C. 20201 ) | |

UNITED STATES DEPARTMENT OF HEALTH     )
AND HUMAN SERVICES                     )
200 Independence Avenue, S.W.          )
Washington, D.C. 20201                 )
                                       )
DR. MEHMET OZ, Administrator, Centers for )
Medicare & Medicaid Services           )
7500 Security Boulevard                )
Baltimore, MD 21244                    )
                                       )
CENTERS FOR MEDICARE & MEDICAID        )
SERVICES                               )
7500 Security Boulevard                )
Baltimore, MD 21244                    )
                                       )
                    *Defendants.*      )

## COMPLAINT

Plaintiffs SkinCure Oncology, LLC ("SkinCure"), PatientsACT.org Inc. ("PatientsACT"), and the individual patient Plaintiffs Bret R. Allard, Michael P. Carney, Brenda Crum, Julien DeBacker Jr., Carl D. Phelps, and L. Peter Smith, by and through undersigned counsel, hereby allege the following:

## INTRODUCTION

1.      This action seeks to invalidate a coordinated, nationwide shift to national Medicare coverage policy that seeks to strip Medicare coverage for Image-Guided Superficial Radiation Therapy (the "Treatment" or "IGSRT")—a proven, vital, innovative treatment for non-melanoma skin cancer ("Cancer" or "NMSC") that has cured tens-of-thousands of patients over the past decade.

2.      Through portions of the U.S. Department of Health and Human Service's ("HHS") 2026 Physician Fee Schedule Rule ("2026 MPFS Rule"), five Local Coverage Determinations ("LCDs") regarding the Treatment's medical reasonableness and necessity ("Final LCDs"), and five proposed Billing and Coding Articles applicable to the Treatment ("Billing Articles")

(together, the "Agency's Action"), HHS suddenly and unjustifiably seeks to reverse longstanding Medicare coverage policy.

3.      Acting through the coordinated efforts of HHS, the Center for Medicare & Medicaid Services ("CMS"), and CMS's Medicare Administrative Contractors ("MACs") (collectively, the "Agency"), the Agency has abruptly adopted a new, coordinated national coverage policy that unlawfully seeks to eliminate coverage for a proven, Cancer-curing treatment.

4.      To date, and in stark contrast to the Agency's Action, thirty decisions by the Qualified Independent Contractor ("QIC") and Administrative Law Judges ("ALJs") have affirmed that the Treatment *is* medically reasonable and necessary for the treatment of Cancer—the most recent of which was issued by an ALJ on February 25, 2026. And, despite numerous administrative decisions finding that the Treatment qualifies for Medicare coverage, the Agency unreasonably implemented a change to national coverage policy after substantial lobbying efforts.

5.      The Agency implemented this change through the challenged portions of the 2026 MPFS Rule and then through its MACs issuing Final LCDs and Billing Articles. First, on October 31, 2025, HHS issued the 2026 MPFS Rule, 90 Fed. Reg. 49266 (Nov. 5, 2025), which, among other things, obtusely combines the Treatment into a new coding group with older, and fundamentally distinct Cancer treatments, calculates a much lower reimbursement rate for the Treatment using inapplicable data, and reimburses critical components of the Treatment only as a one-time event even though the services are clinically required multiple times throughout a patient's course of care.

6.      Then, on January 15, 2026, five MACs, representing seven jurisdictions, issued identical Final LCDs that suddenly designate the Treatment as not medically reasonable or necessary. These LCDs also effectively preclude dermatologists from delivering the Treatment, when/even though/although dermatologists provide approximately 96% of Treatment in the United

States.

7.      Contemporaneously with the Final LCDs, the same MACs issued proposed Billing Articles, intending to complement the coverage limitations contained in the challenged portions of HHS's 2026 MPFS Rule and the Final LCDs. Together, the Agency's Action functions as a sweeping but targeted change to the national coverage policy that seeks to drive this life-changing treatment out of the Medicare market and, in effect, reverse the thirty Agency decisions that have already determined that the Treatment is medically reasonable and necessary and should be covered by Medicare.

8.      As explained herein, the Agency's Action is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), is beyond the Agency's statutory authority, and must be voided before it causes further injury to the Plaintiffs and many other Medicare beneficiaries.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201–02, the Social Security Act and the Medicare Act, 42 U.S.C. § 1395ff(f)(3), and the APA, 5 U.S.C. §§ 701–06.

10.     Plaintiffs' claims are properly subject to judicial review under the APA because the Agency's Action constitutes a "final agency action for which there is no other adequate remedy in court," 5 U.S.C. § 704, and Plaintiffs have suffered "legal wrong[s]," and have been "adversely affected or aggrieved" by the Agency's Action. *Id.* § 702.

11.     Plaintiffs' claims are not precluded by any provision in the Medicare Act limiting judicial review. Plaintiffs each have standing to challenge Agency Action because (a) they have no recourse to submit a claim under the Medicare Act and are injured by the new, arbitrary and capricious reimbursement framework and (b) any such appeal through the Agency's internal

processes would be moot and futile. 5 U.S.C. § 702; *Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1125–26 (D.C. Cir. 1994).

12.     SkinCure and PatientsACT's injuries fall within the "zone of interests" sought to be protected by the Medicare Act, which seeks to "make the best of modern medicine more readily available to the aged." S. Rep. No. 89–404 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1965; *Amgen, Inc. v. Smith*, 357 F.3d 103, 109–10 (D.C. Cir. 2004) ("Parties motivated by purely commercial interests routinely satisfy the zone of interests test under this court's precedents.").

13.     SkinCure and PatientsACT cannot obtain meaningful review through administrative appeals channels because they cannot submit benefits claims, 42 C.F.R. §§ 405.096(a), 405.912(a), and the injuries here arise from program-wide action, not a discrete claim determination.

14.     The Medicare Act's channeling provision, 42 U.S.C. § 405(g)–(h), does not preclude review of SkinCure or PatientsACT's claims. There are no individuals or entities who could conceivably serve as proxies and channel SkinCure or PatientsACT's claims through the Agency because neither beneficiaries nor providers are aligned with their unique interests or have an incentive to pursue their claims before the Agency.

15.     Plaintiffs' claims are properly subject to judicial review pursuant to 42 U.S.C. § 1395ff(f)(3), because there are no material issues of fact in dispute and the only issue of law is the validity of the Agency's Action, consisting of the 2026 MPFS Rule, Final LCDs, and Billing Articles.

16.     Plaintiffs each have standing to challenge the Agency's Action because their health, business, and members' well-being is being thwarted and they are each incurring injury as a result:

        (a)     SkinCure is the nation's leading provider of management and administrative services supporting dermatology practices that deliver IGSRT for Cancer. SkinCure's

model depends on community dermatology practices' ability to deliver IGSRT using Superficial Radiation Therapy ("SRT") with High Resolution Ultrasound ("HRUS") image-guidance. The Agency's Action will predictably reduce use, strand substantial fixed investments (equipment, shielded suites, trained staff), and destabilize SkinCure's practice-support operations. SkinCure already terminated sixty-seven employees and expects to incur millions of dollars in damages if the Agency's Action is permitted to remain in effect. The Agency's arbitrary coverage determination and reimbursement scheme will cause a financial injury to SkinCure. Even more, the Agency's Action threatens SkinCure's goal of providing effective and innovative Cancer treatment.

(b)     PatientsACT is a national patient advocacy organization committed to ensuring that every individual has access to high-quality, medically appropriate care and the right to make informed decisions about their healthcare. The Agency's Action will impair PatientsACT's mission and frustrate its advocacy efforts on behalf of Medicare beneficiaries nationwide who despite their medical need for the Treatment, will either have to forgo treatment or choose more dangerous and less favorable treatment options.

(c)     The individual Plaintiffs Bret R. Allard, Michael P. Carney, Brenda Crum, Julien DeBacker Jr., Carl D. Phelps, and L. Peter Smith are individuals enrolled under Medicare Part B who need the Treatment that will be excluded from coverage by the Agency's Action. 42 U.S.C. § 1395ff(f)(5). Each of the individual Plaintiffs previously underwent successful cycles of the Treatment, which has successfully cured the identified Cancer. Due to the ongoing nature of their disease, many of the individual Plaintiffs already know that they will require further Cancer treatment. As a result of this change to national coverage policy, the Treatment will no longer be a covered treatment option and thus their ability to obtain the therapy that is reasonable and necessary for their recovery is thwarted.

17.    Plaintiffs' claims are not precluded by 42 U.S.C. § 1395w-4(i)(1)(B).

18.    Plaintiffs' claims challenge the source of the Agency's underlying data and the Agency's unlawful exclusion of the Treatment from coverage.  Plaintiffs' claims are not directed to the "determination of relative values and relative value units." 42 U.S.C. § 1395w-4(i)(1)(B).

19.    Even if the Agency action Plaintiffs challenge were deemed a "determination" under section 1395w-4(i)(1)(B), the preclusive language does not apply because the Agency's "determination" exceeded the Agency's statutory authority.  The Agency exceeded its authority in promulgating the Final Rule by basing the RVUs on data and information the Agency was not permitted to consider by statute.

20.    The Agency engaged in *ultra vires* action for which judicial review is available.

21.    Venue is proper in this Court under 28 U.S.C. § 1391(e).

## PARTIES

22.    Plaintiff SkinCure is incorporated in the State of Delaware and maintains its principal place of business in the State of Illinois.

23.    SkinCure is the nation's leading provider of management and administrative services supporting dermatology practices that deliver the Treatment.

24.    Plaintiff PatientsACT is incorporated in the State of Delaware and maintains its principal place of business in the State of Illinois.

25.    PatientsACT is a nonprofit organization which educates and advocates for patients' safety rights and freedom of choice in treatment options to ensure that all patients receive the optimal care for their specific conditions or illnesses and to work toward a healthcare system that prioritizes patients above all other interests—including, but not limited to, ensuring that Medicare patients have access to the Treatment to treat their Cancer.

26.    Plaintiff Mr. Allard is a Medicare beneficiary who has undergone three successful cycles of the Treatment, constituting sixty-seven individual sessions. Mr. Allard's Cancer is ongoing; he was recently diagnosed with six new Squamous Cell Carcinomas for which he is in the process of scheduling further Treatment cycles.

27.    Plaintiff Mr. Carney is a Medicare beneficiary who has undergone two successful cycles of the Treatment, constituting seven individual sessions. Due to the recurrent nature of Mr. Carney's Cancer lesions, he is likely to require future Treatment.

28.    Plaintiff Ms. Crum is a Medicare beneficiary who completed her first successful cycle of the Treatment, consisting of twenty individual sessions, in December 2025. Due to the recurrent nature of Ms. Crum's Cancer lesions, she may require future Treatment.

29.    Plaintiff Mr. DeBacker is a Medicare beneficiary who has undergone over one hundred successful individual Treatment sessions. Mr. DeBacker is currently receiving the Treatment and due to the recurrent nature of his Cancer lesions, he is likely to require future Treatment.

30.    Plaintiff Mr. Phelps is a Medicare beneficiary who has undergone three successful cycles of the Treatment. Due to the ongoing nature of Mr. Phelp's skin cancer, he is likely to require future Treatment.

31.    Plaintiff Mr. Smith is a Medicare beneficiary who has undergone eight successful cycles of the Treatment, constituting approximately one-hundred-sixty individual sessions. Due to the recurrent nature of Mr. Smith's Cancer lesions, he is likely to require future Treatment.

32.    Defendant Robert F. Kennedy Jr., is the HHS Secretary and is named as a defendant in this action in his official capacity as Secretary.

33.    Defendant HHS is an agency of the United States Government, located at 200 Independence Avenue, S.W., Washington, District of Columbia 20546.  It is the federal agency

responsible for, among other things, regulating the Medicare and Medicaid programs. *See* 42 U.S.C. § 1395rr; *see also id.* § 1301 (defining "Secretary").

34.    Defendant Dr. Mehmet Oz is the CMS Administrator and is named as a defendant in this action in his official capacity as Administrator.

35.    Defendant CMS is an agency of the United States Government within HHS, located at 7500 Security Boulevard, Baltimore, Maryland 21244. It is the agency within HHS responsible for promulgating rules and regulations governing Medicare and Medicaid. *See* 42 C.F.R., Chapter IV, Subchapter B.

## FACTUAL BACKGROUND

### a.   What is Non-Melanoma Skin Cancer?

36.    NMSC is a group of malignant, skin-based tumors comprised primarily of basal cell carcinoma and squamous cell carcinoma, which together represent the most common cancers in the United States. *See, e.g.*, Howard W. Rogers et al., *Incidence Estimate of Nonmelanoma Skin Cancer (Keratinocyte Carcinomas) in the US Population, 2012*, JAMA Dermatology, 30 April 2015; 151 (10): 1081-1086. https://doi.org/10.1001/jamadermatol.2015.1187. Approximately 5.4 million basal and squamous cell skin cancers are diagnosed each year in the United States. American Cancer Society, *Key Statistics for Basal and Squamous Cell Skin Cancers*, Am. Cancer Soc'y (last revised Oct. 31, 2023), https://www.cancer.org/content/dam/CRC/PDF/Public/8818.00.pdf.

37.    The incidence of NMSC continues to rise, driven by factors such as longer lifespans, ozone depletion, and increased exposure to ultraviolet light; the prevalence of disease is expected to increase by at least 1.5-times from 2020 to 2044. Aaron S. Farber *et al.*, *Freedom from Recurrence across Age in Non-Melanoma Skin Cancer Treated with Image-Guided Superficial Radiation Therapy*, Geriatrics, 5 September 2024; 9 (5): 114,

https://doi.org/10.3390/geriatrics9050114.

38.    NMSC imposes a growing public health burden due to increasing incidence, delayed detection (particularly in older patients), and risks of tissue damage, morbidity, and impaired quality of life if not appropriately treated. *Id.*; *see also* Rania Agha *et al.*, *Image-Guided Superficial Radiation Therapy for Basal and Squamous Cell Carcinomas Produces Excellent Freedom from Recurrence Independent of Risk Factors*, Journal of Clinical Medicine, 30 September 2024; 13 (19): 5835, https://doi.org/10.3390/jcm13195835.

39.    Dermatologists have used radiation therapy to treat NMSC for more than a century. Peyton M. Harris *et al.*, *The State of the Art of Image-Guided Superficial Radiation Therapy Treatment of Non-melanoma Skin Cancer in Outpatient Dermatology Clinics in the United States and Review of the Literature*, Oncology and Therapy, 21 November 2024; 13 (1): 31-48, https://doi.org/10.1007/s40487-024-00310-6.   By the mid-1970s, more than half of dermatology offices in North America reported having SRT (or similar radiation therapy devices) available for use in the outpatient setting. Alison Tran and Lio Yu, *Old Solutions May Be the New Answer: How the Use of Modern Superficial Radiation Therapy Might Address Disparities in Dermatologic Care*, Journal of Dermatology and Skin Science, 6 December 2022; 4 (4): 6-8, https://doi.org/10.29245/2767-5092/2022/4.1165.

40.    Use of SRT declined in subsequent decades, largely due to the emergence and growth of Mohs micrographic surgery ("Mohs") as a tissue-sparing surgical technique.  Lio Yu *et al.*, *Local control comparison of early-stage non-melanoma skin Cancer (NMSC) treated by superficial radiotherapy (SRT) and external beam radiotherapy (XRT) with and without dermal image guidance: a meta-analysis*, Discover Oncology, 21 November 2022; 13 (1): 129, https://doi.org/10.1007/s12672-022-00593-z.

41.    In 2015, the U.S. Food and Drug Administration ("FDA") cleared the SRT-100

Vision™ device, enabling the integration of HRUS with superficial radiation delivery and marking the introduction of IGSRT. *See* U.S. Food & Drug Admin., 510(k) Premarket Notification No. K150037, Sensus Healthcare Superficial X-ray Radiation Therapy System with Ultrasonic Imaging Capabilities (Oct. 16, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf15/K150037.pdf.

42.    Since the advent of the Treatment, numerous peer-reviewed studies have reported tumor control and recurrence rates at least equivalent—and in some analyses statistically superior—to Mohs for early-stage NMSC. *See, e.g.*, Erin M. McClure *et al.*, *Image-guided superficial radiation therapy has superior 2-year recurrence probability to Mohs micrographic surgery*, Clinical and Translational Radiation Oncology, 17 September 2023; 43: 100678, https://doi.org/10.1016/j.ctro.2023.100678. Studies have consistently found that the Treatment achieves cure rates exceeding 99% across large cohorts and multi-year follow-up. *See e.g.*, Erin M. McClure *et al.*, *Image-Guided Radiation Therapy Is Equally Effective for Basal and Squamous Cell Carcinoma*, Dermatopathology, 19 November 2024; 11 (4): 315-329, https://doi.org/10.3390/dermatopathology11040033; Agha *et al.*, *Image-Guided Superficial Radiation Therapy for Basal and Squamous Cell Carcinomas*, 2024; Farberg *et al.*, *Freedom from Recurrence*, 2024.

###### b.    What is Image-Guided Superficial Radiation Therapy?

43.    IGSRT combines SRT with HRUS imaging to treat NMSC. Jeffrey B. Stricker *et al.*, *Understanding the Importance of Daily Imaging in the Treatment of Non-Melanoma Skin Cancer with Image-Guided Superficial Radiation Therapy*, Dermato, 11 August 2024; 4 (3): 86-96, https://doi.org/10.3390/dermato4030010. The Treatment delivers low-energy superficial radiation that is primarily absorbed in the dermis, where Cancer tumors grow, allowing treatment at shallow depths while sparing deeper structures. *Id.*; *see also* Alison Tran *et al.*, *Analysis of*

*image-guided superficial radiation therapy (IGSRT) on the treatment of early-stage non-melanoma skin cancer (NMSC) in the outpatient dermatology setting*, Journal of Cancer Research and Clinical Oncology, 1 February 2023; 149 (9): 6283–6291, https://doi.org/10.1007/s00432-023-04597-2.

44.     In a typical Treatment cycle, patients receive several individual radiation sessions, called "fractions," each lasting approximately thirty seconds to one minute. Treatments are generally administered two to four times per week over several weeks, with a median of approximately twenty total fractions per course. Lio Yu *et al.*, *The Treatment of Non-Melanoma Skin Cancer with Image-Guided Superficial Radiation Therapy: An Analysis of 2917 Invasive and In Situ Keratinocytic Carcinoma Lesions*, Oncology and Therapy, 5 February 2021; 9 (1): 153-166, https://doi.org/10.1007/s40487-021-00138-4; Tran *et al.*, *Analysis of image-guided superficial radiation therapy (IGSRT)*, 2023.

45.     HRUS imaging is clinically necessary before, during (per-fraction), and after the Treatment because tumor depth and configuration are dynamic and directly determine whether the prescribed radiation energy and dose adequately cover the tumor while limiting avoidable toxicity. Stricker *et al.*, *Understanding the Importance of Daily Imaging*, 2024.

46.     Before the Treatment, HRUS is used to measure tumor breadth and depth and to select initial treatment parameters, and to establish the treatment field. *Id.*; *see also* Tran *et al.*, *Analysis of image-guided superficial radiation therapy (IGSRT)*, 2023; Yu *et al.*, *The Treatment of Non-Melanoma Skin Cancer with Image-Guided Superficial Radiation Therapy*, 2021. During the Treatment, HRUS is performed prior to each treatment fraction to re-measure depth and guide adaptive changes to treatment parameters when needed. *Id.*; *see also* Yu *et al.*, *The Treatment of Non-Melanoma Skin Cancer with Image-Guided Superficial Radiation Therapy*, 2021. After the Treatment, HRUS is used to assess treatment response and to evaluate for residual tumor during

follow-up. *Id.*; *see also* Tran *et al.*, *Analysis of image-guided superficial radiation therapy (IGSRT)*, 2023.

47.    HRUS studies show that 92% of Cancer tumors exhibit **daily** depth fluctuations during the Treatment, demonstrating how these tumors are "moving targets" over the course of treatment, necessitating per-fraction imaging. *Id.* Importantly, these studies have found that nearly 40% of lesions require at least one adaptive replanning—*i.e.*, a responsive change to treatment parameters—during the Treatment. *Id.* The need for compensatory treatment parameters underscores that per-fraction imaging informs clinical decision-making and is not merely confirmatory. *Id.*

48.    Unlike SRT delivered without imaging, the Treatment integrates HRUS to verify tumor depth and configuration to support adaptive treatment adjustments that cannot be made reliably without serial imaging. Yu *et al.*, *The Treatment of Non-Melanoma Skin Cancer with Image-Guided Superficial Radiation Therapy*, 2021.

### c.  Who Needs the Treatment?

49.    NMSC disproportionately affects older adults, as the majority of diagnoses occurring in individuals over the age of 65—a population that overlaps significantly with Medicare beneficiaries. Farberg *et al.*, *Freedom from Recurrence*, 2024.

50.    The Treatment is an appropriate and desirable option for patients with early-stage NMSC who are poor surgical candidates (*e.g.*, because of advanced age, comorbidities, or lesion location), or who prefer a non-surgical approach—particularly for tumors located on cosmetically or functionally sensitive sites such as the face, head, and neck. *Id.*

51.    Peer-reviewed studies further support the Treatment as particularly valuable for patients with complex comorbidity profiles and for those for whom surgery is undesirable or impractical, since the Treatment can be delivered in brief outpatient visits without anesthesia or

surgical wound care. *See, e.g.*, Lio Yu *et al.*, *Enhancing Cosmesis While Achieving High Cure-Rates For Early-Stage Non-Melanoma Skin Cancer In The Outpatient Dermatology Clinic Using Novel Non- Invasive Modality*, American Journal of Biomedical Science & Research, 7 May 2021; 12 (6), DOI: 10.34297/AJBSR.2021.12.001803; Liqiao Ma *et al.*, *The Impact of Socioeconomic Status and Comorbidities on Non-Melanoma Skin Cancer Recurrence After Image-Guided Superficial Radiation Therapy*, Cancers, 1 December 2024; 16 (23): 4037, https://doi.org/10.3390/cancers16234037.

52.    Although Mohs is an effective treatment for NMSC, access barriers persist—particularly in rural regions—making non-surgical options more practical for many patients. Ma *et al.*, *The Impact of Socioeconomic Status and Comorbidities on Non-Melanoma Skin Cancer Recurrence*, 2024. Recent studies indicate that more than 80% of U.S. counties do not have a single Mohs surgeon, and 95% of Medicare beneficiaries living in rural counties lack access to Mohs. *See, e.g.,* Eric C. Olsen *et al.*, *A Post-COVID Population-Based Analysis of Mohs Micrographic Surgeon Distribution in the United States*, Dermatologic Surgery, 1 January 2025; 51 (1): 20-24, https://doi.org/10.1097/DSS.0000000000004356; Christian Gronbeck *et al.*, *Dermatology workforce in the United States - Part I: Overview, transformations, and implications*, Journal of the American Academy of Dermatology, July 2023; 89 (1): 1-14, https://doi.org/10.1016/j.jaad.2022.06.1191.

53.    Traditional SRT has comparatively limited modern evidence because it declined as a preferred non-surgical modality following the rise of Mohs, and published SRT outcomes vary meaningfully across studies and histologies. *See, e.g.*, Erin McClure *et al.*, *Image Guidance is Associated with Improved Freedom From Recurrence After Superficial Radiation Therapy for Nonmelanoma Skin Cancer*, Advances in Radiation Oncology, 9 February 2024; 9 (12): 101605, https://doi.org/10.1016/j.adro.2024.101463. For example, reported cure rates for early-stage

NMSC treated with SRT range from approximately 91% to 96.9% for basal cell carcinoma and 81.1% to 97% for squamous cell carcinoma. Yu *et al.*, *Local control comparison of early-stage non-melanoma skin Cancer (NMSC)*, 2022. In contrast, the Treatment consistently achieves better-than 99% cure rates regardless of lesion type. *See, e.g.*, McClure *et al.*, *Image-Guided Radiation Therapy Is Equally Effective for Basal and Squamous Cell Carcinoma*, 2024.

54.    Moreover, recent Medicare Part B claims data also confirms that the Treatment is overwhelmingly delivered by dermatologists in office-based clinical settings, with approximately 96% of SRT and Treatment claims attributable to dermatologists and other skin specialists, and fewer than 2% attributable to radiation oncologists. Treatment delivered in community dermatology settings expands access to highly effective Cancer treatment without requiring access to a Mohs surgeon or travel to hospital-based radiation oncology departments or cancer centers.

### d.  SkinCure's Treatment Services

55.    SkinCure is the nation's leading provider of management and administrative services supporting dermatology practices that deliver IGSRT for Cancer treatment.

56.    SkinCure's services are designed to meet the advanced care needs of elderly, medically complex, and mobility-limited patients. Many patients treated with the Treatment are unable to undergo surgery due to advanced age, blood thinner use, cardiovascular disease, or other medical conditions.

57.    For these vulnerable populations, access to non-invasive, office-based Cancer therapy is essential. SkinCure enables community dermatology practices to deliver the Treatment locally, eliminating the need for patient travel to distant hospital-based cancer centers or surgical facilities.

58.    SkinCure's solution includes the provision and leasing of the FDA-cleared SRT-100 Vision™ device, buildout of dedicated shielded treatment suites, regulatory compliance,

staffing of certified radiation therapists, and access to radiation oncologists for consultation. SkinCure does not provide clinical care or bill for medical services; instead, its dermatology practice partners deliver and bill for all the Treatment care services.

59.     As of December 31, 2025, SkinCure has supported the care of over 138,000 patients and cured more than 185,000 Cancer lesions through its network of 434 dermatology practices and more than 900 affiliated clinicians.

60.     SkinCure's business model requires substantial capital investment, including acquisition of advanced imaging and radiation equipment, construction of shielded treatment rooms, and ongoing maintenance and quality assurance. By providing these resources and administrative support, SkinCure enables dermatology practices to more readily offer the Treatment within their communities.

61.     SkinCure employs more than 700 people nationwide.

### e.  PatientsACT's Interest in the Treatment

62.     PatientsACT is a national patient advocacy organization committed to ensuring that every individual has access to high-quality, medically appropriate care and the right to make informed decisions about their healthcare.

63.     PatientsACT fights for transparency in medical care, advocates for coverage of proven treatments, and empowers patients with knowledge and options.

64.     PatientsACT's members include Medicare beneficiaries who have been diagnosed with Cancer and who rely on the Treatment as their preferred or only viable treatment option.

### f.  Individual Plaintiffs' Need for the Treatment

65.     The individual patient Plaintiffs are Medicare beneficiaries who (1) have been diagnosed with Cancer, (2) are medically poor candidates for surgery, and (3) prefer both a

reasonable and medically non-invasive therapy option because of a combination of the other health conditions, prior surgical fatigue, and the Treatment's proven success for treating Cancer.

a.     ***Mr. Allard***: Mr. Allard is an individual patient and Medicare beneficiary who was first diagnosed with Cancer in 1973. To date, Mr. Allard has successfully undergone three Treatment cycles, consisting of sixty-seven individual sessions. Due to the ongoing nature of Mr. Allard's Cancer, he requires further Treatment.

b.     ***Mr. Carney***: Mr. Carney is an individual patient and Medicare beneficiary who was first diagnosed with Cancer in 1983. To date, Mr. Carney has successfully undergone two Treatment cycles, constituting seven individual sessions. Due to the location of Mr. Carney's Cancer, additional Treatment is required so that he does not scar for life.

c.     ***Ms. Crum***: Ms. Crum is an individual patient and Medicare beneficiary who was first diagnosed with Cancer in August 2025. To date, Ms. Crum has successfully completed one Treatment cycle, consisting of twenty individual sessions.

d.     ***Mr. DeBacker***: Mr. DeBacker is an individual patient and Medicare beneficiary who was first diagnosed with Cancer in 2014. To date, Mr. DeBacker has successfully undergone over one hundred individual Treatment sessions. Mr. DeBacker is currently receiving the Treatment.

e.     ***Mr. Phelps***: Mr. Phelps is an individual patient and Medicare beneficiary who was first diagnosed with Cancer in 2001. To date, Mr. Phelps has successfully undergone three Treatment cycles. Due to the ongoing nature of Mr. Phelps' Cancer, he is likely to require further cycles of the Treatment.

f.     ***Mr. Smith***:  Mr. Smith is an individual patient and Medicare beneficiary who was diagnosed with Cancer in 2002. To date, Mr. Smith has successfully undergone eight Treatment cycles, constituting approximately one-hundred-sixty individual sessions,

which have cured him of fifteen separate Cancer lesions. Due to the recurrent nature of

Mr. Smith's Cancer, he is likely to require further cycles of the Treatment.

## STATUTORY AND REGULATORY BACKGROUND

### a.    *Medicare Reimbursement Generally*

66.    The Medicare Act, 42 U.S.C. §§ 1395 *et seq.*, establishes a system of health

insurance for the aged and disabled.

67.    The Secretary, Robert F. Kennedy Jr., is responsible for administering the Medicare

program. 42 U.S.C. § 1395kk.

68.    The Secretary has delegated the authority vested in the Secretary under the

Medicare Act to the CMS Administrator, Dr. Mehmet Oz. *See* Statement of Organization,

Functions, and Delegations of Authority of the Department of Health and Human Services, Health

Care Financing Administration (HCFA), 49 Fed. Reg. 35247 (Sept. 6, 1984), as periodically

amended.

69.    Under the Medicare Act, the Government pays for items and services that fall

within a covered Medicare benefit category and are "reasonable and necessary for the diagnosis or

treatment of illness or injury or to improve the functioning of a malformed body member." 42

U.S.C. § 1395y(a)(1)(A).

70.    Medicare Part B covers outpatient medical services, including X-ray therapy and

other radiation therapy services. 42 U.S.C. § 1395l(a)(1); 42 C.F.R. § 410.35.

71.    Medicare reimburses physician and hospital services under distinct payment

systems. Physicians are paid for professional services under the MPFS, established annually by

regulation. *See* 42 U.S.C. § 1395w-4. Hospitals, by contrast, are not reimbursed under the MPFS

but are paid separate, predetermined rates under the Outpatient Prospective Payment System

("OPPS"). *See* 42 U.S.C. § 1395l(t). In short, the MPFS governs payment for services in physician

offices and similar non-hospital settings, while the OPPS governs payment for services furnished in hospital settings.

### b. *Medicare Reimbursement for the Treatment*

72.    The Treatment is a form of X-ray therapy most commonly performed in outpatient dermatology settings and reimbursed on a fee-for-service basis under the MPFS for Part B services. 42 U.S.C. § 1395w-4; 42 C.F.R. § 410.35.

73.    Under 42 U.S.C. § 1395hh(a)(2), no rule, requirement, or other policy statement may create or alter a substantive legal standard governing the scope of benefits or payment for services under the Medicare program unless adopted through formal regulation or issued as a National Coverage Determination ("NCD").

74.    Until the Final LCDs were issued in January 2026, neither CMS nor any MAC had published a final NCD or LCD governing the Treatment. Accordingly, Medicare contractors historically applied the statutory standard to determine whether the Treatment is "reasonable and necessary" under 42 U.S.C. § 1395y(a)(1)(A).

75.    CMS guidance instructs contractors to evaluate whether a service is reasonable and necessary by determining whether it is: (a) safe and effective; (b) not experimental or investigational; and (c) appropriate, including in duration and frequency, in terms of whether the service is: (i) furnished in accordance with accepted standards of medical practice; (ii) furnished in a setting appropriate to the beneficiary's medical needs and condition; (iii) ordered and furnished by qualified personnel; and (iv) one that meets, but does not exceed, the beneficiary's medical need. Medicare Program Integrity Manual (CMS Pub. 100-08), Ch. 3, § 3.6.2.2.

76.    Applying these criteria, over the last five years at least eighteen decisions by QICs have affirmed that the Treatment is medically reasonable and necessary for treating Cancer.

- 19 -

77.    In 2025 and 2026 alone, at least twelve ALJs issued fully favorable decisions affirming Medicare coverage for the Treatment, finding that the services satisfy the statutory requirements under § 1862(a)(1)(A) of the Social Security Act.

### THE AGENCY'S DECISION-MAKING

78.    The Agency effectuated this change to national coverage policy through its 2026 MPFS Rule, the Final LCDs, and proposed Billing Articles. Together, these reimbursement and coverage schemes combine to effectively deny Medicare coverage for the Treatment even though it is a proven, Cancer-curing therapy that has been safely and effectively employed for over a decade with tremendous clinical success and patient satisfaction.

### a.    The 2026 MPFS Rule

79.    On July 16, 2025, the Agency issued proposed rule CMS-1832-P (the "Proposed Rule"), proposing a new coding and payment framework under Medicare Part B for "surface radiation therapy" services, including the Treatment.

80.    The Proposed Rule, titled "Medicare and Medicaid Programs; CY 2026 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B Payment and Coverage Policies; Medicare Shared Savings Program Requirements; and Medicare Prescription Drug Inflation Rebate Program," was published at 90 Fed. Reg. 32352.

81.    In the Proposed Rule, the Agency proposed to consolidate multiple distinct technologies—the Treatment, traditional SRT, electronic brachytherapy, and orthovoltage X-rays—into a single "surface radiation therapy" code family, despite material differences in clinical protocols, imaging requirements, equipment, and outcomes.

82.    The Agency discussed the new "surface radiation therapy" code family using placeholder current procedural terminology ("CPT") identifiers 77X05 (treatment planning/simulation), 77X07 (superficial delivery <150 kV), 77X08 (orthovoltage delivery >150-

500 kV), and 77X09 (ultrasound image guidance). Because the Treatment is a superficial (<150 kV) modality, 77X08 is not applicable to the Treatment. The final fee schedule implemented these services as CPT 77436, 77437, 77438, and 77439, respectively.

83.     The Proposed Rule's core change was to replace the prior coding approach (which the Agency described as relying on CPT 77401 with CPT 77280 and HCPCS G6001) with the new "surface radiation therapy" family. The Agency stated that the CPT Editorial Panel created the new four-code set to replace CPT 77401 (radiation treatment delivery) and HCPCS G6001 (ultrasound guidance).

84.     Critically, the new HRUS code (77X09/77439) was defined as ultrasound image guidance "per course of treatment." The Agency recognized that commenters objected to this limitation for the Treatment because the Treatment's protocols rely on HRUS imaging at each treatment session to confirm tumor depth and margins, monitor response, and guide adjustments.

85.     The Agency nevertheless proposed to treat ultrasound image guidance as a once-per-course add-on, and also proposed to make the ultrasound technical component non-separately payable by assigning Procedure Status "B" to the technical component and packaging the costs into treatment delivery. Procedure Status "B" indicates services that are bundled into another code, designating the non-payable technical component of the service. The Agency described this as aligning MPFS treatment to the *hospital*-based Outpatient Prospective Payment System ("OPPS") approach, even though the MPFS is a *resource*-based system intended to reflect the direct costs of services furnished in physician offices. As a resource-based system, medical services are valued according to the physician work, practice expenses, and malpractice insurance costs required to deliver them—not according to hospital payment rates or other unrelated metrics.

86.     The Agency further proposed to derive practice-expense valuation using OPPS

Ambulatory Payment Classification ("APC") relationships (including APCs 5621 and 5732) to "inform" practice expense RVUs for the surface radiation delivery codes and for the technical component of planning/simulation, rather than relying on direct office-based practice expense inputs.

87.    The Proposed Rule relied heavily on the American Medical Association ("AMA") Specialty Society Relative Value Scale Update Committee's ("RUC") survey recommendations, including adoption of the RUC-recommended work RVUs for the only work-bearing services in the code family (77X05 and 77X09), including 0.77 for planning/simulation and 0.30 for ultrasound image guidance.

88.    The RUC's survey drew on targeted samples of dermatologists and radiation oncologists identified through the Agency's "Physician & Other Practitioners Lookup" tool and resulted in sixty-four completed surveys for 77436 and fifty-one completed surveys for 77439, out of a combined distribution of more than 5,000 surveys across both specialties.

89.    The RUC's survey materials also document several deficiencies in the data collection process, including reports of declinations to participate, follow-up sampling prompted by concerns about the representativeness of dermatology responses, and expressions of concern regarding potential coordinated non-participation among certain survey recipients. Indeed, dermatologists with a history of delivering the Treatment were specifically barred from the survey process.

90.    In the final RUC survey datasets, both 77436 and 77439 showed 0% of respondents reporting the typical case in an office setting, even though the Treatment is predominantly furnished in office settings. The survey medians for work RVUs—1.75 for 77436 and 0.90 for 77439—were accompanied by wide response ranges and variations in reported intra-service times. In its final recommendations to the Agency, the RUC selected values below the reported survey

medians.

91.    The Agency received extensive public comments opposing these changes. SkinCure and PatientsACT submitted detailed comment letters on September 12, 2025, explaining that the proposed coding and valuation framework was fundamentally misaligned with how the Treatment is actually delivered in community practice and would materially reduce patient access.

92.    PatientsACT emphasized the patient impact: the Treatment is an office-based therapy that combines low-energy x-ray treatment with HRUS imaging performed at every visit, and the proposed "surface radiation therapy" framework "fails to align payment structures with the realities of community-based IGSRT delivery." PatientsACT warned that undervaluation would make the Treatment "financially and operationally unsustainable" for many clinics, restricting access for seniors—especially those in rural or underserved communities for whom the Treatment may be the only viable nonsurgical option.

93.    SkinCure likewise warned that the proposal would "disrupt established clinical protocols" essential to the Treatment's documented efficacy and make continued office-based delivery financially unsustainable. SkinCure explained that collapsing distinct technologies into one code family ignores critical differences in workflow and resources, and that the proposal fails to capture the Treatment's requirements—particularly per-fraction HRUS imaging, specialized staffing, and the cost structure of office-based delivery.

94.    SkinCure explained that the Treatment is a clinically distinct modality with protocols dependent on per-fraction HRUS imaging. Further, the proposed three-code framework is "grossly inadequate" to describe and reimburse the services required to deliver the Treatment according to established protocols.

95.    Beyond the Plaintiffs' submissions, the broader stakeholder consensus echoed the same core points: (i) the code family improperly collapses distinct modalities, (ii) limiting

ultrasound to once per course contradicts the per-fraction imaging workflow required for the Treatment, (iii) OPPS-based practice expense proxies do not fit the Treatment's predominantly office-based delivery, and (iv) the RUC survey process did not reflect Treatment providers' experience and therefore produced unreliable work valuation assumptions.

96.     Stakeholders provided extensive evidence that the Treatment is a clinically distinct, image-guided, and adaptively managed modality, requiring per-fraction HRUS imaging, multidisciplinary staffing, and advanced equipment. They explained that the proposed codes and RVUs do not account for the unique work and resource requirements of the Treatment, including per-fraction imaging, radiation therapists' labor, custom shielding, quality assurance and medical physics oversight, and device maintenance.

97.     Multiple comment letters—including those from leading dermatology practices, medical societies, and individual clinicians and physician-scientists—highlighted that the Proposed Rule would force physicians to deviate from established Treatment protocols, which require per-fraction HRUS imaging to achieve >99% cure rates. Stakeholders warned that undervaluing physician work and practice expenses would jeopardize the sustainability of office-based Treatment programs, diminish patient choice, and compromise quality of care.

98.     Stakeholders also identified serious procedural flaws in the CPT and RUC valuation process. SkinCure, PatientsACT, and others documented that dermatology-led Treatment programs were excluded from meaningful participation in the CPT/RUC survey process, and that the survey respondents had no practical experience with the Treatment or surface radiation therapies. The resulting codes and valuations were therefore based on inaccurate assumptions, flawed cross-walks, and the perspectives of competing specialties with direct financial interests in limiting the Treatment's adoption.

99.     Commenters further explained that the Proposed Rule's reliance on hospital OPPS

cost proxies for practice expense RVUs is inappropriate for the Treatment, which is delivered almost exclusively in office-based dermatology settings. As SkinCure's letter explained, "Hospital outpatient APC [ambulatory payment classifications] proxies are tailored to services provided within large, facility-based settings and do not account for the resource profile inherent to office-based dermatology. [The Treatment] is administered almost exclusively through office-based practices, with 96% of claims submitted by dermatologists or skin specialists and fewer than 2% by radiation oncologists."

100.    Stakeholders provided detailed cost data, workflow protocols, and clinical evidence demonstrating that the proposed codes and valuations would not cover the actual costs of providing the Treatment in accordance with standards of care established over the past decade. For example, SkinCure's analysis showed that the manufacturer's suggested retail price for a Treatment system is approximately $549,000 with up to $100,000 of additional costs for vault construction, shielding, and regulatory compliance—far exceeding the capital cost assumptions used by the Agency.

101.    Despite the significant concerns raised by commenters, the Agency issued its final 2026 MPFS Rule on October 31, 2025, which was thereafter published in the Federal Register on November 5, 2025. *See* CY 2026 MPFS Final Payment Rule, 90 Fed. Reg. 49266 (Nov. 5, 2025). On pages 121 through 123 of the 2026 MPFS Rule, the Agency addressed its conclusions with respect to "Superficial Radiation Therapy (CPT Codes 77X05, 77X07, 77X08, and 77X09)." 90 Fed. Reg. at 49386–88.

102.    The Agency finalized the key components of the proposal: it retained the consolidated "surface radiation therapy" code family, adopted the RUC-recommended work RVUs for the planning/simulation and ultrasound guidance services, and continued the OPPS-based methodology to inform practice expense valuation. *Id.*

103.    With respect to per-fraction imaging, the Agency acknowledged commenters' objections that imaging is performed before each fraction and that the proposed "per treatment course" limitation undervalues the time, judgment, and specialized equipment required. *Id.* at 49387-88. The Agency nevertheless declined to change the limitation, stating that the descriptor was adopted by the CPT Editorial Panel and directing concerns to CPT for "additional explanation," while reiterating that the Agency lacks authority to change CPT descriptors. *Id.* at 49387. The Agency stated that, "on balance," the new coding "represents an improvement" over current coding. *Id.*

104.    The Agency also finalized the OPPS-style bundling approach: it assigned Procedure Status "B" to the technical component of the ultrasound guidance code so that ultrasound would not vary payment under the MPFS, expressly describing this approach as aligned with OPPS packaging principles. *Id.*

105.    The Agency responded to commenters who argued that OPPS hospital cost proxies are inappropriate for an overwhelmingly office-based service by acknowledging that superficial radiation therapy services are "infrequently provided in the hospital setting" and estimating that only about 2 percent occur in hospitals. The Agency nonetheless maintained that OPPS APC relationships "more accurately reflect" costs than direct office-based practice-expense inputs and emphasized that its aggregate calculation aimed to keep overall practice-expense and malpractice RVUs similar between CY 2025 and CY 2026. *Id.* at 49386-87.

106.    The Agency also responded to commenters who opposed collapsing the Treatment with other modalities by stating that it "do[es] not agree" the CPT code set reflects an inappropriate grouping and that the Agency saw no Medicare program need to develop separate codes for the Treatment. *Id.* at 49387.

107.    In addressing the bundling of ultrasound, the Agency cited the view that bundling

would "eliminate financial incentives" to provide ultrasound "where it may be of questionable value," even while acknowledging that other commenters cited evidence supporting Treatment efficacy and the importance of imaging in Treatment delivery. *Id.*

108.    In addition to setting out the new CPT code set covering the Treatment, CMS also published additional coding and billing rules in the form of National Correct Coding Initiative (NCCI) Medically Unlikely Edits (MUEs), which further restrict the provision of and billing for Cancer treatment. MUEs are automated prepayment edits established by the Centers for Medicare & Medicaid Services (CMS) to establish the maximum units of service that a provider can bill for a single beneficiary on a single date of service. On February 25, 2026, CMS posted MUE edits for the four new codes relevant to the Treatment, setting a maximum number of units of "1," meaning that providers can bill for treating only one cancerous lesion per date of service when using the Treatment. Meanwhile, CMS permits up to four units of the Mohs surgery code (CPT 17311) and two units of megavoltage radiation therapy (CPT 77402, 77407, and 77412). The disparate nature of these MUE edits—restricting Treatment to only one cancerous lesion per day, but allowing treatment of two lesions with megavoltage radiation therapy or four lesions with Mohs surgery—has no rational clinical basis.

109.    The final coding and valuation structure has four fundamental features that commenters—including Plaintiffs SkinCure and PatientsACT—explained would destabilize office-based Treatment access: (i) it treats the Treatment as interchangeable with other modalities through a consolidated code family; (ii) it limits ultrasound image guidance to once per course of treatment even though Plaintiffs and other commenters explained why per-fraction imaging is essential to Treatment delivery; (iii) it uses hospital OPPS-based practice expense valuation despite the Agency acknowledging the services are rarely hospital-based; and (iv) it relies on a valuation framework derived from an AMA RUC process that stakeholders argued failed to reflect IGSRT

providers.

110.    In short, Plaintiffs and other commenters explained that the 2026 MPFS Rule's structure undermines the continued viability of the Treatment in community dermatology settings—the settings where the Treatment is actually delivered—thereby threatening Medicare beneficiary access to an effective, locally available, nonsurgical cancer treatment.

111.    As a result, the 2026 MPFS Rule adopts a payment policy that is not supported by the administrative record, fails to reflect the realities of clinical practice, and disregards the input of those most knowledgeable about the Treatment's delivery and patient needs. The Agency's decision-making process was both procedurally and substantively deficient, resulting in a rule that threatens to eliminate access to safe, effective, and widely used Cancer therapy for Medicare beneficiaries nationwide.

### b.    The LCDs and Billing Articles

112.    In advance of the Proposed Rule, on May 15, 2025, five MACs posted virtually identical proposed LCDs ("Proposed LCDs") titled "Superficial Radiation Therapy (SRT) for the Treatment of Nonmelanoma Skin Cancers" addressing when superficial radiation therapy would be covered, including the Treatment. These Proposed LCDs were issued by: (1) CGS Administrators, LLC ("CGS") (DL40179, Jurisdiction 15); (2) National Government Services, Inc. ("NGS") (DL40168, Jurisdictions 06, K); (3) Noridian Healthcare Solutions, LLC ("Noridian") (DL40176, Jurisdictions E, F); (4) Palmetto GBA ("Palmetto") (DL40189, Jurisdictions J, M); and (5) Wisconsin Physicians Service Insurance Corporation and its Government Health Administrators division ("WPS") (DL40193, Jurisdictions 05, 08).

113.    The Proposed LCDs were clearly coordinated as they were identical in all respects across jurisdictions, including the core framing of the Treatment as a "variation" of SRT and the categorical limitations on HRUS guidance and coverage criteria.

114.    Following the close of the comment period, each MAC issued a Final LCD that remained materially unchanged from its Proposed LCD. The Final LCDs state that changes were limited largely to bibliography expansion and did not meaningfully alter the restrictive coverage framework adopted in the Proposed LCDs.

115.    The Proposed LCDs introduced sweeping and unprecedented coverage changes that stakeholders explained would eliminate the Treatment in practice. The major flaws identified in the comment record fall into four categories: (1) treating the Treatment as merely a "variation" of SRT and addressing HRUS-guided care in the same context as electronic brachytherapy, despite the Treatment being clinically distinct; (2) adopting a categorical "Limitation" stating that use of HRUS to guide treatment delivery is not reasonable and necessary, while relying on outdated or irrelevant evidence and discounting the modern Treatment literature; (3) restricting coverage to narrow classes of "nonsurgical candidates" and imposing additional lesion-based limitations without a reasoned explanation consistent with the Treatment evidence base; and (4) imposing provider qualification requirements that would shift the Treatment away from community dermatology settings and effectively redefine dermatologists' scope of practice, despite the LCDs' own National Coverage Policy language.

116.    During the May 15 through June 28, 2025, notice-and-comment period, a broad coalition of stakeholders submitted detailed comments identifying significant clinical, legal, and procedural flaws in the Proposed LCDs. Commenters included dermatologists, radiation oncologists, medical physicists, radiation therapists, professional societies, patient advocacy organizations, health policy experts, and Medicare beneficiaries who had personally undergone the Treatment.

117.    Across these submissions, stakeholders consistently expressed concern that the Proposed LCDs were not a standard "reasonable and necessary" framework applied to evolving

evidence. Rather, the Proposed LCDs were a categorical policy design that would (i) eliminate HRUS-guided delivery, (ii) confine coverage to a narrow subset of patients, and (iii) relocate care to settings and specialties inconsistent with how stakeholders described the Treatment as actually delivered. For example, comments summarized in the Agency's response materials reflect concerns about tumor size and depth limits, the practical impact of requiring radiation oncology supervision, and the access consequences of restricting office-based care.

118.    Plaintiffs SkinCure and PatientsACT each submitted comprehensive comment letters explaining that the Proposed LCDs were fundamentally misaligned with the modern Treatment evidence base and would materially restrict patient access. PatientsACT framed the Proposed LCDs as policies that "would effectively eliminate access to IGSRT," including by "[d]eclaring that HRUS imaging is not medically necessary" and by imposing provider qualifications that "shift delivery of care from dermatologists" and "forc[e] treatment out of accessible outpatient dermatology settings."

119.    SkinCure likewise explained that the Proposed LCDs "threaten[] to effectively eliminate image-guided superficial radiation therapy (IGSRT) as a treatment modality altogether," despite "overwhelming clinical evidence supporting its safety, efficacy, and necessity." SkinCure supported that point with clinical literature summaries and with operational evidence about the real-world delivery model for Treatment in outpatient dermatology practices.

120.    SkinCure explained that the Proposed LCD's structure wrongly treats the Treatment as a minor variation of legacy SRT rather than as a distinct modality enabled by HRUS imaging. SkinCure described "a major technological advancement" in 2015 in which the Treatment "integrates high-resolution ultrasound (HRUS) imaging with traditional SRT," enabling clinicians to visualize tumor depth "before each treatment session" and to deliver "adaptive dosing on a per-fraction basis."

121.    PatientsACT made a similar point from the patient-care perspective, describing the Treatment as a modern, office-based therapy that integrates HRUS imaging with SRT "to precisely target and adapt treatment during a course of therapy," and stressing that policy should align coverage determinations with the peer-reviewed evidence and realities of community-based Treatment delivery.

122.    The Proposed LCDs include a categorical Limitation stating: "Use of HRUS to guide SRT delivery and to assess lesion reduction during the superficial radiation treatment protocol is not considered reasonable and necessary and is not supported by literature."

123.    SkinCure explained why this is outcome-determinative: "The hallmark of IGSRT is its use of HRUS imaging before each treatment fraction," and "HRUS imaging is not an optional enhancement—it is a clinical necessity." SkinCure further argued that the Proposed LCD's justification was built on outdated or irrelevant evidence, stating the Proposed LCD "cites only a single study—a 2019 study by Likhacheva et al.—as support," and that relying solely on that study "ignores numerous studies on IGSRT" published since.

124.    More broadly, SkinCure explained that the Proposed LCDs did not meaningfully engage the modern, peer-reviewed Treatment literature and instead attempted to discount it through conclusory characterizations—asserting that image guidance is "currently under active investigation" while omitting at least ten peer-reviewed studies supporting per-fraction HRUS imaging. SkinCure emphasized that these studies show the Treatment is efficacious, safe, and superior to previous generations of non-image-guided SRT technology without image guidance, and the suggestion that the Treatment is "unproven" misrepresents the evidence.

125.    SkinCure also addressed the Proposed LCDs' emphasis on the absence of randomized clinical trials ("RCTs") comparing the Treatment to SRT, noting that an RCT design would be impractical in this setting because it would require withholding per-fraction HRUS

guidance from certain patients, despite clear evidence supporting superior outcomes with the Treatment. The Proposed LCDs themselves also acknowledge that "there are no prospective or randomized clinical trials (RCTs)" comparing outcomes between Mohs or surgical excision and SRT, while at the same time stating that SRT "had been relegated to a second line treatment option for patients who were not surgical candidates or who refused surgical treatment."

126.    SkinCure and other commenters also objected to the Proposed LCDs' restrictive coverage criteria limiting the Treatment to narrow classes of nonsurgical candidates and imposing additional lesion-based restrictions. Comment summaries in the Agency's response materials reflect stakeholder concerns that tumor size and depth limitations were overly rigid and not consistent with clinical practice and that restricting delivery and coverage would reduce access—especially in rural areas—forcing patients into more invasive or less available alternatives.

127.    PatientsACT highlighted provider qualification requirements as a core access barrier, warning the Proposed LCD would "shift delivery of care from dermatologists . . . to radiation oncologists" and "forc[e] treatment out of accessible outpatient dermatology settings."

128.    The Agency's response to comments reflects this approach, stating that while the LCD "does not prohibit dermatologists," it "expects" providers to have training "acquired within the framework of an accredited residency and/or fellowship" in radiation oncology or a "qualified dermatology program . . . with didactic and clinical experience in radiation treatment." SkinCure and other commenters raised serious concerns that the ambiguous and undefined language presents a substantial risk of being interpreted and applied in a manner that would restrict board-certified dermatologists from providing the Treatment—despite the Proposed LCDs themselves acknowledging that "the bulk of claims coming through processed for SRT are from dermatologists as opposed to radiation oncologists." Many dermatologists have expressed concern that the provision raises questions about the LCDs' compatibility with their state-authorized scope of

practice.

129.    Commenters further emphasized that the LCDs' approach conflicts with the LCDs' own National Coverage Policy language stating that LCDs do not "replace, modify, or supersede applicable state statutes" regarding medical practice and scope of practice and that providers must follow state laws and deliver services within their scope of practice.

130.    Despite the extensive stakeholder record, the Agency issued Final LCDs in January 2026 with a future-effective date of March 1, 2026. The Final LCDs mirror the Proposed LCDs in all material respects, including the same categorical HRUS Limitation, the same narrow coverage posture focused on nonsurgical candidates, and the same provider qualification framework described above. The Agency's published response documents confirm that comments were reviewed but that the Agency retained the core policy conclusions—most notably continuing to state that the evidence supporting HRUS guidance is "low quality" and calling for prospective comparative studies.

131.    The Agency also issued Billing Articles corresponding to each LCD, which operationalize the LCD restrictions through claim-processing instructions. These Billing Articles include: (1) CGS Article A60185, (2) NGS Article A60176, (3) Noridian Article A60181, (4) Palmetto Article A60211, and (5) WPS Article A60213.

132.    Critically, the Billing Articles designate CPT 77439 (ultrasound image guidance) as "not medically reasonable and necessary (non-covered)," implementing the Final LCDs' HRUS Limitation through coding rules and claim denials. This designation eliminates any possibility of Medicare coverage for HRUS imaging—and therefore the Treatment itself—in the relevant jurisdictions.

133.    The Billing Articles also specify that CPT code 77436 (treatment planning/simulation) "is not typically repeated with each treatment except when clinically

indicated and documentation supports additional simulation requirements," which commenters stated is inconsistent with per-fraction imaging and simulation verification protocols used in Treatment delivery.

134.    The Billing Articles further restrict operational billing and documentation expectations in ways that stakeholders warned conflict with per-fraction imaging and verification protocols described in the Treatment literature and in Plaintiffs' comment submissions. For example, the Billing Articles direct providers to use modifiers GY or GZ when billing for ultrasound image guidance. Thus effectively forcing providers to submit claims they know will be denied or to forgo billing for the Treatment altogether.

135.    The combined effect of the Final LCDs and Billing Articles is to operationalize noncoverage of the core elements that make the Treatment clinically distinct—particularly per-fraction HRUS guidance—thereby threatening Medicare beneficiary access to a widely used, community-delivered, nonsurgical cancer treatment option described in the comment record.

## INJURY TO PLAINTIFFS AND BENEFICIARIES

136.    This change to national coverage policy has and will continue to cause immediate and irreparable harm to Plaintiffs. SkinCure and its hundreds of dermatology practice partners, PatientsACT and its members, the individual Plaintiffs, and tens-of-thousands of Medicare beneficiaries nationwide will suffer immediate and irreparable harm due to the Agency's Action that eliminates access to the most effective non-surgical treatment for Cancer and reverses a decade of progress in community-based Cancer care. The Court's intervention is necessary to prevent the collapse of office-based treatment programs and the ensuing harm to patients who depend on them.

137.    This national coverage policy will directly injure SkinCure, PatientsACT, the individual Plaintiffs, and Medicare beneficiaries who require or prefer non-surgical treatment for Cancer. For example, the Agency's coding and valuation framework, within the 2026 MPFS Rule

and Billing Articles, materially reduces payment for office-based Treatment. This threatens the viability of Treatment programs across SkinCure's network of hundreds of practice partners and threatens Treatment coverage for PatientsACT's members, the individual Plaintiffs, and Medicare beneficiaries.

138.    This national coverage policy will fundamentally upend SkinCure's ability to support office-based treatment and PatientsACT's members', individual Plaintiffs', and Medicare beneficiaries' ability to receive office-based treatment. The Agency's Action created a new CPT coding family (77436, 77437, 77438, 77439) and associated RVUs that fail to account for per-fraction imaging, multidisciplinary staffing, permanently installed equipment and shielding, and the adaptive workflow that defines the Treatment—rendering the Treatment clinically, financially, and operationally unfeasible for SkinCure and their practice partners. As a result, PatientsACT's members, the individual Plaintiffs, and Medicare beneficiaries will be unable to obtain the Treatment.

139.    The financial impact of this national coverage policy is immediate and severe. SkinCure's analysis of Medicare Part B payment for a single-tumor Treatment course shows current reimbursement of approximately $11,922 (CY 2025). Under the Agency's new code family and RVUs, Medicare payment would drop to approximately $3,692 beginning January 1, 2026—a nearly 70% decrease for the same course of care. Given SkinCure's management-fee structure (approximately 54% of total reimbursements paid to practice partners), SkinCure's revenue per course would fall from roughly $6,438 to $1,993. This will cause a significant reduction in the number of outpatient facilities able to offer the Treatment, and in turn will limit access to the Treatment for PatientsACT's members, the individual Plaintiffs, and Medicare beneficiaries.

140.    Additionally, due to the Agency Action, SkinCure has issued sixty-seven letters of termination and expects to lay off scores of additional employees because of the Agency Action.

The subsequent effects of these layoffs will certainly include a reduction in the number of outpatient facilities offering Medicare-reimbursed Treatment, harming PatientsACT's members, the individual Plaintiffs, and Medicare beneficiaries.

141.    This national coverage policy's reliance, reflected in the 2026 MPFS Rule and Billing Articles, on the OPPS ambulatory payment classification payment rates (5621 and 5732) to set practice-expense RVUs for non-facility Treatment services, and its "per course of treatment" limitation for ultrasound image guidance, contradict the prevailing delivery setting and clinical workflow documented in CMS claims data and the peer-reviewed literature. CMS itself acknowledges that SRT/Treatment are "infrequently provided in the hospital setting" (approximately 2% of cases), yet it imports facility-based cost relationships to office-based care and restricts imaging frequency central to the Treatment's efficacy. The result is an artificial, significant under-valuation of the Treatment that damages SkinCure's business model and diminishes the Treatment's effectiveness, severely harming PatientsACT's members, the individual Plaintiffs, and Medicare beneficiaries.

142.    SkinCure's injuries are concrete and irreparable. SkinCure is a non-clinical management entity that finances and administers the capital, personnel, and compliance infrastructure that dermatology practices need to deliver the Treatment—for example, leasing the SRT-100 Vision™ units, building and maintaining shielded vaults, supplying certified radiation therapists, and coordinating medical physics and regulatory components. The Agency's payment reductions will force contract terminations, program pauses, or permanent closures across SkinCure's practice network, causing lost revenue streams, stranded capital, and harm to business reputation and goodwill that cannot be remedied by post-hoc damages.

143.    SkinCure will submit declarations attesting to imminent program closures, terminations, and layoffs attributable to the Agency's payment changes, together with site-level access maps showing the concentration of Treatment facilities outside hospital settings.

144.    This change to national coverage policy will likewise cause immediate and irreparable harm to PatientsACT because its members will be denied coverage for the Treatment, a life-saving Cancer treatment that is particularly suitable for the vulnerable patient populations that PatientsACT represents.

145.    Similarly, this change to national coverage policy will cause significant, immediate, and irreparable harm to the individual Plaintiffs Mr. Allard, Mr. Carney, Ms. Crum, Mr. DeBacker, Mr. Phelps, and Mr. Smith who will lose coverage for the Treatment.

146.    The individual Plaintiffs have been (a) diagnosed with Cancer, (b) in consultation with their medical providers determined that the Treatment is the most medically appropriate Cancer treatment option for them, (c) previously successfully underwent the Treatment in which the Treatment cured their cancerous tumors, and (d) are currently undergoing the Treatment or are likely to develop new cancerous tumors in the future for which they will now be denied coverage for the Treatment. This loss of coverage will cause severe harm to the individual Plaintiffs.

147.    Mr. Allard is eight-four years old, suffers from recurrent skin cancer, has undergone sixty-seven individual sessions of the Treatment in the last eighteen months, and is in the process of scheduling additional Treatment to address newly diagnosed Cancer. Without coverage for the Treatment, Mr. Allard's only treatment option would be to undergo numerous invasive surgeries for which he has already experienced functional impairments and impaired wound healing. Due to the high surgical risk posed by his advanced age, comorbidities, and use of blood thinner medication, Mr. Allard would likely be forced to forgo Cancer treatment all together. As a Wyoming resident, Mr. Allard is within MAC Jurisdiction F, which is administered by Noridian,

one of the five MACs to issue the Final LCDs. Because the 2026 MPFS Rule became effective on January 1, 2026, and the Final LCDs are effective for services performed on and after March 1, 2026, Mr. Allard faces imminent loss of coverage and disruption of future courses of care.

148.    Mr. Carney will suffer severe harm due to this loss of coverage. Mr. Carney has been diagnosed with Cancer on his ears, nose, cheek, and bicep, four types of skin cancer, and impaired wound healing. Without coverage for the Treatment, Mr. Carney will be forced to travel seventy-one miles, one-way, to endure multiple surgeries that will result in significant downtime, loss of work, pain, and physical scarring. As a Massachusetts resident, Mr. Carney is within MAC Jurisdiction K, which is administered by NGS, one of the five MACs to issue the Final LCDs. Because the 2026 MPFS Rule became effective on January 1, 2026, and the Final LCDs are effective for services performed on and after March 1, 2026, Mr. Carney faces imminent loss of coverage and disruption of future courses of care.

149.    Ms. Crum recently completed her first Treatment cycle for cancer on her nose. Without coverage for the Treatment, Ms. Crum would have been forced to undergo Mohs surgery, which is painful and invasive, particularly when performed on the face, followed by future nasal reconstructive surgeries. Those procedures are complex and would result in worse cosmetic and functional outcomes, while also requiring in-patient hospital stays, multiple surgeries with associated risks, and significantly increased recovery time and pain. As a Nevada resident, Ms. Crum is within MAC Jurisdiction E, which is administered by Noridian, one of the five MACs to issue the Final LCDs. Because the 2026 MPFS Rule became effective on January 1, 2026, and the Final LCDs are effective for services performed on and after March 1, 2026, Ms. Crum faces imminent loss of coverage and disruption of ongoing courses of care.

150.    Mr. DeBacker is currently receiving the Treatment and has previously undergone over one hundred individual Treatment sessions. Without Medicare coverage for the Treatment,

Mr. DeBacker would not only be forced to suffer through an untold number of painful surgeries—which in itself creates risks, particularly at his age of sixty-nine—but would face severe risks of post-surgical infection and impaired wound healing due to his use of immunosuppressants. As a Michigan resident, Mr. DeBacker is within MAC Jurisdiction 8, which is administered by WPS, one of the five MACs to issue the Final LCDs. Since the 2026 MPFS Rule became effective on January 1, 2026, Mr. DeBacker's share of the Treatment cost has increased from $800 per cycle to $1,000 per lesion. Coupled with the Final LCDs, which are effective for services performed on and after March 1, 2026, Mr. DeBacker now faces an imminent loss of coverage and disruption of ongoing courses of care.

151.    Mr. Phelps is eighty years old and has suffered from recurrent Cancer lesions for over twenty-five years. Without Medicare coverage for the Treatment, Mr. Phelps would have to endure numerous painful and invasive facial surgeries, which due to his advanced age, comorbidities, use of blood thinner medication, and inability to adhere to post-surgical guidelines, makes him a risk surgical candidate and creates heightened post-surgical infection and impaired wound healing risks. As an Illinois resident, Mr. Phelps is within MAC Jurisdiction 6, which is administered by NGS, one of the five MACs to issue the Final LCDs. Because the 2026 MPFS Rule became effective on January 1, 2026, and the Final LCDs are effective for services performed on and after March 1, 2026, Mr. Phelps faces imminent loss of coverage and disruption of ongoing courses of care.

152.    Mr. Smith is seventy-seven years old and suffers from recurrent Cancer lesions. In the past eight years he has undergone approximately one-hundred-sixty individual Treatment sessions. Without coverage for the Treatment, Mr. Smith will be forced to endure numerous painful, invasive, and risky surgeries. Because the 2026 MPFS Rule became effective on January 1, 2026, Mr. Smith faces imminent and disruption of future courses of care.

153.    Lastly, the change to the national coverage policy will cause direct and substantial harm to Medicare beneficiaries broadly. By making the Treatment financially unsustainable for community dermatology practices, this national coverage policy eliminates access to the most effective, non-surgical treatment option for Cancer, especially for elderly, medically complex, anticoagulated, mobility-limited, rural, or facial/scalp tumor patients who cannot tolerate surgery or travel to hospital-based centers.

154.    Patient testimony confirms the access and quality-of-life stakes. In a comment letter addressing the Agency Action, one Medicare beneficiary explained that office-based Treatment "cured my cancer, spared me from surgery, and gave me an experience that was safe, effective, and close to home," and warned that removing this option would leave future patients with "fewer choices and more burdens at a time when they most need support and flexibility." This harm is not speculative; it has been felt immediately upon implementation.

155.    These impacts are magnified in rural and underserved communities, where over 80% of U.S. counties lack a Mohs surgeon and 95% of rural Medicare beneficiaries lack access to Mohs. Olsen *et al.*, *A Post-COVID Population-Based Analysis of Mohs Micrographic Surgeon Distribution in the United States*, 2025; Gronbeck *et al.*, *Dermatology workforce in the United States - Part I: Overview, transformations, and implications*, 2023. Eliminating office-based Treatment will widen existing disparities, forcing patients to travel long distances for surgery, defer care, or accept inferior, less-effective alternatives. Without access to office-based radiation therapy, patients may also be forced to seek treatment at hospitals, which necessarily increases costs for both patients and the Medicare Program.

156.    This national coverage policy also undermines CMS's stated policy aims of equitable, high-quality, and patient-centered care. By undervaluing the Treatment and privileging hospital-based or surgical treatments via the OPPS cross-walks and bundling, the Agency restricts

access to a proven, evidence-based therapy with documented cure rates >99% and superior cosmetic and functional outcomes—contrary to the standard of care and to Medicare beneficiaries' needs.

157.    Downstream system harms are predictable: shifting Cancer care to surgical interventions increases total costs due to repairs, wound care, complications, and travel burdens, while depriving beneficiaries of non-invasive care delivered locally. Stakeholder analyses submitted to the Agency and MACs warned that such distortions would raise aggregate Medicare spending and worsen outcomes; these concerns were not meaningfully addressed in the 2026 MPFS Rule, Final LCDs, or proposed Billing Articles.

**COUNT ONE**
**(The 2026 MPFS Rule is an *ultra vires* Agency action in violation of the**
**Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C))**

158.    Paragraphs 1 through 157 are incorporated by reference as if set forth fully herein.

159.    Pursuant to the APA, this Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "not in accordance with law" and taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

160.    Agency action that exceeds the power conferred by statute is invalid and must be vacated. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 104–05 (2015). Courts must exercise their independent judgment in determining whether an agency has acted within its statutory authority and "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

161.    Congress established the Resource-Based Relative Value Scale in Section 1848 of the Social Security Act, 42 U.S.C. § 1395w-4, as the *mandatory* methodology for valuing physicians' services under the MPFS. The Resource-Based Relative Value Scale is a formula-based system that values medical services according to the physician work, practice expenses, and

malpractice insurance costs required to deliver them—not according to hospital payment rates or other unrelated metrics.

162.    Section 1848 requires the Secretary to develop and combine three RVU components—physician work (§ 1395w-4(c)(1)(A)), practice expenses (§ 1395w-4(c)(2)(C)), and malpractice (§ 1395w-4(c)(3))—"for each service in a manner to produce a relative value for that service." § 1395w-4(c)(2)(A)(i). In short, Congress mandated a *physician-resource*–based valuation scheme for the MPFS.

163.    Consistent with this statute, the Agency's MPFS regulations confirm that "practice expense RVUs are based entirely on relative practice expense resources" for services furnished in 2002 and subsequent years. 42 C.F.R. § 414.22(b)(5). The provision does not authorize importing hospital outpatient cost constructs to set physician office (non-facility) practice expense RVUs.

164.    Nevertheless, in the Final 2026 MPFS Rule, the Agency finalized the use of the OPPS ambulatory payment classification relationships to inform the practice expense RVUs for the new "surface radiation therapy" code family, including practice expense only CPT codes 77437 and 77438 and the technical component of 77436, and assigned Procedure Status "B" (i.e. non-payable technical component) to 77439 to align with the OPPS bundling by packing ultrasound guidance into the delivery codes. 90 Fed. Reg. at 49386–88.

165.    The Agency adopted these OPPS-based adjustments even though the Treatment is administered almost exclusively in office-based dermatology practices, with approximately 96% of SRT/Treatment claims submitted by office-based dermatologists and other skin cancer specialists, and only a small fraction submitted by radiation oncologists practicing primarily in facility-based settings.

166.    Because the statute authorizes MPFS valuations only by reference to the statutory physician resource components (work, practice expense, and malpractice), and the 2026 MPFS

Rule impermissibly tethered non-facility MPFS valuations for the Treatment to a hospital facility payment framework, the Agency acted in excess of its statutory authority and the Rule is *ultra vires*, not in accordance with the law, and must be set aside.

## COUNT TWO
**(The Final LCDs and Billing Articles are an *ultra vires* Agency action in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C))**

167.    Paragraphs 1 through 157 are incorporated by reference as if set forth fully herein.

168.    The Final LCDs and Billing Articles likewise constitute an *ultra vires* Agency Action because they are based on unauthorized criteria and a flawed application of federal law, and establish standards for qualified providers that are impermissibly vague and incompatible with state law.

169.    Congress delegated to the MACs the responsibility for developing LCDs under 42 U.S.C. § 1395kk-1(a)(4), and limited LCDs to MAC determinations "respecting whether or not a particular item or service is covered" on a MAC-wide basis under 42 U.S.C. § 1395y(a)(1)(A), which consists solely of the "reasonable and necessary" requirement. *See* 42 U.S.C. § 1395ff(f)(2)(B).

170.    Section 1395ff(f)(2)(B) further restricts MACs, in developing LCDs, to considering whether a given item or service is "reasonable and necessary for the diagnosis or treatment of illness or injury" within the meaning of 42 U.S.C. § 1395y(a)(1)(A).

171.    When a MAC does not adhere to this "reasonable and necessary" standard and instead bases an LCD on factors beyond § 1395y(a)(1)(A), it has "gone beyond what Congress has permitted it to do" and "exceed[ed] the scope of its authority." *City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013).

172.    That is precisely what the MACs did here. The Final LCDs and Billing Articles rest on unauthorized criteria and a flawed application of the "reasonable and necessary" standard.

173.    To determine whether a service is reasonable and necessary, CMS instructs MACs to assess whether it is: (a) safe and effective; (b) not experimental or investigational; and (c) appropriate, including in duration and frequency, in that the service is: (i) furnished in accordance with accepted standards of medical practice; (ii) furnished in a setting appropriate to the beneficiary's medical needs and condition; (iii) ordered and furnished by qualified personnel; and (iv) one that meets, but does not exceed, the beneficiary's medical need. Medicare Program Integrity Manual (CMS Pub. 100-08), Ch. 3, § 3.6.2.2; *see also* 42 U.S.C. § 1395y(a)(1)(A).

174.    Neither these criteria nor 42 U.S.C. § 1395y(a)(1)(A) impose a threshold evidentiary requirement that a service or product must meet to obtain Medicare coverage.

175.    Yet, in the Final LCDs and Billing Articles, the MACs denied coverage for the Treatment and HRUS based on the absence of RCTs and prospective studies.

176.    The MACs' imposition of this extra-statutory evidentiary requirement is contrary to § 1395y(a)(1)(A) and Agency guidance. Accordingly, the MACs were not permitted to consider this post-hoc factor in developing the Final LCDs and Billing Articles, and these actions are thus "beyond what Congress has permitted [the MACs] to do" and are *ultra vires*. *City of Arlington*, 569 U.S. at 297–98.

177.    The Final LCDs further attempt to define the scope of practice for qualified personnel permitted to perform the Treatment, but these requirements contravene state law and are so vague that compliance is practically impossible.

178.    Additionally, the Due Process Clause of the Fifth Amendment embodies the "fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S. at 253. This "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause," and "requires the invalidation of laws [and regulations] that are impermissibly vague."

*Id.* The "void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

179.    The D.C. Circuit has "established that fair-notice due process vagueness principles are indeed incorporated into administrative law." *Planned Parenthood of Greater N.W. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-CV-2453, 2025 WL 2840318, at *23 (D.D.C. Oct. 7, 2025) (citing *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)). To determine whether a party received fair notice, courts "consider whether, 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform.'" *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024) (quoting *Gen. Elec. Co.*, 53 F.3d at 1329). An agency "cannot set out requirements so vague as to preclude compliance." *Planned Parenthood*, 2025 WL 2840318, at *23.

180.    Under existing practice, the Treatment is overwhelmingly administered by dermatologists. Recent Medicare Part B claims data shows that approximately 96% of SRT and Treatment claims are attributable to dermatologists and other skin specialists, and fewer than 2% of claims are attributable to radiation oncologists. The LCDs, however, redefine a "qualified physician" in such vague and ambiguous terms that is unclear how dermatologists can permissibly deliver the Treatment going forward.

181.    The LCDs require a "qualified physician" to have "training and expertise . . . within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty (i.e., ***Radiation Oncology OR by a qualified dermatology program of with***

*didactic and clinical experience in radiation treatment*)." Yet no such "qualified dermatology program . . . with didactic and clinical experience in radiation treatment" exists in practice. While dermatology residency programs may include didactic training in radiation treatment, clinical experience is typically gained in practice. Accordingly, because the dermatology training purportedly required by the Final LCDs do not exist, it is unclear how dermatologists can comply with the new "qualified physician" requirement. Regardless, since the LCDs have gone into effect, dermatologists have stopped providing Treatments out of *fear* that their residency program did not satisfy this requirement, even though some of these dermatologists have been successfully and safely providing the Treatment for the better part of the past decade.

182.    The LCDs' qualified physician standard therefore "set[s] out requirements so vague as to preclude compliance." *Planned Parenthood*,  2025 WL 2840318, at *23. The LCDs thus fails to provide fair notice in violation of the Fifth Amendment because regulated parties cannot "identify, with ascertainable certainty,' the standards with which the agency expects parties to conform." *Nissan Chem. Co.*, 744 F. Supp. 3d at 9 (quoting *Gen. Elec. Co.*, 53 F.3d at 1329); *Fox Television*, 567 U.S. at 253.

183.    The Final LCDs' definition of "qualified physician" also conflicts with state law and exceeds the Agency's authority.

184.    Section 1395 specifically prohibits "any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." *See* 42 U.S.C. § 1395 *see also* 42 C.F.R. § 410.20(b) (allowing reimbursement for physicians' services if they are "legally authorized to practice by the State in which he or she performs . . . and who is acting within the scope of his or her license"). The section further defines a "physician" as "a doctor of medicine or osteopathy legally authorized to practice medicine and

surgery *by the State* in which he performs such function or action." *See* 42 U.S.C. § 1395x(r) (emphasis added).

185.    Regulation of a physician's scope of practice lies firmly within the States' police powers, and "[t]here is no right to practice medicine which is not subordinate to the police power." *Garcia v. Texas State Bd. of Med. Examiners*, 384 F. Supp. 434, 437 (W.D. Tex. 1974); *see also Zahl v. Harper*, 282 F.3d 204, 211-12 (3d Cir. 2002) (holding that a state's "exceedingly strong interest in regulating the practice of medicine in its jurisdiction" outweighed HHS's interest in exclusively determining whether physicians violated Medicare regulations); *Gonzales v. Oregon*, 546 U.S. 243, 269–70 (2006) (reinforcing federalist principle "allow[ing] the States 'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996))).

186.    Accordingly, the Final LCDs' attempt to define which physician sub-specialties are qualified to perform the Treatment exceeds not only the MACs' authority, but HHS's authority under the Medicare Act.

187.    By attempting to regulate a physician's scope of practice—a traditional state police power—the Final LCDs also violate the Tenth Amendment, which "reserves to the states powers not delegated to the federal government," including "the authority to protect public health and safety." *In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *2 n.1 (E.D. Pa. Nov. 21, 2025).

188.    The MACs' attempt to regulate a physician's scope of practice is prohibited by § 1395 and violates the Tenth Amendment. As such, the MACs were not permitted to attempt to regulate physician scope of practice in developing the Final LCDs. These actions are thus *ultra vires*.

## COUNT THREE
### (The 2026 MPFS Rule is an unexplained change in Agency position in violation of 5 U.S.C. § 706(2)(A))

189.    Paragraphs 1 through 157 are incorporated by reference as if set forth fully herein.

190.    The APA requires agencies to engage in "reasoned decision making," and directs that agency actions found to be "arbitrary" or "capricious" shall be held unlawful and set aside. 5 U.S.C. § 706(2)(A); *see also Michigan v. EPA*, 576 U.S. 743, 750 (2015).

191.    When an agency departs from its prior guidance or precedent, it must acknowledge the change in position and provide a reasonable explanation for that departure. *FCC v. Fox Television Stations, Inc. ("Fox")*, 556 U.S. 502, 515 (2009).

192.    Moreover, when an agency changes course, the APA requires a "more substantial justification" where "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Perez*, 575 U.S. at 106 (internal quotation omitted).

193.    For years preceding the 2026 MPFS Rule, Medicare reimbursement for the Treatment was governed by individual MAC determinations, under which at least thirty QICs and ALJs affirmed that the Treatment is a medically reasonable and necessary service for treating NMSC and that repeated imaging throughout the course of the Treatment is clinically necessary.

194.    These prior decisions, *which were not overturned*, constitute final agency action by the Agency. *Agendia, Inc. v. Kennedy*, No. 24-5180, 2025 WL 1467116, at *2 (D.C. Cir. May 22, 2025); *Cal. Clinical Lab'y Ass'n v. Sec'y of Health & Hum. Servs.*, 104 F. Supp. 3d 66, 72 (D.D.C. 2015).

195.    Thousands of Medicare beneficiaries, including Mr. Allard, Mr. Carney, Ms. Crum, Mr. DeBacker, Mr. Phelps, and Mr. Smith, and PatientsACT's members, relied on these decisions

to seek and obtain the Treatment, and SkinCure relied on this Agency action in continuing to invest in and supply this life-saving therapy.

196.    In issuing the 2026 MPFS Rule and reclassifying the Treatment into four new CPT codes, however, the Agency abruptly departed from this longstanding practice and precedent to Plaintiffs' detriment.

197.    In both the Proposed Rule and 2026 MPFS Rule, the Agency asserted that it assigned the Treatment these new codes to "more accurately reflect the actual costs of these services compared to use of direct practice expense input and allocation methodologies." 90 Fed. Reg. 32429; 90 Fed. Reg. 49386.

198.    Yet, as numerous commenters explained, the RVU values in both the Proposed and Final Rule were substantially below the reported survey median figures for the Treatment.

199.    As a result, the RVU values the Agency adopted in the 2026 MPFS Rule are less aligned with the actual costs of furnishing the Treatment than the Agency's prior reimbursement policy.

200.    The Agency further stated that it would reimburse ultrasound image guidance as a once-per-course add-on under CPT code 77439 "to align with OPPS of this code whose costs are packaged into payment for the treatment delivery CPT codes [77437] and [77438]." 90 Fed. Reg. 32429; 90 Fed. Reg. 49386.

201.    That justification is irreconcilable with how the Treatment is actually administered and with the governing statutory scheme because the OPPS is a facility-based payment model, whereas the MPFS is a resource-based system intended to reflect the direct costs of services furnished in physician offices.

202.    The Agency's rationale also conflicts with its own regulations, which require the MPFS RVUs to be based on data reflecting the actual practice expenses incurred by physicians in the settings where they furnish the service. *See* 42 C.F.R. § 414.22.

203.    Moreover, the Agency failed to explain why ultrasound image guidance should be reimbursed as a one-time event rather than as a service provided multiple times throughout the course of treatment, even though the clear clinical protocol for the Treatment is per-fraction ultrasound imaging rather than one-time use.

204.    Plaintiffs and Medicare beneficiaries reasonably relied on the Agency's prior practice of reimbursing imaging multiple times throughout the course of treatment—a defining feature of the Treatment and a key component of its clinical effectiveness.

205.    Because the Agency failed to acknowledge or reasonably explain its departure from prior policy, ignored substantial reliance interests, and adopted CPT code valuations for the Treatment that are artificially low and unsupported by the record, the Final Rule does not reflect "reasoned decision making" within the meaning of the APA. *See Fox*, 556 U.S. at 515.

206.    Accordingly, the 2026 MPFS Rule is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) and must be held unlawful and set aside.

## COUNT FOUR
### (The Final LCDs and Billing Articles depart from
### prior Agency policy without a reasoned explanation, 5 U.S.C. § 706(2)(A))

207.    Paragraphs 1 through 157 are incorporated as if fully set forth herein.  Under the APA, "an agency changing its course must supply a reasoned analysis." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (quoting *Greater Boston Television Co. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1971)).  The agency must "display awareness that it is changing position," and "show that there are good reasons for the new policy." *Fox*, 556 U.S. at 515. An agency's policy change that is not "supported by 'reasoned analysis' . . . compels the

conclusion that its action was arbitrary and capricious." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 40 (D.D.C. 2020) (quoting *State Farm*, 463 U.S. at 42).

209.    The five substantively identical Final LCDs and associated Billing Articles are arbitrary and capricious because they, for the first time, require support from RCTs for coverage of the Treatment, in direct conflict with past Agency guidance and precedent, and without acknowledging or explaining this change in Agency position. This Agency Action is further arbitrary and capricious because the new definition of "qualified physician" practically precludes dermatologists from delivering the Treatment when the Treatment has historically been delivered almost exclusively by dermatologists, and the MACs failed to provide a coherent explanation for this sea change.

210.    Prior to this coordinated shift in national coverage policy, the Treatment was deemed reasonable and necessary for Medicare reimbursement.

211.    Under the Final LCDs and Billing Articles, however, the Treatment will be denied coverage: none of the dermatology practices that SkinCure supports will be able to bill Medicare for the Treatment; none of PatientACT's Medicare members seeking Cancer treatment will qualify for the Treatment; and Mr. Allard, Mr. Carney, Ms. Crum, Mr. DeBacker, Mr. Phelps, Mr. Smith, and other beneficiaries will be denied Medicare coverage for the Treatment.

212.    The MACs failed to provide the "reasoned analysis" required to distinguish the Treatment from traditional SRT or Mohs. *State Farm*, 463 U.S. at 57.

213.    In the Final LCDs, the MACs' only explanation is that the Treatment literature is not supported by RCTs or prospective studies, even while acknowledging that "there are no prospective or [RCTs] in the peer-reviewed literature that compare the outcomes . . . between Mohs or surgical excisions and SRT."

214.    The MACs thus deemed RCT support a necessary predicate for coverage approval and a justification to limit SRT coverage, while simultaneously designating Mohs—which also lacks RCT support—as the front-line approach. In so doing, the MACs created a new, post-hoc approval requirement and applied that requirement in an unfair and arbitrary manner.

215.    The MACs never disclosed or acknowledged this purported RCT requirement prior to issuing the Final LCDs.

216.    To the contrary, Agency guidance and messaging confirm that RCT support was not required. Before 2019, Section 13.7.1 of CMS's manual governing LCD development stated that "[i]n order of preference, [local coverage determinations] should be based on: [1] Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and [2] General acceptance by the medical community (standard of practice), as supported by sound medical evidence." *United States ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1371–72 (C.D. Cal. 2014). Under this standard—even though RCT support was expressly listed— decisions by thirty QICs and ALJs affirmed Medicare coverage for the Treatment.

217.    In 2019, CMS removed Section 13.7.1, and the current manual no longer mentions RCTs. *See* Change Req. 10901, Trans. No. 683 (Feb. 12, 2019, eff. Oct. 3, 2018) (deleting § 13.7.1).

218.    Instead, § 13.5.3 now provides that "MACs shall use the available evidence of general acceptance by the medical community, such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines."

219.    Under § 13.5.4, an item or service is deemed "reasonable and necessary" if the MAC determines it is (1) "safe and effective," (2) "not experimental or investigational," and (3) "appropriate." Thus, Agency guidelines do not require items or services to be supported by RCTs

to obtain coverage, nor is there any guidance directing MACs to issue LCDs on the basis of RCT support.

220.    By limiting SRT coverage and declining to extend coverage for the Treatment, the Final LCDs and Billing Articles effectively impose a de facto RCT requirement. This undisclosed, heightened evidentiary standard constitutes a change in Agency position, and the Agency's failure to acknowledge or reasonably explain that change renders the Final LCDs and Billing Articles arbitrary and capricious. *See Fox*, 556 U.S. at 515.

221.    Additionally, the Final LCDs and associated Billing Articles impose a new definition of "qualified physician." Prior to the Final LCDs, the Treatment had been administered almost exclusively (96%) by dermatologists, and by only an extreme minority (2%) of radiation oncologists. The LCDs require "qualified physicians" to have "training and expertise . . . within the framework of an accredited residency and/or fellowship program in . . . Radiation Oncology OR by a qualified dermatology program of with didactic and clinical experience in radiation treatment."

222.    When the MACs proposed this language, commenters warned that, because such a "qualified dermatology program" does not exist in practice, the requirement would operate to prevent dermatologists from providing the Treatment—even though the Proposed LCDs themselves acknowledge that "the bulk of claims coming through processed for SRT are from dermatologists as opposed to radiation oncologists." Commenters further emphasized that the LCDs' approach conflicts with the LCDs' own National Coverage Policy language stating that LCDs do not "replace, modify, or supersede applicable state statutes" regarding medical practice and scope of practice, and that providers must follow state laws and deliver services within their scope of practice.

223.    Nonetheless, the MACs ignored these substantive concerns and "explained" their rationale by simply restating the vague and ambiguous terms in the definition: "The LCD does not prohibit dermatologists . . . it expects that any provider . . . has the experience and training . . . acquired within the framework of an accredited residency and/or fellowship program in . . . Radiation Oncology OR by a qualified dermatology program of training with didactic and clinical experience in radiation treatment."

224.    This "explanation" is no explanation at all, and further compounds the opacity of the LCDs' "qualified physician" standard. Agencies are charged with reasoned decision-making, which requires an agency to "explain 'why it chose to do what it did.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Tourus Records v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)). Thus, "where the agency's explanation for its action 'lacks any coherence,'" the action will not "survive arbitrary and capricious review." *Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012) (quoting *Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006)). "[T]o this end, conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" *Amerijit Int'l*, 753 F.3d at 1350 (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).

225.    Because the Agency's explanation for the "qualified physician" definition ignores the practical impossibility of dermatologist compliance and simply reflects a conclusory restatement of the incoherent definition itself, the Agency failed to "supply a reasoned analysis" for this change, further rendering the LCDs and associated Billing Articles arbitrary and capricious. *State Farm*, 463 U.S. at 57; *Amerijet Int'l*, 753 F.3d at 1250.

### COUNT FIVE
### (The Agency violated 42 U.S.C. § 1395hh(b)(1) by unlawfully adopting a substantive legal standard without notice and comment)

226.    Paragraphs 1 through 157 are incorporated by reference as if set forth fully herein.

227.    The Final LCDs and Billing Articles, coupled with the 2026 MPFS Rule, establish a new substantive legal standard governing Medicare coverage and payment for the Treatment that could only lawfully be adopted through formal notice and comment rulemaking.

228.    In *Azar v. Allina Health Services*, the Supreme Court held that a CMS payment formula constituted a "substantive legal standard" requiring a formal notice and comment period under 42 U.S.C. § 1395hh(a)(2), distinguishing "substantive legal standards" under the Medicare Act from "substantive rules" under the APA and expressly recognizing that interpretive rules may qualify as "substantive legal standards" under the Medicare Act that trigger notice and comment obligations. 587 U.S. 566, 577–78, 581–82 (2019).

229.    Here, five MACs simultaneously issued substantively identical Final LCDs and Billing Articles, and the Billing Articles mirror the Agency's 2026 MPFS Rule. Accordingly, the Final LCDs and Billing Articles rise to the level of a substantive legal standard and therefore require formal notice and comment rulemaking under 42 U.S.C. § 1395hh(b)(1).

230.    First, the Final LCDs and Billing Articles are binding on the MACs at the initial determination stage and are afforded substantial deference by QICs, ALJs, and the Appeals Council on appeal, and together they define and regulate a provider's right to payment and a beneficiary's right to reimbursement for the Treatment.

231.    Second, the Final LCDs establish a blanket non-coverage policy for the Treatment, which is then codified and enforced through the Billing Articles and the 2026 MPFS Rule, exemplifying precisely the kind of "gap-filling" policy that *Allina* held cannot evade formal notice and comment procedures.

232.    Third, the Final LCDs and Billing Articles do not resemble a traditional LCD in which a single MAC makes an individualized coverage determination for its jurisdiction. Rather, when paired with the 2026 MPFS Rule, they operate as part of an interwoven, nationwide

regulatory scheme that imposes new, specific, and binding rules governing what is "medically reasonable and necessary" and how covered services must be billed, and thus constitute unlawful substantive legal standards adopted without the notice and comment rulemaking required by 42 U.S.C. § 1395hh(a)(2)–(b)(1).

## COUNT SIX
### (Alternatively, the Agency violated the Administrative Procedure Act by Unlawfully adopting de facto NCDs without the required rulemaking)

233.    Paragraphs 1 through 157 are incorporated by reference as if set forth fully herein.

234.    Pursuant to APA, this Court is required to hold unlawful and set aside agency action, findings, and conclusions that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

235.    Courts do not accord an "overwhelming" degree of deference to an agency's characterization of its own rule; rather, they examine the "language used in the statement itself." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537–38 (D.C. Cir. 1986).

236.    The Final LCDs and Billing Articles constitute a sweeping change in Medicare coverage policy, impacting over 59% of Medicare Part A and B claims, nine of the twelve Medicare Part A and B MACs, approximately 14,000 hospitals, more than 700,000 physicians, and approximately 24.7 million Medicare beneficiaries, and, together with the 2026 MPFS Rule, are the product of a coordinated effort to change national Medicare coverage policy outside the procedures prescribed by Congress.

237.    Because the Final LCDs and Billing Articles are nearly identical across MAC jurisdictions and affect coverage for SRT treatments in more than half of the country, they collectively operate as a de facto NCD over SRT treatments. *See Associated Builders & Contractors, Inc. v. Reich*, 922 F. Supp. 676, 680 (D.D.C. 1996) ("The label that the agency puts

on its given exercise of administrator power is not conclusive; rather it is what the agency does in fact."); *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416 (1942) (same).

238.    While Congress has authorized the Agency to delegate to MACs the ability to issue LCDs affecting their respective regions, 42 U.S.C. § 1395kk-1(a)(4); 42 U.S.C. § 1395ff(f)(2)(B), NCDs can only be issued by the Agency, 42 U.S.C. § 1395ff(f)(1)(B). By orchestrating substantively identical Final LCDs and Billing Articles across multiple MAC jurisdictions to effectuate a de facto NCD regarding SRT treatments, the Agency has acted in excess of its statutory jurisdiction, authority, and limitations in violation of 5 U.S.C. § 706(2)(C).

**COUNT SEVEN**
**(The Agency arbitrarily and capriciously failed to implement**
**the de facto NCDs through the CED framework)**

239.    Paragraphs 1 through 157 are incorporated by reference as if set forth fully herein.

240.    Where the evidence supporting an item or service is deemed lacking, Congress has authorized the Agency to issue a NCD providing coverage for such item or service under a Coverage with Evidence Development ("CED") framework pursuant to 42 U.S.C. § 1395y(a)(1) and 42 U.S.C. § 1320b–12.

241.    The Agency is further authorized to seek independent guidance and expert advice from the Medicare Evidence Development & Coverage Advisory Committee regarding coverage determinations where there is controversy among experts, published studies contain potentially flawed or conflicting results, or dissemination of a technology may have a major impact on the Medicare population, as set forth in Medicare Program; Revised Process for Making National Coverage Determinations, 78 Fed. Reg. 48164 (Aug. 7, 2013).

242.    Notwithstanding this statutory and regulatory framework, the Agency unlawfully circumvented the CED process and instead issued the Final LCDs and Billing Articles, which, on

the asserted basis of insufficient evidence, nearly eliminate coverage of the Treatment for Medicare beneficiaries in more than half of the country.

243.    The Agency took this Action despite at least thirty determinations by QICs and ALJs concluding that the Treatment is medically reasonable and necessary. Yet, the Final LCDs nevertheless determined that there is purportedly insufficient evidence to support the use of the Treatment for NMSC.

244.    The Billing Articles mimic the Agency's 2026 MPFS Rule by changing billing codes in a manner that causes claims for the Treatment to be denied.

245.    Instead of denying coverage for the Treatment—a treatment that was previously covered—through the Final LCDs, Billing Articles, and 2026 MPFS Rule on the asserted ground of insufficient evidence, the Agency should have sought guidance from the Medicare Evidence Development & Coverage Advisory Committee and, if it wished to limit coverage, to proceed by issuing a CED-based NCD. The Agency's failure to issue a CED-based NCD is arbitrary and capricious, an abuse of discretion, and contrary to the authority conferred upon the Agency by Congress.

## COUNT EIGHT
### (The Agency arbitrarily and capriciously extended the 2026 MPFS Rule through the Final LCDs and Billing Articles)

246.    Paragraphs 1 through 157 are incorporated by reference as if set forth fully herein.

247.    To the extent this Court declines to review this coordinated change to national coverage policy as an unlawful substantive legal standard or de facto NCD, the policy was initiated and implemented by the MACs at the Agency's direction, and the lawfulness of the 2026 MPFS Rule, and thus the Final LCDs and Billing Articles, is therefore properly before the Court.

248.    Acting at the Agency's direction, the MACs initiated the Final LCDs and Billing Articles, further confirming the coordinated nature of this national coverage policy. As a result,

neither the Final LCDs nor the Billing Articles are "determination[s] by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts." 42 U.S.C. § 1395ff(f)(2)(B). Rather, they operate as extensions of the Agency's 2026 MPFS Rule and as an unlawful attempt to circumvent the APA.

249.    The Billing Articles conclude that billing code G6001 (ultrasonic guidance for placement of radiation therapy fields) is not medically reasonable or necessary and therefore not covered, a determination made at the Agency's express direction through the 2026 MPFS Rule, which eliminated G6001 and replaced it with new code 77439 after G6001 was identified "by the RAW via the CMS/Other Medicare utilization over 20,000 screen."

250.    The Final LCDs supply the purported substantive justification for this change in coverage, effectively implementing the 2026 MPFS Rule's policy decision through coverage restrictions and claim denials.

251.    Rather than follow the proper process for effectuating billing changes, the Agency directed the MACs to issue the Final LCDs and Billing Articles to implement this policy determination. *See Hays v. Leavitt*, 538 F. Supp. 2d 62 (D.D.C. 2008), *aff'd Hays v. Sebelius*, 589 F.3d 1279 (D.C. Cir. 2009).

252.    The validity of this policy determination should therefore be reviewed as an agency interpretation of a federal statute that, under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), is no longer entitled to *Chevron* deference, but must still reflect reasoned decision making and comply with applicable notice and comment requirements. Under such review, this coordinated shift to national coverage policy is arbitrary and capricious for at least the following reasons.

253.    First, this coordinated effort represents a material policy shift in the coverage of the Treatment that the Agency failed to reasonably explain or justify. The Agency promulgated the 2026 MPFS Rule purportedly to limit "profiteering practices occurring in this industry," 90 Fed. Reg. 33644, but has offered no proof of such "profiteering practices," relying instead on conclusory assertions that "cannot substitute for a reasoned explanation." *Env't Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021) (internal citation omitted).

254.    Second, the Agency neither meaningfully distinguished between traditional SRT and the Treatment nor explained its decision to treat them as interchangeable; failed to address extensive peer-reviewed literature endorsing the Treatment as a first-line treatment and affirming that HRUS imaging is medically reasonable and necessary for its delivery; and offered only vague assertions that further investigation was needed—assertions that do not justify relegating the Treatment to a secondary treatment or denying coverage for HRUS imaging. Such unexplained departures from the evidentiary record render the Agency's Action arbitrary and capricious. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015).

255.    Third, this coordinated change to national coverage policy—undertaken at the Agency's direction—runs "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Numerous commenters identified fundamental defects in the 2026 MPFS Rule, including its improper conflation of traditional SRT and the Treatment, relegation of the Treatment to a secondary treatment, categorical exclusion of HRUS imaging, and effective limitation of the Treatment to radiation oncologists, thereby restricting access for rural and underserved patients. Despite these extensive comments and the peer-reviewed evidence submitted, the Final 2026 MPFS Rule is nearly identical to the Proposed Rule.

256.    Fourth, this national coverage policy will have significant anti-competitive effects on the skin cancer treatment market, threatening patients and suppliers alike. The Agency did not

acknowledge, address, or justify these effects in enacting this coordinated change to national coverage policy and thus "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

257. Finally, the requirement that agency action not be arbitrary and capricious obligates the Agency to respond to "relevant" and "significant" public comments. *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (internal quotation omitted). The Agency failed to meet this obligation by offering circular, conclusory responses to comments that raised significant substantive concerns. The MACs mirrored this approach, dismissing substantial peer-reviewed evidence supporting the Treatment as a first-line treatment for Cancer and denying coverage on the ground that the Treatment purportedly requires further study due to the absence of RCTs or prospective trials—while simultaneously designating Mohs as first-line treatment despite the lack of such trials for the vast majority of its clinical uses.

## COUNT NINE
**(The 2026 MPFS Rule, Final LCDs, and Billing Articles deny coverage for "reasonable and necessary" care in violation of the Administrative Procedure Act and Medicare Act)**

258. Paragraphs 1 through 157 are incorporated by reference as if set forth fully herein.

259. This coordinated change to national coverage policy—effectuated through the 2026 MPFS Rule, the Final LCDs, and the Billing Articles—improperly denies coverage for previously covered, life-saving Cancer therapies that are "reasonable and necessary" for medical care, in violation of the Medicare Act and the APA.

260. The Medicare Act entitles Plaintiffs to coverage for "reasonable and necessary" medical items and services. 42 U.S.C. § 1395y(a)(1). An item or service is "reasonable and necessary" if it is (a) safe and effective, (b) not experimental or investigational, and (c) "appropriate." Medicare Program Integrity Manual, Ch. 13, § 13.5.4.

261.    An item or service is deemed "appropriate" when it is (i) furnished in accordance with accepted standards of medical practice, (ii) furnished in an appropriate setting, (iii) ordered and furnished by qualified personnel, (iv) meets but does not exceed a patient's medical need, and (v) is at least as beneficial as an existing and available medically appropriate alternative. Medicare Program Integrity Manual, Ch. 13, § 13.5.4.

262.    The MACs determined that the Treatment is not "reasonable and necessary" because, in their view, it lacks sufficient supporting evidence and requires further investigation. That conclusion is contrary to the governing "reasonable and necessary" standard in 42 U.S.C. § 1395y(a)(1).

263.    First, the Treatment is safe and effective. Patients, including Mr. Allard, Mr. Carney, Ms. Crum, Mr. DeBacker, Mr. Phelps, and Mr. Smith have been successfully treated with the Treatment for years with minimal side effects, and the Treatment has effectively managed and treated their Cancer. The Treatment's safety and efficacy are further demonstrated by peer-reviewed studies reporting local control rates exceeding 99% with minimal adverse events.

264.    Second, the Treatment is not experimental or investigational. The Treatment has repeatedly been deemed medically reasonable and necessary in at least thirty decisions by QICs and ALJs, allowing patients to receive a less invasive, yet more effective and accessible Cancer treatment. The Treatment has been FDA-cleared and in continuous clinical use since 2015, and subject of numerous favorable peer-reviewed studies.

265.    Third, the Treatment is "appropriate" within the meaning of the Medicare standard because it is furnished in accordance with accepted standards of medical practice, as reflected in its inclusion in national treatment guidelines; is delivered in settings appropriate to patients' medical needs; is ordered and furnished by qualified personnel, including board-certified dermatologists supported by radiation therapists and medical physicists; is provided in a manner

that meets but does not exceed patients' medical needs; and achieves outcomes at least as beneficial as existing medically appropriate alternatives, including Mohs.

266.    The Final LCDs are therefore inconsistent with the Medicare Act and are "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA. 5 U.S.C. § 706(2)(A)–(C).

267.    Additionally, the MACs' categorical denial of HRUS imaging cannot be reconciled with the governing "reasonable and necessary" criteria. The MACs did not find the Treatment unsafe, ineffective, or experimental, nor did they identify any deficiency in the setting, personnel, or appropriateness of its delivery. Instead, they imposed an extra-statutory requirement—RCT support—that appears nowhere in the statutory or regulatory standard, causing a fundamental misapplication of the governing framework.

268.    Further, the Final LCDs are part of a broader, coordinated national decision on coverage policy, and "agency interpretations of statutes—like agency interpretations of the Constitution—are not entitled to deference." *Loper Bright Enters.*, 603 U.S. at 392. Thus, neither the MACs' interpretation of the Medicare Act nor the Agency's 2026 MPFS Rule is entitled to deference. "Under the APA, it thus 'remains the responsibility of the court to decide whether the law means what the agency says.'" *Id.* (internal quotation omitted).

269.    Because the Treatment is medically reasonable and necessary under the Medicare Act, the Agency's coordinated national coverage policy denying coverage for the Treatment and HRUS imaging cannot withstand APA review and is arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

a.    Declare that the new CPT coding family (77436, 77437, 77438, 77439) and associated RVUs for the Treatment in the Final Rule violate the APA because they

are arbitrary, capricious, and contrary to law;

b.      Enjoin Defendants from administering or enforcing the new CPT coding family (77436, 77437, 77438, 77439) and associated RVUs for the Treatment set forth in the Final Rule;

c.      Mandate that Defendants continue to reimburse the Treatment through the existing methodology;

d.      Mandate that Defendants continue to reimburse ultrasound image guidance per-fraction throughout treatment rather than as a once-per-course add-on;

e.      Declare that the Final LCDs and associated Billing Articles violate the APA because they are arbitrary, capricious, and contrary to law;

f.      Enjoin Defendants from administering or enforcing the Final LCDs and associated Billing Articles;

g.      Award Plaintiffs costs and reasonable attorney's fees in connection with this action, pursuant to 28 U.S.C. § 2412 and other applicable authority; and

h.      Grant such other relief as the Court deems necessary, just, and proper.


Dated: March 3, 2026                         Respectfully submitted,

                                             HOLLAND & KNIGHT LLP

                                             /s/ *Lynn Estes Calkins*
                                             Lynn Estes Calkins (DC Bar No. 445854)
                                             Zachary P. Lundgren (DC Bar No. 90012330)
                                             800 17th Street, N.W., Suite 1100
                                             Washington, D.C. 20006
                                             Phone:  (202) 955-3000
                                             lynn.calkins@hklaw.com
                                             zachary.lundgren@hklaw.com

Andrew Solinger (DC Bar No. 1014742)
511 Union Street, Suite 2700
Nashville, TN 37219
Phone:  (615) 850-8062
andrew.solinger@hklaw.com

*Counsel for Plaintiffs*