**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SKINCURE ONCOLOGY, LLC, *et al.*,<br><br>*Plaintiffs,*<br>v.<br><br>ROBERT F. KENNEDY JR.,<br>Secretary, United States Department<br>of Health and Human Services, *et al.*,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br>Civil Action No. 1:26-cv-00737-RC |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY AND PERMANENT INJUNCTION**

Lynn Estes Calkins (DC Bar No. 445854)
Zachary P. Lundgren (DC Bar No. 90012330)
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Phone: (202) 955-3000
lynn.calkins@hklaw.com
zachary.lundgren@hklaw.com

Andrew Solinger (DC Bar No. 1014742)
511 Union Street, Suite 2700
Nashville, TN 37219
Phone: (615) 850-8062
andrew.solinger@hklaw.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... iv

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

A. What Is Non-Melanoma Skin Cancer ("Cancer")? ..... 2

B. What Is Image-Guided Superficial Radiation Therapy ("the Treatment")? ..... 3

C. Who Needs the Treatment? ..... 4

D. SkinCure's Treatment Services. ..... 4

E. PatientsACT's Interest in the Treatment. ..... 5

F. Individual Plaintiffs' Need for the Treatment. ..... 6

STATUTORY AND REGULATORY BACKGROUND ..... 8

A. Medicare Reimbursement Generally. ..... 8

B. Coverage and Reimbursement for the Treatment. ..... 8

C. Challenged Portions of 2026 MPFS Rule. ..... 9

D. The Final LCDs at Issue. ..... 10

E. The Billing Articles at Issue. ..... 11

STANDARD OF REVIEW ..... 12

JURISDICTION AND STANDING ..... 13

A. Suit Is Properly Brought in this Court. ..... 13

B. Plaintiffs Have Standing. ..... 13

C. The Medicare Act's Channeling Requirement Does Not Preclude Review Because SkinCure and PatientsACT Cannot Channel These Claims Through the Agency and Lack Conceivable Proxies Who Could. ..... 14

D. Plaintiffs' Claims Are Not Precluded. ..... 16

ARGUMENT ..... 19

I. Plaintiffs Are Likely to Succeed on Their Challenges to the Agency's Action. ..... 19

A. The Agency Used Unauthorized Criteria to Develop the Rule and the LCDs and Thus Engaged in *Ultra Vires* Action. ..... 19

1. The Final Rule Is *Ultra Vires*. ..... 20

2. The LCDs and Billing Articles Are *Ultra Vires*. ..... 23

B. The Rule and the LCDs Depart from Agency Guidelines and Precedent and Are Thus Arbitrary and Capricious in Violation of 5 U.S.C. § 706(2)(A). ..... 26

1. The Final Rule Departs from Agency Guidelines and Precedent by Ignoring Prior Decisions, Adopting an OPPS Model, and Depressing CPT Code Valuations and Is Thus Arbitrary and Capricious.......................... 27

2. The Final LCDs and Billing Articles Depart from Agency Guidelines and Precedent by Requiring RCTs and Are Thus Arbitrary and Capricious. ......................................................................................... 28

3. The Final LCDs Depart from Agency Guidelines and Precedent in Regulating Practice Scopes and Are Thus Arbitrary and Capricious............. 31

C. The Agency Enacted a Coordinated National Coverage Policy That Circumvented the Required Regulatory Frameworks. .......................................... 33

1. The LCDs and Billing Articles Are "Substantive Legal Standards" Requiring Formal Notice and Comment Under § 1395hh(b)(1). .................. 33

2. Alternatively, the LCDs Are De Facto NCDs. ............................................... 34

3. The LCDs Should Have Been Enacted Under the CED Framework............. 36

4. This Coordinated Change to National Coverage Policy Was at the Agency's Direction and Was Arbitrary and Capricious. ................................ 37

D. This National Coverage Policy Denies Coverage for "Reasonable and Necessary" Medical Items and Thus Violates the APA and Medicare Act............. 41

II. The Agency's Change to National Coverage Policy Will Irreparably Harm Plaintiffs............................................................................................................ 43

III. The Balance of Equities Supports the Relief Sought, and the Relief Will Not Disserve the Public Interest. ...................................................................................... 44

CONCLUSION.......................................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agendia, Inc. v. Becerra*,
420 F. Supp. 3d 985 (C.D. Cal. 2019) ....................34

*Aid Ass'n for Lutherans v. USPS*,
321 F.3d 1166 (D.C. Cir. 2003) ....................18

*Am. Chiropractic Ass'n, Inc. v. Leavitt*,
431 F.3d 812 (D.C. Cir. 2005) ....................16

*Am. Hosp. Ass'n v. Azar*,
895 F.3d 822 (D.C. Cir. 2018) ....................14, 22

**Am. Hosp. Ass'n v. Azar*,
964 F.3d 1230 (D.C. Cir. 2020) ....................18, 19

**Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) ....................16, 17, 22, 23

*Am. Soc'y of Cataract & Refractive Surgery v. Thompson*,
279 F.3d 447 (7th Cir. 2002) ....................17

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ....................27, 32, 33

**Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) ....................17, 18

*Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*,
721 F.3d 666 (D.C. Cir. 2013) ....................20

*Associated Builders & Contractors, Inc. v. Reich*,
922 F. Supp. 676 (D.D.C. 1996) ....................35

*Azar v. Allina Health Servs.* (*Allina*),
587 U.S. 566 (2019) ....................33, 34

*Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ....................42

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ....................15

*Brock v. Cathedral Bluffs Shale Oil Co.*,
796 F.2d 533 (D.C. Cir. 1986) ........................................ 35

*Campaign Legal Ctr. v. Fed. Election Comm'n*,
466 F. Supp. 3d 141 (D.D.C. 2020) ........................................ 12

*Can-Am Plumbing, Inc. v. NLRB*,
321 F.3d 145 (D.C. Cir. 2003) ........................................ 22

*Cigar Ass'n of Am. v. FDA*,
480 F. Supp. 3d 256 (D.D.C. 2020) ........................................ 40

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ........................................ 19, 23

*Connecticut v. U.S. Dep't of the Interior*,
363 F. Supp. 3d 45 (D.D.C. 2019) ........................................ 39

**Council for Urological Ints. v. Sebelius*,
668 F.3d 704 (D.C. Cir. 2011) ........................................ 14, 15, 16

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019) ........................................ 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........................................ 26, 27, 28

*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) ........................................ 39

*District of Columbia v. USDA*,
444 F. Supp. 3d 1 (D.D.C. 2020) ........................................ 43

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ........................................ 28

*Env't Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021) ........................................ 27, 38

**FCC v. Fox Television Stations, Inc.* (*Fox I*),
556 U.S. 502 (2009) ........................................ *passim*

*FCC v. Fox Television Stations, Inc.* (*Fox II*),
567 U.S. 239 (2012) ........................................ 24, 25

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................ 12

*Fox v. Clinton*,
684 F.3d 67 (D.C. Cir. 2012) ....................................................................................32

*Furlong v. Shalala*,
No. 94-cv-4817, 1996 WL 393526 (S.D.N.Y. July 12, 1996)..............................................17

*Garcia v. Texas State Bd. of Med. Examiners*,
384 F. Supp. 434 (W.D. Tex. 1974)...............................................................................26

*Gonzales v. Oregon*,
546 U.S. 243 (2006)........................................................................................................26

*Hays v. Leavitt*,
538 F. Supp. 2d 62 (D.D.C. 2008) ..................................................................................38

*Howard v. Pritzker*,
775 F.3d 430 (D.C. Cir. 2015) ........................................................................................22

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
613 F.3d 1112 (D.D.C. 2010) ..........................................................................................12

*Kort v. Burwell*,
209 F. Supp. 3d 98 (D.D.C. 2016) ...................................................................................31

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986).........................................................................................................19

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......................................................................................44, 45

*Leedom v. Kyne*,
358 U.S. 184 (1958).........................................................................................................19

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*,
741 F.3d 1309 (D.C. Cir. 2014) .......................................................................................40

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).......................................................................................19, 20, 38, 43

*Luokung Tech. Co. v. Dep't of Def.*,
538 F. Supp. 3d 174 (D.D.C. 2021) .................................................................................29

*Mathews v. Eldridge*,
424 U.S. 319 (1976).........................................................................................................15

*Minney v. OPM.*,
130 F. Supp. 3d 225 (D.D.C. 2015) .................................................................................44

*U.S. ex rel. Modglin v. DJO Glob. Inc.*,
48 F. Supp. 3d 1362 (C.D. Cal. 2014) ....................30

*Monument Realty LLC v. Wash. Metro. Area Transit Auth.*,
540 F. Supp. 2d 66 (D.D.C. 2008) ....................43

**Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (*State Farm*),
463 U.S. 29 (1983) .................... *passim*

*Nat'l Women's Law Ctr. v. OPM*,
358 F. Supp. 3d 66 (D.D.C. 2019) ....................38

*Nissan Chem. Co. v. FDA*,
744 F. Supp. 3d 1 (D.D.C. 2024) ....................24, 25

*Nken v. Holder*,
556 U.S. 418 (2009) ....................44

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*,
No. 25-cv-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ....................24, 25

*POM Wonderful, LLC v. FTC*,
777 F.3d 478 (D.C. Cir. 2015) ....................30

*Porzecanski v. Azar*,
943 F.3d 472 (D.D.C. 2019) ....................33

*Powderly v. Schweiker*,
704 F.2d 1091 (9th Cir. 1983) ....................33

*Prof'ls & Patients for Customized Care v. Shalala*,
56 F.3d 592 (5th Cir. 1995) ....................36

*R.J. Reynolds Vapor Co. v. FDA*,
65 F.4th 182 (5th Cir. 2023) ....................31

*Risteen v. Youth For Understanding, Inc.*,
245 F. Supp. 2d 1 (D.D.C. 2002) ....................44

*Ritter Transp. Inc. v. Interstate Com. Comm'n*,
684 F.2d 86 (D.C. Cir. 1982) ....................12

**Shalala v. Ill. Council on Long Term Care, Inc.* (*Ill. Council*),
529 U.S. 1 (2000) ....................14, 15, 16

*Smith v. Berryhill*,
587 U.S. 471 (2019) ....................15

*In re Subpoena No. 25-1431-014*,
No. 25-cv-0039, --F. Supp. 3d --, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) ....................26

*U.S. Telecom Ass'n v. FCC*,
359 F.3d 554 (D.C. Cir. 2004) ....................20

*United States v. Bayer Co.*,
No. 07-cv-0001, 2015 WL 5822595 (D.N.J. Sept. 24, 2015) ....................30

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001) ....................22

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) ....................28

*Wilson v. Grp. Hosp. & Med. Servs., Inc.*,
791 F. Supp. 309 (D.D.C. 1992) ....................44

*Zahl v. Harper*,
282 F.3d 204 (3d Cir. 2002) ....................26

**Statutes**

5 U.S.C. § 705 ....................43

5 U.S.C. § 706 .................... *passim*

28 U.S.C. § 1331 ....................13, 14, 15

28 U.S.C. § 1361 ....................13

28 U.S.C. § 1391(e) ....................13

28 U.S.C. § 2201 ....................13

28 U.S.C. § 2202 ....................13

42 U.S.C. § 405 ....................14, 15, 16

42 U.S.C. § 1320b–12 ....................36

42 U.S.C. § 1394x(r) ....................25

42 U.S.C. § 1395ff .................... *passim*

42 U.S.C. § 1395ii ....................14

42 U.S.C. § 1395kk-1(a)(4) ....................23, 35

42 U.S.C. § 1395*l* ........ 8, 18, 21

42 U.S.C. § 1395w-4 ........ *passim*

42 U.S.C. § 1395y ........ *passim*

**Other Authorities**

42 C.F.R. § 405.906(a) ........ 15

42 C.F.R. § 405.912(a) ........ 15

42 C.F.R. § 410.20(b) ........ 25

42 C.F.R § 414.22(a)(1) ........ 21

78 Fed. Reg. 48164 (Aug. 7, 2013) ........ 36, 37

90 Fed. Reg. 32352 (July 16, 2025) ........ 9, 38

90 Fed. Reg. 49266 (Nov. 5, 2025) ........ *passim*

Aaron S. Farberg et al., *Freedom from Recurrence Across Age in Non-Melanoma Skin Cancer Treated with Image-Guided Superficial Radiation Therapy*, 9(5) Geriatrics 114, 115–16 (2024), https://doi.org/10.3390/geriatrics9050114 ........ 2

Alison Tran et al., *Old Solutions May Be the New Answer: How the Use of Modern Superficial Radiation Therapy Might Address Disparities in Dermatologic Care*, 4(4) J. Dermatol & Skin Sci. 6, 7 (2022), https://doi.org/10.29245/2767-5092/2022/4.1165 ........ 2

Am. Soc'y for Radiation Oncology, *Multi-Jurisdictional Superficial Radiation Therapy (SRT) Proposed LCD Released*, https://www.astro.org/news-and-publications/what-is-happening-in-washington/2025/multi-jurisdictional-superficial-radiation-therapy-(srt)-proposed-lcd-released ........ 35

Award of MAC Contract for Jurisdictions 5, 6, 8, 15, E, F, J, K, M, https://www.cms.gov/medicare/coding-billing/medicare-administrative-contractors-macs/who-are-macs ........ 35

Erin M. McClure et al., *Image-Guided Radiation Therapy Is Equally Effective for Basal and Squamous Cell Carcinoma*, 11(4) Dermatopathology 315, 319 (2024), https://doi.org/10.3390/dermatopathology11040033 ........ 3

Erin M. McClure et al., *Image-Guided Superficial Radiation Therapy Has Superior 2-Year Recurrence Probability to Mohs Micrographic Surgery*, 43 Clinical & Translational Radiation Oncology 1, 2–3 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10539860/ ........ 3

Lio Yu et al., *The Treatment of Non-Melanoma Skin Cancer with Image-Guided Superficial Radiation Therapy: An Analysis of 2917 Invasive and In Situ Keratinocytic Carcinoma Lesions*, 9(1) Oncology Therapy 153, 157 (2021), https://doi.org/10.1007/s40487-021-00138-4 ....................3

U.S. Food & Drug Admin., *510(k) Premarket Notification No. K150037, Sensus Healthcare Superficial X-ray Radiation Therapy System with Ultrasonic Imaging Capabilities* (Oct. 16, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf15/K150037.pdf ....................2

## INTRODUCTION

This suit challenges a coordinated, nationwide shift in Medicare policy that seeks to eliminate coverage for Image-Guided Superficial Radiation Therapy ("IGSRT" or "Treatment")—a vital, innovative treatment for non-melanoma skin cancer ("NMSC" or "Cancer") that has cured hundreds of patients.

Through portions of the U.S. Department of Health and Human Service's ("HHS") 2026 Physician Fee Schedule Rule ("Final Rule"), five Local Coverage Determinations ("LCDs") regarding the Treatment's medical reasonableness and necessity ("Final LCDs"), and five proposed billing and coding articles applicable to the Treatment ("Billing Articles") (together, the "Agency's Action"), HHS suddenly and unjustifiably seeks to reverse longstanding Medicare policy. Acting through the coordinated efforts of HHS, the Center for Medicare & Medicaid Services ("CMS"), and CMS's Medicare Administrative Contractors ("MACs") (collectively, the "Agency"), the Agency has abruptly adopted a new, coordinated national coverage policy that unlawfully seeks to eliminate coverage for a proven Cancer-curing therapy.

To date, in stark contrast to the Agency's Action, thirty decisions by Qualified Independent Contractors ("QIC") and Administrative Law Judges ("ALJ") have already affirmed that the Treatment is medically reasonable and necessary for the treatment of Cancer. And, despite numerous administrative decisions finding that the Treatment qualifies for Medicare coverage, after substantial lobbying efforts, the Agency decided to implement a change to national coverage policy through portions of the Final Rule and thereafter through MAC-issued Final LCDs and Billing Articles.

The Agency's Action functions as a targeted, sweeping, change to national coverage policy that seeks to drive this life-saving Cancer-cure out of the Medicare market and reverse the thirty

Agency decisions that have already determined that the Treatment is medically reasonable and necessary and should receive Medicare coverage. It is arbitrary and capricious and is beyond the Agency's statutory authority. Plaintiffs are likely to prevail on their challenge to the Agency's Action; Plaintiffs will suffer serious and irreparable harm absent the preliminary relief sought; the balance of equities favors preliminary relief; and such relief would advance the public interest. Accordingly, the requested stay and preliminary and permanent injunctive relief is proper.

## FACTUAL BACKGROUND

### A. What Is Non-Melanoma Skin Cancer ("Cancer")?

NMSC is a group of skin malignancies primarily consisting of basal cell carcinoma and squamous cell carcinoma, which together are the most common cancers in the United States and continue to increase in incidence. Exhibit A, Declaration of Dr. Daniel J. Ladd, Jr., ¶ 3. Its increasing incidence, delayed detection in older patients, and risks of tissue destruction, morbidity, and impaired quality of life if not appropriately treated, make Cancer a growing public health concern, the burden of which is expected to grow by at least 1.5 times from 2020 to 2044. *Id.*[1]

By 1975, over half of North American dermatology offices offered superficial radiation therapy ("SRT") for Cancer. *Id.*[2] In 2015, the U.S. Food and Drug Administration ("FDA") cleared the SRT-100 Vision™ device, integrating High Resolution Ultrasound ("HRUS") imaging with SRT and introducing the Treatment. *Id.* ¶ 5.[3]

---

[1] Aaron S. Farberg et al., *Freedom from Recurrence Across Age in Non-Melanoma Skin Cancer Treated with Image-Guided Superficial Radiation Therapy*, 9(5) Geriatrics 114, 115–16 (2024), https://doi.org/10.3390/geriatrics9050114.

[2] Alison Tran et al., *Old Solutions May Be the New Answer: How the Use of Modern Superficial Radiation Therapy Might Address Disparities in Dermatologic Care*, 4(4) J. Dermatol & Skin Sci. 6, 7 (2022), https://doi.org/10.29245/2767-5092/2022/4.1165.

[3] *See* U.S. Food & Drug Admin., *510(k) Premarket Notification No. K150037, Sensus Healthcare Superficial X-ray Radiation Therapy System with Ultrasonic Imaging Capabilities* (Oct. 16, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf15/K150037.pdf.

### B. What Is Image-Guided Superficial Radiation Therapy ("the Treatment")?

The Treatment is a non-surgical skin cancer therapy delivered with the SRT 100 Vision™ device, which combines low-energy radiation with HRUS imaging and achieves ***cure rates exceeding 99%***.[4] HRUS is performed before each cycle of the Treatment and at every fraction, colloquially referred to as sessions, so that clinicians can monitor tumor response and adjust the therapy plan, which is required in a substantial share of cases. Ex. A ¶¶ 6–7.[5]

While surgical options such as Mohs Micrographic Surgery ("Mohs") are effective, they are often unavailable in rural and underserved areas and unsuitable for older adults, patients with comorbidities, those on blood thinners, or those with tumors in cosmetically or functionally sensitive areas. For these patients, a nonsurgical, office-based alternative is medically necessary, making the Agency's coordinated change to national coverage policy an effective denial of Cancer treatment for large segments of the Medicare population.

Peer-reviewed studies using fraction-by-fraction HRUS report tumor control rates above 99%, superior efficacy to non-image-guided radiation, and cure rates comparable to or better than Mohs for early-stage disease, with improved cosmetic outcomes and lower toxicity. Ex. A ¶¶ 6–7, 9.[6] [7] All published studies employ HRUS at every treatment session, and no evidence supports less frequent imaging—a conclusion reinforced by decisions from thirty QICs and ALJs finding the Treatment medically reasonable and necessary.

---

[4] Erin M. McClure et al., *Image-Guided Radiation Therapy Is Equally Effective for Basal and Squamous Cell Carcinoma*, 11(4) Dermatopathology 315, 319 (2024), https://doi.org/10.3390/dermatopathology11040033.

[5] Lio Yu et al., *The Treatment of Non-Melanoma Skin Cancer with Image-Guided Superficial Radiation Therapy: An Analysis of 2917 Invasive and In Situ Keratinocytic Carcinoma Lesions*, 9(1) Oncology Therapy 153, 157 (2021), https://doi.org/10.1007/s40487-021-00138-4.

[6] Farberg, *supra* note 1; McClure, *supra* note 4.

[7] Erin M. McClure et al., *Image-Guided Superficial Radiation Therapy Has Superior 2-Year Recurrence Probability to Mohs Micrographic Surgery*, 43 Clinical & Translational Radiation Oncology 1, 2–3 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10539860/.

### C. Who Needs the Treatment?

The Treatment is recommended for (a) patients for whom surgery is contraindicated, impracticable, or undesirable and (b) lesions located on cosmetically or functionally sensitive anatomic sites like the face, head, and neck. Ex. A ¶ 10.[8] The Treatment is especially beneficial for elderly patients, individuals with multiple medical comorbidities, patients on blood thinners, patients with impaired wound healing, and patients who prefer to avoid surgery or have "surgical fatigue" from repeat Mohs procedures. *Id.* ¶ 11.[9] While Mohs is an effective Cancer therapy, more than 80% of U.S. counties lack a single Mohs surgeon, and 95% of Medicare beneficiaries living in rural counties lack Mohs access. *Id* ¶ 12.

The Treatment is predominantly used by Medicare beneficiaries and is rapidly expanding, with Medicare Part B claims showing approximately 50% annual growth compared to about 6% for Mohs. *Id.* ¶ 13. Claims data further show that the Treatment is overwhelmingly delivered by dermatologists in office-based settings—approximately 96% of claims are attributable to dermatologists and other skin specialists, with fewer than 2% billed by radiation oncologists—thereby expanding access to effective Cancer treatment without requiring travel to hospital-based cancer centers. *Id.* ¶ 14.

### D. SkinCure's Treatment Services.

SkinCure is the nation's leading provider of management and administrative services supporting dermatology practices that deliver the Treatment. Exhibit B, Declaration of Kerwin Brandt, ¶ 3. SkinCure's services are designed to meet the advanced care needs of elderly, medically complex, and mobility-limited patients. *Id.* ¶ 6. For these vulnerable populations, access to office-based, non-invasive Cancer therapy is essential. *Id.* ¶ 7.

---

[8] Farberg, *supra* note 1, at 115–16.
[9] Yu, *supra* note 5, at 530.

SkinCure provides non-clinical management and administrative support for the Treatment, including leasing the FDA-cleared SRT-100 Vision™ device, constructing shielded treatment suites, ensuring regulatory compliance, staffing certified radiation therapists, and facilitating radiation-oncology consultation. *Id.* ¶ 8. SkinCure does not provide clinical care or bill for medical services; all Treatment procedures are performed by its dermatology practice partners. *Id.*

Through a network of more than 434 dermatology practices and 900 clinicians, SkinCure has supported treatment for over 138,000 patients and the cure of more than 185,000 Cancer lesions. *Id.* ¶ 9. This model requires substantial capital investment in equipment, facilities, maintenance, and quality assurance, supported by more than 700 employees, and enables community practices to offer the Treatment locally. *Id.* ¶¶ 5, 10.

**E. PatientsACT's Interest in the Treatment.**

PatientsACT is a nonprofit national patient advocacy organization whose core mission is to educate and advocate for patients' safety rights and freedom of choice in treatment options. Exhibit C, Declaration of Matthew Bassett ¶ 4. PatientsACT is committed to ensuring that every individual has access to high-quality, medically appropriate care and the right to make informed decisions about their healthcare. *Id.* PatientsACT represents thousands of patients across the United States, a substantial portion of whom are Medicare beneficiaries who suffer from conditions for which the Treatment is a medically necessary treatment. *Id.* ¶ 7.

The Agency's Action directly frustrates PatientsACT's core mission by eliminating coverage for a critical, non-invasive treatment option, thereby undermining patients' freedom of choice and access to optimal care. *Id.* ¶ 16. Without Medicare coverage, many providers will cease to offer the Treatment, and many of the patients that PatientsACT represents—often elderly individuals on fixed incomes who are poor surgical candidates—will be unable to afford this therapy, effectively denying them access to medically necessary care. *Id.* ¶¶ 19, 22, 24-25.

**F. Individual Plaintiffs' Need for the Treatment.**

The individual Plaintiffs are Medicare beneficiaries who (1) have been diagnosed with Cancer, (2) are medically poor candidates for surgery, and (3) need both a reasonable and non-invasive treatment option. *See* Exhibits D–I, Declarations of Individual Plaintiffs. Because the Final Rule became effective on January 1, 2026 and the Final LCDs became effective on March 1, 2026, Mr. Allard (Wyoming, Noridian), Mr. Carney (Massachusetts, NGS), Ms. Crum (Nevada, Noridian), Mr. DeBacker (Michigan, WPS), Mr. Phelps (Illinois, NGS), and Mr. Smith (Florida) each face imminent coverage loss or disruption of ongoing or future cycles of care.[10] *Id.*

[redacted]

[redacted]

[10] The LCDs were issued by: (1) CGS Administrators, LLC ("CGS") (L40179, Jurisdiction 15); (2) National Government Services, Inc. ("NGS") (L40168, Jurisdictions 06, K); (3) Noridian Healthcare Solutions, LLC ("Noridian") (L40176, Jurisdictions E, F); (4) Palmetto GBA ("Palmetto") (L40189, Jurisdictions J, M); and (5) Wisconsin Physicians Service Insurance Corporation and its Government Health Administrators division ("WPS") (L40193, Jurisdictions 05, 08).

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

## STATUTORY AND REGULATORY BACKGROUND

### A. Medicare Reimbursement Generally.

The Medicare Act, 42 U.S.C. §§ 1395 *et seq.*, establishes a system of health insurance for the aged and disabled. Under the Medicare Act, eligible beneficiaries are entitled to payment for medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). Physicians are paid for professional services under the Medicare Physician Fee Schedule ("MPFS"), established annually by regulation. *See* 42 U.S.C. § 1395w-4. Hospitals are paid separate, predetermined rates under the Outpatient Prospective Payment System ("OPPS")—not reimbursed under the MPFS. *See* 42 U.S.C. § 1395*l*.

### B. Coverage and Reimbursement for the Treatment.

Before the Agency Action challenged here, neither CMS nor any MAC had issued a national coverage decision ("NCD") or LCD governing the Treatment. Instead, contractors applied the statutory "reasonable and necessary" standard under 42 U.S.C. § 1395y(a)(1)(A) on a claim-by-claim basis. To do so, contractors, under CMS guidance, assessed whether a service is "reasonable and necessary" by determining whether it is safe and effective, not experimental or investigational, and appropriate in duration and frequency. *See* Medicare Program Integrity

Manual (CMS Pub. 100-08), Ch. 3, § 3.6.2.2; *see also* 42 U.S.C. § 1395y(a)(1)(A). At least eighteen decisions by QICs over the past five years have found the Treatment to be medically reasonable and necessary, and, in 2025 and 2026, at least twelve ALJs issued fully favorable decisions affirming Medicare coverage for the Treatment.

**C. Challenged Portions of 2026 MPFS Rule.**

On July 16, 2025, the Agency issued proposed rule CMS-1832-P (the "Proposed Rule"), 90 Fed. Reg. 32352, which sought to consolidate the Treatment, SRT, electronic brachytherapy, and orthovoltage X-ray therapy into a single "surface radiation therapy" code family, despite material differences in clinical protocols, imaging requirements, resources and cost, and patient outcomes. To implement this consolidation, the Agency introduced four new current procedural technology ("CPT") codes—77436 (treatment planning/simulation), 77437 (superficial delivery <150 kV), 77438 (orthovoltage delivery >150-500 kV), and 77439 (ultrasound image guidance)—with codes 77436, 77437, and 77439 replacing existing Treatment planning, Treatment delivery, and ultrasound imaging codes. The Agency relied on survey data from the American Medical Association's ("AMA") Specialty Society Relative Value Scale Update Committee ("RUC"), that did not reflect typical office-based practice, used OPPS hospital cost proxies instead of direct practice-expense data, and bundled the technical component of ultrasound image guidance into the delivery codes, limiting ultrasound to a once-per-course add-on, despite the Treatment's per-fraction imaging requirements and materially different clinical workflow and resources.

SkinCure, PatientsACT, and other stakeholders submitted comments explaining that the Proposed Rule: (1) collapses clinically distinct technologies, (2) underrepresents the work and cost of the Treatment, (3) rests on a procedurally flawed CPT/RUC process and inappropriate hospital-based valuation for an almost entirely office-based therapy, and (5) would seriously Medicare

patients.[11] Stakeholders provided clinical evidence, workflow descriptions, and cost data showing that the proposed payment would not cover the actual cost of delivering the Treatment.

In the Final Rule issued on October 31, 2025, the Agency did not cure these defects, address evidence that the Treatment is clinically and operationally distinct, nor explain its disregard of office-based dermatology practice patterns and resource requirements. 90 Fed. Reg. 49266 (Nov. 5, 2025). Instead, it adhered to OPPS-based valuation and a consolidated code structure, even while acknowledging that the Treatment and SRT are "infrequently provided in the hospital setting." 90 Fed. Reg. at 49387. This procedurally and substantively deficient decision threatens to eliminate access to a safe, effective, and widely used Cancer therapy.

**D. The Final LCDs at Issue.**

Thereafter, on May 15, 2025, five MACs—CGS, NGS, Noridian, Palmetto, and WPS—posted virtually identical proposed LCDs addressing Medicare coverage for the Treatment, titled "Superficial Radiation Therapy (SRT) for the Treatment of Nonmelanoma Skin Cancers." *See* DL40168, DL40176, DL40179, DL40189, DL40193.[12] The proposed LCDs effectively eliminated the Treatment by deeming HRUS-guided SRT not reasonable and necessary, viewing the Treatment as interchangeable with non-image-guided SRT and electronic brachytherapy, restricting coverage to narrow categories of nonsurgical candidates, and imposing provider-qualification requirements that shift the Treatment away from office-based dermatology practices.

[11] SkinCure's comment letters were signed by its CEO Kerwin Brandt and are designated as Comment ID CMS-2025-0304-13215 and Comment ID CMS-2025-0304-13226. Exhibit B, Brandt Dec., ¶ 16 and Ex. A.

[12] The Proposed LCDs were issued by: (1) CGS Administrators, LLC ("CGS") (DL40179, Jurisdiction 15); (2) National Government Services, Inc. ("NGS") (DL40168, Jurisdictions 06, K); (3) Noridian Healthcare Solutions, LLC ("Noridian") (DL40176, Jurisdictions E, F); (4) Palmetto GBA ("Palmetto") (DL40189, Jurisdictions J, M); and (5) Wisconsin Physicians Service Insurance Corporation and its Government Health Administrators division ("WPS") (DL40193, Jurisdictions 05, 08).

During the notice and comment period, SkinCure and PatientsACT submitted comprehensive comments explaining that the MACs (1) ignored peer-reviewed evidence; (2) relied on flawed and outdated data, including Likhacheva et al. (2019), that does not address the Treatment or HRUS; (3) failed to recognize HRUS's clinical necessity; (4) imposed a de facto RCT requirement; (5) mischaracterized the lesions treatable with the Treatment; (6) included provider qualification language that would shift the Treatment out of dermatology settings, contrary to the LCDs' own National Coverage Policy language; and (7) failed to account for the resulting harm to patients if Medicare coverage were withdrawn.

Despite these detailed comments, the MACs finalized the LCDs without material change, retaining the same categorical denial of HRUS imaging, arbitrary coverage restrictions, and restrictive provider-qualification requirements, notwithstanding cursory responses and nominal bibliography expansions.[13] Substantially identical across jurisdictions, the Final LCDs reflect a coordinated policy choice that perpetuates the same clinical, legal, and procedural defects and replaces case-by-case "reasonable and necessary" determinations under § 1862(a)(1)(A).

**E. The Billing Articles at Issue.**

The five MACs also issued proposed Billing Articles, further compounding the refusal to cover and reimburse for the Treatment. Billing articles are supplemental documents that provide guidance, billing instructions, and other non-clinical clarifications to support an LCD's implementation, but do not create coverage policy. Billing articles apply to claim submission and reimbursement. The Billing Articles categorically designate CPT code 77439—the new code for HRUS imaging—as "not medically reasonable or necessary (non-covered)." This determination

[13] The Final LCDs were issued by: (1) CGS (L40179, Jurisdiction 15); (2) NGS (L40168, Jurisdictions 06, K); (3) Noridian (L40176, Jurisdictions E, F); (4) Palmetto (L40189, Jurisdictions J, M); and (5) WPS (L40193, Jurisdictions 05, 08).

implements and operationalizes the Final LCDs' coverage restrictions, eliminating any possibility of Medicare coverage for HRUS imaging, and therefore the Treatment itself.

**STANDARD OF REVIEW**

Under the APA, courts are "require[d] . . . to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.D.C. 2010) (quoting 5 U.S.C. § 706(2)(A)); *see also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("[A]gency action must be reasonable and reasonably explained.").

Under arbitrary and capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "Agency action is arbitrary and capricious if, for example, the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Campaign Legal Ctr. v. Fed. Election Comm'n*, 466 F. Supp. 3d 141, 156 (D.D.C. 2020) (quoting *State Farm*, 463 U.S. at 43).

In reviewing an agency's explanation for the action taken, "the reviewing court 'must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment.'" *Ritter Transp. Inc. v. Interstate Com. Comm'n*, 684 F.2d 86, 88 (D.C. Cir. 1982) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). A court shall find that an agency has violated its duties when it failed to "cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48–49.

## JURISDICTION AND STANDING

### A. Suit Is Properly Brought in this Court.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201–2202, the Social Security Act and the Medicare Act, 42 U.S.C. § 1395ff(f)(3), and the APA, 5 U.S.C. §§ 701–706. Plaintiffs' claims are properly subject to judicial review pursuant to 42 U.S.C. § 1395ff(f)(3) because there are no material issues of fact in dispute and the only issue of law is the validity of the challenged portions of the 2026 MPFS Rule, the LCDs, and the Billing Articles. Venue is also proper in this Court under 28 U.S.C. § 1391(e), because Defendants reside in the District of Columbia and the challenged portions of the Rule and the LCDs affect a substantial number of individuals and businesses in this District.

### B. Plaintiffs Have Standing.

Plaintiffs have standing to challenge the Agency's Action because their health, well-being, and business is being thwarted and they are incurring injuries as a result:

(1) SkinCure is the nation's leading provider of management and administrative services supporting dermatology practices that deliver Cancer Treatment. SkinCure's model depends on community dermatology practices' ability to deliver the Treatment with HRUS imaging. The Agency's Action will predictably reduce use, strand substantial fixed investments (equipment, shielded suites, trained staff), and destabilize SkinCure's practice-support operations. To date, SkinCure has already had to terminate 60 employees and expects additional layoffs if the Agency's Action is permitted to take effect. *See* Exhibit J, Declaration of Perry Baker, ¶ 18.

(2) PatientsACT is a national patient advocacy organization committed to ensuring that every individual has access to high-quality, medically appropriate care and the right to make informed decisions about their healthcare. The Agency's Action will impair PatientsACT's mission and frustrate its advocacy efforts on behalf of Medicare beneficiaries nationwide who

desperately need access to the Treatment and will either have to forgo treatment or undertake more dangerous treatment and less favorable options.

(3) Each individual Plaintiff is an individual enrolled under Medicare Part B in need of the Treatment, which the Agency's Action will exclude from coverage. 42 U.S.C. § 1395ff(f)(5). Each individual Plaintiff has previously undergone successful cycles of the Treatment which have each time eradicated the identified Cancer. Due to the ongoing nature of the disease, many of the individual Plaintiffs will require further Treatment cycles. As a result of this change to national coverage policy, the Treatment will no longer be covered and thus the individual Plaintiffs' ability to obtain the treatment that is reasonable and necessary for their recovery is thwarted.

### C. The Medicare Act's Channeling Requirement Does Not Preclude Review Because SkinCure and PatientsACT Cannot Channel These Claims Through the Agency and Lack Conceivable Proxies Who Could.

Certain claims related to the Medicare Act must be "channeled" through the Agency before they can be challenged in federal court. *Council for Urological Ints. v. Sebelius*, 668 F.3d 704, 706 (D.C. Cir. 2011). This requirement is set forth in 42 U.S.C. §§ 405(g) and (h).[14]

Section 405(g) is the Medicare Act's judicial review provision, and it authorizes judicial review of "any final decision of the [Secretary] made after a hearing." 42 U.S.C. § 405(g); *Shalala v. Ill. Council on Long Term Care, Inc.* (*Ill. Council*), 529 U.S. 1, 20 (2000). Section 405(h), in turn, channels claims into section 405(g), making section 405(g) the "exclusive" judicial review method for claims "arising under" the Medicare Act and barring review under 28 U.S.C. §§ 1331 or 1346. 42 U.S.C. §§ 405(h), 1395ii; *Ill. Council*, 529 U.S. at 10.

When it applies, the channeling requirement has two sub-requirements—the presentment

[14] The channeling requirement is codified in the Social Security Act, 42 U.S.C. §§ 405(g) and (h), but Congress later incorporated Sections 405(g) and 405(h) into the Medicare Act at 42 U.S.C. §§ 1395ff(b)(1)(A) and 1395ii. *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018).

requirement and the exhaustion requirement. *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976). Presentment is "a jurisdictional requirement that claims be presented to the agency," and this requirement cannot be waived, although it is subject to an important exception clarified in *Illinois Council*. *Smith v. Berryhill*, 587 U.S. 471, 478 (2019); *Mathews*, 424 U.S. at 328. Exhaustion, on the other hand, is "a waivable requirement that the administrative remedies prescribed by the Secretary be exhausted." *Berryhill*, 587 U.S. at 478.

"[T]he Supreme Court has . . . held that section 405(h)'s 'channeling requirement' is not absolute." *Council for Urological Ints.*, 668 F.3d at 707. In *Bowen v. Michigan Academy of Family Physicians*, the Court allowed the plaintiffs challenge to Medicare Part B regulations to proceed under section 1331 when, at that time, there was no avenue for the plaintiff to challenge the regulations under the Medicare Act, and applying section 405(h) would have meant "no review at all of substantial statutory and constitutional challenges" to those regulations. 476 U.S. 667, 670 (1986). Proceeding from "the strong presumption that Congress intends judicial review of administrative action," *id.*, the Court found it "implausible to think [that Congress] intended that there be *no* forum to adjudicate statutory and constitutional challenges to regulations promulgated by the Secretary," *id.* at 678; *see also Ill. Council*, 529 U.S. at 17 (holding section 405(h) inapplicable to Medicare Act claims "where its application . . . would not lead to a channeling of review through the agency, but would mean no review at all").

Here, SkinCure and PatientsACT undoubtedly cannot "channel" their claims through the agency because the administrative review process is not available to them. Medicare beneficiaries and providers are typically the only "parties" that can seek administrative review of Medicare determinations. 42 C.F.R. §§ 405.906(a), 405.912(a); *Council for Urological Ints.*, 668 F.3d at 707. Because SkinCure and PatientsACT are unable to seek administrative review of their claims,

applying section 405(h) "would mean no review at all," and the channeling requirement therefore does not apply to SkinCure's or PatientsACT's claims. *Ill. Council*, 529 U.S. at 22–23.

Even if this Court concluded that the channeling requirement applies to SkinCure and PatientsACT, it would not bar their claims here. The D.C. Circuit has recognized that, in limited situations, the Medicare channeling requirement might apply to parties that cannot pursue administrative appeals. *Council for Urological Ints.*, 668 F.3d at 707–09; *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816–18 (D.C. Cir. 2005). That situation exists if a third party or proxy with similar interests exercised its appeal rights and if that claim could potentially be assigned to the non-appealing party. *Council for Urological Ints.*, 668 F.3d at 707–09; *Am. Chiropractic Ass'n*, 431 F.3d at 816–18. In such a situation, the *Illinois Council* exception may not apply. *Am. Chiropractic Ass'n*, at 816–18; *Council for Urological Ints.*, 668 F.3d at 707–09. But this Circuit has limited this doctrine, requiring courts to consider the proxy's incentive for pursuing an appeal and any "misalignment of interests," any claims actually brought by potential proxies, and the potential for the claim to be assigned. *Council for Urological Ints.*, 668 F.3d at 712–14.

Each of the three pertinent factors would support application of the exception here: (1) there are no potential proxies for SkinCure or PatientsACT, (2) no potential proxy has brought a claim, and (3) SkinCure and PatientsACT are unable to become assignees of the potential proxies. *Id.* Thus, applying section 405(h) here would "amount[] to the 'practical equivalent of a total denial of judicial review'" because there is no adequate proxy with aligned incentives to bring SkinCure's or PatientsACT's claims to the Agency. *Id.* at 712–13 (quoting *Ill. Council*, 529 U.S. at 21–22).

### D. Plaintiffs' Claims Are Not Precluded.

Plaintiffs' claims are also not precluded by 42 U.S.C. § 1395w-4(i)(1)(B). Any preclusion analysis begins with the "'strong presumption' in favor of judicial review of final agency action." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 733 (2022) (quoting *Weyerhaeuser Co. v. U.S. Fish &*

*Wildlife Serv.*, 586 U.S. 9, 23 (2018)). That presumption "can only be overcome by [] 'clear and convincing evidence' that Congress intended to preclude the suit." *Amgen, Inc. v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). The presumption in favor of judicial review applies with full force to reviews of HHS final agency action. *Am. Hosp. Ass'n*, 596 U.S. at 733. Here, that presumption is not overcome for multiple reasons.

First, Congress has given no indication that section 1395w-4(i)(1)(B) is intended to bar an action such as this. Section 1395w-4(i)(1)(B) ostensibly prohibits a claimant from challenging the Secretary's "determination" of "relative value units," but Plaintiffs' claims are not directed to the "determination of relative values and relative value units" themselves. 42 U.S.C. § 1395w-4(i)(1)(B). Rather, Plaintiffs' claims challenge the source of the Agency's underlying data and the Agency's unlawful exclusion of the Treatment from coverage. *See Furlong v. Shalala*, No. 94-cv-4817, 1996 WL 393526, at *8 (S.D.N.Y. July 12, 1996) (holding that section 1395w-4(i)(1)(B) "does not foreclose judicial review of all issues which may implicate" relative values and RVUs); *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 450, 452 (7th Cir. 2002) (citing *Furlong* in recognizing a challenge that is "ancillary to the determination of relative values" is not precluded).

Second, even if the Agency's Action is deemed a "determination" under section 1395w-4(i)(1)(B), the preclusive language does not apply because the Agency's "determination" exceeded the Agency's statutory authority. Given the "presumption that Congress rarely intends to foreclose review of action exceeding agency authority," even when Congress expressly precludes judicial review of certain agency action, that preclusion "extends no further than the Secretary's statutory authority" to engage in that activity. *Amgen*, 357 F.3d at 113. When a plaintiff claims that the

agency lacked authority to engage in the ostensibly non-reviewable activity, "the determination of whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action, and the court must address the merits to the extent necessary to determine whether the challenged agency action falls within the scope of the preclusion on judicial review." *Id.* Under this merits-based review, "'the jurisdiction-stripping provision does not apply' if the agency's action fails to qualify as the kind of action for which review is barred." *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020) (quoting *Sw. Airlines Co. v. TSA*, 554 F.3d 1065, 1071 (D.C. Cir. 2009)).

Plaintiffs claim that the Agency "acted outside the scope of its statutory mandate" in promulgating the Final Rule. *Id.* (quoting *COMSAT Corp. v. FCC*, 114 F.3d 223, 227 (D.C. Cir. 1997)). Specifically, Plaintiffs allege that Congress only permits the Agency to base MPFS RVUs on physician work, 42 U.S.C., § 1395w-4(c)(1)(A), practice expense, *id.* § 1395w-4(c)(2)(C), and malpractice, *id.* § 1395w-4(c)(3). In the Final Rule, however, the Agency based the MPFS RVUs for the Treatment on *hospital outpatient* data, which is not permitted by section 1395w-4 and is handled by a different statute for OPPS reimbursement rates, section 1395*l*. By relying on this inapposite, inapplicable, and unauthorized data, the Agency exceeded its authority and issued an unlawful "determination of relative values and relative value units." 42 U.S.C. § 1395w-4(i)(1)(B). Accordingly, this is action is not precluded because "the determination of whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action." *Amgen*, 357 F.3d at 113.

Third, section 1395w-4(i)(1)(B) also does not preclude this action because Plaintiffs have alleged that the Agency engaged in *ultra vires* action, and "judicial review is available when an agency acts *ultra vires*." *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003).

This doctrine, from *Leedom v. Kyne*, 358 U.S. 184 (1958), permits "judicial review of agency action for alleged statutory violations even when a statute precludes review." *Am. Hosp. Ass'n*, 964 F.3d at 1238 (quoting *Nyunt v. Chairman, Broad Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). Because Plaintiffs have alleged that the Agency violated section 1395w-4 in issuing the RVUs for IGSRT in the Final Rule, this is *ultra vires* action sufficient to forestall preclusion under *Kyne*. Importantly, *Kyne* review is distinct from the above approach from *Amgen*, but both apply here. *See DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509–10 (D.C. Cir. 2019) (discussing distinction between *Kyne* exception and *Amgen* test).

Accordingly, to the extent the Agency claims that this Action is precluded by section 1395w-4(i)(1)(B), that is incorrect for the above reasons.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on Their Challenges to the Agency's Action.

Plaintiffs have raised nine legal challenges to the Agency's Action. Although they only need to demonstrate the likelihood of success on one, Plaintiffs are likely to succeed on each.

#### A. The Agency Used Unauthorized Criteria to Develop the Rule and the LCDs and Thus Engaged in *Ultra Vires* Action.

The Final Rule, Final LCDs, and Billing Articles should be vacated because they are the product of *ultra vires* Agency action. An agency may only act within the authority delegated by Congress, and actions that exceed that authority are *ultra vires* and must be vacated as unlawful. *City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (holding "an agency literally has no power to act . . . unless and until Congress confers power upon it"). Under the APA, courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). In practice, courts "may not defer to an agency interpretation

of the law." *Id.* at 396, 413. Although a court may "accord[] due respect to Executive Branch interpretations of federal statutes," whether such "respect" is "due" depends on whether the interpretation was made "contemporaneously with enactment of the statute and remained consistent over time." *Id.* at 385–86, 393. And, "[w]hatever respect" might be due, it can never "supersede" the court's "own judgment" about the statute's meaning. *Id.* at 386.

The same principle applies when agency functions are delegated to private entities, where the risk of overreach is heightened because such entities may not share the agency's "national vision and perspective." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004) (quoting *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 20 (D.D.C. 1999)). For that reason, delegations to private parties must be closely scrutinized to ensure they do not exceed the scope of delegated authority. *Id.* at 565. And some powers cannot lawfully be delegated. For instance, "[f]ederal lawmakers cannot delegate regulatory authority to a private entity," as doing so would constitute "legislative delegation in its most obnoxious form." *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)), *vacated and remanded on other grounds*, 575 U.S. 43 (2015).

### 1. The Final Rule Is *Ultra Vires*.

The 2026 MPFS Rule is *ultra vires* action because the Agency based the Treatment's RVUs on outpatient data and information that it was not authorized to consider. Congress restricted the information that the Agency can consider to develop RVUs. Section 1848 of the Medicare Act requires the Agency to set the payment amount for a physician's services based on the product of:

> (A) the relative value for the service (as determined in subsection (c)(2)),
>
> (B) the conversion factor (established under subsection (d) of this section) for the year, and
>
> (C) the geographic adjustment factor (established under subsection (e)(2) of this section) for the service for the fee schedule area.

42 U.S.C. § 1395w-4(b)(1). Congress has also expressly spelled out *what* information the Agency can rely on to calculate RVUs, *id.* § 1395w-4(c)(2)(M)(iii), and *where* the Agency can get it, *id.* § 1395w-4(c)(2)(M)(iv). The Agency is required to calculate RVUs under Section 1848 based on the value of *physician* resources. *See, e.g.*, 42 C.F.R § 414.22(a)(1) ("Physician work RVUs are established using a relative value scale in which the value of physician work for a particular service is rated relative to the value of work for other physician services.").

This stands in contrast to the OPPS framework, which calculates reimbursement under an outpatient facility-based model rather than a resource-based model. 42 U.S.C. § 1395*l*(t). In the Final Rule, however, the Agency calculated the practice expense RVUs for the Treatment based on *hospital OPPS* ambulatory payment classifications' relative weights and then assigned the Treatment new CPT codes to align with *OPPS* bundling. This exceeded the Agency's authority for establishing MPFS RVUs under 42 U.S.C. § 1395w-4(c) and was therefore *ultra vires*.

The Agency received scores of comments criticizing its use of outpatient hospital data when approximately 2% of the Treatment occurs in hospitals and 42 U.S.C. § 1395w-4(c) does not authorize the use of outpatient data to develop MPFSs RVUs. Although it acknowledged that the Treatment is "infrequently provided in the hospital setting," the Agency responded that OPPS ambulatory payment classifications "more accurately reflect" the Treatment costs than direct practice expense inputs, despite Congress's *explicit direction* to calculate RVUs based on the latter.

The Agency acknowledged comments criticizing its use of OPPS data for SRT services, "which are overwhelmingly performed by dermatologists in office-based settings," and that "direct PE inputs more accurately measure typical costs" than "nonexistent OPPS data." 90 Fed. Reg. at 49387. Yet the Agency spurned these comments with a circular response bordering on nonsensical:

> We acknowledge these concerns from the commenters, as SRT services are infrequently provided in the hospital setting. However, the PFS claims data

> indicates that there is a minority of SRT services that do take place in the hospital setting, approximately 2 percent of the overall total. As we stated in the proposed rule, we believe that using the relationship between the relative weights of the OPPS APCs [ambulatory payment classifications] to which codes in this family are assigned more accurately reflect the actual costs of these services compared to the use of the direct PE inputs recommended by the RUC and CMS's PE allocation methodologies.

*Id.* The Agency further "disagree[d] with commenters who stated that CMS does not have the authority to utilize OPPS data in PFS ratesetting," asserting authority under § 1395w-4(c)(2)(N). 90 Fed. Reg. at 49382. But that provision permits only alternative resource-based approaches, as reflected in its limitation to "cost, charge, or other data from suppliers or providers of services." 42 U.S.C. § 1395w-4(c)(2)(N). Nothing in Section 1848 authorizes the Agency to rely on outpatient hospital data for these RVUs. The Agency treats the reference to "other data" as a lacuna permitting reliance on outpatient facility data, but that ignores the structure and purpose of section 1848, which requires RVUs to reflect physician resources "involved in furnishing the service" in physicians' practice settings. 42 U.S.C. § 1395w-4(c)(2)(C)(iii); *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes."). If the Agency's reading were true, it could rely on *any* "other data" whatsoever, a result Congress plainly did not intend. The Agency's interpretation of 42 U.S.C. § 1395w-4(c)(2)(N) is incorrect. *See Howard v. Pritzker*, 775 F.3d 430, 432 (D.C. Cir. 2015) (shutting down agency "attempt to reconfigure Congress's statutory scheme"); *Can-Am Plumbing, Inc. v. NLRB*, 321 F.3d 145, 154 (D.C. Cir. 2003) (holding that an agency must apply a statute "insofar as possible, in a manner that minimizes the impact of its actions on the policies of . . . [an]other statute").

Because 42 U.S.C. § 1395w-4(c) requires the Agency to consider specific types of data in establishing RVUs and does not authorize the Agency to base the RVUs on outpatient OPPS data, the Agency accordingly exceeded its statutory authority in issuing the Final Rule. *See Am. Hosp.*

*Ass'n*, 596 U.S. at 735–36.

### 2. The LCDs and Billing Articles Are *Ultra Vires*.

The LCDs and Billing Articles are also *ultra vires*. Although Congress delegated the responsibility of developing LCDs to the MACs, 42 U.S.C. § 1395kk-1(a)(4), that delegation is limited to determining whether a particular item or service is "reasonable and necessary" and thus covered by the MAC. 42 U.S.C. §§ 1395y(a)(1)(A), 1395ff(f)(2)(B). No statute permits a MAC to deny coverage through LCDs based on any other statutory or regulatory provisions—the power to consider additional criteria in developing NCDs is reserved for the Secretary. *Compare* 42 U.S.C. § 1395ff(f)(1)(B), *with* § 1395ff(f)(2)(B). If a MAC bases an LCD on factors beyond the "reasonable and necessary" standard, it has "gone beyond what Congress has permitted it to do" and "exceed[ed] the scope of its authority." *City of Arlington*, 569 U.S. at 291, 299.

That is exactly what the MACs did here. The Final LCDs and Billing Articles rest on unauthorized criteria and a flawed application of the "reasonable and necessary" standard. Neither § 1395y(a)(1)(A) nor CMS guidance—which ask only whether a service is safe and effective, not experimental or investigational, and appropriate in duration and frequency—impose a threshold evidentiary requirement for coverage. *See* Medicare Program Integrity Manual (CMS Pub. 100-08), Ch. 3, § 3.6.2.2. Yet the MACs effectively denied coverage for the Treatment and HRUS due to the lack of peer-reviewed RCTs, foisting an extra-statutory requirement contrary to § 1395y(a)(1)(A) and Agency guidance. Because the MACs were not permitted to consider this post-hoc factor, the Final LCDs and Billing Articles go "beyond what Congress has permitted [the MACs] to do" and are *ultra vires*. *City of Arlington*, 569 U.S. at 297–98.

The Final LCDs are also *ultra vires* because their ambiguous and undefined language presents a substantial risk of being interpreted and applied in a manner that would restrict board-certified dermatologists from providing the Treatment. The Final LCDs' "qualified physician"

requirement violates the Fifth Amendment because it is so vague that compliance is practically impossible. This requirement also violates the Tenth Amendment because it requires dermatologists to break state law scope of practice limitations.

The Final LCDs include ambiguous and undefined language regarding the medical background physicians must have to be considered "qualified personnel" permitted to perform the Treatment. The Due Process Clause of the Fifth Amendment requires "that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.* (*Fox II*), 567 U.S. 239, 253 (2012). This "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause," and "requires the invalidation of laws [and regulations] that are impermissibly vague." *Id.*[15] The D.C. Circuit has "established that fair-notice due process vagueness principles are indeed incorporated into administrative law." *Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-2453, 2025 WL 2840318, at *23 (D.D.C. Oct. 7, 2025) (citing *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)). To determine whether a party received fair notice, courts "consider whether, 'a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform.'" *Nissan Chem. Co. v. FDA*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024) (quoting *Gen. Elec. Co.*, 53 F.3d at 1329). An agency "cannot set out requirements so vague as to preclude compliance." *Planned Parenthood*, 2025 WL 2840318, at *23.

In practice, the Treatment is overwhelmingly administered by dermatologists. Medicare

[15] The "void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972)).

Part B claims data shows that approximately 96% of SRT and Treatment claims are submitted by dermatologists and other skin specialists, while fewer than 2% of claims are attributable to radiation oncologists. Yet the Final LCDs describe "qualified physician" in vague and ambiguous terms that create a substantial risk of excluding dermatologist from providing the Treatment. The Final LCDs require "training and expertise . . . within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty (i.e., Radiation Oncology OR by a qualified dermatology program with didactic and clinical experience in radiation treatment)." *See, e.g.*, L40189.[16] Yet no such dermatology program exists in practice. Accordingly, the Final LCDs impose requirements "so vague as to preclude compliance." *Planned Parenthood*, 2025 WL 2840318, at *23. The Final LCDs thus fail to provide fair notice in violation of the Fifth Amendment because regulated parties cannot "identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *Nissan Chem. Co.*, 744 F. Supp. 3d at 9 (quoting *Gen. Elec. Co.*, 53 F.3d at 1329); *Fox II*, 567 U.S. at 253.

The Final LCDs' "qualified physician" language also contravenes state law and exceeds the Agency's authority. Section 1395 of the Medicare Act prohibits "any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395; *see also* 42 C.F.R. § 410.20(b) (allowing reimbursement for physicians "legally authorized to practice by the State" and "acting within the scope of his or her license"); L40189 ("RT services must be within the physician's scope of practice and consistent with any additional state regulations and guidelines."). Section 1395 further defines a "physician" as "a doctor of medicine or osteopathy ***legally authorized to practice***

[16] Each of the five LCDs include identical language. *See* L40189 (Palmetto), L40176 (Noridian), L40193 (WPS), L40179 (CGS), L40168 (NGS).

***medicine and surgery by the State*** in which he performs such function or action." 42 U.S.C. § 1394x(r) (emphasis added).

Regulation of a physician's scope of practice lies firmly within the States' police powers, and "[t]here is no right to practice medicine which is not subordinate to the police power." *Garcia v. Texas State Bd. of Med. Examiners*, 384 F. Supp. 434, 437 (W.D. Tex. 1974); *see also Zahl v. Harper*, 282 F.3d 204, 211–12 (3d Cir. 2002) (holding a state's "exceedingly strong interest in regulating the practice of medicine in its jurisdiction" outweighed HHS's interest in exclusively determining whether physicians violated Medicare regulations); *Gonzales v. Oregon*, 546 U.S. 243, 269–70 (2006) (reinforcing federalist principle "allow[ing] the States 'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996))).

Accordingly, the Final LCDs' vague and ambiguous physician qualification language exceeds both the MACs' delegated authority and HHS's authority under the Medicare Act. By attempting to regulate physicians' scope of practice, a core state police power, the Final LCDs also violate the Tenth Amendment, which "reserves to the states powers not delegated to the federal government," including "the authority to protect public health and safety." *In re Subpoena No. 25-1431-014*, No. 25-cv-0039, --F. Supp. 3d --, 2025 WL 3252648, at *2 n.1 (E.D. Pa. Nov. 21, 2025). Because § 1395 does not permit MACs to regulate physicians' scope of practice, the Final LCDs' attempt to do so is *ultra vires.*

### B. The Rule and the LCDs Depart from Agency Guidelines and Precedent and Are Thus Arbitrary and Capricious in Violation of 5 U.S.C. § 706(2)(A).

When an agency departs from prior policy, it must "display awareness that it is changing position," provide "good reasons," and show that its new policy is "permissible under the statute." *FCC v. Fox Television Stations, Inc.* (*Fox I*), 556 U.S. 502, 515 (2009). The agency must also "be

cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation omitted). It is "arbitrary and capricious to ignore such matters." *Id*. The Agency materially changed its policy on the regulation and reimbursement of the Treatment through the Final Rule, Final LCDs, and Billing Articles yet failed to reasonably explain or justify this drastic policy shift. The Agency's Action is therefore arbitrary and capricious.

**1. The Final Rule Departs from Agency Guidelines and Precedent by Ignoring Prior Decisions, Adopting an OPPS Model, and Depressing CPT Code Valuations and Is Thus Arbitrary and Capricious.**

The Final Rule materially changes Agency policy on the regulation and reimbursement of IGSRT, yet the Agency failed to reasonably explain or justify this drastic policy shift. *Fox I*, 556 U.S. at 515. Until the Final LCDs became effective on March 1, the Agency's policy for determining Treatment reimbursement was through ad hoc MAC determinations, and there was no LCD or NCD addressing the Treatment. Under this scheme, practices providing the Treatment typically bill a combination of up to fourteen different CPT codes during a therapy course. This framework reflects and supports the dynamic service that the Treatment provides.

The Agency abandoned a well-functioning reimbursement scheme that properly recognized the Treatment and SRT as clinically distinct—reflecting their different functions and cure rates—and replaced it with the 2026 Final Rule, which bundles the two together for payment. The Agency justified this shift by asserting that bundling is "consistent with the OPPS" and "eliminate[s] financial incentives to provide ultrasound guidance where it may be of questionable value." 90 Fed. Reg. at 49387. But the Agency offered no evidence that ultrasound guidance is of "questionable value," nor identified any improper "financial incentives," relying instead on conclusory statements that "cannot substitute for a reasoned explanation." *Env't Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021) (internal citation omitted); *Amerijet Int'l, Inc. v. Pistole*, 753

F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" (internal citation omitted)). To the contrary, ultrasound guidance is the *raison d'être* of the Treatment and the driver of its 99% cure rate. Yet the Agency blithely dismissed ultrasound guidance without addressing its clinical importance or the "serious reliance interests" created by the Agency's longstanding reimbursement policy. *Regents of Univ. of Cal.*, 591 U.S. at 30; *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 44 (D.D.C. 2020) (finding agency failed to provide "reasoned explanation" by not "grappl[ing] with" important issues or consequences of policy change). The Agency's invocation of OPPS principles does not cure these defects; its claim that OPPS data "more accurately reflect" costs and "improve" coding is itself conclusory and, as explained above, contrary to the Medicare Act's resource-based MPFS framework. 90 Fed. Reg. at 49386–87. The Agency's discussion was therefore "patently insufficient to discharge its duty to provide a 'reasoned explanation' for its change in policy." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 44 (internal quotation omitted).

The Agency has justified the Final Rule with only conclusory statements, thus, "when it came to explaining the 'good reasons for the new policy,' the [Agency] said almost nothing." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223–24 (2016) (quoting *Fox I*, 556 U.S. at 515). The 2026 MPFS Rule is therefore arbitrary and capricious because the Agency failed to provide a reasoned explanation supporting this change in policy. *Fox I*, 556 U.S. at 515.

**2. The Final LCDs and Billing Articles Depart from Agency Guidelines and Precedent by Requiring RCTs and Are Thus Arbitrary and Capricious.**

The five identical Final LCDs and Billing Articles are also arbitrary and capricious because they require RCTs contrary to past guidance and precedent without acknowledging or explaining this change in Agency position. It has long been held under the APA that "an agency changing its course must supply a reasoned analysis." *State Farm*, 463 U.S. at 57 (quoting *Greater Boston*

*Television Co. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1971)). That is, an agency must "display awareness that it is changing position," and it may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox I*, 556 U.S. at 515. Moreover, "the agency must show that there are good reasons for the new policy." *Id.* Courts "must set the agency determination aside as arbitrary and capricious" if the agency does not "articulate a satisfactory explanation for its action with a rational connection between the facts found and the choice made." *Luokung Tech. Co. v. Dep't of Def.*, 538 F. Supp. 3d 174, 183 (D.D.C. 2021).

Prior to this coordinated shift to national coverage policy, the Treatment was covered by Medicare and provided effective Cancer therapy to patients nationwide. This new national policy eliminates that coverage—barring SkinCure-supported practices from billing Medicare for the Treatment and denying the individual Plaintiffs and other Medicare beneficiaries PatientsACT represents access to the Treatment.

Neither the Agency nor the MACs provided a "reasoned analysis" distinguishing the Treatment from SRT or Mohs. *State Farm*, 463 U.S. at 57. The MACs' sole justification was the absence of RCTs or prospective studies supporting the Treatment, even while acknowledging that no such studies "compare the outcomes . . . between [Mohs] or surgical excisions and SRT." Yet the MACs deemed RCT support a necessary prerequisite to approve the Treatment and a justification to limit SRT coverage, while simultaneously designating Mohs, which also lacks RCT support, as the front-line Cancer therapy. The MACs' determination both creates a new, post-hoc approval requirement, and applies that requirement in an unfair, arbitrary fashion.

First, the MACs conditioned Treatment approval on RCT support, without ever acknowledging this requirement before issuing the Final LCDs. To the contrary, Agency guidance confirms that RCT support was *not* required. Before 2019, Section 13.7.1 of CMS's manual stated,

"[i]n order of preference, [LCDs] should be based on: [1] Published authoritative evidence derived from definitive [RCTs] or other definitive studies, and [2] General acceptance by the medical community (standard of practice), as supported by sound medical evidence." *U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1371–72 (C.D. Cal. 2014). But in 2019, CMS removed Section 13.7.1, and the current manual makes no reference to RCTs. *See* Change Req. 10901, Trans. No. 683 (Feb. 12, 2019, eff. Oct. 3, 2018) (deleting § 13.7.1).

Instead, at all relevant times, Agency guidelines instructed MACs to "use the available evidence of general acceptance by the medical community, such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines"—to determine if the item or service is safe and effective, not experimental or investigational, and appropriate in duration and frequency. *See* Medicare Program Integrity Manual (CMS Pub. 100-08), Ch. 3, §§ 13.5.3; 13.5.4. Nothing in these guidelines requires RCT support, and no Agency directive authorizes MACs to impose an RCT requirement when developing LCDs.

In sum, prior to issuing the LCDs, the Agency's position was clear, RCT support was not required for coverage. That conclusion is reinforced by the Agency's prior practice of explicitly referencing RCTs when it wished to require them, and its deliberate omission of any such requirement after 2019. As courts have recognized, "when the Government wants to require RCTs, it knows how to do so." *United States v. Bayer Co.*, No. 07-cv-0001, 2015 WL 5822595, at *15 (D.N.J. Sept. 24, 2015). Indeed, the D.C. Circuit has similarly held that the FTC's "competent and reliable scientific evidence" standard "does not require RCT substantiation," in contrast to its disease-related claims, where they "not only contemplate RCT substantiation, but call for—as a categorical matter—two RCTs." *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 501 (D.C. Cir.

2015). Likewise, here, the Agency's post-2019 guidance sent a clear signal that RCT support was not required. The MACs imposition of an RCT requirement was therefore unauthorized.

The Agency reinforced this position through dozens of individual coverage determinations. Since 2020, at least thirty decisions by QICs and ALJs approved Medicare coverage for the Treatment. Thus, at least thirty times, the Agency has deemed Treatment coverage medically "reasonable and necessary" despite the lack of RCTs, which did not factor into those coverage decisions at all.

Finally, although the Final Rule significantly restricts coverage for the Treatment and is arbitrary and capricious in its own right, it neither conditions coverage on RCT support nor eliminates coverage altogether. By contrast, the Final LCDs impose a *de facto* RCT requirement by limiting SRT coverage and declining to extend coverage for the Treatment. *See, e.g.*, *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 192–94 (5th Cir. 2023). This is yet another unexplained change in Agency position, rendering the Action arbitrary and capricious. *Fox I*, 556 U.S. at 515.

The MACs also applied the *de facto* RCT requirement in an unfair and arbitrary fashion. The MACs admit that there are no RCTs or prospective studies comparing the "outcomes in recurrence rates (long-term 5 years or more, short-term less than 2 years)" of Mohs and SRT. *See, e.g.*, L40189. When approving treatments for Medicare coverage, the same evidence requirements must be uniformly applied. *See Kort v. Burwell*, 209 F. Supp. 3d 98, 114–15 (D.D.C. 2016).

### 3. The Final LCDs Depart from Agency Guidelines and Precedent in Regulating Practice Scopes and Are Thus Arbitrary and Capricious.

The Final LCDs and Billing Articles impose ambiguous and undefined language regarding "qualified physicians." Before the LCDs, the Treatment was administered almost exclusively (96%) by dermatologists, with radiation oncologists administering an extreme minority (2%). Yet, the Final LCDs require "qualified physicians" to have training "within the framework of an

accredited residency and/or fellowship program" in Radiation Oncology or through a "qualified dermatology program of with didactic and clinical experience in radiation treatment."

When the MACs proposed this language, commenters warned that because no such "qualified dermatology program" exists in practice, the requirement risked being interpreted and applied in a way that would restrict dermatologists from providing the Treatment, despite the Proposed LCDs' own acknowledgment that "the bulk of claims coming through processed for SRT are from dermatologists as opposed to radiation oncologists." *See, e.g.*, DL40189. Commenters further noted that this approach conflicts with the LCDs' National Coverage Policy, which states that LCDs do not "replace, modify, or supersede applicable state statutes" regulating medical practice and scope of practice, and that providers must comply with state laws and deliver services within their scope of practice. *See, e.g.*, L40189.

Nonetheless, the MACs ignored these substantive concerns and "explained" their rationale by simply restating the vague and ambiguous definition of "qualified physician." They asserted that the LCDs do not prohibit dermatologists, but instead that "[t]raining and expertise must have been acquired within the framework of an accredited residency and/or fellowship" in "Radiation Oncology" or through "a qualified dermatology program of training with didactic and clinical experience in radiation treatment." *See, e.g.*, L40189. This "explanation" is no explanation at all, and only worsens the opacity of the LCDs' "qualified physician" language. The APA requires an agency to engage in reasoned decision-making and "explain why it chose to do what it did." *Amerijet Int'l*, 753 F.3d at 1350 (internal quotation omitted). Where, as here, the agency's explanation "lacks any coherence," it cannot "survive arbitrary and capricious review," *Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012) (internal quotation omitted), and "conclusory statements will not do." *Amerijet Int'l*, 753 F.3d at 1350.

Because some dermatologists interpret the Agency's explanation of "qualified physician" to mean that no dermatology residency programs provide the required experience and training, the Agency failed to "supply a reasoned analysis" for this change, rendering the Final LCDs arbitrary and capricious. *State Farm*, 463 U.S. at 57; *Amerijet Int'l*, 753 F.3d at 1250.

**C. The Agency Enacted a Coordinated National Coverage Policy That Circumvented the Required Regulatory Frameworks.**

**1. The LCDs and Billing Articles Are "Substantive Legal Standards" Requiring Formal Notice and Comment Under § 1395hh(b)(1).**

The Final LCDs and Billing Articles, combined with the Final Rule, "establish[] or change[] a substantive legal standard" and therefore required notice and comment rulemaking under the Medicare Act. 42 U.S.C. § 1395hh(a)(2). In *Azar v. Allina Health Services* (*Allina*), the Supreme Court invalidated a Medicare payment formula implemented without notice and comment, holding that it was a "substantive legal standard" subject to § 1395hh(a)(2). 587 U.S. 566, 581–82 (2019). The Court distinguished "substantive legal standards" from "substantive rules" under the APA and left open the possibility that interpretive rules, those that "merely clarify or explain existing law or regulations," *Powderly v. Schweiker*, 704 F.2d 1091, 1098 (9th Cir. 1983), could qualify as "substantive legal standards" requiring notice and comment, *Allina*, 587 U.S. at 577–78.

Here, the Final LCDs and Billing Articles rise to the level of a substantive legal standard and therefore required formal notice and comment rulemaking under § 1395hh(b)(1). The Final LCDs and Billing Articles are binding on the MACs at the initial determination stage and will be afforded "substantial deference" by QICs, ALJs, and the Appeals Council in later appeals. *See Porzecanski v. Azar*, 943 F.3d 472, 480 (D.D.C. 2019). Together, they effectively regulate providers' right to payment and beneficiaries' right to reimbursement. Treating these LCDs as mere guidance elevates form over substance where, as here, they establish a blanket non-coverage

policy for a category of services that is codified in the Billing Articles and the Agency's Final Rule. Far from a traditional LCD issued by a single MAC, these LCDs form part of a coordinated change to national coverage policy that impose new, specific, and binding obligations governing what is medically reasonable and necessary and how services must be billed.

*Allina* has produced conflicting decisions on whether LCDs may constitute substantive legal standards. Although the government is likely to rely on the Ninth Circuit's split decision in *Agendia, Inc. v. Becerra*, that reliance overlooks the district court's well-reasoned analysis. 4 F.4th 896 (9th Cir. 2021). The district court held that identical LCDs issued simultaneously by seven MACs established a substantive legal standard because they "define[d] Agendia's right to payment throughout the administrative process." *Agendia, Inc. v. Becerra*, 420 F. Supp. 3d 985, 997–98 (C.D. Cal. 2019). On appeal, a divided Ninth Circuit concluded instead that LCDs merely "guide[] the application of that legal standard" rather than "establish or change" it. *Agendia*, 4 F.4th at 900.

Critically, the LCDs at issue in *Agendia* were not paired with Billing Articles or an Agency MPFS Rule. Here, the Final LCDs and Billing Articles do not merely "help adjudicators apply the reasonable and necessary standard to the facts of a claim," *id.* at 902, but instead, in tandem with the Final Rule, implement a coordinated change to national coverage policy, which is the result of significant lobbying efforts. Even setting those distinctions aside, this Court should not be guided by the split decision of the only appellate court to squarely address the issue. Outside of the Ninth Circuit, there is no binding appellate precedent. And *Allina* strongly suggests that LCDs do establish substantive legal standards requiring formal notice and comment rulemaking, rather than the limited informal process currently required of MACs under § 1395y(l)(5)(D).

**2. Alternatively, the LCDs Are De Facto NCDs.**

Even if the Court concludes that the Final LCDs and Billing Articles are not substantive legal standards, they were still impermissibly implemented because they constitute a *de facto* NCD

and an attempt by the Agency to evade the required regulatory framework. Congress has authorized the Agency to delegate to MACs the ability to issue LCDs affecting their respective regions. 42 U.S.C. § 1395kk-1(a)(4); 42 U.S.C. § 1395ff(f)(2)(B). NCDs on the other hand, can only be issued by the Agency. 42 U.S.C. § 1395ff(f)(1)(B).

The APA directs courts not only to set aside arbitrary and capricious agency actions, 5 U.S.C. § 706(2)(A), but also to "hold unlawful and set aside" agency action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). In determining the nature of an agency rule, courts do not afford "overwhelming" deference to the agency's characterization. *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537–38 (D.C. Cir. 1986). "The label that the agency puts on its given exercise of administrative power is not conclusive; rather it is what the agency does in fact." *Associated Builders & Contractors, Inc. v. Reich*, 922 F. Supp. 676, 680 (D.D.C. 1996) (internal citation omitted).

The Final LCDs and Billing Articles impact over 59% of Medicare claims, 9 of the 12 Medicare MACs, 14,000 hospitals, over 700,000 physicians, and most importantly, 24.7 million Medicare beneficiaries.[17] But it is not merely their breadth that renders them de facto NCDs. On June 4, 2025, the American Society for Radiation Oncology publicly stated that it had "successfully secured exclusion of high-resolution ultrasound (HRUS) and electronic brachytherapy" through a "proposed LCD is a multi-jurisdictional Medicare Administrative Contractor (NGS, WPS, Palmetto, Noridian, CGS) effort to curb inappropriate use of RT services."[18] The Final LCDs and Billing Articles are thus products of a coordinated lobbying effort,

---

[17] *See* Award of MAC Contract for Jurisdictions 5, 6, 8, 15, E, F, J, K, M, https://www.cms.gov/medicare/coding-billing/medicare-administrative-contractors-macs/who-are-macs. In reality, the percentage of affected Medicare claims is greater than 59% as Jurisdiction E, which represents over 9.7% of national benefit expenditures, did not provide this data.

[18] Am. Soc'y for Radiation Oncology, *Multi-Jurisdictional Superficial Radiation Therapy (SRT)*

alongside the Final Rule, to effectuate a change to national coverage policy.

Because these five MACs simultaneously issued these identical Final LCDs and Billing Articles affecting over half of the country, they collectively effectuated a national coverage determination over SRT modalities. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995). When multiple identical Final LCDs and Billing Articles act in tandem with an Agency MPFS Rule, a uniform national coverage policy is created. The Final LCDs, and Billing Articles implementing the LCDs, are LCDs in name only and effectively constitute an NCD. Therefore, because only the Agency is authorized to issue an NCD, the MACs' attempt to implement a *de facto* NCD is Agency action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

**3. The LCDs Should Have Been Enacted Under the CED Framework.**

Where evidence is deemed insufficient, Congress has authorized the Agency to issue an NCD under a Coverage with Evidence Development ("CED") framework. 42 U.S.C. § 1395y(a)(1); 42 U.S.C. § 1320b–12. Consistent with Medicare's mandate to cover services that are "reasonable and necessary," 42 U.S.C. § 1395y(a)(1), CED-based NCDs provide conditional coverage while additional evidence is developed regarding outcomes and effectiveness. The Agency may also seek independent guidance from the Medicare Evidence Development & Coverage Advisory where evidence is disputed, studies are conflicting or flawed, or a technology's dissemination could significantly affect the Medicare population. Medicare Program; Revised Process for Making National Coverage Determinations, 78 Fed. Reg. 48164 (Aug. 7, 2013).

Rather than use these tools, the Agency bypassed the NCD process and punted to the

---

*Proposed LCD Released*, https://www.astro.org/news-and-publications/what-is-happening-in-washington/2025/multi-jurisdictional-superficial-radiation-therapy-(srt)-proposed-lcd-released.

MACs, resulting in the Final LCDs that all but eliminate Treatment coverage for over half the country based on purportedly insufficient evidence, and the Billing Articles that mimic the Agency's Final Rule by changing billing codes to ensure claim denial for the Treatment. The Final LCDs and Billing Articles conflict with the decisions of at least thirty QICs and ALJs who determined that the Treatment is medically reasonable and necessary. The Agency should have channeled this evidentiary concern—which was significant enough to motivate the Agency to wipe out over half the country's coverage for the Treatment—through the CED framework rather than outsource the decision to private contractors. *See* 78 Fed. Reg. 48164, 48167 (authorizing Agency to initiate NCD review where "[n]ew evidence or reasonable re-interpretation of previously available evidence indicates that a national coverage review may be warranted.").

Because the Final LCDs and Billing Articles deny coverage for the Treatment—a previously covered therapy—on the basis of insufficient evidence, the Agency should have requested guidance from the Medicare Evidence Development & Coverage Advisory Committee and issued a CED-based NCD. The Agency's decision not to issue a CED-based NCD was therefore arbitrary and capricious, and contrary to the authority granted by Congress.

#### 4. This Coordinated Change to National Coverage Policy Was at the Agency's Direction and Was Arbitrary and Capricious.

Review of the Final LCDs and Billing Articles is appropriate because the MACs acted at the Agency's direction. The Final LCDs and Billing Articles were initiated to implement the Agency's coverage decisions codified in the Final Rule, underscoring the coordinated nature of this national coverage policy. As such, neither the Final LCDs nor Billing Articles are the "determination[s] by a fiscal intermediary or a carrier . . . respecting whether or not a particular item or service is covered" 42 U.S.C. § 1395ff(f)(2)(B). Rather, they are an extension of the Agency's Final Rule, and a blatant Agency attempt to circumvent the APA.

At the Agency's direction, the Billing Articles deem G6001 (ultrasonic guidance for placement of radiation therapy fields) not medically reasonable or necessary, and thus not covered. This determination flows from the Final Rule, which replaced G6001 with four new codes after it was identified "by the RAW via the CMS/Other Medicare utilization over 20,000 screen." 90 Fed. Reg. at 49386. The Final LCDs then justify the changes to coverage in the Billing Articles.

This case closely parallels *Hays v. Leavitt*, where four MACs issued identical LCDs implementing the Agency's "least costly medically appropriate alternative" policy. 538 F. Supp. 2d 62 (D.D.C. 2008), *aff'd*, 589 F.3d 1279 (D.C. Cir. 2009). Because the LCDs merely extended Agency policy, the court rejected the Agency's claim that § 1395y(a) is ambiguous or permits coverage determinations based on expense rather than the medical reasonableness and necessity. *Id.* at 67–71. Here, the Agency has made a policy determination to remove coverage based on data that showed that SRT related treatments were billed over 20,000 times. As in *Hays*, the Agency had the MACs initiate the Final LCDs and the Billing Articles, rather than follow the proper process for effectuating billing changes. The Court must review the validity of this policy determination as an agency interpretation of a federal statute, which is no longer entitled to deference under *Loper Bright*, and this interpretation still must represent reasoned decision making. *Loper Bright*, 603 U.S. at 392, 412. The Court must also review whether this policy determination conformed with notice and comment requirements. Whether the Court's review is part of its broader consideration of the Agency's coordinated national coverage policy or isolated to the Rule itself, it is clear that denial of coverage for the Treatment is arbitrary and capricious.

First, this coordinated effort represents a material shift in coverage policy that the Agency failed to reasonably explain or justify. *Fox I*, 556 U.S. at 515. Although the Agency justified the Final Rule as a response to "concerns" about the valuation of the "relative resource costs associated

with furnishing" the Treatment, 90 Fed. Reg. at 32428, the Agency did not explain these concerns, relying instead on conclusory statements which "cannot substitute for a reasoned explanation," *Env't Health Tr.*, 9 F.4th at 905 (quoting *Am. Radio Relay League*, 524 F.3d at 241); *see also Nat'l Women's Law Ctr. v. OPM*, 358 F. Supp. 3d 66, 90 (D.D.C. 2019). The Agency was required to present much more support and explanation to justify this departure in reimbursement policy. *See Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 61 (D.D.C. 2019).

Second, the Agency failed to "examine the relevant data and articulate a satisfactory explanation for its action" in effectuating this coordinated policy shift. *State Farm*, 463 U.S. at 43. The Agency did not meaningfully distinguish between traditional SRT and the Treatment and failed to provide an explanation for this decision. Additionally, the Agency failed to address the numerous peer-reviewed studies that endorse the Treatment as a first-line modality and affirm that HRUS imaging is medically reasonable and necessary for the Treatment's delivery. *Id.* at 50. Moreover, the limited information that the Agency *did* reveal regarding the need for additional investigation made no sense and did not justify relegating the Treatment to a secondary therapy or denying coverage for HRUS imaging used in conjunction with the Treatment. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015).

Third, this coordinated policy shift, undertaken at the Agency's direction, runs "counter to the evidence before the agency." *State Farm*, 463 U.S. at 50. Numerous comments were submitted to the Agency detailing the Rule's oversights, particularly regarding the effective merger of SRT and the Treatment, relegation of the Treatment to a secondary modality, exclusion of coverage for HRUS imaging when used in conjunction with the Treatment, and the implication that the Treatment should be limited to radiation oncologists—blocking access to care for many rural Americans. Despite the scores of comments and peer-reviewed studies presented to the Agency,

the Final Rule is nearly identical to the proposed Rule.

Fourth, this policy has significant anticompetitive effects in the skin cancer treatment market, harming both patients and suppliers. The Agency's Action has effectively forced the Treatment out of the market altogether, and even where coverage nominally remains, some dermatologists interpret the Agency's Action to mean they are not qualified to perform the Treatment—leaving oncologist-administered SRT as the only covered non-surgical option for Cancer. This will naturally funnel care toward Mohs surgeons and radiation oncologists. The Agency did not address or justify these devastating effects in enacting the change to national coverage policy, thus the Agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 50.

Finally, the requirement that agency action not be arbitrary and capricious requires the Agency to "respond to 'relevant' and 'significant' public comments," *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (quoting *Pub. Citizen, Inc. v. FAA,* 988 F.2d 186, 197 (D.C. Cir. 1993)). This inquiry looks at substance over form, and cursory, summary, or conclusory responses will not meet this burden. *Cigar Ass'n of Am. v. FDA*, 480 F. Supp. 3d 256, 279 (D.D.C. 2020) ("An agency cannot meet this burden by nodding to concerns raised by commenters only to dismiss them in a conclusory manner.").

Here, the Agency failed this requirement because it responded to the comments raising substantive, significant issues with circular and conclusory responses that did not meaningfully address or resolve the concerns raised. The MACs, in turn, aped the Agency's laissez-faire response by summarily dismissing the significant body of peer-reviewed research supporting the Treatment as a first line Cancer modality. Moreover, the MACs denied coverage for the Treatment because its efficacy and use required further research and cited the absence of RCTs or prospective

studies—while at the same time designating Mohs as the first-line approach, even though Mohs likewise lacks RCTs or prospective studies for the vast majority of contexts in which it is used.

**D. This National Coverage Policy Denies Coverage for "Reasonable and Necessary" Medical Items and Thus Violates the APA and Medicare Act.**

Lastly, this coordinated change to national coverage policy, as effectuated through the Final Rule, Final LCDs, and Billing Articles, improperly denies coverage for previously covered, life-saving Cancer Treatment that is "reasonable and necessary" for medical care in violation of the Medicare Act and the APA. The Medicare Act entitles beneficiaries to coverage for "reasonable and necessary" medical items and services. 42 U.S.C. § 1395y(a)(1). An item or service is "reasonable and necessary" if it is (a) safe and effective, (b) not experimental or investigational, and (c) "appropriate." Program Integrity Manual, Ch. 13, § 13.5.4. Further, an item or service is deemed "appropriate" when it is (i) furnished in accordance with accepted standards of medical practice, (ii) furnished in an appropriate setting, (iii) ordered and furnished by qualified personnel, (iv) meets but does not exceed a patient's medical need, and (v) is at least as beneficial as an existing and available medically appropriate alternative. *Id.*

The MACs misapplied the Medicare Act's "reasonable and necessary" standard by denying coverage for the Treatment based on an asserted lack of evidence and the absence of RCTs. That narrow interpretation conflicts with Agency guidance, ignores substantial peer-reviewed evidence, and flouts thirty QIC and ALJ decisions finding the Treatment medically reasonable and necessary. Instead, the MACs relied on a single study that does not even review the Treatment and general references to the absence of RCTs to deem the Treatment insufficient.

This conclusion defies the meaning of "reasonable and necessary." 42 U.S.C. § 1395y(a)(1). First, the Treatment is proven to be safe and effective. The Treatment successfully treated and managed the symptoms of Cancer patients, including the individual Plaintiffs. The

Treatment's safety and efficacy is confirmed by peer-reviewed studies reporting cure rates exceeding 99% with minimal adverse events. Second, the Treatment is a far cry from experimental or investigational. The Treatment has been deemed medically reasonable and necessary by thirty QICs and ALJs, and this coverage allowed patients a less-invasive, but more effective and accessible Cancer therapy. The Treatment has also been FDA-cleared and in clinical use since 2015 and has received numerous, positive, peer-reviewed studies.

Lastly, the Treatment is appropriate because it is furnished in accordance with accepted standards of medical practice, as shown by its inclusion in national treatment guidelines. The Treatment is furnished in appropriate settings by qualified personnel including board-certified dermatologists supported by radiation therapists and medical physicists. The Treatment also meets but does not exceed patient medical needs because it precisely targets cancerous lesions for the most efficient Cancer care possible, and with a 99% cure rate, the Treatment is at least as beneficial as existing alternatives, including Mohs. Accordingly, the Treatment is "reasonable and necessary" for Cancer patients' treatment under 42 U.S.C. § 1395y(a)(1), and the MACs misinterpreted and misapplied this standard in denying Treatment coverage. The Final LCDs and Billing Articles are therefore inconsistent with the Medicare Act, and are thus "not in accordance with law" and issued "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of the APA. 5 U.S.C. § 706(2)(A)–(C); *see N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025) (holding an executive order contradicting implementing regulations was "in direct violation of the APA" and must be set aside).

Additionally, the MACs' categorical denial of HRUS imaging cannot be reconciled with these criteria. The MACs did not find that the Treatment is unsafe, ineffective, or experimental. Nor did they identify any deficiency in the settings, personnel, or appropriateness of the Treatment

delivery to support the categorical coverage denial or the heightened provider qualification requirements. Instead, the MACs imposed an extra-statutory evidentiary requirement (RCTs) that appears nowhere in the "reasonable and necessary" criteria established by Chapter 13. This represents a fundamental misapplication of the governing standard.

Further, the Final LCDs are part of a broader, coordinated change to national coverage policy, and "agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Loper Bright*, 603 U.S. at 392. Thus, neither the MACs' interpretation of the Medicare Act nor the Agency's Final Rule are entitled to deference. "Under the APA, it thus 'remains the responsibility of the court to decide whether the law means what the agency says.'" *Id.* (internal quotation omitted).

As coverage for the Treatment is both medically reasonable and necessary under the Medicare Act, the Agency's coordinated change to national coverage policy cannot survive APA review. Accordingly, the Agency's coverage denial for the Treatment is arbitrary and capricious.

**II. The Agency's Change to National Coverage Policy Will Irreparably Harm Plaintiffs.**

To demonstrate this factor, "the injury must be both certain and great, actual and not theoretical" and "the harm must be irreparable, in that the harm cannot be remedied solely with monetary damages." *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 74 (D.D.C. 2008) (internal citations omitted); *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (stating preliminary injunction factors are same as § 705 stay factors).

Here, the Final Rule, Final LCDs, and Billing Articles directly threaten to eliminate Medicare coverage for the Treatment, and, in doing so, effectively threaten SkinCure's business model, PatientsACT, the individual Plaintiffs, and Medicare beneficiaries' access to medically reasonable and necessary Cancer treatment. Without Medicare coverage, the individual Plaintiffs

and other Medicare beneficiaries cannot obtain the Treatment, a highly effective Cancer therapy with a cure rate exceeding 99%. As a non-surgical modality delivered in outpatient dermatology practices, it is also the only Cancer treatment accessible to many rural patients. Not only is the Treatment the most effective and available Cancer treatment, it is also the least invasive, making it particularly appropriate for Cancers located in cosmetically sensitive areas and for patients who face heightened surgical risks or with surgical fatigue.

Further, even if a stay and a preliminary injunction did not issue and Plaintiffs ultimately won on the merits, Plaintiffs would still be denied access to the Treatment for a considerable amount of time, interrupting Plaintiffs' business and unnecessarily delaying their medical care. Courts have recognized that even an interruption or delay in medical coverage constitutes irreparable harm. *See, e.g.*, *Minney v. OPM.*, 130 F. Supp. 3d 225, 235 (D.D.C. 2015); *Risteen v. Youth For Understanding, Inc.,* 245 F. Supp. 2d 1, 16 (D.D.C. 2002); *Wilson v. Grp. Hosp. & Med. Servs., Inc.,* 791 F. Supp. 309, 313–14 (D.D.C. 1992). Likewise, the Agency's Action threatens imminent and irreversible harm by disrupting Plaintiffs' medical care and business. No amount of money can fully repair the harm caused by stalling medical care, money damages would be inadequate.

## III. The Balance of Equities Supports the Relief Sought, and the Relief Will Not Disserve the Public Interest.

"When the government is the opposing party" the balance of harms and the public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). There is no public interest in 'the perpetuation of unlawful agency action.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

Here, Plaintiffs have alleged that the Agency's Action violates the APA and Medicare Act in multiple respects and must be stayed and enjoined to prevent this harm. Plaintiffs have further demonstrated the ruinous medical and financial effects that this Agency Action could have on them, especially if their care is disrupted, and there is no reasonable alternative treatment. The Agency would suffer no harm or hardship if a stay and preliminary injunction issued. Granting the requested relief maintains the status quo, and courts have long held that there is no public interest in "the perpetuation of unlawful agency action." *Id.* The balance weighs in favor of granting a stay and preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion

Dated: March 6, 2026

Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ *Lynn Estes Calkins*
Lynn Estes Calkins (DC Bar No. 445854)
Zachary P. Lundgren (DC Bar No. 90012330)
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Phone: (202) 955-3000
lynn.calkins@hklaw.com
zachary.lundgren@hklaw.com

Andrew Solinger (DC Bar No. 1014742)
511 Union Street, Suite 2700
Nashville, TN 37219
Phone: (615) 850-8062
andrew.solinger@hklaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I will have a true and correct copy of the foregoing served by email on the following:

Andrew J. Vaden, Assistant U.S. Attorney
Civil Division, U.S. Attorney's Office
601 D St., NW, Washington, DC 20530
andrew.vaden@usdoj.gov

I hereby certify that I will have a true and correct copy of the foregoing served along with the Complaint by certified mail on the following:

Robert F. Kennedy Jr., In His Official Capacity
United States Secretary of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, DC 20201

United States Department of Health and Human Services
Office of the General Counsel
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, DC 20201

Mehmet Oz, In His Official Capacity
Administrator, United States Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

United States Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Civil Process Clerk
United States Attorney for the District of Columbia
601 D Street, N.W.
Washington, DC 20530

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

/s/ *Lynn Estes Calkins*
Lynn Estes Calkins

**LOCAL RULE 7(M) CERTIFICATE**

Pursuant to Local Rule 7(m), I hereby certify that, on March 4, 2026, Lynn Estes Calkins who is counsel for Plaintiffs, conferred by videoconference with Andrew Vaden of the U.S. Attorney's Office, who is counsel for Defendants, regarding Plaintiffs' intention to file this motion. Defense counsel stated in a follow-up communication that Defendants are opposed to this motion.

/s/ *Lynn Estes Calkins*
Lynn Estes Calkins