UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SKINCURE ONCOLOGY, LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., *et al.*,<br><br>Defendants. | Civil Action No. 26-0737 (RC) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY AND PERMANENT INJUNCTION**


*Of Counsel:*

MICHAEL B. STUART
General Counsel

ELIZABETH C. KELLEY
Deputy General Counsel
Chief Legal Officer for CMS

LENA AMANTI YUEH
Acting Associate General Counsel

JOCELYN S. BEER
Acting Deputy Associate General
for Litigation

JULLIA BRADLEY
LUCY C. LISIECKI
Attorneys, CMS Division
U.S. Department of Health and Human Services

JEANINE FERRIS PIRRO
U.S. Attorney

PETER C. PFAFFENROTH
Chief, Civil Division

ANDREW J. VADEN
Assistant U.S. Attorney
D.C. Bar # 1044860
601 D Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2500
Email: andrew.vaden@usdoj.gov

*Attorneys for the United States of America*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. The Medicare Program and Administrative Review Process .......... 3

B. "Reasonable and Necessary" Services and Local Coverage Determinations .......... 4

C. Background on the Final Payment Rule and Preclusion of Review .......... 6

D. Background on the Five Challenged Local Coverage Determinations .......... 8

1. Development and Issuance .......... 8

2. "Reasonable and Necessary" Analysis for Superficial Radiation Therapy and Ultrasound Scans .......... 10

3. The Local Coverage Determinations Do Not Impact Coverage for Superficial Radiation Therapy Provided by Dermatologists .......... 13

E. Three Avenues Exist for Review of Local Coverage Determinations .......... 14

LEGAL STANDARDS .......... 15

ARGUMENT .......... 16

I. Plaintiffs Are Not Entitled To Provisional Relief. .......... 17

A. Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims Because This Court Lacks Jurisdiction to Hear Them. .......... 17

1. The First Four Provisions Cited by Plaintiffs Do Not Supply Jurisdiction. .......... 17

2. No Jurisdiction Exists under the Medicare Statute. .......... 19

3. Waiver of Medicare's Exhaustion Requirements Does Not Apply. .......... 21

4. Plaintiffs Lack Standing under the Medicare Statute and Article III. .......... 22

5. Plaintiffs Fail to Meet Section 1395ff(f)(3)'s Waiver Criteria. .......... 25

6. Plaintiffs Are Unlikely to Succeed on Merits-Based Challenges to the Local Coverage Determinations. .......... 29

7. Plaintiffs' Final Payment Rule Challenges Attack a Determination of Relative Values and Are Precluded by the Medicare Statute. .................. 33

B. Plaintiffs Have Not Established Irreparable Harm. ............................................. 36

1. Safe and Effective Treatments Remain Available for the Patient Plaintiffs. ................................................................................................ 37

2. SkinCure's Lost Profits Do Not Constitute Irreparable Harm................. 39

3. PatientsACT Articulates No Viable Theory of Irreparable Harm. ........... 41

4. Plaintiffs' Delay in Seeking Provisional Relief Further Weighs Against a Finding of Irreparable Harm. .................................................................. 42

C. The Remaining Factors Weigh Against Provisional Relief................................ 43

II. If the Court Orders Injunctive Relief, the Court Should Require a Bond......................... 44

III. Plaintiffs' Motion for a Permanent Injunction Should Be Denied as Premature............. 45

CONCLUSION ....................................................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agendia Inc. v. Becerra*,
4 F.4th 896 (9th Cir. 2021) .......... 30, 31, 32

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank*,
840 F. Supp. 2d 327 (D.D.C. 2012) .......... 40, 41

*Am. Coll. of Cardiology v. Sebelius*, Civ. A.,
No. 09-62034, 2010 WL 9463882 (S.D. Fla. Apr. 27, 2010) .......... 34

*Am. Soc'y of Anesthesiologists v. Shalala*,
90 F. Supp. 2d 973 (N.D. Ill. 2000) .......... 34

*Am. Soc'y of Cataract & Refractive Surgery v. Thompson*,
279 F.3d 447 (7th Cir. 2002) .......... 33, 34

*Am. Wildlands v. Kempthorne*,
530 F.3d 991 (D.C. Cir. 2008) .......... 42

*Asante v. Azar*,
436 F. Supp. 3d 215 (D.D.C. 2020) .......... 20

*Aviles-Wynkoop v. Neal*,
978 F. Supp. 2d 15 (D.D.C. 2013) .......... 36

*Azar v. Allina Health Services*,
587 U.S. 566 (2019) .......... 31, 32

*Benisek v. Lamone*,
585 U.S. 155 (2018) .......... 16

*Biovail Corp. v. FDA*,
448 F. Supp. 2d 154 (D.D.C. 2006) .......... 40

*Bowen v. Michigan Academy of Family Physicians*,
476 U.S. 667 (1986) .......... 21

*Cal. Clinical Lab. Ass'n v. Sec'y of Health & Hum. Servs.*,
104 F. Supp. 3d 66 (D.D.C. 2015) .......... 24

*Califano v. Sanders*,
430 U.S. 99, (1977) .......... 18

*Carney v. Adams*,
592 U.S. 53 (2020) .......... 24, 25

*Cathedral Rock of North Coll. Hill v. Shalala*,
223 F.3d 354 (6th Cir. 2000) .......... 41

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 16, 36

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) .......... 16

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2024) .......... 36

*Cornish v. Dudas*,
540 F. Supp. 2d 61 (D.D.C. 2008) .......... 36

*Darby v. Cisneros*,
509 U.S. 137 (1993) ........................................ 18
*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) ........................................ 32
*Davis v. Pension Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ........................................ 40
*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019) ........................................ 35, 36
*Dorfmann v. Boozer*,
414 F.2d 1168 (D.C. Cir. 1969) ........................................ 17
*Fla. Health Scis. Ctr., Inc. v. HHS*,
830 F.3d 515 (D.C. Cir. 2016) ........................................ 34, 36
*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) ........................................ 43
*Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........................................ 36, 40
*Gober v. Collins*, Civ. A.,
No. 25-0714, 2025 WL 1360434 (D.D.C. May 8, 2025) ........................................ 17
*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) ........................................ 42
*Griffith v. Fed. Lab. Rels. Auth.*,
842 F.2d 487 (D.C. Cir. 1988) ........................................ 35
*HCSC-Laundry v. United States*,
450 U.S. 1 (1981) ........................................ 30
*Heckler v. Chaney*,
470 U.S. 821 (1985) ........................................ 44
*Heckler v. Ringer*,
466 U.S. (1984) ........................................ passim
*Info. Ctr. v. DOJ*,
15 F. Supp. 3d 32 (D.D.C. 2014) ........................................ 16
*Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.*,
374 F. Supp. 2d 135 (D.D.C. 2005) ........................................ 45
*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ........................................ 42
*Lewis v. Becerra*, Civ. A.,
No. 18-2929 (RBW), 2022 WL 123909 (D.D.C. Jan. 13, 2022) ........................................ 42, 43
*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ........................................ 21
*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................ 23
*Maldonado v. District of Columbia*,
Civ. A. No. 10-1511 (RJL), 2019 WL 6877913 (D.D.C. Dec. 16, 2019) ........................................ 39, 42
*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........................................ 21, 22
*Maynard v. Architect of the Capitol*,
544 F. Supp. 3d 64 (D.D.C. 2021) ........................................ 17

*Minney v. OPM*,
130 F. Supp. 3d 225 (D.D.C. 2015) ........ 39
*Nat'l Kidney Patients Ass'n v. Sullivan*,
958 F.2d 1127, (D.C. Cir. 1992) ........ 21
*Nat'l Treasury Emps. Union v. Trump*,
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ........ 41, 44
*Newdow v. Bush*,
355 F. Supp. 2d 265 (D.D.C. 2005) ........ 43
*Nken v. Holder*,
556 U.S. 418 (2009) ........ 43
*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ........ 35
*Physicians Nat'l House Staff Ass'n v. Fanning*,
642 F.2d 492 (D.C. Cir. 1980) ........ 32
*Pittston Coal Grp. v. Sebben*,
488 U.S. 105 (1988) ........ 18
*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........ 30
*Renoir v. Governor of Va.*,
755 F. Supp. 2d 82 (D.D.C. 2010) ........ 45
*RICU LLC v. HHS*,
22 F.4th 1031 (D.C. Cir. 2022) ........ 20
*Risteen v. Youth For Understanding, Inc.*,
245 F. Supp. 2d 1 (D.D.C. 2002) ........ 39
*Row 1 Inc. v. Becerra*,
92 F.4th 1138, (D.C. Cir. 2024) ........ 18, 20, 44
*Rueth v. EPA*,
13 F.3d 227 (7th Cir. 1993) ........ 17
*Santos v. Collins*,
Civ. A. No. 24-1759, 2025 WL 1823471 (D.D.C. Feb. 26, 2025) ........ 36
*Save Long Beach Island, Inc. v. U.S. Dep't of Commerce*,
Civ. A. No. 25-2214 (CJN), 2025 WL 2996157 (D.D.C. Oct. 24, 2025) ........ 16
*Shalala v. Ill. Council on Long Term Care, Inc.*,
529 U.S. 1 (2000) ........ passim
*Sierra Club v. EPA*,
793 F. Supp. 3d 158 (D.D.C. 2025) ........ 43
*Singh v. Carter*,
185 F. Supp. 3d 11 (D.D.C. 2016) ........ 17
*Skelly Oil Co. v. Phillips Petroleum Co.*,
339 U.S. 667 (1950) ........ 17
*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 25
*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) ........ 16
*U.S. Ass'n of Reptile Keepers v. Zinke*,
852 F.3d 1131 (D.C. Cir. 2017) ........ 16

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ..... 45
*W. Va. Ass'n of Cmty. Health Centers, Inc. v. Heckler*,
734 F.2d 1570 (D.C. Cir. 1984) ..... 45
*Weinberger v. Salfi*,
422 U.S. 749 (1975) ..... 19, 21, 27
*Wilson v. Grp. Hospitalization & Med. Servs., Inc.*,
791 F. Supp. 309 (D.D.C. 1992) ..... 39
*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..... 15, 16
*Your Home Visiting Nurse Servs., Inc. v. Shalala*,
525 U.S. 449 (1999) ..... 19

**Statutes**

5 U.S.C. § 701(a) ..... 18
5 U.S.C. § 705 ..... 16
28 U.S.C. § 1331 ..... 17, 18, 19, 21
28 U.S.C. § 1361 ..... 17, 18
28 U.S.C. §§ 2201-02 ..... 17
42 U.S.C. § 405(h) ..... 19
42 U.S.C. § 1395ff(a)(1)(C) ..... 4
42 U.S.C. § 1395ff(a)(3) ..... 4
42 U.S.C. § 1395ff(b)(1)(A) ..... 3
42 U.S.C. § 1395ff(c) ..... 4
42 U.S.C. § 1395ff(d) ..... 4
42 U.S.C. § 1395ff(f) ..... passim
42 U.S.C. § 1395ff(f)(1)(B) ..... 5
42 U.S.C. § 1395ff(f)(2) ..... 14
42 U.S.C. § 1395ff(f)(3) ..... passim
42 U.S.C. § 1395ff(f)(5) ..... 23
42 U.S.C. § 1395hh ..... 29, 30, 31
42 U.S.C. § 1395hh(a) ..... 29
42 U.S.C. § 1395hh(a)(1) ..... 3, 29
42 U.S.C. § 1395ii ..... 19
42 U.S.C. § 1395j ..... 3
42 U.S.C. § 1395u ..... 3
42 U.S.C. § 1395w-4 ..... 6
42 U.S.C. § 1395w-4(b)(1) ..... 7
42 U.S.C. § 1395w-4*i*(1)(B), (F) ..... 2, 33
42 U.S.C. § 1395y(a)(1)(A) ..... 5, 30
42 U.S.C. § 1395y(*l*)(1) ..... 31
42 U.S.C. § 1395y(*l*)(5)(A) ..... 31
42 U.S.C. § 1395y(*l*)(5)(D) ..... 5, 6, 30
42 U.S.C. § 1395ff(f)(2)(B) ..... 5, 30
42 U.S.C. § 1395kk-1 ..... 3

**Rules**

Fed. R. Civ. P. 65(c) .......... 44

**Regulations**

42 C.F.R. Part 421 .......... 3
42 C.F.R. § 405.1016 .......... 4
42 C.F.R. § 405.904 .......... 3
42 C.F.R. § 405.906 .......... 3
42 C.F.R. § 405.920 .......... 5
42 C.F.R. § 400.202 .......... 5
42 C.F.R. § 405.1062(c) .......... 14
42 C.F.R. § 405.1120 .......... 4
42 C.F.R. § 405.1124 .......... 4
42 C.F.R. §§ 405.940-405.958 .......... 4
42 C.F.R. §§ 405.960-405.978 .......... 4
68 Fed. Reg. 63692 .......... 15
90 Fed. Reg. 49266 .......... 6, 7, 8, 9

**Other Authorities**

Melissa J. Durkee, Astroturf Activism, 69 Stan. L. Rev. 201 (2017) .......... 42
Medicare Program Integrity Manual, *Chapter 13 — Local Coverage Determinations* .......... 5, 6

Defendants Robert F. Kennedy, Jr., in his capacity as Secretary of Health and Human Services (the "Secretary"); the U.S. Department of Health and Human Services ("HHS"); Dr. Mehmet Oz, in his capacity as Administrator, Centers for Medicare & Medicaid Services ("CMS"); and CMS, by and through undersigned counsel, respectfully submit this opposition to Plaintiffs' Motion for Stay and for Preliminary and Permanent Injunction (ECF No. 10-2) as corrected (ECF No. 14). A proposed order is attached.

**INTRODUCTION**

The Medicare statute establishes a national program of healthcare coverage for older adults and people with disabilities. Medicare Part B covers outpatient care and physician services. To aid the Secretary in administering the program—which involves over a billion Part B claims per year—the statute and its implementing regulations establish a complex range of tools to regulate coverage determinations and claims processing. This case concerns services provided under the Physician Fee Schedule. Given the complexity of the statutory regime, it is no surprise that Congress has set strict limits on a federal court's jurisdiction to hear challenges to its administration. First, Congress precluded all challenges to the establishment of "relative value units" under the Physician Fee Schedule, which Plaintiffs challenge here. Second, the Medicare statute "demands the 'channeling' of virtually all legal attacks" through administrative channels. *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000). Indeed, the Supreme Court and the D.C. Circuit repeatedly have held that "all aspects" of a claim arising under the Medicare statute must "be channeled first into the administrative process which Congress has provided for the determination of claims for benefits." *Heckler v. Ringer*, 466 U.S. 614 (1984).

Through artful pleading, Plaintiffs seek to circumvent the review procedures established by the Medicare statute and its implementing regulations and implore this Court to order emergency relief. Plaintiffs are SkinCure Oncology, LLC ("SkinCure"), a company that supplies

superficial radiation therapy equipment and other services to dermatologists' offices; a lobbying organization ("PatientsACT"); and six individual Plaintiffs (the "Patient Plaintiffs"). Plaintiffs contend they would be harmed by changes to Medicare local coverage determinations and payment rules under which superficial radiation therapy—which treats skin cancer—would continue to be covered, but ultrasound imaging—which does not treat cancer—would no longer be separately reimbursed. At issue are the Calendar Year 2026 Physician Fee Schedule final rule ("Final Payment Rule") issued by CMS; five identical local coverage determinations issued by Medicare contractors (the "Local Coverage Determinations"); and five identical billing and coding articles issued to implement the Local Coverage Determinations (the "Articles"). *See generally* Corrected Complaint, ECF No. 13-1 ("Compl.") ¶¶ 1–8. Plaintiffs seek a declaration that the adjustments in the Final Payment Rule and the Local Coverage Determinations are arbitrary and capricious, and they seek injunctive relief to mandate reimbursement for the ultrasound scans provided with superficial radiation therapy. Plaintiffs also have filed a Corrected Motion for Stay and Preliminary and Permanent Injunction, ECF No. 14, and their memorandum in support, ECF No. 14-1 ("Pls.' Mem.").

Plaintiffs cannot succeed on the merits in the absence of jurisdiction. Presentment to the agency is a non-waivable jurisdictional requirement that Plaintiffs have not satisfied. The Medicare statute also precludes all challenges to the Secretary's determination of relative value units under the Physician Fee Schedule. 42 U.S.C. § 1395w-4*i*(1)(B), (F). As Plaintiffs seek to challenge the Secretary's determination of the relative value units for superficial radiation therapy and ultrasound scans, those claims are precluded. Nor can Plaintiffs succeed on their merits-based challenges to the Local Coverage Determinations and Final Payment Rule, both of which are authorized by law and well-supported.

Plaintiffs also fail to demonstrate irreparable harm, and Plaintiffs' motion should be denied for this independent reason. Plaintiffs' briefing seeks to obscure a fact critical to the analysis—neither the Final Payment Rule nor the Local Coverage Determinations restrict coverage for superficial radiation therapy, which treats cancer. Only the repeated high-resolution ultrasound imaging scans—which are not a cancer treatment—are affected. As a consequence, the Patient Plaintiffs will retain access to effective non-surgical treatments for skin cancer, and thus will suffer no irreparable harm. As to SkinCure, its vague suggestions of lost profits plainly are not the type of harm that justifies emergency relief.

## BACKGROUND

### A. The Medicare Program and Administrative Review Process

This case concerns the Medicare program's rules for coverage and payment of claims under Part B, a voluntary insurance program providing payment for physician and other health services. Part B is financed by its enrollees' monthly premiums and by all federal taxpayers via Congressional appropriations. 42 U.S.C. § 1395j.

The Secretary has overall responsibility for the Medicare program and has broad authority to "prescribe such regulations as may be necessary to carry out [its] administration." 42 U.S.C. § 1395hh(a)(1). CMS contracts with private entities who assist in performing Medicare program activities. 42 U.S.C. §§ 1395u, 1395kk-1. The relevant contractors here are Medicare Administrative Contractors ("Medicare contractors"), who were previously known as carriers. Among their many responsibilities, Medicare contractors process and pay claims for services provided to Medicare beneficiaries. *Id.*, 42 C.F.R. Part 421, Subparts C, E.

Before any claim arising under the Medicare statute can be filed in federal court, it must first be channeled through administrative review. *See* 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.904, 405.906; *Ill. Council*, 529 U.S. at 13. The Medicare statute provides four levels of

administrative review. *First*, within 120 days of receiving an adverse initial determination, claimants must present their disputes to the agency by requesting redetermination by a Medicare contractor. 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. §§ 405.940-405.958. An individual who was not involved in the initial determination decides timely requests, generally within 60 days of receipt. *Id.* §§ 405.948, 405.950. *Second*, claimants who are dissatisfied with a redetermination decision can request reconsideration by a qualified independent contractor. 42 U.S.C. § 1395ff(c); 42 C.F.R. §§ 405.960-405.978. *Third*, if that contractor cannot meet its deadline, or claimants are dissatisfied with the decision on reconsideration, they can request an administrative law judge ("ALJ") hearing. 42 C.F.R. § 405.1016. The ALJ generally issues a post-hearing decision within 90 days; otherwise, escalation to the fourth level may apply. *Id.* §§ 405.1016, 405.1020, 405.1046(d); 405.1104. *Fourth*, if claimants are still not satisfied, they can request review by the Medicare Appeals Council. 42 U.S.C. § 1395ff(d), 42 C.F.R. §§ 405.1100-405.1130. The Council receives briefs and may hear oral arguments. 42 C.F.R. §§ 405.1120, 405.1124. Its decision is final and binding, and becomes the Secretary's final decision. *Id.* §§ 405.1130, 405.1140. Only *after* administrative review is completed may a party file an action in federal district court. *Id.* §§ 405.1100-405.1130.

### B. "Reasonable and Necessary" Services and Local Coverage Determinations

Congress has given the Secretary broad authority to determine whether Medicare should cover items or services furnished to beneficiaries. 42 U.S.C. § 1395ff(a)(1)(C). The Medicare statute itself excludes coverage for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *Id*. § 1395y(a)(1)(A). Thus, claims for Medicare items and services must be reasonable and necessary to be eligible for Medicare coverage and reimbursement. *Id.*

To accomplish the daunting task of administering the "reasonable and necessary" coverage

standard for more than a billion Part B claims per year, the Secretary employs a range of tools, including formal regulations, and administrative appeals decisions. *See*, *e.g.*, *Ringer*, 466 U.S. at 617 (discussing Secretary's discretion to promulgate rules and allow individual adjudications). The Secretary may also issue a national coverage determination "with respect to whether or not a particular item or service is covered nationally," which is legally binding on all contractors and adjudicators during the Medicare administrative claims and appeals process. 42 U.S.C. § 1395ff(f)(1)(B); 42 C.F.R. §§ 400.202, 405.1060(a)(4). In the absence of a binding policy such as a national coverage determination, Medicare contractors may implement the Secretary's coverage policies through individual determinations. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 405.920. A Medicare contractor also may develop a local coverage determination that specifies, for purposes of its own jurisdiction, whether a particular item or service is reasonable and necessary. 42 U.S.C. §§ 1395ff(f)(2)(B), 1395kk-1(a)(4), 1395y(*l*)(5), 1395y(*l*)(6)(B).

The process to develop and issue a new local coverage determination is robust. *See* 42 U.S.C. § 1395y(*l*)(5)(D); Medicare Program Integrity Manual ("Manual"), *Chapter 13 — Local Coverage Determination*s, https://perma.cc/WPU5-F3TH. In developing a local coverage determination, the Medicare contractor reviews research and other evidence, consults with experts (including through use of a Contractor Advisory Committee), issues a proposed local coverage determination, conducts an open meeting, and provides the public a minimum of 45 days for comment. Manual, §§ 13.2.3-13.2.4.4. After considering and responding to comments, and revising its determination as needed, the Medicare contractor publishes the final local coverage determination, providing another notice period of at least 45 days before it goes into effect. *Id.* §§ 13.1.1, 13.2.5-13.2.6; 42 U.S.C. § 1395y(*l*)(5)(D).

Specific content requirements govern proposed and final local coverage determinations. 42

U.S.C. § 1395y(*l*)(5)(D); Manual, §§ 13.5.1–13.5.4. The Medicare contractor must include a bibliography of sources considered in drafting the determination. Manual § 13.5.3. The Medicare contractor also must explain the rationale that supports its determination to cover or not cover an item or service. *Id.* The determination must rely upon evidence of general acceptance by the medical community. *Id.* Such evidence includes published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements, and clinical guidelines. *Id.* CMS cautions Medicare contractors that: "Acceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community." *Id.* § 13.2.3.

When a Medicare contractor wishes to convey information to the provider community, but the information is not a local coverage determination, the contractor may issue an article. For example, articles may convey information to health care providers about billing and coding. *Id.* § 13.5.3. Such information may help to implement a local coverage determination. *Id.*

### C. Background on the Final Payment Rule and Preclusion of Review

Each year, CMS engages in a massive rulemaking to develop the Physician Fee Schedule that sets the amounts that Medicare will pay for physician services and associated items. 42 U.S.C. § 1395w-4. The Calendar Year 2026 Physician Fee Schedule final rule was on display on October 31, 2025, and appeared in print in the Federal Register on November 5, 2025. *Medicare and Medicaid Programs; CY 2026 Payment Policies Under the Physician Fee Schedule*, 90 Fed. Reg. 49266 (Nov. 5, 2025). The final rule went into effect on January 1, 2026.

Superficial radiation therapy and high-resolution ultrasound scans for certain types of skin cancer are among the thousands of procedures, ancillary services, and supplies within the Physician Fee Schedule. The services paid for under the Schedule are defined and described by billing codes that are part of the Healthcare Common Procedure Coding System. Part I of that

system is comprised of Current Procedural Terminology codes which are created by the American Medical Association.

Generally speaking, the payment for each service under the Fee Schedule is calculated as a product of the relative value for the service, the conversion factor, and the geographic adjustment factor. 42 U.S.C. § 1395w-4(b)(1). This case concerns the calculation of the relative values assigned to radiation therapy and add-on ultrasound scans. *See* Compl. ¶¶ 162–166. In response to changes in clinical practice and Current Procedural Terminology billing code revisions by the American Medical Association, CMS reevaluated the payment structure for superficial radiation therapy used to treat skin cancer, and for high-resolution ultrasound scans used in connection with that therapy. 90 Fed. Reg. 49266, at 49384, 49386-87. CMS examined claims data showing unusually high utilization of ultrasound scans and other information regarding how the services have been furnished in practice, including stakeholders' comments that ultrasound imaging functions, at best, as localization or treatment guidance that is ancillary to the provision of radiation therapy, rather than as a separate diagnostic service. *Id.* at 49380-81, 49386-88.

CMS determined that the resources associated with ultrasound scans should be reflected in the valuation of the radiation therapy services themselves, rather than paid separately in all circumstances. *Id*. at 49384-87. CMS noted that bundling the payment for the ultrasound scans into the payment for radiation therapy in this way would bring billing for these procedures into alignment with the Physician Fee Schedule payment for other radiation oncology services. *Id.* at 49386. CMS therefore revised the relative value units associated with the codes for radiation therapy and ultrasound, adjusting the work component, practice expense component, and malpractice component as necessary. *Id.* at 49380-81, 49386.

Relative values are relative in another sense: Congress said that changing the relative values may not significantly change the absolute amount that the Medicare program will pay in either an upward or downward direction except within a very small margin ($20 million nationwide out of roughly $500 billion in Part B reimbursements annually). 42 U.S.C. § 1395w-4(c)(2)(B)(II). In other words, the Physician Fee Schedule's relative values must ensure that it is budget neutral. *Id.* Thus, raising the number assigned as the relative value of some procedures will not significantly raise federal expenditures, but will instead lower the amounts paid for other procedures whose relative value numbers, even if unchanged, will be lower relative to the raised-value procedures.

As with several other Medicare payment schemes that are intended to be budget-neutral, Congress specified that "there shall be no administrative or judicial review under section 1395ff of this title or otherwise" of the Secretary's "determination of relative values." 42 U.S.C. § 1395w-4(i)(1)(B). Congress further prohibited review of "the collection and use of information in the determination of relative values under subsection (c)(2)(M)." *Id.* § 1395w-4(i)(1)(F).

### D. Background on the Five Challenged Local Coverage Determinations

#### 1. Development and Issuance

Five out of seven Medicare contractors, who cover different geographical jurisdictions, collaborated on the Local Coverage Determinations at issue in this case. Each *proposed* Local Coverage Determination can be downloaded by entering its unique identification number on CMS's public Medicare Coverage Database, at https://www.cms.gov/medicare-coverage-database/search.aspx. The unique identification numbers for each contractor are: CGS Administrators, LLC, DL40179; National Government Services, Inc., DL40168; Noridian Healthcare Solutions, LLC, DL40176; Palmetto GBA, DL40189; and WPS, DL40193. Entering the same number, minus the "D," allows access to each *final* local coverage determination on the

same CMS website. *Id.*

The five Local Coverage Determinations are identical, though they list unique contractor information. *Id.* The Local Coverage Determinations do not constitute a national coverage determination, which is governed by a separate process as noted above. Nor do the five separate Local Coverage Determinations at issue cover the whole nation. Two Medicare contractors, First Coast Service Options, Inc. and Novitas Solutions, Inc., did not participate in the preparation of the challenged Local Coverage Determinations, nor, to date, have they issued any such determinations themselves. Declaration of Juan L. Schaening Perez, M.D. (Ex. 1) ("Schaening Perez Decl."), ¶¶ 3, 8.

The referenced five Medicare contractors issued the final Local Coverage Determinations in accordance with the thorough process set forth in § B, above. This process included a rigorous review of the evidence, meeting with subject matter experts who served on the Contractor Advisory Committee, issuing the proposed Local Coverage Determinations with comment periods (from May 15, 2025 through June 28, 2025), conducting an open meeting, publishing responses to comments (*see*, *e.g.*, Ex. 3), revising the proposed Local Coverage Determinations, publishing the final Local Coverage Determinations, and providing another notice period (from January 15, 2026 through February 28, 2026) before the final Local Coverage Determinations became effective on March 1, 2026. Ex. 1, ¶¶ 7-12. The Medicare contractors also issued the identical Articles, which merely provide technical guidance on implementation of the Local Coverage Determinations. *Id.* at ¶ 10; *see*, *e.g.*, Ex. 4 (WPS's Articles). The Articles' effective date is March 1, 2026. *Id.* at 16. Neither the Secretary nor CMS directed the Medicare contractors to issue the proposed or final Local Coverage Determinations, or the Articles. Ex. 1, ¶ 11; Exs. 2-4.

WPS led the Medicare contractors' workgroup on the Local Coverage Determinations. Ex.

1, ¶¶ 7-10. On October 17, 2024, the workgroup convened a Contractor Advisory Committee meeting. *Id*. at ¶ 12; Ex. 2 at 23. SkinCure's co-founder, Daniel Ladd, Jr., D.O., a leader in the Dermatology Association of Radiation Therapy ("DART") group that lobbies for ultrasound scans coverage, participated in the meeting, as did another DART leader, Jacob Scott, M.D. Drs. Ladd and Scott were the only two Committee members on the panel of twelve to vote in favor of covering every instance of ultrasound scans administered with superficial radiation therapy. *See* DART, About Us, https://perma.cc/K76C-84KV (listing Drs. Ladd and Scott as leadership); Ex. 1 at ¶ 12 (confirming Contractor Advisory Committee participation and votes of Drs. Ladd and Scott); Ex. 2 at 23 (discussing Committee votes); *see also* Open Lobby, https://perma.cc/6F6T-K7Z7 (listing PatientsACT's executive director as a DART lobbyist). The Committee reached "a consensus" that superficial radiation therapy is "a well-established therapy for non-melanoma skin cancers" but the panelists, on the whole, believed that the literature presented questions and discrepancies regarding the use of "initial and daily" ultrasound scans performed with superficial radiation therapy. Ex. 2 at 23. Many of the subject matter experts "questioned the value of the ultrasound image guidance because they thought it was based on highly flawed and conflicted literature that had been rushed through an inadequate review process." *Id.*

2. <u>"Reasonable and Necessary" Analysis for Superficial Radiation Therapy and Ultrasound Scans</u>

In the five Medicare contractor jurisdictions where the Local Coverage Determinations are in effect, Medicare will continue to cover superficial radiation therapy for appropriate patients, but will not cover ultrasound scans used in connection with superficial radiation therapy because the determinations find such scans are not reasonable and necessary. *See* Ex. 2 at 10, 14-15, 18-23; Ex. 3 at 6-7, 11-12, 14-15. In reaching their determinations, the Medicare contractors reviewed the published and recommended guidelines from leading organizations such as the National

Comprehensive Cancer Network, the American Academy of Dermatology Association, and the American Society of Radiation Oncology. Ex. 2 at 8-15. The Medicare contractors also considered peer-reviewed literature and the opinions of a consortium of experts. *Id.* at 8-15; 22-23. These sources recommend using superficial radiation therapy to treat only certain types of skin cancer, such as smaller, less aggressive lesions or tumors, and using the therapy only for non-surgical candidates. *Id.; see also id.* at 10 (defining "non-surgical candidates"); Ex. 1, ¶¶ 9, 14-17.

The Medicare contractors determined that the retrospective studies relied upon by advocates for ultrasound scans do *not* support adding the scans to superficial radiation therapy in treating skin cancer. The Medicare contractors' rationale provided in part:

> [F]rom the retrospective studies cited above, there is no evidence to support that the addition of HRUS [high resolution ultrasound] to SRT [superficial radiation therapy] is required for the treatment of low-risk BCC or low-risk SCC [basal cell carcinoma and squamous cell carcinoma, two non-melanoma skin cancers]. Comparing HRUS/SRT with prior older technology SRT does not provide additional meaningful comparisons since newer technology machines for delivering SRT have different energy settings and more recent published data with SRT shows nearly equivalent recurrence rates with longer periods of follow-up. In addition, when comparisons were made to the SRT studies without HRUS, no corrections were made for the fact that the SRT studies without HRUS had also included more aggressive lesions and histological subtypes and often larger cutaneous tumors. The smaller more favorable lesions were more preponderant in the retrospective IGSRT [image-guided superficial radiation therapy] studies that were published. Therefore, the quality of evidence is low to support the use of HRUS with SRT.

Ex. 2 at 22. The Medicare contractors also observed that "no randomized clinical studies or prospective studies" show that "the additional use of high-resolution ultrasound guidance (HRUS) improves the short-term and long-term recurrence rates" of non-melanoma skin cancers treated with superficial radiation therapy. *Id.* at 9. In their responses to comments, the Medicare contractors further explained that:

> [T]here is no evidence to support that the addition of HRUS to SRT is required for the treatment of low-risk BCC or low-risk SCC. HRUS IG-SRT's comparative safety and effectiveness cannot be determined because available comparison

> studies are at high risk of bias and provide indirect comparisons with standard care for NMSC [non-melanoma skin cancers], such as MMS [Mohs micrographic surgery]. Prospective comparison studies that directly compare HRUS IG-SRT and surgery in well-matched patient groups are needed to enable conclusions on comparative outcomes.

Ex. 3 at 6-7. Another response to a comment explained that "no direct head-to-head trials" exist to compare outcomes between patients who received superficial radiation therapy with ultrasound scans and those who received superficial radiation therapy only, which itself is an effective treatment for appropriate cases. *Id.* at 12. The Medicare contractors explained, again, that "the quality of evidence" to support superficial radiation therapy with ultrasound scans is low. *Id.* In particular, studies touting a "99% cure rate" for superficial radiation therapy with ultrasound scans had a high risk of bias. *Id.* Importantly, the Medicare contractors noted that "there are no validated protocols for assessing tumor depth by ultrasound nor correlation of ultrasound tumor depth with microscopic tumor invasion." *Id.*; *see also* Ex. 1 at ¶¶ 15-17. As summarized in the response to comments, "there is insufficient evidence to demonstrate [high-resolution ultrasound scan] guidance improves outcomes of SRT treatment." Ex. 3, at 9.

In sum, under the Local Coverage Determinations, superficial radiation therapy is still covered by Medicare for patients for whom it is clinically indicated (including for patients with a documented refusal of surgery), but ultrasound scans in connection with superficial radiation therapy are not covered. Ex. 1, ¶ 14; Ex. 2 at 10-11, 22; Ex. 3 at 6-9; Ex. 4. Nothing in the Determinations precludes Medicare providers from practicing medicine as they see fit, including by using ultrasound scans in connection with superficial radiation therapy, but providers and their Medicare beneficiary patients can expect most claims for reimbursement for ultrasound scans to be denied in jurisdictions where the Determinations are in effect.

3. The Local Coverage Determinations Do Not Impact Coverage for Superficial Radiation Therapy Provided by Dermatologists

Plaintiffs assert that the Local Coverage Determinations made dermatologists fearful of providing superficial radiation therapy because it is unclear if their services will receive Medicare coverage. Compl. ¶ 181, Pls.' Mem. at 32-33. The Determinations do not preclude qualified dermatologists from providing superficial radiation therapy in their offices. *See* Schaening Perez Decl. (Ex. 1), ¶ 13; Ex. 2 at 23; Ex. 5 at 23. The original Determinations provided in pertinent part: "All radiation oncology therapeutic services will be considered reasonable and necessary only when performed by appropriately trained providers." *See, e.g.*, Ex. 2 at 23. The Determinations further noted that:

> Training and expertise must have been acquired within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty, (i.e., Radiation Oncology OR by a qualified dermatology program of training with didactic and clinical experience in radiation).

*Id.* In the responses to comments on this language, the Medicare contractors clarified that: "The LCD [Local Coverage Determination] does not prohibit dermatologists from performing SRT [superficial radiation therapy], it expects that any provider utilizing these services has the experience and training necessary to deliver SRT in a safe manner and complies with all current guidelines for radiation therapy." *See, e.g.*, Ex. 3 at 10. The continued ability of trained dermatologists to provide superficial radiation therapy negates Plaintiffs' assertions that lobbying from Mohs surgeons or radiation oncologists (Pls.' Mem. at 35, 40) drove the Local Coverage Determinations.

Based on additional feedback, and prior to this lawsuit, WPS identified the need for a minor technical amendment to the Local Coverage Determinations; the five Medicare contractors issued the same amendment to the Determinations. *See* Ex. 1 at ¶ 13; Ex. 5 at 23 (revised version). The amendment revised only the single clause, "of training with didactic and clinical experience in

radiation," in a single sentence, as follows:

> A qualified physician for this service is defined as follows: training and expertise must have been acquired within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty (i.e., Radiation Oncology OR by a qualified dermatology program *and the dermatologist has didactic training* and clinical experience in radiation *treatment*).

*See*, *e.g*., Ex. 5 at 23 (emphasis added); Ex. 1 at ¶ 13.

### E. Three Avenues Exist for Review of Local Coverage Determinations

There are three avenues for Plaintiffs to seek administrative review of the Local Coverage Determinations. *First,* as discussed in § A, *supra*, when a Medicare contractor issues an adverse initial determination—*e.g.*, denying a claim for a service as not reasonable and necessary—claimants (such as Medicare beneficiaries or Medicare providers of services) have the right to challenge that determination through the administrative review scheme. All stages must be completed before judicial review. *Id.* None of these Plaintiffs alleges that they or their proxies have sought review of a denied claim for ultrasound scans in connection with superficial radiation therapy, much less that they exhausted the administrative review process for a denied claim.

*Second*, a separate appeals process applies for an "aggrieved party" to challenge the validity of a local coverage determination directly before an ALJ. 42 U.S.C. § 1395ff(f)(2). Aggrieved parties are "individuals entitled to benefits under part A of this subchapter, or enrolled under part B of this subchapter, or both, who are in need of the items or services that are the subject of the coverage determination." *Id.* § 1395ff(f)(5). Equipment suppliers like SkinCure and organizations like PatientsACT cannot appeal the validity of a local coverage determination directly, because they are not considered aggrieved parties. *Id.*; 42 C.F.R. §§ 405.1062(c), 426.320(a). But nothing prevents SkinCure or PatientsACT from assisting a beneficiary who has

standing to initiate the ALJ review process.[1] *See* CMS, *Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations*, 68 Fed. Reg. 63692, 63695 (Nov. 7, 2003) (noting that "beneficiaries may seek assistance" from knowledgeable third parties in developing their request for review, but "the beneficiary may not assign his or her legal right to request a review of an LCD or an NCD to a third party."). No Patient Plaintiff alleges having sought ALJ review of the Local Coverage Determinations.

*Third*, under the Medicare policy described in the Manual at § 13.3, an "interested party" may seek reconsideration of a final local coverage determination. *Id.* §§ 13.3.1, 13.3.2. The reconsideration process is available to SkinCure and PatientsACT. Indeed, SkinCure (through their attorneys in this litigation) requested reconsideration of the final Local Coverage Determination on March 2, 2026. Ex. 1 at ¶ 18. Its request is pending. PatientsACT has not sought reconsideration to date. *Id.* The Medicare contractor's reconsideration process does not have a path for judicial review, but if a local coverage determination is revised because of a reconsideration process, the revised determination can be challenged again, under the three avenues described above.

**LEGAL STANDARDS**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Supreme Court has rejected a sliding scale approach to the preliminary injunction factors, holding that "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

---

[1] In rare circumstances not met here, a beneficiary with standing may bypass the ALJ and Board review process to seek review of a local coverage determination directly in federal court. *Id.* § 1395ff(f)(3), (5); *see infra*, § I.A.3-4.

his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20).

On a motion for provisional relief, the moving party bears the burden of persuasion and must demonstrate "by a clear showing" that the requested relief is warranted. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The required showing is heightened "[w]here an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act." *Elec. Priv. Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014).

Thus, if the Court concludes that a claim fails as a matter of law—on a point of jurisdiction or merits—then a preliminary injunction is inappropriate. *See U.S. Ass'n of Reptile Keepers v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017). Because preliminary injunctions are not "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not [even] follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). Even if the movant can show a strong likelihood of success on the merits but fails to make a sufficient showing of irreparable injury, the Court should deny the request for preliminary injunctive relief without considering the other factors. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Requests for a stay under 5 U.S.C. § 705 are "evaluated . . . under the same post-*Winter*, four-factor framework" as requests for a preliminary injunction. *Save Long Beach Island, Inc. v. U.S. Dep't of Commerce*, Civ. A. No. 25-2214 (CJN), 2025 WL 2996157, at *3 (D.D.C. Oct. 24, 2025) (collecting cases).

**ARGUMENT**

Plaintiffs' motion for a stay and for a preliminary injunction should be denied because they fail to carry their heavy burden of justifying extraordinary injunctive relief. Because Plaintiffs

effectively seek to rescind the Final Payment Rule and Local Coverage Determinations that have already entered into force, Plaintiffs' requested relief is mandatory in character and subject to the "higher standard" for such injunctions. *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016); *see Gober v. Collins*, Civ. A. No. 25-0714, 2025 WL 1360434, at *4 (D.D.C. May 8, 2025) (Contreras, J.) ("[T]he power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969))).

## I. <u>Plaintiffs Are Not Entitled To Provisional Relief.</u>

### A. Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims Because This Court Lacks Jurisdiction to Hear Them.

Plaintiffs have failed to identify a basis for a waiver of sovereign immunity, and no subject-matter jurisdiction exists under any of the five potential sources for jurisdiction Plaintiffs identify: (1) the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; (2) the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; (3) mandamus jurisdiction, 28 U.S.C. § 1361; (4) federal question jurisdiction, 28 U.S.C. § 1331; and (5) the Medicare statute, 42 U.S.C. § 1395ff(f)(3).[2] Compl. ¶ 9. Because sovereign immunity is not waived, and none of the cited statutes supply subject-matter jurisdiction, Plaintiffs are not likely to succeed on the merits of their claims.

#### 1. <u>The First Four Provisions Cited by Plaintiffs Do Not Supply Jurisdiction.</u>

Plaintiffs' first four alleged bases for subject-matter jurisdiction fall quickly by the wayside. *First*, the Declaratory Judgment Act contains no waiver of sovereign immunity and does not provide an independent basis for jurisdiction; it merely creates a remedy. *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72 (1950); *Rueth v. EPA*, 13 F.3d 227, 231 (7th Cir. 1993); *Maynard v. Architect of the Capitol*, 544 F. Supp. 3d 64, 77 (D.D.C. 2021).

---

[2] Section 1395ff(f)(3) does not supply jurisdiction under the Medicare statute; it allows for *waiver* of statutory exhaustion requirements in circumstances not present here. *See* § I.A.3-4, *infra*.

*Second*, the Supreme Court long has held that "the APA is not to be interpreted as an implied grant of subject-matter jurisdiction to review agency actions." *Califano v. Sanders*, 430 U.S. 99, 105, (1977) (no jurisdiction for APA claim against HHS's predecessor without exhaustion of remedies under the Social Security Act). While the APA does contain a waiver of sovereign immunity, it does not apply if "statutes preclude judicial review." 5 U.S.C. § 701(a); *see also Darby v. Cisneros*, 509 U.S. 137, 146 (1993) (agency exhaustion requirements mandated in statutes or regulations must be completed before APA review). Here, the APA does not apply because Plaintiffs have not exhausted administrative remedies provided by the Medicare statute as discussed in Background § A, *supra*.

*Third*, Plaintiffs raise the mandamus statute solely by a single citation to 28 U.S.C. § 1361 in paragraph 9 of their complaint. *Id.* The mandamus statute provides no independent basis for jurisdiction. Mandamus is an "extraordinary remedy." *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 109 (1988). It is available only if a plaintiff "has exhausted all other avenues of relief," and "only if the defendant owes [plaintiffs] a clear nondiscretionary duty." *Ringer*, 466 U.S. at 616. Here, Plaintiffs have not exhausted all other avenues of relief—namely, their administrative remedies under the Medicare statute—so mandamus jurisdiction necessarily does not exist. *Id.*; *Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1149, (D.C. Cir. 2024) (upholding dismissal where plaintiff failed to meet its burden of showing that it satisfied the jurisdictional requirements for mandamus relief). While the inquiry can end here, Plaintiffs also alleged no facts to support the second part of the test; the word "duty" does not even appear in the complaint.

Plaintiffs also cannot establish jurisdiction under their *fourth* alleged basis, 28 U.S.C. § 1331, the federal question statute. Because Plaintiffs' allegations involve Medicare Local Coverage Determinations and a Final Payment Rule, the "federal questions" in their complaint

necessarily involve the Medicare statute. The Medicare statute bars suits brought under § 1331. *See* 42 U.S.C. § 405(h), incorporated into the Medicare statute by 42 U.S.C. § 1395ii (no "action against the United States, the [Secretary] or any officer thereof shall be brought under section 1331 . . . of Title 28 to recover any claim arising under this subchapter"). Accordingly, the Supreme Court has recognized that "Section 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all claim[s] arising under the Medicare statute." *Ringer*, 466 U.S. at 615 (cleaned up); *see also Ill. Council*, 529 U.S. at 13. Plaintiffs cannot invoke § 1331 jurisdiction.

2. <u>No Jurisdiction Exists under the Medicare Statute.</u>

In examining jurisdiction under the Medicare statute, courts first look to whether the statute provides "both the standing and the substantive basis" for a claim, in which case the claim arises under that statute. *Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 456 (1999) (cleaned up). Even if another statute (or the Constitution) provides a substantive basis for a claim, "all aspects" of a claim arising under the Medicare statute must "be channeled first into the administrative process which Congress has provided for the determination of claims for benefits." *Ringer*, 466 U.S. at 614, 622. Plaintiffs challenge Medicare Local Coverage Determinations and a Medicare Final Payment Rule, so their claims arise under the Medicare statute, and the mandatory administrative review process applies. *See* Background § A, *supra*. Plaintiffs or their proxies must obtain a "final decision" after a "hearing" by the Secretary, which is a condition of Congress's waiver of sovereign immunity and is a "statutorily specified jurisdictional prerequisite" to suit. *Weinberger v. Salfi*, 422 U.S. 749, 763-64, 766 (1975); *accord Ringer*, 466 U.S. at 617; *Ill. Council*, 529 U.S. at 23. They have not met these conditions, and so the Medicare statute does not provide jurisdiction. The Medicare statute's judicial review bar is not limited by the nature of relief (*i.e.*, declaratory or injunctive) that is sought. *Ill. Council*, 529 U.S. at 13-14. Neither type of relief can be pursued without administrative exhaustion. *Ringer*, 466 U.S. at 611-621.

Here, Plaintiffs' claims also are not ripe. *Cf. Asante v. Azar*, 436 F. Supp. 3d 215, 227 (D.D.C. 2020) (dismissing for lack of subject-matter jurisdiction hospitals' unripe challenges to Medicare payment scheme that was not subject of final agency action). None of the six Patient Plaintiffs has alleged that Medicare denied reimbursement for superficial radiation therapy or an ultrasound scan provided in connection with such therapy. Thus, none of the six can present for administrative review a claim denial (in connection with which they conceivably could channel other challenges to the Local Coverage Determinations and Final Payment Rule).

The remaining two Plaintiffs, SkinCure and PatientsACT, are not Medicare providers or beneficiaries, and so will not have been denied claims for services. But it is well-established that these two Plaintiffs can work with proxies to raise claims on their behalf. *RICU LLC v. HHS*, 22 F.4th 1031, 1039 (D.C. Cir. 2022) (holding RICU's client hospitals were "adequate proxies" to channel RICU's challenges through Medicare administrative review on a "concrete" payment claim); *Row 1*, 92 F.4th at 1147 ("record suggests there are adequate proxies for Appellant that have the incentive to seek administrative review"); *cf. Ill. Council*, 529 U.S. at 5 ("The association *or its members* [*i.e.*, Medicare providers] must proceed instead through the special review channel that the Medicare statutes create" (emphasis added)).

While SkinCure and PatientsACT assert that their interests are not "aligned" with Medicare providers or Medicare beneficiaries and so they cannot rely on proxies, Compl. ¶ 14, their own complaint belies these assertions. For instance, SkinCure alleges that its "practice partners" will receive reduced Medicare payments (of which SkinCare gets a cut). *Id.* ¶¶ 137, 139. PatientsACT alleges that its "members," who are Medicare beneficiaries, may receive adverse coverage decisions. *Id.* ¶¶ 137. PatientsACT's executive director further avers that the organization's "mission" is to protect beneficiary access to superficial radiation therapy with ultrasound scans,

and to ensure its availability on behalf of dermatology practices that provide the service. Pls.' Mem. Ex. C. at ¶¶ 16, 19, 21, 24. Thus, PatientsACT's interests are aligned with both beneficiaries and providers. *Id*. These potential proxies could present and channel claims through all levels of administrative review for SkinCure or PatientsACT, as required by § 405(g). *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976); *Ill. Council*, 529 U.S. at 15, 24.

Plaintiffs' assertion that this Court should somehow apply *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024) (Pls.' Mem. at 43) is misplaced—there is no final agency decision for this court's review because Plaintiffs did not exhaust their administrative remedies. Deference or lack thereof to an agency decision is a non-issue. Because the Medicare statute's presentment and exhaustion requirements have not been satisfied, that statute cannot provide jurisdiction and judicial review cannot thereby occur.

3. Waiver of Medicare's Exhaustion Requirements Does Not Apply.

The Supreme Court has explained why exhaustion under § 405(g) is so important, and why the circumstances to waive it are rare. *Salfi*, 422 U.S. at 765; *Ill. Council*, 529 U.S. at 13. Waiver of exhaustion may apply under "limited" conditions. *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1130, (D.C. Cir. 1992). Those conditions generally occur in one of two contexts, neither of which exists here.

First, as the Court held in *Bowen v. Michigan Academy of Family Physicians*, a party may be able to file in federal court under 28 U.S.C. § 1331 where exhaustion would not simply *channel* review through the agency, but rather would mean "no review at all." 476 U.S. 667, 680 (1986). This exception to exhaustion does not apply here, because there is a detailed and comprehensive administrative review process that provides an avenue for Plaintiffs to press any future challenge to the Local Coverage Determinations or the Final Payment Rule (if, *arguendo*, mandatory preclusion under the Medicare statute did not apply for the Final Payment Rule challenge—but it

does). *See* Background §§ A, E, *supra*; *Ill. Council*, 529 U.S. at 17, 22-23. With respect to local coverage determinations only, there are two other avenues for review—a direct appeal to an ALJ by a beneficiary, and the reconsideration process before the Medicare contractor, available to beneficiaries and interested parties. *See* Background § E, *supra*. Plaintiffs cannot meet the narrow "no review at all" exception.

Second, exhaustion may be excused when a plaintiff brings a "constitutional claim" that is "entirely collateral" to its claims under the Medicare statute. *Mathews*, 424 U.S. at 330. Plaintiffs mention the Fifth and Tenth Amendments in passing when they claim that the Local Coverage Determinations are vague (they are not) or try to regulate medicine (they do not). Compl. ¶¶ 178, 182, 187-88. Putting aside whether they have even stated a constitutional claim (they have not), Plaintiffs' allegations are not "wholly" collateral, but rather are "inextricably intertwined" with the claims for benefits. *Ringer*, 466 U.S. at 614, 618. Indeed, part of the relief Plaintiffs seek is for Medicare to cover and pay all claims that involve superficial radiation therapy with ultrasound, which would encompass all concrete payment claims involving all Plaintiffs or their proxies. *See* Compl., Prayer for Relief, ¶¶ c, d, g. In sum, neither of the two conditions is met that could allow a waiver for any of the Plaintiffs of the mandatory administrative review process described in Background § A.

4. <u>Plaintiffs Lack Standing under the Medicare Statute and Article III.</u>

Plaintiffs raise the separate assertion that a waiver of administrative review applies under 42 U.S.C. § 1395ff(f)(3), albeit while incorrectly casting § 1395ff(f)(3) as an independent jurisdictional basis. Compl. ¶ 9. But Plaintiffs cannot invoke subsection (f)(3)'s waiver process because they lack standing to do so under both subsection (f)(5) and Article III.

Subsection (f)(5), titled "Standing," provides in pertinent part that: "An action under this subsection seeking review of a … local coverage determination may be initiated only by

individuals … enrolled under part B … who are in need of the items or services that are the subject of the coverage determination." 42 U.S.C. § 1395ff(f)(5). By its terms, subsection (f)(5) cannot apply to a company like SkinCure or an organization like PatientsACT. It applies only to *individual*s enrolled in Medicare Part B. Thus, if subsection (f)'s review processes apply at all, they apply only to the Patient Plaintiffs. 42 U.S.C. § 1395ff(f).

But the Patient Plaintiffs cannot establish standing under subsection (f)(5), because they are not "in need of the … services that are the subject of the coverage determination." *Id.* Four of the six Patient Plaintiffs admit that they have already *completed* superficial radiation therapy for their skin cancer. Pls.' Mem. Ex. E, ¶¶ 8-9, 13 (alleging conclusion of superficial radiation therapy cycles but speculating that it is "likely" that more may be needed); *id*. Ex. F, ¶¶ 8-9 (alleging conclusion of superficial radiation therapy cycles, with no information about need for future therapy); *id*. Ex. H, ¶¶ 8-11, 15 (alleging conclusion of superficial radiation therapy cycles, and speculating that future therapy is "likely"); *id*. Ex. I, ¶¶ 8-10, 13 (alleging completion of superficial radiation therapy cycles, and speculating that future therapy is "likely"). These four Plaintiffs have not demonstrated a current "need" for therapy, whether with or without ultrasound scans, and so they lack standing to proceed under § 1395ff(f)(5). For the same reasons, they have not established a concrete and particularized injury for purposes of Article III standing, which provides an additional ground as to why they cannot succeed on the merits. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Only two of the six Patient Plaintiffs allege that they have a current need for skin cancer treatment. *See* Pls.' Mem. Ex. D, ¶ 16 (alleging diagnosis with six new skin cancer lesions for which the declarant is "in the process of scheduling" superficial radiation therapy with ultrasound); Pls.' Mem. Ex. G, ¶¶ 9, 12 (alleging diagnosis of skin cancer for which the declarant is "currently

undergoing" superficial radiation therapy with ultrasound, and that declarant is in the "middle" of a treatment cycle). Tellingly, nowhere do these two declarants allege *why* they have a specific need for the *ultrasound add-on* to treat their skin cancer. Pls.' Mem. Exs. D, G. Indeed, as discussed above, they do not have such a need—ultrasound scans do not treat cancer, radiation does. Ex. 1, at ¶ 14; Background, § D. They cannot establish standing under subsection (f)(5). Nor can the two remaining Patient Plaintiffs show a concrete injury based on the Local Coverage Determinations that would satisfy Article III. Without an actual denied claim for an ultrasound in connection with superficial radiation therapy, and without a demonstrated inability to receive superficial radiation therapy, Plaintiffs cannot plausibly allege an injury-in-fact to justify a lawsuit. *Carney v. Adams*, 592 U.S. 53, 64 (2020); *Cal. Clinical Lab. Ass'n v. Sec'y of Health & Hum. Servs.*, 104 F. Supp. 3d 66, 68-69, 79 (D.D.C. 2015).

In *California Clinical Laboratory Association*, the court concluded that, before a Jane Doe laboratory patient could proceed in federal court under subsection (f)(3), she had to demonstrate her standing to file a lawsuit challenging local coverage determinations and the process for issuing them. *Id.* at 72, 79. But she failed to show that the specific determinations or the issuance process caused her a "concrete and particularized" injury that is "actual or imminent, not conjectural or hypothetical," *id.* at 79. Unlike the two patient Plaintiffs here, Jane Doe had a denied claim for coverage, but nonetheless could access laboratory test results and was not charged for them, so suffered no injury-in-fact. *Id.* In contrast, the two Patient Plaintiffs do *not* have a denied claim for coverage, nor have they alleged that they cannot access superficial radiation therapy, with or without ultrasound scans, so they have even less of a chance of establishing standing than Jane Doe. Pls.' Mem. Exs. D, G. Like Jane Doe, the two patient Plaintiffs have suffered no injury-in-fact and cannot establish standing. *Cal. Clinical Lab. Ass'n*, 104 F. Supp. 3d at 79.

Absent a plausible allegation of injury, the complaint reduces to "a desire to vindicate" Plaintiffs' "view of the law." *Carney*, 592 U.S. at 64. This is not an interest that suffices to establish standing, because "a grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.'" *Id.* at 58, 59. Because the Patient Plaintiffs cannot carry their burden on the injury-in-fact requirement, they cannot establish Article III standing. *Spokeo*, *Inc. v. Robins*, 578 U.S. 330, 338 (2016).

5. Plaintiffs Fail to Meet Section 1395ff(f)(3)'s Waiver Criteria.

If a plaintiff has standing to sue, and if subsection (f)(3)'s waiver criteria are met (neither condition is met here), a Medicare beneficiary may bypass subsection (f)(2)'s administrative review requirements, and may proceed in federal court to challenge a local coverage determination *only*. *See* 42 U.S.C. § 1395ff(f). Even if the patient Plaintiffs could establish standing under subsection (f)(5) and Article III (they cannot), they nonetheless do not qualify for a waiver of subsection (f)(2)'s administrative review process, because they do not meet subsection (f)(3)'s requirements for such a waiver. 42 U.S.C. § 1395ff(f).

To provide context, §1395ff(f) is titled "Review of coverage determinations." Subsection (f)(1) addresses national coverage determinations by the Secretary (not at issue here) and subsection (f)(2) addresses local coverage determinations by Medicare contractors. *Id.* Under subsection (f)(2)(A)(i), an "aggrieved party" may seek review of a local coverage determination before an ALJ by filing a complaint. *Id.* Subsection (f)(2)(A)(i)(I) and (II) set forth the ALJ's responsibilities to review the record, to permit discovery, to take evidence if the record is inadequate or incomplete "to evaluate the reasonableness of the determination," and to consult with experts. *Id.* In issuing a decision, the ALJ defers only to the Secretary's "reasonable" findings of fact, interpretations of law, and applications of fact to law. *Id.* § (f)(2)(A)(i)(III).

In turn, subsection (f)(3) provides in pertinent part:

> **(3) No material issues of fact in dispute**
> In the case of a determination that may otherwise be subject to review under paragraph … (2)(A)(i), where the moving party alleges that—
>
> (**A**) there are no material issues of fact in dispute, and
> **(B)** the only issue of law is the constitutionality of a provision of this subchapter, or that a regulation, determination, or ruling by the Secretary is invalid,
>
> the moving party may seek review by a court of competent jurisdiction without filing a complaint under such paragraph and without otherwise exhausting other administrative remedies.

*Id*. In other words, subsection (f)(3) spares the ALJ from issuing a decision that requires only a legal determination as to the validity of a local coverage determination, *i.e.*, in cases when it is not necessary to develop a record, issue findings of fact, or consult with experts. *Id.*

Subsection (f)(3) does *not* excuse compliance with the mandatory administrative review process under subsection (b)(1)(A) for claims *other* than those involving the validity of a local coverage determination. *Id.* § 1395ff; Background § A, *supra*. Under subsection (f)(3)'s plain language, it applies *only* to a "determination that may otherwise be subject to review under paragraph … (2)(A)(i)." 42 U.S.C. § 1395ff(f)(3). By its own terms, subsection (f)(3) cannot apply to waive administrative review requirements for the Final Payment Rule, which is not a determination under subsection (f)(2)(A)(i). *Id*. Likewise, the Articles are not determinations for which review may be sought; they merely implement the Local Coverage Determinations. Manual, § 13.5.3; Pls.' Mem. at 11-12.

Plaintiffs impermissibly attempt to extend subsection (f)(3) to apply to more than local coverage determinations. They allege that all of Plaintiffs' claims are "subject to judicial review" under subsection (f)(3) "because there are no material issues of fact in dispute and the only issue of law is the validity of the Agency's Action, consisting of the *2026 MPFS Rule, Final LCDs, and Billing Articles*." Compl. ¶ 15 (emphasis added). The court should reject this blatant misreading of subsection (f)(3). 42 U.S.C. § 1395ff(f). Again, only Medicare beneficiaries—not SkinCure nor

PatientsACT—can access administrative review under subsection (f)(2). *Id.* And Plaintiffs' attempt to apply subsection (f)(3) to seek judicial review of the Final Payment Rule, the Articles, or anything other than the legal validity of the final Local Coverage Determinations is contrary to subsection (f)(3)'s plain language. *Id.*

The Patient Plaintiffs' attempt to seek judicial review of the Local Coverage Determinations under subsection (f)(3), without prior ALJ and Board review, must fail. The Patient Plaintiffs do not satisfy the remaining criteria of subsection (f)(3). 42 U.S.C. § 1395ff(f)(3). First, subsection (f)(3) itself is titled "No material issues of fact in dispute," and Defendants submit it requires just that: a dispute that involves only whether a local coverage determination is valid as a matter of law. *Id.* Subsection (f)(3)(A) also requires that Plaintiffs "allege" that there are no material facts in dispute such that they "may seek" judicial review. *Id.* Here, Plaintiffs may *not* seek judicial review, because despite a bare allegation at paragraph 15 that "there are no material issues of fact in dispute" (which Defendants vigorously deny), the balance of the complaint alleges *many* factual disputes. Plaintiffs have pled away the potential applicability of subsection (f)(3). 42 U.S.C. § 1395ff(f)(3).

To state the most obvious area of dispute, Plaintiffs' declarant, Dr. Ladd, raises numerous factual disputes about the bases for the rationale contained in the Local Coverage Determinations. *Compare* Pls.' Mem. Ex. A *with* Schaening Perez Decl. (Ex. 1). This is precisely the type of situation that requires ALJ and then Board review under subsection (f)(2)—to allow consultation with experts, fact-finding, and development of a record for judicial review. 42 U.S.C. § 1395ff(f)(2)(A)(i); *see also Salfi*, 422 U.S. at 765.

Plaintiffs' own complaint also identifies numerous other factual disputes: they dispute that the Medicare contractors used proper criteria when they issued the Local Coverage

Determinations, Compl. ¶¶ 171-172; they dispute that the Local Coverage Determinations are local (claiming that they are national in scope), Compl. ¶ 138; they dispute that superficial radiation therapy without scans remains covered for the Medicare patient Plaintiffs, Compl. ¶¶ 136-137 (claiming that the patient Plaintiffs will be forced to have surgery instead); they dispute that the Medicare contractors directed the process for establishing the Local Coverage Determinations, claiming that CMS did so, Compl. ¶¶ 247-248; they dispute the Local Coverage Determinations' evidence-based conclusions that superficial radiation therapy does not result in improved cancer cure rates when ultrasound scans are added, Compl. ¶ 124; and they dispute that the Local Coverage Determinations allow dermatologists with experience with radiation therapy to provide superficial radiation therapy, Compl. ¶¶ 180-187. The factual disputes that Plaintiffs themselves identify prevent them from satisfying subsection (f)(3)(A), and so they may not bypass administrative review. 42 U.S.C. § 1395ff(f)(3).

Nor do Plaintiffs satisfy subsection (f)(3)(B): that the "only issue of law" is that a local coverage "determination" is "invalid." *Id.* § 1395ff(f)(3)(B). Indeed, their 65-page, nine count complaint, as well as their motion for a stay, preliminary injunction, and permanent injunction reveals that there are many issues of law in this matter, not "only" one involving validity of the Local Coverage Determinations. The court should decline to allow judicial review for any Patient Plaintiff's claims because the criteria to waive administrative review are not satisfied here. 42 U.S.C. § 1395ff(f)(3). The patient Plaintiffs can seek ALJ review of the Local Coverage Determinations under subsection (f)(2), and all Plaintiffs or their proxies can use the administrative process under subsection (b)(2)(A) for all non-precluded claims. *See id.* § 1395ff; Background §§ A, C, *supra*.

6. <u>Plaintiffs Are Unlikely to Succeed on Merits-Based Challenges to the Local Coverage Determinations.</u>

As a threshold matter, the statutory standards that Plaintiffs rely upon to support their insistence that local coverage determinations must go through notice and comment rulemaking apply exclusively to the Secretary, not to Medicare contractors. *See* Pls.' Mem. at 33; 42 U.S.C. § 1395hh(a). Section 1395hh(a)(1) provides that "[t]he Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this title." *Id.* Subsection (a)(1) further provides that "[w]hen used in this title, the term 'regulations' means, unless the context otherwise requires, regulations prescribed by the Secretary." *Id.* Local coverage determinations are not regulations. Moreover, other provisions of the Medicare statute require Medicare contractors to issue local coverage determinations, not the Secretary. *See, e.g.*, 42 U.S.C. §§ 1395m-1(g)(1)(A), 1395y(*l*)(5)(D), 1395ff(f)(2)(B), 1395kk-1(a)(4). Section 1395y(*l*)(5)(A), however, provides that "[t]he Secretary shall develop a plan to evaluate new local coverage determinations to determine … to what extent greater consistency can be achieved among local coverage determinations." *Id.*

Plaintiff's procedural rulemaking claims also cannot be squared with subsection (a)(2) of 42 U.S.C. § 1395hh, which provides:

> No rule, requirement, or other statement of policy (other than [a national coverage determination]) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this title shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

*Id*. As with subsection (a)(1), subsection (a)(2) applies only to rulemaking by the Secretary. *Id.* Moreover, local coverage determinations are not legislative. That is, local coverage determinations do not "establish[] or change[] a substantive legal standard governing the scope of benefits, [or] the payment for services." *Id.* § 1395hh(a)(2).

Instead, a local coverage determination just "guides the application of" the statutory "reasonable and necessary" coverage standard in 42 U.S.C. § 1395y(a)(1)(a) "in a particular claim adjudication." *Agendia Inc. v. Becerra*, 4 F.4th 896, 900 (9th Cir. 2021). Thus, as the Ninth Circuit concluded, local coverage determinations "are not subject to the § 1395hh notice-and comment [rulemaking] process because such determinations do not 'establish[] or change[] a substantive legal standard.'" *Id.* More specifically, a local coverage determination does not establish or change the statutory "reasonable and necessary" coverage standard. *Id.*; *see also* 42 U.S.C. § 1395ff(f)(2)(B) (a Medicare contractor's local coverage determination involves "whether or not a particular item or service is covered on [a Medicare contractor]-wide basis … in accordance with" § 1395y(a)(1)(a)'s reasonable and necessary coverage standard). Since local coverage determinations simply determine coverage "in accordance with" this statutory coverage standard, they cannot establish or change the coverage standard.

Moreover, as Plaintiffs acknowledge (Pls.' Mem. at 34), the Medicare statute provides a specialized notice-and-comment process for local coverage determinations, separate and apart from 42 U.S.C. § 1395hh. In fact, 42 U.S.C. § 1395y(*l*)(5)(D) provides that "[t]he Secretary shall require each Medicare administrative contractor that develops a local coverage determination to make available on the Internet website of such contractor and on the Medicare Internet website, at least 45 days before the effective date of such determination," certain specified information. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). That principle applies with particular force here because §§ 1395y(*l*) and 1395hh "are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]." *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam). Given that the Medicare statute has specific notice-and-comment provisions targeted solely to Medicare contractors' local coverage determinations,

Plaintiffs' reliance on § 1395hh's more general process for rulemaking by the Secretary is misconceived.

Also, national coverage determinations are expressly exempt from § 1395hh(a)'s general notice-and-comment procedures for rulemaking by the Secretary, and 42 U.S.C. § 1395y(*l*)(1)–(4) establishes notice-and-comment procedures for national coverage determinations that differ from those for local coverage determinations in § 1395y(*l*)(5)(D). As the Ninth Circuit concluded, "[s]ubjecting local coverage determinations, which are not binding, to a more demanding procedure than their national, binding counterparts would make little sense." *Agendia*, 4 F.4th at 900. Furthermore, Congress recognized that local coverage determinations were regional, non-binding potential precursors to national coverage determinations when it directed the Secretary in 2003 to "develop a plan to evaluate" which local coverage determinations "should be adopted nationally." 42 U.S.C. § 1395y(*l*)(5)(A). Notably, Congress included these provisions in the same section of the Medicare statute that contains the specific but different notice-and-comment requirements applicable to national coverage determinations. *Id.* § 1395y(*l*)(3)(A)–(B). Congress's decision in 2003 to add specific provisions governing local coverage determinations in the same section of the statute that governs national coverage determinations confirms that Congress similarly did not intend for § 1395hh to apply to local coverage determinations. Rather, as § 1395y(*l*) makes clear, Congress viewed local coverage determinations as potential precursors to national coverage determinations, and, as such, equally outside the ambit of § 1395hh. *See Agendia*, 4 F.4th at 902.

Plaintiff's reliance on *Azar v. Allina Health Services*, 587 U.S. 566 (2019), is unavailing. *See* Pls.' Mem. at 33-34. *Allina* is distinguishable because the Supreme Court found that an announcement by the agency—not a Medicare contractor—as to how Medicare payment would

be calculated for thousands of hospitals nationwide "was at least a statement of policy" that is subject to § 1395hh's general notice-and-comment procedures for rulemaking by the Secretary. *Id.* at 572 (cleaned up). Here, by contrast, the five Local Coverage Determinations apply only within the jurisdiction of each issuing contractor, and the local coverage determinations are not binding at any level of the claim appeals process beyond the issuing contractor. *See Agendia*, 4 F.4th at 901–02 (rejecting reliance on *Allina*). Plaintiffs' procedural rulemaking arguments fail.[3]

In another attempt to obtain judicial review, despite the express prohibitions of § 1395ff(b)(1)(A), Plaintiffs argue that the Medicare contractors' and agency's conduct in issuing the Local Coverage Determinations is arbitrary and capricious under the APA and *ultra vires*, allowing for review of whether the agency acted without delegated authority. *See* Pls.' Mem. at 19-20, 23-27, 31-43. The D.C. Circuit, however, has explained that a plaintiff may not bypass a statutory provision expressly precluding review by simply alleging an agency's action to be "*ultra vires*." *See Dart v. United States*, 848 F.2d 217, 231 (D.C. Cir. 1988).

The principle favoring reviewability of *ultra vires* action is "narrow" and applies only when it is evident that an agency has acted in violation of a "clear and mandatory" statutory command. *Id*. This does not include instances like the instant case, where Plaintiffs' claim on the merits turn on a "dispute over statutory interpretation." *Id.* Indeed, "that the [agency] may have made an error of . . . law is insufficient [to bypass administrative review]; the [agency] must have acted without statutory authority." *Physicians Nat'l House Staff Ass'n v. Fanning*, 642 F.2d 492, 496 (D.C. Cir.

---

[3] As for Plaintiffs' references to other beneficiaries' appeals of denied claims pre-dating the Local Coverage Determinations, Pls.' Mem. at 41, those bind only the parties to those decisions, with respect to those specific claims, as Plaintiffs themselves concede. *Id*. (describing decisions are "individual coverage determinations"). Moreover, the existence of individual claim appeals pre-dating the Determinations calls into serious doubt Plaintiffs' allegations that ultrasounds scans were covered uniformly in connection with superficial radiation therapy prior to the Local Coverage Determinations. Compl. ¶¶ 193, 210.

1980) (*en banc*). In the instant case, the agency's statutory authority to delegate local coverage determinations to Medicare contractors is clear on the face of the Medicare statute, for the reasons discussed above, and the Local Coverage Determinations are neither arbitrary and capricious nor *ultra vires*.

7. Plaintiffs' Final Payment Rule Challenges Attack a Determination of Relative Values and Are Precluded by the Medicare Statute.

The Medicare statute also precludes all challenges to the Secretary's determination of relative value units under the Physician Fee Schedule. 42 U.S.C. § 1395w-4*i*(1)(B). Plaintiffs' challenge to the Final Payment Rule is a challenge to the Secretary's determination of the relative value units for superficial radiation therapy and ultrasound scans. "[I]t would be difficult for Congress to have written paragraph (B) in clearer terms prohibiting such a challenge." *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 453 (7th Cir. 2002).

Plaintiffs undoubtedly seek to challenge the Secretary's determination of relative values here, as plainly shown by their pleadings. Plaintiffs allege that "the Agency exceeded its authority and issued an unlawful "determination of relative values and relative value units." Pls.' Mem. at 18. And the entirety of count one of their complaint is a lengthy discussion of why CMS's determination of relative value units was allegedly unlawful. Compl. ¶¶ 158-166.

Plaintiffs cannot evade this preclusion of judicial review by asserting that they are seeking review, not of the determination of relative values itself, but of the allegedly erroneous method by which the Secretary reached that determination, in particular by utilizing data from the Outpatient Prospective Payment System. Pls.' Mem. at 18. Even if that were an accurate characterization of their lawsuit (and it is not), it still would not make their claims reviewable. After all, any claim that the ultimate determination of relative values is wrong necessarily involves some proximate argument that the method of getting there took one or more wrong turns. As Judge Shadur

explained in the *Anesthesiologists* case: "[I]t simply will not do for [Plaintiffs] to say 'Oh, we're only challenging Secretary's 'decisions that must be made *before* the relative value and relative value unit determinations.'" *Am. Soc'y of Anesthesiologists v. Shalala*, 90 F. Supp. 2d 973, 976 (N.D. Ill. 2000) (emphasis in original); *see Cataract & Refractive Surgery*, 279 F.3d at 452 (rejecting view that statute "does not foreclose review of a systemic challenge to the Secretary's interpretation").

In a case similar to this one, a group of physicians sought to challenge the Secretary's reliance on information used in the determination of relative value units. *Am. Coll. of Cardiology v. Sebelius*, Civ. A. No. 09-62034, 2010 WL 9463882 (S.D. Fla. Apr. 27, 2010). The court rejected such a hair-splitting interpretation of § 1395w-4(*i*) on the basis that it would render the bar on judicial review "virtually ineffectual." *Id.* at *5. Similarly, the D.C. Circuit rejected an argument similar to the one that Plaintiffs make here in a case involving another Medicare preclusion statutory provision. *Fla. Health Scis. Ctr., Inc. v. HHS*, 830 F.3d 515 (D.C. Cir. 2016). There, plaintiffs argued that the Medicare statute's preclusion of review of the estimates that the Secretary created to set certain payment rates did not apply to their case because they were only challenging the data that the Secretary used to make the estimates. *Id.* at 517. The court rejected that distinction, finding that "a challenge to the data would 'eviscerate the bar on judicial review.'" *Id.* at 519.

Additionally, here Congress not only specifically barred judicial review of the Secretary's "determination of relative values," 42 U.S.C. § 1395w-4(*i*)(1)(B), but also of "the collection and use of information in the determination of relative values under subsection (c)(2)(M)." *Id.* § 1395w-4(*i*)(1)(F).

Plaintiffs' effort to avoid the statutory preclusion of review by arguing that the Secretary's actions were *ultra vires* is similarly unavailing. Pls.' Mem. at 18. The *Kyne* exception relied on

by Plaintiffs is inapplicable here because that exception applies "at most" when three requirements are met: "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). Because there is an express preclusion of review, the first requirement cannot be met.

The third requirement—which requires "extreme" agency error, not merely "[g]arden-variety errors of law or fact," *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)—likewise is not met. The Medicare statue expressly grants broad authority to the Secretary to "collect and use information on physicians' services in the determination of relative values." 42 U.S.C. § 1395w-4(c)(2)(M), § 1395w-4(c)(2)(N). The statute further provides that the Secretary may collect and use "[a]ny other element that would improve the valuation of services under this section, § 1395w-4(c)(2)(M)(iii)(V), and that he may collect such information by any mechanism he deems appropriate. *Id.* § 1395w-4(c)(2)(M)(iv)(IV). The statute therefore expressly allows the Secretary to make use of the Outpatient Prospective Payment System data. For this reason, even if the Court did have jurisdiction, Plaintiffs are unlikely to succeed on their claim that the challenged portions of the Physician Fee Schedule are unlawful. The statue also provides a preclusion of review of "the collection and use of information in the determination of relative values under subsection (c)(2)(M)." *Id.* § 1395w-4(c)(2)(M)(iv)(IV).

At most, Plaintiffs' *ultra vires* argument is that the Secretary should have used only physician-specific data in the determination of relative values. But the Medicare statute has no such limitation. Plaintiffs' *ultra vires* claim is "simply worlds away" from the "obvious violation

of the clear statutory command" at issue in *Kyne*. *DCH*, 925 F.3d at 510; *Florida Health Scis. Ctr. v. HHS*, 830 F.3d 515 (D.C. Cir. 2016) (a "'patent violation of agency authority'" is required).

**B. Plaintiffs Have Not Established Irreparable Harm.**

Plaintiffs' meager briefing on the irreparable harm element is unpersuasive. Pls.' Mem. at 43–44. A careful analysis shows that none of the Plaintiffs demonstrates irreparable harm: the Patient Plaintiffs have safe and effective skin cancer treatments that remain covered and available, and SkinCure's projected revenue losses do not justify extraordinary provisional relief.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy*, 454 F.3d at 297. The moving party must demonstrate an injury that is "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id*. (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). To support a claim for provisional injunctive relief, the injury must "be beyond remediation," *id*., meaning that where the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2024).

To satisfy this standard, "[t]he movant cannot simply make 'broad conclusory statements' about the existence of harm. Rather, [the movant] must 'submit[] . . . competent evidence into the record . . . that would permit the Court to assess whether [the movant], in fact, faces irreparable harm.'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (Bates, J.) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)). In short, "irreparable harm requires not only a concrete, particularized harm, but a harm that is sufficiently serious and irremediable so as to warrant the extraordinary relief of a court's intervention in a case before factual and legal development." *Santos v. Collins*, Civ. A. No. 24-1759, 2025 WL 1823471, at *6 (D.D.C. Feb. 26,

2025). None of the Plaintiffs has demonstrated the type of injury that justifies extraordinary provisional relief.

1. Safe and Effective Treatments Remain Available for the Patient Plaintiffs.

The Patient Plaintiffs face no irreparable harm because safe and effective treatments for skin cancer remain covered and available. As the Declaration from Dr. Schaening Perez demonstrates, Medicare coverage for superficial radiation therapy as a treatment option for non-melanoma skin cancers in non-surgical patients remains in place, no matter how the instant dispute is resolved. Schaening Perez Decl. (Ex. 1) ¶ 14.

Plaintiffs' argue that the challenged Final Payment Rule, Local Coverage Determinations, and Articles "threaten . . . [the Patient Plaintiffs'] access to medically reasonable and necessary Cancer treatment." Pls.' Mem. at 43; *see also* Pls.' Mem. at 6–8. Plaintiffs submit declarations from the Patient Plaintiffs in which each proclaims that "Image-Guided Superficial Radiation Therapy is the most medically appropriate treatment for my skin cancer." Pls.' Mem. Ex. D, ¶ 12; *accord* Pls.' Mem. Ex. E, ¶ 10 (same); Pls.' Mem. Ex. F, ¶ 10 (same); Pls.' Mem. Ex. G, ¶ 10 (same); Pls.' Mem. Ex. H, ¶ 12 (same); Pls.' Mem. Ex. I, ¶ 11 (same).

As an initial matter, Plaintiffs' irreparable harm arguments rely on an elementary sleight of hand. The challenged Final Payment Rule, Local Coverage Determinations, and Articles emphatically do not eliminate coverage for "the only Cancer treatment accessible to many rural patients," as Plaintiffs disingenuously imply. Pls.' Mem. at 44 (citing no evidence). Rather, superficial radiation therapy to treat skin cancer—which has been in use for decades, Pls.' Mem. at 2—remains available and covered under Medicare in non-surgical patients. Schaening Perez Decl. (Ex. 1), ¶ 14. So when Plaintiffs describe reduced coverage for "the Treatment," they are referring not to superficial radiation therapy generally but to what they term "Image-Guided Superficial Radiation Therapy" or "IGSRT" that SkinCure works with dermatologists to offer as

their "GentleCure™ Experience."[4] Examined carefully, SkinCure's own declarations confirm continuing Medicare coverage of superficial radiation therapy—the cancer-treating component of "IGSRT." *E.g.*, Pls.' Mem. Ex. J, ¶ 10 (objecting that challenged actions "view[] IGSRT as interchangeable with non-image-guided SRT"). And Plaintiffs fail to submit any evidence that covered treatments (like superficial radiation therapy without ultrasound scans) would be unsafe or ineffective.

This important distinction, once understood, exposes the weakness of the Plaintiffs' claims. Plaintiffs' available treatment options covered by Medicare in all jurisdictions include superficial radiation therapy without ultrasound scans, Mohs surgery, and others. Ex. 1 at ¶ 15. While Plaintiffs appear to claim in their brief—without citation to any evidence—that IGSRT is the "only Cancer treatment accessible to many rural patients," this claim is contradicted by record evidence. *See* Exs. 1-3 (confirming availability of superficial radiation therapy without ultrasound scans for appropriate patients). Although the patients themselves declare (verbatim) that "Image-Guided Superficial Radiation Therapy is the most medically appropriate treatment for [their] skin cancer," *e.g.*, Pls.' Mem. Ex. D, ¶ 12, that claim is belied by the evidence in the well-supported Local Coverage Determinations. Plaintiffs' claims of irreparable harm simply do not withstand scrutiny.

Moreover, the Patient Plaintiffs' claims of irreparable harm are plagued by additional weaknesses. For example, the Patient Plaintiffs speculate that IGSRT "may no longer be a covered treatment option for [them]," Pls.' Mem. Ex. D, ¶ 17, but Plaintiffs' own evidence suggests only that superficial radiation therapy and ultrasound scans will be reimbursed at a lower rate, *id*. Ex. J,

---

[4] SkinCure Oncology, It's Not Just a Cure, It's GentleCure™ (last accessed March 15, 2026), https://perma.cc/W6ZL-7YF2 ("There are many ways to treat nonmelanoma skin cancer, but nothing compares to the GentleCure™ Experience available exclusively through a partnership with SkinCure Oncology.").

¶ 15 (forecasting drop in reimbursement from $11,922 to $3,692 per course of treatment). Plaintiffs offer no evidence that the Patient Plaintiffs' respective providers will cease offering superficial radiation therapy if they are reimbursed at lower rates or that they will cease offering ultrasounds with that therapy (even if the ultrasounds are not reimbursed by Medicare and Plaintiffs must pay out of pocket).

Even assuming *arguendo* that the Patient Plaintiffs' access to "IGSRT" may be interrupted, it does not follow that "an interruption or delay" in cancer treatment would occur and would "constitute[] irreparable harm," as Plaintiffs incorrectly claim. Pls.' Mem. 44. Indeed, the cases they cite provide no support for their position. In *Minney v. OPM*, 130 F. Supp. 3d 225, 235 (D.D.C. 2015), for example, Judge Leon found irreparable harm where the plaintiff was a blind veteran who faced a loss of his federal retirement benefits, including a complete loss of "emergency health coverage." As Judge Leon explained in a later decision, this ruling was predicated on the conclusion that the medical coverage of the plaintiff in *Minney* would have "*terminate[d]* completely" absent provisional relief. *Maldonado v. District of Columbia*, Civ. A. No. 10-1511 (RJL), 2019 WL 6877913, at *4 (D.D.C. Dec. 16, 2019); *see also Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) (complete "loss of health insurance benefits"); *Wilson v. Grp. Hospitalization & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992) (same). These cases are clearly inapposite where, as here, Plaintiffs retain access to insurance and to safe and effective forms of treatment. *See, e.g.*, *Maldonado*, 2019 WL 6877913, at *4 (finding no irreparable harm where "Plaintiffs do not face the complete and total termination of their Medicaid coverage"). In short, there is no irreparable harm here.

2. <u>SkinCure's Lost Profits Do Not Constitute Irreparable Harm.</u>

Plaintiffs also contend that the "Final [Payment] Rule, Final LCDs, and Billing Articles . . . effectively threaten SkinCure's business model" and threaten to "disrupt [SkinCure's] business."

Pls.' Mem. 43–44. But one of the several "well known and indisputable principles" of equity is that "economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas*, 758 F.2d at 674; *see also Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (Kavanaugh, J.) ("[I]n the absence of special circumstances, . . . recoverable economic losses are not considered irreparable.").

In light of this principle, SkinCure's effort to show irreparable harm never really gets off the ground. SkinCure's declarants assert that the Final Payment Rule "materially reduces payment for office-based IGSRT and thereby threatens the viability of IGSRT programs," and that the LCDs in question "effectively eliminate coverage for IGSRT by deeming . . . IGSRT as interchangeable with non-image-guided SRT" in the "five . . . covered jurisdictions." Pls.' Mem. Ex. B ¶¶ 24, 29, 32; *id*. Ex. J ¶¶ 8, 10 (Final Payment Rule "fold[s] ultrasound practice expense into treatment delivery codes," thereby "eliminat[ing] separate technical payment for imaging"; Local Coverage Determinations "view[] IGSRT as interchangeable with non-image-guided SRT"). SkinCure's CFO reckons that the Final Payment Rule, Local Coverage Determinations, and Articles reduce reimbursement in affected jurisdictions from approximately $11,922 to approximately $3,692 per course of treatment, which would in turn reduce SkinCure's share of that revenue. *Id*. Ex. J ¶ 15. Apparently anticipating a decrease in revenue, SkinCure's CEO states that he "has already issued at least 67 letters of termination . . . and is expected to be forced to lay off additional employees." *Id*. Ex. B ¶ 37; *see also id.* ¶ 5 (SkinCure had "more than 700 employees").

Such claims of lost profits are common fare in courts sitting in equity, and they do not suffice to establish irreparable harm. *See, e.g.*, *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 164 (D.D.C. 2006) ("[T]he fact that the plaintiff will face competition in the market and may lose profits . . . is insufficient to establish irreparable harm."); *Air Transp. Ass'n of Am., Inc. v. Exp.-*

*Imp. Bank*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) (alleged $2.1 billion loss insufficient to show irreparable harm given movant's $31.8 billion in annual revenue). SkinCure also does not explain why its affiliated providers could not recover the higher levels of reimbursement from Medicare if it ultimately prevails on the merits of its claims. *See Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (no irreparable harm where movant could "seek to recover" losses if movant "ultimately prevails in this litigation"). Regardless, SkinCure and its employees are not the intended beneficiaries of the Medicare program, and it is not Medicare's purpose to guarantee SkinCure's profits or employment for its staff. *Cathedral Rock of North Coll. Hill v. Shalala*, 223 F.3d 354, 365 (6th Cir. 2000).

To be sure, "[e]conomic harm may constitute irreparable injury . . . when 'the loss threatens the very existence of the movant's business.'" *Air Transp. Ass'n*, 840 F. Supp. 2d at 336. But SkinCure attempts no such showing here. Indeed, SkinCure avoids making any kind of estimate of lost annual revenues and provides no other data probative of the question. SkinCure also omits any analysis addressing the extent to which the alleged economic harms are attributable to the Final Payment Rule (which is in effect throughout the country) and to the Local Coverage Determinations and Articles (which are in effect only in certain jurisdictions). Instead, it relies on labels and conclusions—such as a broad assertion that the administrative actions "effectively threaten SkinCure's business model," Pls.' Mem. at 43—where a rigorous showing supported by data and a detailed analysis was required.

3. PatientsACT Articulates No Viable Theory of Irreparable Harm.

Plaintiffs' sparse briefing on the question of irreparable harm makes it unclear whether they are asserting that PatientsACT would suffer irreparable harm absent an injunction. *See* Pls.' Mem. 43. Although Plaintiffs assert that PatientsACT "represents thousands of patients across the United States," PatientsACT does not appear to claim that it is a membership organization whose

members would be irreparably harmed absent an injunction. *See, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 223 (D.D.C. 2025).[5] Rather, it appears to characterize itself as an advocacy organization whose "core mission is to educate and advocate for patients' safety rights and freedom of choice in treatment options," that represents patients only in the sense that it advocates for their interests. Pls.' Mem. Ex. C, ¶ 4; *see generally* Melissa J. Durkee, Astroturf Activism, 69 Stan. L. Rev. 201, 244–45 (2017).

Nor do Plaintiffs appear to argue that the PatientsACT organization itself would be injured by the Final Payment Rule, Local Coverage Determinations, or Articles, beyond a conclusory assertion that its mission would be "undermine[d]" and its "limited resources—including staff time, funds, and advocacy efforts" would be drawn away from "other important patient education and support programs." Pls.' Mem. Ex. C, ¶¶ 16–17. If Plaintiffs think this is irreparable harm, they do not explain why. By failing to meaningfully develop any argument on irreparable harm experienced by PatientsACT in their opening brief, Plaintiffs have forfeited the argument. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

4. Plaintiffs' Delay in Seeking Provisional Relief Further Weighs Against a Finding of Irreparable Harm.

It is well settled that an "extensive delay in seeking a preliminary injunction weighs heavily against a finding of irreparable harm." *Maldonado*, 2019 WL 6877913, at *3. While an untimely filing, by itself, "is not a proper basis for denial of a preliminary injunction," "untimely filings may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) (collecting cases); *see also Lewis v. Becerra*, Civ. A.

---

[5] If that is indeed Plaintiffs' argument, Plaintiffs fall well short of providing the level of detail that would be required for the Court to determine whether one or more of PatientsACT's members would experience irreparable harm absent an injunction. In any event, such a claim would fail for the same reasons that the patient Plaintiffs' claims fail. *See* § I.B.1, *supra*.

No. 18-2929 (RBW), 2022 WL 123909, at *9 (D.D.C. Jan. 13, 2022) (additional cases); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (delay of 44 days in seeking an injunction was "inexcusable"). That is because a "significant delay in requesting a preliminary injunction . . . 'implies a lack of urgency'" that calls into question any representation that extraordinary provisional relief is required on an urgent basis. *Lewis*, 2022 WL 123909, at *10 (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).

Here, as in the cases cited above, Plaintiffs' delay "is in tension with the high bar they must clear to establish irreparable harm." *Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025) (Contreras, J.). Recall that Plaintiffs challenge a rule proposed in July 2025 and issued in October 2025, along with Local Coverage Determinations proposed in May 2025 and issued in January 2026. Pls.' Mem. 9–10; Compl. ¶¶ 112, 130; Ex. 1, ¶ 9.[6] Plaintiffs did not file their Complaint and request injunctive relief until March 2026.

### C. The Remaining Factors Weigh Against Provisional Relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decisively against granting a preliminary injunction here.

First, if the Final Payment Rule and Local Coverage Determinations were enjoined, Defendants would be forced to pay excessive rates to providers, and potentially never be able to fully recover those excessive payments. On the other hand, if SkinCure's affiliated providers were to prevail in an appeal through the Medicare administrative process and judicial review, they would

---

[6] The Billing Articles may have been issued later, but they "do not create coverage policy" and instead merely "implement[] and operationalize[] the Final LCDs' coverage restrictions." Pls.' Mem. at 11–12.

receive whatever payment they are entitled to receive from Defendants. Although Plaintiffs complain of "ruinous . . . financial effects" of the delayed payment of benefits if they ultimately prevail, Pls.' Mem. at 45, the possibility of "delay-related hardship" associated with the administrative-appeals process through which providers are supposed to channel their claims is one that was justified in the "judgment of Congress" "[i]n the context of a massive, complex health and safety program such as Medicare." *Ill. Council*, 529 U.S. at 13; *see Row 1*, 92 F.4th at 1145-48. More broadly, entering this sort of preliminary relief would displace and frustrate the Executive's decision about how to best address those issues. *See Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985).

Second, while Plaintiffs also assert that the Patient Plaintiffs' medical care would be "disrupted." Pls.' Mem. at 45, that assertion fails to withstand scrutiny, as Defendants have explained at length above. *See* § I.B.1, *supra*. Regardless of what happens in this lawsuit, the patient Plaintiffs will retain access to and coverage for superficial radiation therapy without ultrasound scans. Schaening Perez Decl (Ex. 1), ¶ 14; WPS's Local Coverage Determination (Ex. 2), at 10. In sum, the balance of the equities and the public interest both favor Defendants.

## II. <u>If the Court Orders Injunctive Relief, the Court Should Require a Bond.</u>

Defendants respectfully request that any injunctive relief ordered by this Court be accompanied by a bond. Fed. R. Civ. P. 65(c); *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025), *reh'g en banc denied* (July 16, 2025). A bond is appropriate here given that the requested preliminary relief would potentially require the Executive to expend resources to implement Plaintiffs' preferred reimbursement policies and to pay claims at reimbursement rates exceeding that mandated by law, and there is no guarantee Defendants could recoup these expenditures once they prevail on the merits. In the event the Court were to grant

injunctive relief, Defendants request the opportunity to propose an appropriate bond amount after having an opportunity to review the nature of any such relief granted.

## III. Plaintiffs' Motion for a Permanent Injunction Should Be Denied as Premature.

Plaintiffs also request a permanent injunction, but advance no argument at all for upending the presumption that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In light of the "significant procedural differences between preliminary and permanent injunctions," *W. Va. Ass'n of Cmty. Health Centers, Inc. v. Heckler*, 734 F.2d 1570, 1578 (D.C. Cir. 1984), a decision on the ultimate merits of Plaintiffs' claims at this juncture would be premature. *See Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.*, 374 F. Supp. 2d 135, 137 n.1 (D.D.C. 2005); *Renoir v. Governor of Va.*, 755 F. Supp. 2d 82, 87 (D.D.C. 2010).

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for Stay and for Preliminary and Permanent Injunction.

Dated: March 20, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

PETER C. PFAFFENROTH
Chief, Civil Division

By: */s/ Andrew J. Vaden*
ANDREW J. VADEN, D.C. Bar # 1044860
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2500
andrew.vaden@usdoj.gov

*Attorneys for the United States of America*