**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| SKINCURE ONCOLOGY, LLC, *et al.*, | : | | |
| Plaintiffs, | : | | |
| | : | Civil Action No.: | 26-737 (RC) |
| v. | : | | |
| | : | Re Document Nos.: | 10, 11, 14 |
| ROBERT F. KENNEDY, JR., | : | | |
| Secretary of Health and Human | : | | |
| Services, *et al.*, | : | | |
| Defendants, | : | | |

<u>**MEMORANDUM OPINION**</u>

**DENYING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY AND PERMANENT INJUNCTION**

## I.  INTRODUCTION

In March 2026, Plaintiffs brought this suit challenging recent changes to Medicare

reimbursements for Image-Guided Superficial Radiation Treatment ("IGSRT" or "the

Treatment").  Since 2015, IGSRT has been commercially available to patients in the United

States to treat certain cases of non-melanoma skin cancer.  Plaintiffs include SkinCure Oncology,

LLC ("SkinCure"), a company that leases Treatment equipment and provides administrative

services to dermatology practices that deliver the Treatment, and PatientsAct.org Inc.

("PatientsAct"), a nonprofit patient advocacy organization (collectively, "Entity Plaintiffs").

Plaintiffs also include six individuals who have received or are currently receiving the Treatment

("Patient Plaintiffs").  Plaintiffs are concerned that the recent changes to Medicare

reimbursements for the Treatment will result in either claim denials or reduced reimbursements.

Those changes were implemented through the (1) Calendar Year 2026 Physician Fee Schedule

(the "Final Rule") and (2) Local Coverage Determinations made by Medicare contractors that the

Treatment was not reasonable and necessary, and would not be covered by Medicare, as well as

guidance to implement those determinations called "Billing Articles."  Plaintiffs claim that these

actions were *ultra vires* and in violation of the Administrative Procedure Act ("APA"). Plaintiffs' Complaint names as Defendants Robert F. Kennedy, Jr., in his capacity as Secretary of the U.S. Department of Health and Human Services ("HHS"), HHS, Dr. Mehmet Oz, in his capacity as Administrator of the Center for Medicare & Medicaid Services ("CMS"), and CMS (collectively, the "Agency"). Shortly after filing their Complaint, Plaintiffs moved for a stay, preliminary injunction, and permanent injunction. Plaintiffs argue that the Agency's actions reduce the availability and amount of reimbursement payments for the Treatment, and may jeopardize availability of the Treatment altogether. For the reasons below, the Court concludes that Plaintiffs have not made a clear showing that they are entitled to the preliminary relief they seek, and accordingly denies the motion.

## II.  BACKGROUND

### A.  Statutory and Regulatory Background

Congress passed the Medicare Act as part of the Social Security Amendments of 1965. Pub. L. No. 89-97, 79 Stat. 291 (July 30, 1965) (codified at 42 U.S.C. §§ 1395 *et seq.*). The Medicare Act "establishes a program of health insurance for the elderly and disabled." *Hall v. Sebelius*, 770 F. Supp. 2d 61, 64 (D.D.C. 2011), *aff'd*, 667 F.3d 1293 (D.C. Cir. 2012). Medicare Part B "is the supplementary medical insurance program that covers certain physicians' services, outpatient hospital care, and other medical items and services not covered under Part A." *Cal. Clinical Lab'y Ass'n v. Sec'y of Health & Hum. Servs.*, 104 F. Supp. 3d 66, 70 (D.D.C. 2015); *see* 42 U.S.C. § 1395j. Importantly, the Medicare Act prohibits payments "under part A or part B for any expenses incurred for items or services which . . . are not *reasonable and necessary* for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added).

"The HHS Secretary implements this rule through CMS—the agency that administers Medicare more generally." *Greenwald v. Becerra*, No. 17-cv-797, 2022 WL 2046108, at \*2 (D.D.C. June 7, 2022). The Secretary of HHS is responsible for overseeing the Medicare Program and has authority to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs." 42 U.S.C. § 1395hh(a)(1).

By statute, "[t]he administration of [Part B] shall be conducted through contracts with medicare administrative contractors," also known as "MACs" or "carriers." *Id.* § 1395u(a); *id.* § 1395kk-1. A MAC is "a private entity that processes claims in a geographic region assigned by HHS." *Agendia, Inc. v. Becerra*, 4 F.4th 896, 897 (9th Cir. 2021). MACs perform many functions in administering the program and processing billions of claims annually, including processing and paying claims for eligible services provided to Medicare beneficiaries. *See* 42 U.S.C. § 1395kk-1(a)(4). As relevant here, claims may be filed by a beneficiary or by a "provider of services who files a claim for items or services furnished to a beneficiary." 42 C.F.R. § 405.906(a). If the beneficiary or provider is dissatisfied with the initial determination, then they may appeal that determination through the Medicare administrative appeals process. 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. §§ 405.904, 405.906(b).

"The administrative appeals process consists of up to four steps: (1) a redetermination by the MAC that originally denied the claim; (2) a review by a different contractor (known as a "qualified independent contractor"); (3) a hearing before an Administrative Law Judge ("ALJ"); and finally, (4) review by the Medicare Appeals Council ("the Council"), an adjudicatory body within HHS." *Agendia*, 4 F.4th at 897 (citing 42 C.F.R. § 405.904(a)(2), (b)); *see* 42 U.S.C. § 1395ff(a)(3), (c)–(d); 42 C.F.R. § 405.900–.1140. If an aggrieved party is still unsatisfied after

exhausting the administrative appeals process, they can pursue judicial review in federal district court.  42 U.S.C. §§ 405(g), 1395ff(b)(1)(A); 42 C.F.R. § 405.1130.

But how are these MACs supposed to determine whether a service in an individual claim is "reasonable and necessary" and thus covered by Medicare?  *See* 42 U.S.C. § 1395y(a)(1)(A). Congress has provided a few mechanisms to promote uniformity.  First, the Secretary can make a "national coverage determination" or "NCD" regarding "whether or not a particular item or service is covered nationally."  *Id.* § 1395y(l)(6)(A).  "An NCD is binding on fiscal intermediaries, carriers [or MACs], QIOs [Quality Improvement Organizations], QICs [Qualified Independent Contractors], ALJs [Administrative Law Judges] and attorney adjudicators, and the [Medicare Appeals] Council."  42 C.F.R. § 405.1060(a)(4).

In the absence of a binding NCD with national applicability, a MAC can make a "local coverage determination" or "LCD" regarding "whether or not a particular item or service is covered on an intermediary- or carrier-wide basis," meaning within that MAC's jurisdiction.  42 U.S.C. § 1395ff(f)(2)(B).  Unlike NCDs, which are binding throughout the claim appeal process, LCDs are not binding on ALJs or the Council.  42 C.F.R. § 405.1062(a).  LCDs are, however, entitled to "substantial deference," and if an ALJ or the Council "declines to follow a policy," they must "explain the reasons why the policy was not followed."  *Id.* § 405.1062(a)–(b). Though an ALJ or the Council cannot invalidate an LCD through the claim appeal process, *id.* § 405.1062(c), there is a separate process for challenging and invalidating LCDs before ALJs and the Council, *see generally id.* § 426.400–.490.

In the absence of an applicable NCD or LCD, MACs must make their own determination whether a service is "reasonable and necessary."  *See* 42 U.S.C. § 1395kk-1(a)(4)(A); 42 C.F.R.

4

§ 405.920(a). And again, if a beneficiary or provider is dissatisfied with that determination, then they may pursue the appeals process described above. *See* 42 U.S.C. § 1395ff(a)(3).

**B. The Agency Actions at Issue**

1. The Final Rule

Each year, the Secretary must "establish, by regulation, fee schedules that establish payment amounts for all physicians' services furnished in all fee schedule areas . . . for the year." 42 U.S.C. § 1395w-4(b)(1). Each payment amount is the product of the "relative value for the service," the "conversion factor," and the "geographic adjustment factor." *Id.* § 1395w-4(b)(1). The "relative value" for each service is determined by "combining the work, practice expense, and malpractice relative value units." *Id.* § 1395w-4(c)(2)(A)(i). In determining these relative values, "the Secretary may collect or obtain information on the resources directly or indirectly related to furnishing services" from "any eligible professional or any other source." *Id.* § 1395w-4(c)(2)(M)(i). The statute gives the Secretary broad discretion in determining both the types of information to be collected and the mechanisms for collecting that information. *See id.* § 1395w-4(c)(2)(M)(iii)–(iv), (N). Consistent with that discretion, the statute precludes "administrative or judicial review" of "the determination of relative values and relative value units under subsection (c)," as well as "the collection and use of information in the determination of relative values under subsection (c)(2)(M)." *Id.* § 1395w-4(i)(1)(B), (F).

"Since 1966, the American Medical Association ("AMA") has published and updated the *Physicians' Current Procedural Terminology* ("*CPT*")." *Am. Soc. of Dermatology v. Shalala*, 962 F. Supp. 141, 144 (D.D.C. 1996), *aff'd*, 116 F.3d 941 (D.C. Cir. 1997). The CPT codes "provide a uniform language that accurately describes medical, surgical, and diagnostic services to facilitate nationwide communications among health care workers, patients, and others." *Id.*

5

The Calendar Year 2026 Physician Fee Schedule (the "PFS" or "Final Rule") was published on October 31, 2025, and appeared in the Federal Register the following week. *See Medicare and Medicaid Programs; CY 2026 Payment Policies Under the Physician Fee Schedule*, 90 Fed. Reg. 49266 (Nov. 5, 2025). The Final Rule became effective January 1, 2026. *Id.* Plaintiffs challenge one portion of the Final Rule, titled "Use of the Relationship Between OPPS [Outpatient Prospective Payment System] APC [Ambulatory Payment Classification] Relative Weights To Establish PE [Practice Expense] RVUs [Relative Value Units] for Radiation Oncology Treatment Delivery, Superficial Radiation Treatment, and Proton Beam Treatment Delivery." 90 Fed. Reg. at 49379–90 (citation modified). As the Final Rule explained, "the CPT Editorial Panel" revised the CPT codes for CY 2026 for radiation treatment delivery services, presenting "an opportunity both to consider adopting CPT codes under the PFS and to re-examine how to best assign relative value units to radiation treatment delivery and superficial radiation treatment delivery services under the PFS." *Id.* at 49380. Though the Agency typically determines Practice Expense RVUs for non-facility settings, such as a physician's office, separately from those for services provided in a hospital facility, the Agency noted concerns with obtaining accurate data and using "incomplete, small sample, potentially biased or inaccurate resource input costs [that] may distort [the Agency's] valuation of the non-facility PE RVUs used in calculating PFS payment rates for individual services." *Id.* at 49379.

In the Agency's view, "[c]onsidering that the resources involved in furnishing radiation treatment delivery and superficial radiation treatment delivery services seem to be primarily driven by capital costs that aren't as likely to vary greatly between facilities like hospitals and free standing centers, and because the billing codes for the services (both old and new) are already stratified into professional and technical services, these services have obvious

characteristics that make use of OPPS data particularly appropriate." *Id.* at 49380.  The Agency

also "determined that identifying an alternative data source that is more routinely updated and

standardized would improve the accuracy of valuation for these services." *Id.*  Citing to its broad

authority to determine practice expense relative values under § 1395w-4(c)(2)(N), the Agency

decided to use "OPPS cost data to develop PE RVUs," and to adopt the CPT codes used under

the OPPS.  *Id.* at 49380, 49386.

Specific to Superficial Radiation Therapy ("SRT"), the Final Rule adopted four new CPT

codes to replace the old ones and established RVUs according to the new methodology, relying

on OPPS data.  *See id.* at 49386–88.  Under this new scheme, "image guidance costs" are not

separately payable.  *See id.* at 49382.  The Agency reasoned that "the payment for the treatment

delivery services includes the resource costs associated with furnishing the image guidance

services."  *Id.*  Specifically, the Agency responded to comments:

> we believe that one of the advantages of bundling in the payment for ultrasound
> guidance, consistent with the OPPS, would eliminate financial incentives to provide
> ultrasound guidance where it may be of questionable value. As we stated earlier in
> this section, services in this code family that describe technical costs and are not
> separately payable under the OPPS will not be separately payable under the PFS,
> because the associated costs are incorporated into the costs for separately paid
> codes. We will assign the procedure status of "B" to the CPT code describing
> ultrasound guidance; this will mean that the use of ultrasound guidance will not
> vary the payment made under the PFS.

*Id.* at 49387.  Thus, while SRT would still be payable, the image-guided element of IGSRT

would not be separately payable because it would be considered included in the cost of SRT.

2.  The Local Coverage Determinations ("LCDs") and Billing Articles

In May 2025, five of the seven MACs issued identical proposed LCDs titled "Superficial

Radiation Therapy (SRT) for the Treatment of Nonmelanoma Skin Cancers (NMSC)" that they

had developed jointly through a workgroup.  *See* CGS Administrators, LLC, DL40179; National

Government Services, Inc., DL40168; Noridian Healthcare Solutions, LLC, DL40176; Palmetto

GBA, DL40189; WPS, DL40193.[1]  On January 8, 2026, the MACs published final LCDs under the same name.  *See* CGS Administrators, LLC, L40179; National Government Services, Inc., L40168; Noridian Healthcare Solutions, LLC, L40176; Palmetto GBA, L40189; WPS, L40193. Those LCDs were accompanied by identical responses to comments, *see, e.g.*, Defs.' Ex. 3 ("LCD Responses to Comments"), ECF No. 17-4, and Billing Articles that provide guidance to implement the LCDs, *see, e.g.*, Defs.' Ex. 4 ("Billing Articles"), ECF No. 17-5.  The LCDs were amended on March 12, 2026, *see* Defs.' Ex. 6 ("Final LCD"), ECF No. 17-6.[2]

As relevant here, the LCDs concluded that "[u]se of [high-resolution ultrasound] HRUS to guide SRT delivery and to assess lesion reduction during the superficial radiation treatment protocol is not considered reasonable and necessary and is not supported by literature."  Final LCD at 10.  So, while "the use of SRT is considered reasonable and necessary" in certain conditions under the LCDs, the full scope of the Treatment, is not.  *Id.*

The LCDs also explained that "[s]ervices will be considered medically reasonable and necessary only if performed by appropriately trained providers."  *Id.* at 11.  Under the LCDs,

> A qualified physician for this service is defined as follows: training and expertise must have been acquired within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty (i.e., Radiation Oncology OR by a qualified dermatology program and the dermatologist has didactic training and clinical experience in radiation treatment).

*Id.*  The final LCDs and Billing Articles became effective on March 1, 2026.

---

[1] Each proposed and final LCD is available by entering the document code at https://www.cms.gov/medicare-coverage-database/search.aspx.

[2] For clarity, when citing to the operative LCD in this opinion, the Court refers to Defendants' Exhibit 6 and the corresponding ECF-generated page numbers.

### C. Factual and Procedural Background

Non-melanoma skin cancer, or NMSC, "is a group of malignant, skin-based tumors comprised primarily of basal cell carcinoma and squamous cell carcinoma, which together represent the most common cancers in the United States." Corrected Compl. ("Compl.") ¶ 36, ECF No. 13. "Dermatologists have used radiation therapy to treat NMSC for more than a century." *Id.* ¶ 39. "By the mid-1970s, more than half of dermatology offices in North America reported having SRT (or similar radiation therapy devices) available for use in the outpatient setting." *Id.* "Use of SRT declined in subsequent decades, largely due to the emergence and growth of Mohs micrographic surgery ("Mohs") as a tissue-sparing surgical technique." *Id.* ¶ 40.

In 2015, the FDA "cleared the SRT-100 Vision™ device, enabling the integration of HRUS with superficial radiation delivery and marking the introduction of IGSRT." *Id.* ¶ 41. "The Treatment delivers low-energy superficial radiation that is primarily absorbed in the dermis . . . allowing treatment at shallow depths while sparing deeper structures." *Id.* ¶ 43. Based on these features, Plaintiffs allege that the "Treatment is an appropriate and desirable option for patients with early-stage NMSC who are poor surgical candidates (*e.g.*, because of advanced age, comorbidities, or lesion location), or who prefer a non-surgical approach—particularly for tumors located on cosmetically or functionally sensitive sites such as the face, head, and neck." *Id.* ¶ 50. "[T]he Treatment is overwhelmingly delivered by dermatologists in office-based clinical settings, with approximately 96% of SRT and Treatment claims attributable to dermatologists and other skin specialists, and fewer than 2% attributable to radiation oncologists." *Id.* ¶ 54.

"In a typical Treatment cycle, patients receive several individual radiation sessions, called 'fractions,' each lasting approximately thirty seconds to one minute," and each course of

Treatment involves a median of 20 fractions. *Id.* ¶ 44. Plaintiffs allege that HRUS imaging is clinically necessary before and after the course of Treatment, as well as during each fraction because the tumor depths fluctuate. *Id.* ¶ 45. But Plaintiffs assert that this frequent imaging is worthwhile, reporting that Treatment studies have found "cure rates exceeding 99% across large cohorts and multi-year follow-up." *Id.* ¶ 42.

On March 3, 2026, two days after the LCDs and Billing Articles took effect, Plaintiffs filed suit in this case challenging the Final Rule, LCDs, and Billing Articles. ECF No. 1. Plaintiffs are two entities, SkinCure and Patients Act (the "Entity Plaintiffs") and six individuals (the "Patient Plaintiffs").

According to the Complaint, "SkinCure is the nation's leading provider of management and administrative services supporting dermatology practices that deliver IGSRT for Cancer." Compl. ¶ 16(a). Specifically, "SkinCure's solution includes the provision and leasing of the FDA-cleared SRT-100 Vision™ device, buildout of dedicated shielded treatment suites, regulatory compliance, staffing of certified radiation therapists, and access to radiation oncologists for consultation." *Id.* ¶ 58. But SkinCure does not directly provide or bill for medical services; "instead, its dermatology practice partners deliver and bill for all the Treatment care services." *Id.* Through its management-fee structure, SkinCure receives "approximately 54% of total reimbursements paid to practice partners" for the Treatment. *Id.* ¶ 139.

"PatientsACT is a national patient advocacy organization committed to ensuring that every individual has access to high-quality, medically appropriate care and the right to make informed decisions about their healthcare." *Id.* ¶ 16(b). PatientsAct alleges that the challenged Agency actions "impair PatientsACT's mission and frustrate its advocacy efforts on behalf of Medicare beneficiaries." *Id.*

The Patient Plaintiffs are six "individuals enrolled under Medicare Part B" who allege that they need the Treatment. *Id.* ¶ 16(c). Two of the Patient Plaintiffs are currently in the process of scheduling or receiving IGSRT. *See* Pls.' Ex. D ¶ 16; Pls.' Ex. G ¶ 12. They both claim that without Medicare coverage for IGSRT, they will be forced to undergo invasive surgery, which presents heightened risks based on personal health factors, or forgo treatment. *See* Pls.' Ex. D ¶ 18–19; Pls.' Ex. G ¶ 14–15.

Plaintiffs' Complaint brings 9 counts that they have grouped into three categories: (1) claims that Defendants' actions were *ultra vires* and exceeded statutory authority (Counts 1 and 2); (2) claims that Defendants improperly changed Agency policy without a reasoned explanation in violation of the APA (Counts 3, 4, and 9); and (3) claims that Defendants circumvented binding procedural requirements in violation of the APA and Medicare Act (Counts 5, 6, 7, and 8). *See* Reply in Supp. Pls.' Mot. ("Reply") at 1–2, ECF No. 18. To simplify further, the Entity Plaintiffs challenge the Final Rule, and the Patient Plaintiffs challenge the LCDs and Billing Articles. *See id.* at 2–6. Their Complaint seeks declaratory and injunctive relief enjoining the CPT coding and corresponding RVUs for the Treatment and enjoining enforcement of the Final LCDs and associated Billing Articles. *See* Compl. at 63–64.

On March 6, 2026, Plaintiffs filed their "Motion for Stay and Preliminary and Permanent Injunction." *See* Mem. Supp. Pls.' Mot. Stay & Prelim. & Perm. Inj., ECF No. 10-3.[3] Plaintiffs'

---

[3] On March 16, 2026, Plaintiffs filed corrected versions of their Complaint, Motion, and one declaration to amend the treatment history of one Patient Plaintiff. *See* ECF No. 13. For consistency, the Court cites only to the corrected version of Plaintiffs' Motion and Complaint. *See* Mem. Supp. Pls.' Corrected Mot. Stay & Prelim. & Perm. Inj. ("PI Mot."), ECF No. 14-1.

Plaintiffs have also moved to file those Patient Plaintiffs' declarations and an unredacted version of their Motion under seal because they contain personal medical information and healthcare history of those Plaintiffs. *See* ECF Nos. 10, 14. Upon consideration of the factors in *United States v. Hubbard*, 650 F.2d 293, 317–22 (D.C. Cir. 1980), the Court will grant those motions.

proposed order requests that the Court stay the portions of the Final Rule establishing new CPT codes and RVUs for the Treatment, as well as the Final LCDs and Billing Articles.[4]  *See* ECF No. 14-2.  Defendants oppose the Motion and argue that each of Plaintiffs' claims is either precluded from review—by statute and requirements of administrative channeling—and that any claims that this Court may consider lack merit.  *See* Defs.' Mem. in Opp'n ("Opp'n") at 1–2, ECF No. 17.  Defendants also argue that Plaintiffs have failed to demonstrate irreparable harm such that preliminary relief is unwarranted.  *See id.* at 3.  The Motion is fully briefed, and the Court heard argument on April 1, 2026.  The Motion is thus ready for this Court's review.

### III.  LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "To get a preliminary injunction the movant must show: (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'"  *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025) (quoting *Winter*, 555 U.S. at 20).  "The balance of the equities and the public interest 'merge when, as here, the Government is the opposing

---

[4] Though Plaintiffs originally requested a permanent injunction, they conceded in their reply brief that "entry of a permanent injunction at this time would be premature."  Reply at 25 n.7, ECF No. 18.  At the April 1 hearing, however, Plaintiffs' counsel backtracked and argued for the first time that Counts 1 and 2 "will require a decision on the merits" because "they are *ultra vires* claims," such that "a permanent injunction is in order."  Hr'g Tr. at 3:3–8, 3:15–22.  Plaintiffs have provided no legal basis for this argument, which is contrary to the rule that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).  The Court sees no reason to deviate from this general rule and will consider only Plaintiffs' requests for preliminary relief.

party . . . .'"  *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)).  The movant's likelihood of success on the merits is the "most important factor."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  And "a failure to show a likelihood of success on the merits alone is sufficient to defeat the motion."  *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 21 (D.D.C. 2025) (citing *Ark. Dairy Coop. Ass'n v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009)).

Under the APA, a "reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay."  *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020); *Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, No. 25-cv-02214, 2025 WL 2996157, at *3 (D.D.C. Oct. 24, 2025).

## IV.  ANALYSIS

Plaintiffs have not demonstrated that they are entitled to the preliminary relief they seek. As a first step, the Court analyzes Plaintiffs' Article III standing.  Then, the Court analyzes each claim using Plaintiffs' three categories: (1) claims that Defendants actions were *ultra vires* (Counts One and Two), (2) claims that Defendants improperly changed Agency policy without a reasoned explanation, and were thus arbitrary and capricious in violation of the APA (Counts Three, Four, and Nine), and (3) claims that Defendants circumvented binding procedural requirements, and were thus taken without required procedure in violation of the APA (Counts Five, Six, Seven, and Eight).  For many of these claims, this Court's jurisdiction is either precluded by a specific statute or by requirements of administrative channeling.  To the extent the Court can reach the merits of Plaintiffs' claims, Plaintiffs have not made a clear showing that

13

they should prevail on their claims that Defendants' actions were *ultra vires* or that the LCDs[5]

were arbitrary and capricious or promulgated without required procedures under the APA.

Because the Court concludes that Plaintiffs have failed to show that they are likely to succeed on

the merits of any of their claims, they are not entitled to the preliminary relief they seek, and the

Court need not analyze the other preliminary injunction factors.  Accordingly, the Court will

deny the motion for a stay and a preliminary injunction.

### A.  Standing

The Court briefly addresses Plaintiffs' standing under Article III.  Constitutional standing

"limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress

for a legal wrong."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "A plaintiff establishes

standing by showing '(i) that he suffered an injury in fact that is concrete, particularized, and

actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury

would likely be redressed by judicial relief.'"  *Jibril v. Mayorkas*, 101 F.4th 857, 867 (D.C. Cir.),

*cert. denied*, 145 S. Ct. 550 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423

(2021)).

Defendants argue that none of the Patient Plaintiffs have demonstrated a concrete injury

to support their Article III standing.  *See* Opp'n at 23–24.  The Court disagrees.  Two Patient

Plaintiffs currently have skin cancer and are in the process of scheduling or receiving IGSRT.

*See* Pls.' Ex. D ¶ 16; Pls.' Ex. G ¶ 12.  They both claim that without Medicare coverage for

---

[5] For ease of analysis the Court does not separately refer to the Billing Articles when analyzing the LCDs.  As discussed below, this Court's jurisdiction to review the Patient Plaintiffs' challenges is limited to their challenges to the LCDs.  *See* 42 U.S.C. § 1395ff(f)(3). Moreover, Patient Plaintiffs do not identify any legal infirmity in the Billing Articles that does not flow from the Final Rule or the LCDs, *see generally* PI Mot., so the Court sees no practical reason to discuss them separately.

IGSRT, they will be forced to undergo invasive surgery—which presents heightened risks based on personal health factors—or forgo treatment. *See* Pls.' Ex. D ¶ 18–19; Pls.' Ex. G ¶ 14–15. Defendants liken these Patient Plaintiff claims to the Jane Doe in *California Clinical Laboratory Association v. Secretary of Health and Human Services*, 104 F. Supp. 3d 66, 75 (D.D.C. 2015). *See* Opp'n at 24. In that case, the court reached the unremarkable conclusion that a Medicare beneficiary who has received the services at issue and who has not had to pay for those services has not suffered any injury. *Cal. Clinical Lab'y Ass'n*, 104 F. Supp. 3d at 79 ("[I]t is undisputed that Doe and her doctor were indeed able to access the test results at issue notwithstanding the coverage denial and that she was not charged personally for any testing expenses."). Moreover, in that case, the plaintiffs did "not contend that Jane Doe's doctor ha[d] ordered (or imminently w[ould] order) further clinical testing of the type challenged." *Id.* Thus, there was not a substantial probability of a future injury. *Id.* at 79–80 (citing *Sierra Club v. Jewell*, 764 F.3d 1, 7 (D.C. Cir. 2014)).

In contrast, here, two Patient Plaintiffs who live in MAC jurisdictions with these LCDs are currently seeking or undergoing IGSRT for their skin cancer—meaning they will likely either not receive the Treatment, have to undergo surgery or forgo treatment altogether, or will have to pay out of pocket for the Treatment. *See* Pls.' Ex. D ¶¶ 4, 18–19; Pls.' Ex. G ¶¶ 4, 14–15. These Patient Plaintiffs are facing this choice currently, and the imminent physical or financial injury is sufficient. No one disputes that the LCDs cause their quandary, or that enjoining the Agency actions would remedy it. Accordingly, the Court concludes these Patient Plaintiffs have established their standing. And because the other Patient Plaintiffs seek the same relief, for purposes of deciding this preliminary motion, the Court will rely on "the rule that if many

plaintiffs seek the same relief and at least one of them has Article III standing, the court need not determine whether others also do." *M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021).

Defendants do not challenge the Entity Plaintiffs' Article III standing explicitly. *See* Opp'n at 22–25. The Court agrees that SkinCure has established that it will suffer concrete financial loss as a result of the challenged Agency actions in the form of lower reimbursement rates for fewer claims. *See* Reply at 15–17. SkinCure thus has constitutional standing to challenge the Agency actions causing its pocketbook injuries. *See TransUnion*, 594 U.S. at 425 (explaining that "monetary harms" are some of the "most obvious" that constitute concrete injuries under Article III). And because PatientAct's claims are coextensive with SkinCure's, the Court similarly need not decide at this preliminary stage whether PatientAct has standing of its own. *See M.M.V.*, 1 F.4th at 1110.

### B. Likelihood of Success

Having assured itself that at least one Plaintiff in each category of Plaintiffs has standing, the Court now analyzes each of Plaintiffs' three categories of claims, in the order Plaintiffs presented them. "It is fundamental to federal jurisprudence that Article III courts . . . are courts of limited jurisdiction." *NO Gas Pipeline v. FERC*, 756 F.3d 764, 767 (D.C. Cir. 2014). That said, the Supreme Court "has long recognized a 'strong presumption' in favor of judicial review of final agency action" that applies "unless 'a statute's language or structure' precludes judicial review." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 733 (2022) (first quoting *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 23 (2018); and then quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)). For each claim, the Court first determines whether it has jurisdiction to reach the merits of the claim, and if so, analyzes those merits. Ultimately, the Court concludes that it has jurisdiction to consider Plaintiffs' *ultra vires* claims (Counts 1 and 2),

but that those claims fail on the merits, an unsurprising result given the high standard to succeed on such claims. The Entity Plaintiffs' challenges to the Final Rule under the APA (Counts 3 and 9) fail for two independent reasons: first, this Court lacks jurisdiction over these claims, which require channeling through the Medicare administrative process, and second, the Entity Plaintiffs essentially challenge the Final Rule's RVUs, which are unreviewable under 42 U.S.C. § 1395w-4(i)(1)(B). The Patient Plaintiffs' APA claims (Counts 4–9), are also subject to the Medicare Act's channeling requirement, so they instead rely on 42 U.S.C. § 1395ff(f)(3), which excuses exhaustion to challenge the legal validity of LCDs where no material facts are disputed. The Court accordingly analyzes each of the Patient Plaintiffs' claims to determine which raise purely legal challenges subject to this Court's jurisdiction, and then analyzes the merits of those legal challenges. As discussed below, the Court concludes that Plaintiffs are not likely to succeed on any of their claims.

### 1. *Ultra Vires* Claims

An *ultra vires* claim "is available where (i) there is no express statutory preclusion of all judicial review; (ii) 'there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory[.]'" *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (alteration in original) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)); *see also Leedom v. Kyne*, 358 U.S. 184, 187–88 (1958). *Ultra vires* claims "are confined to 'extreme' agency error where the agency has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]'" *Fed. Express*, 39 F.4th at 764 (alterations in original) (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir.

17

1988)).  Accordingly, "a challenged action must 'contravene[ ] a clear and specific statutory mandate' to be susceptible to *ultra vires* review."  *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) (alteration in original) (quoting *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006)).  Given this stringent standard, the D.C. Circuit has aptly analogized this claim to "a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *Nyunt*, 589 F.3d at 449.

In Count 1, the Entity Plaintiffs assert that the Agency exceeded "clear statutory limits" by considering "hospital outpatient data" when issuing the Physician Fee Schedule in the Final Rule.  Reply at 2.  Instead, Plaintiffs argue, the Agency could only make its decisions "based on certain information and data," that is, "physician information."  *Id.*

The Entity Plaintiffs' *ultra vires* challenges to the Final Rule and its RVUs fail on multiple elements.  For starters, there is express statutory preclusion of all judicial review.  42 U.S.C. § 1395w-4(*i*)(1).  The relevant subsection titled "Restriction on Administrative and Judicial Review" provides that "[t]here shall be no administrative or judicial review under section 1395ff of this title *or otherwise* of . . . the determination of relative values and relative value units under subsection (c)."  *Id.* § 1395w-4(*i*)(1)(B) (emphasis added); *see Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 453 (7th Cir. 2002) ("It would be difficult for Congress to have written paragraph (B) in clearer terms prohibiting such a challenge.").  Plaintiffs provide three reasons why their claims are not precluded by that plain language, but none is persuasive.

First, Plaintiffs assert that their claims do not challenge the RVUs themselves, but instead "challenge the source of the Agency's underlying data."  PI Mot. at 17; Reply at 9.  The challenge for Plaintiffs is that § 1395w-4(*i*)(1)(F) also precludes judicial review of "the

18

collection and use of information in the determination of relative values under subsection (c)(2)(M)." Subsection (c)(2)(M) permits the Secretary to "use information collected or obtained . . . in the determination of relative values for services," and specifies that "at the Secretary's discretion," that information may include "[a]ny other element that would improve the valuation of services under this section." 42 U.S.C. § 1395w-4(c)(2)(M)(i)–(iii). Subsection (c)(2)(M) also permits the Secretary to collect information by "[a]ny other mechanism determined appropriate by the Secretary." *Id.* § 1395w-4(c)(2)(M)(iv)(IV). Thus, the scope of preclusion related to RVU determinations appears to also preclude challenges to the data source for RVU determinations.

Second, Plaintiffs argue that the statutory bar on review in § 1395w-4(*i*)(1)(B) does not apply because the Agency's reliance on hospital outpatient data to determine the RVUs was beyond the scope of its statutory authority, so much so that "the preclusion of review would not apply to shield the Secretary's unauthorized action." *See* PI Mot. at 18; *Amgen, Inc. v. Smith*, 357 F.3d 103, 114 (D.C. Cir. 2004). This argument is based on a theory that "if the agency's action fails to qualify as the kind of action for which review is barred," then "the jurisdiction-stripping provision does not apply." *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020) (quoting *Southwest Airlines Co. v. TSA*, 554 F.3d 1065, 1071 (D.C. Cir. 2009)). But in cases where that doctrine applies, review is permitted "not because an obvious legal error justifie[s] disregarding an applicable statutory bar, but because the relevant statutory bar" is "effectively coextensive with the merits." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 510 (D.C. Cir. 2019).

The statute precluding review here is not effectively coextensive. Plaintiffs do not challenge whether the Agency determined "relative values and relative value units under

subsection (c)." 42 U.S.C. § 1395w-4(i)1(B). They challenge the inputs the Secretary used when making that determination. *See* PI Mot. at 18 ("By relying on this inapposite, inapplicable, and unauthorized data, the Agency exceeded its authority and issued an unlawful 'determination of relative values and relative value units.'" (quoting 42 U.S.C. § 1395w-4(i)(1)(B)). Thus, because they do not challenge whether the Agency determined RVUs, but instead challenge *how* the Agency made that determination, their challenge is not coextensive with the applicability of the statute precluding review of RVU determinations. Moreover, whether the Agency used appropriate data is indistinguishable from "the collection and use of information in the determination of relative values," for which review is also precluded. 42 U.S.C. § 1395w-4(*i*)(1)(F). And here, the Court struggles to understand how to disentangle the data used to calculate RVUs from the RVUs themselves; after all, the outpatient data provide "the entire basis for the" RVUs. *See Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 519 (D.C. Cir. 2016). Thus, this Court is not at liberty to disregard the statute precluding judicial review.[6]

Third, Plaintiffs argue that § 1395w-4(*i*)(1) is no bar because the Agency's actions were *ultra vires*, relying on *Kyne*. PI Mot. at 18–19. As for Count 1, this argument is entirely circular—the Court asks whether there is statutory preclusion of judicial review as the first

---

[6] At the motion hearing, Plaintiffs' counsel raised an additional argument based on the Medicare Act's text. Plaintiffs' counsel explained that 42 U.S.C. § 1395w-4(j)(3)'s definition of "physicians' services" includes, by cross-reference to 42 U.S.C. § 1395x(s)(4), "X-ray, radium, and radioactive isotope therapy, including materials and services of technicians." *See* Hr'g Tr. at 12:5–19, 25:22–26:10. Plaintiffs' counsel then directed the Court to 42 U.S.C. § 1395w-4(c)(2)(C), which provides that the number of Practice Expense relative value units "shall be determined based entirely on such relative practice expense resources." *Id.* at 12:19–13:8, 26:12–27:4. Plaintiffs cited to neither § 1395w-4(j)(3) nor § 1395x in either of their briefs. Accordingly, the Court need not consider this argument, *United States ex rel. Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015), but does so only to note that it sees no clear and mandatory prohibition on the Agency considering hospital outpatient data in these provisions.

element under caselaw tracing to *Kyne*, so *Kyne* cannot obviate the need to determine whether there is statutory preclusion.  Section 1395w-4(*i*)(1) expressly precludes review.

Though the analysis of Count 1 could stop there, the Court briefly addresses the other two elements of an *ultra vires* claim.  The Court will address the availability of other review for these statutory claims in its discussion of administrative channeling below, but notes that the Entity Plaintiffs "are not Medicare providers or beneficiaries, and so will not have been denied claims for services."  *See* Defs.' Opp'n at 20.  Even so, the Agency's error in this case, if any, was not plain or extreme.  Plaintiffs fail to identify any "clear statutory limit[]" that prohibits the Secretary from relying on hospital outpatient data when determining Physician Fee Schedule RVUs.  Reply at 2.  Plaintiffs cite generally to 42 U.S.C. § 1395w-4, as well as to § 1395w-4(c)(2)(M) specifically, but as discussed above, that statute appears to provide the Secretary with broad discretion in determining RVUs.  *See* PI Mot. at 21.  Plaintiffs fail to identify any portion of the statute that specifically prohibits the use of outpatient hospital OPPS figures to calculate RVUs in "clear and mandatory" terms.  *See Fed. Express*, 39 F.4th at 763.  For these reasons, Plaintiffs' *ultra vires* claim in Count 1 fails.

In Count 2, the Patient Plaintiffs claim that the LCDs are *ultra vires* because "the MACs used unauthorized criteria and heightened evidentiary requirements and therefore exceeded the scope of their delegation."  Reply at 2–3.  Plaintiffs concede that the Medicare Act permits the Secretary to delegate to MACs the authority to develop LCDs, but argue that the LCDs are based on factors that go "beyond the 'reasonable and necessary' standard."  PI Mot. at 23; 42 U.S.C. § 1395kk-1(a)(1), (4).  This *ultra vires* claim also fails on multiple elements.  First, Patient Plaintiffs have multiple avenues for challenging the LCDs, either through an appeals process if

21

their claims are denied, 42 C.F.R. § 405.1062, or as an aggrieved party through the LCD review process before an ALJ, 42 U.S.C. § 1395ff(f)(2)(A); 42 C.F.R. § 426.400–.490.

Second, the MACs did not act in plain excess of delegated powers or contrary to any clear and mandatory prohibition. The MACs determined that "[u]se of HRUS to guide SRT delivery and to assess lesion reduction during the superficial radiation treatment protocol is not considered reasonable and necessary and is not supported by literature." Final LCD at 10. Before reaching that conclusion, the LCDs explained that "there are no randomized clinical studies or prospective studies to show that the additional use of high-resolution ultrasound guidance (HRUS) [with SRT] improves the short-term and long-term recurrence rates." *Id.* at 9. Plaintiffs argue that by doing so, "the MACs effectively denied coverage for the Treatment and HRUS due to the lack of peer-reviewed RCTs [randomized clinical trials], foisting an extra-statutory requirement contrary to § 1395y(a)(1)(A) and Agency guidance." PI Mot. at 23. But Plaintiffs fail to identify any rule prohibiting the MACs from considering the absence of random clinical trial evidence in making a determination as to whether a treatment is "reasonable and necessary." Nothing in the text of 42 U.S.C. § 1395y(a)(1)(A) contains such a prohibition. Nor does the provision of the Medicare Program Integrity Manual Plaintiffs cite support their position; the language they cite from that Manual discusses criteria MACs should consider in making a "reasonable and necessary" determination "[i]f no local coverage determination (LCD) exists for a particular item or service," not what criteria MACs must use, or not use, when issuing an LCD. *See* Medicare Program Integrity Manual (CMS Pub. 100-08), Ch. 3, § 3.6.2.2; PI Mot. at 23. If there is a statutory or regulatory limitation on MACs considering the absence of RCTs in making LCDs, Plaintiffs have not identified it. Thus, this *ultra vires* claim fails.

22

In Count 2, Patient Plaintiffs also bring two additional challenges to the LCDs, invoking this Court's jurisdiction under 42 U.S.C. § 1395ff(f)(3). *See* Reply at 3. That statute provides:

> In the case of a determination that may otherwise be subject to review under paragraph (1)(A)(iii) [regarding National Coverage Determinations] or paragraph (2)(A)(i) [regarding Local Coverage Determinations], where the moving party alleges that—
>> (A) there are no material issues of fact in dispute, and
>> (B) the only issue of law is the constitutionality of a provision of this subchapter, or that a regulation, determination, or ruling by the Secretary is invalid,
> the moving party may seek review by a court of competent jurisdiction without filing a complaint under such paragraph and without otherwise exhausting other administrative remedies.

42 U.S.C. § 1395ff(f)(3). As relevant here, this provision provides an avenue for review of purely legal challenges to the LCDs and a "limited exception" to administrative exhaustion, but only as to the Patient Plaintiffs. *See Hays v. Leavitt*, 583 F. Supp. 2d 62, 66 (D.D.C. 2008), *aff'd sub nom. Hays v. Sebelius*, 589 F.3d 1279 (D.C. Cir. 2009); 42 U.S.C. § 1395ff(f)(5) ("An action under this subsection seeking review of a national coverage determination or local coverage determination may be initiated only by individuals entitled to benefits under part A, or enrolled under part B, or both, who are in need of the items or services that are the subject of the coverage determination.").

Defendants resist that § 1395ff(f)(3) is available to Patient Plaintiffs to challenge the LCDs here. *See* Defs.' Opp'n at 27–28. For one, Defendants argue that "Plaintiffs have pled away the potential applicability of subsection (f)(3)" because "the complaint alleges many factual disputes." *Id.* at 27. For example, Defendants highlight Plaintiffs' allegation that peer-reviewed studies show that the IGSRT technology is "efficacious, safe, and superior to previous generations" of SRT technology without imaging. *See* Defs.' Opp'n at 28; Compl. ¶ 124. This allegation disputes the LCDs' findings that "the effectiveness of this additional modality is currently under active investigation." Final LCD at 8; Compl. ¶ 124.

The Court is not convinced that the existence of some factual issues entirely precludes its ability to review the validity of the LCDs here. *See Hays*, 583 F. Supp. 2d at 66 (finding that while plaintiffs did "raise factual issues in their briefing" the court could analyze the narrower, "purely legal" question "regarding the interpretation of the authority granted in the Act"). After all, many of Plaintiffs challenges concern only an "issue of law" as to whether a "determination," the LCD, "is invalid." *See* 42 U.S.C. § 1395ff(f)(3). For instance, Patient Plaintiffs assert APA challenges to the LCDs. *See* Compl. Counts 4–9. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and generally assesses the entire case as "a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Thus, the factual issues in some of Patient Plaintiffs' APA challenges to the LCDs may not be "material to plaintiffs' primary challenge," here, whether the LCDs violated the APA or were implemented without statutory authority. *See Hays*, 583 F. Supp. 2d at 66. The Court will, of course, analyze each claim to determine whether it is susceptible to this sort of narrowing. *See, e.g.*, *Greenwald v. Becerra*, No. 17-cv-797, 2022 WL2046108, at *7 (D.D.C. June 7, 2022) (finding jurisdiction under § 1395ff(f)(3)(B) to determine whether an LCD conflicted with an NCD, reasoning that the "conflict [was] evident in the plain language of the text, and additional facts or expert opinions would not eliminate the conflict").

Returning to Count 2, Patient Plaintiffs argue that the LCDs are *ultra vires* because they are impermissibly vague, in violation of the Fifth Amendment, and that the LCDs' definition of "qualified physician" impedes on States' right to regulate medicine, in violation of the Tenth Amendment. *See* Reply at 3. Specifically, Plaintiffs assert that the LCDs' "ambiguous and undefined language presents a substantial risk of being interpreted and applied in a manner that would restrict board-certified dermatologists from providing the Treatment." *See* PI Mot. at 23–

24

26. The Court agrees that these constitutional claims are purely legal, and that Patient Plaintiffs may bring them in this Court under § 1395ff(f)(3).  Though this Court has jurisdiction, these claims fail on the merits.

Plaintiffs' Fifth Amendment argument faults the LCDs' definition of "qualified personnel" as being unconstitutionally vague.  *See* PI Mot. at 24.  The Court disagrees.  "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  "In determining whether a party received fair notice, the Court considers whether, 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform.'"  *Nissan Chem. Corp. v. U.S. Food & Drug Admin.*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024) (quoting *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)).

Here, the LCDs explained that "[s]ervices will be considered medically reasonable and necessary only if performed by appropriately trained providers."  Final LCD at 11.  The LCDs go on to define a "qualified physician for this service . . . as follows: training and expertise must have been acquired within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty (i.e., Radiation Oncology OR by a qualified dermatology program and the dermatologist has didactic training and clinical experience in radiation treatment)."  *Id.*  This definition does not appear vague on its face, as stating that only someone experienced with radiation treatment should provide superficial radiation treatment seems both

25

clear and logical. Nevertheless, Plaintiffs insist that "qualified physician" is defined in "vague and ambiguous terms that create a substantial risk of excluding dermatologists from providing the Treatment." PI Mot. at 25. Specifically, Plaintiffs assert that "approximately 96% of SRT and Treatment claims are submitted by dermatologists," but that the definition of qualified physician will not include those dermatologists because "no such dermatology program" as referenced in the definition "exists in practice." *See id.* Even were it true that no such program existed, that would not make the requirement "vague." For example, Plaintiffs have not argued that the definition is vague because they are not sure what experiences a dermatology program would need to provide to be qualified. Plaintiffs simply have not explained what is vague about the definition; instead, they appear to disagree with its limitation to restrict coverage from services performed by dermatologists who were previously covered. But that does not make the LCD unconstitutionally vague.

For Patient Plaintiffs' other constitutional *ultra vires* theory, they assert that the LCDs' definition of "qualified physician" somehow "contravenes state law and exceeds the Agency's authority" because it alters who can legally practice medicine and the scope of that practice. *See* PI Mot. at 25–26. Plaintiffs argue that this alleged intrusion on the States' police powers violates the Tenth Amendment. *See id.* at 26. But the LCDs do not "regulate physicians' scope of practice." *But see id.* Rather, they are determinations of whether certain procedures will be covered under Medicare, not whether those procedures may be lawfully performed. Plaintiffs fail to develop any persuasive argument explaining how these LCDs violate the Constitution.

In sum, the Court concludes that Plaintiffs are unlikely to succeed on their *ultra vires* claims brought in Counts 1 and 2 of the Complaint. Accordingly, the Court will not grant preliminary relief based on these claims.

2.  Arbitrary-and-Capricious Claims

Under the APA, courts can set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  "[A]n agency acts arbitrarily or capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997–98 (D.C. Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Arbitrary-and-capricious review is "highly deferential" and "presumes agency action to be valid."  *Id.*, 530 F.3d at 997 (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976)).  The agency action need only "be reasonable and reasonably explained."  *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014).  Additionally, courts "will give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise."  *Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954–55 (D.C. Cir. 2007) (citation modified).

In Counts 3, 4, and 9, Plaintiffs allege that "Defendants improperly changed Agency policy without a reasoned explanation."  Reply at 3.  "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  A reasoned explanation displays awareness that the agency is changing its position; shows that there are good reasons for the new policy, though

27

those reasons need not be better than the reasons for the old policy; and is permissible under the statutory scheme. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

In Count 3, the Entity Plaintiffs contend that the Agency's Final Rule departed from past policy of reimbursing for the Treatment in full "by reclassifying the Treatment into four new CPT codes and reimbursing ultrasound image guidance as a once-per-course add-on." Reply at 3. In Count 9, the Entity Plaintiffs challenge the Final Rule as "severely restricting coverage for the Treatment when it is 'reasonable and necessary' for the treatment of non-melanoma skin cancer," and thus contrary to the Medicare Act.[7] *Id.* at 4–5. For both claims, the Entity Plaintiffs invoke federal question jurisdiction under 28 U.S.C. § 1331. *Id.* at 3–5.

The Entity Plaintiffs' APA claims challenging the Final Rule are precluded by the Medicare Act's channeling provisions. *See* 42 U.S.C. §§ 405(g)–(h), 1395ff(b)(1)(A); *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018). 42 U.S.C. § 1395ii provides that § 405(h) "shall also apply with respect to this subchapter [regarding Medicare benefits] to the same extent as they are applicable with respect to subchapter II [regarding Social Security benefits]" and specifies that "any reference therein to the Commissioner of Social Security or the Social Security Administration shall be considered a reference to the Secretary or the Department of Health and Human Services, respectively." 42 U.S.C. § 1395ii. In turn, § 405(h) divests courts of jurisdiction under 28 U.S.C. §§ 1331 and 1346 "on any claim arising under" the Medicare Act, "except as herein provided." *Id.* § 405(h). Instead of general federal question jurisdiction, the Medicare statute provides that "any individual dissatisfied with any initial determination . . . shall be entitled to reconsideration of the determination, and . . . a hearing

---

[7] The Court notes that Plaintiffs at times suggest this claim is an arbitrary-and-capricious claim, but at other times base this argument on the action being in excess of statutory authority. *See* Reply at 1, 5. Under either theory, this claim fails.

28

thereon by the Secretary . . . and . . . to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title." *Id.* § 1395ff(b)(1)(A).  And § 405(g) provides that "[a]ny individual, after any final decision of the [Secretary] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action." *Id.* § 405(g).  So together, the Medicare statute incorporates the Social Security statute's review scheme, including its divesting of general federal question jurisdiction to channel appeals through the Agency's review process before permitting judicial review.  *See Am. Hosp. Ass'n*, 895 F.3d at 825; *Heckler v. Ringer*, 466 U.S. 602, 614–15 (1984) ("The third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." (alterations in original) (footnote omitted)).  Thus, to obtain judicial review under § 405(g), the plaintiff must, at a minimum, have "presented" the claim to the Secretary.  *Am. Hosp. Ass'n*, 895 F.3d at 825 (explaining that the presentment "requirement is not waivable, because without presentment 'there can be no "decision" of any type,' which § 405(g) clearly requires" (quoting *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976))).  "There are, however, narrow exceptions to these channeling and exhaustion requirements, which derive from the Medicare Act itself," including § 1395ff(f)(3) as discussed above, "as well as from Supreme Court precedent." *Henry v. Azar*, 518 F. Supp. 3d 520, 527 (D.D.C. 2021) (citing *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000)).

The Supreme Court has explained that "§ 1395ii does not apply § 405(h) where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." *Ill. Council*, 529 U.S. at 19; *Am. Hosp. Ass'n*, 895 F.3d at 825.  The D.C. Circuit

29

has clarified that "the *Illinois Council* exception is not intended to allow section 1331 federal question jurisdiction in every case where section 405(h) would prevent a particular individual or entity from seeking judicial review." *Council for Urological Ints. v. Sebelius*, 668 F.3d 704, 708, 711 (D.C. Cir. 2011). Rather, where an adequate proxy with aligned interests is willing and able to pursue the plaintiff's claims through the Medicare administrative channels "as a practical matter," jurisdiction under § 1331 is still precluded. *Id.* at 711–12; *see Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005).

Here, the Entity Plaintiffs[8] claim that "SkinCure and PatientsACT undoubtedly cannot 'channel' their claims through the agency because the administrative review process is not available to them." PI Mot. at 15. Further, they argue that "(1) there are no potential proxies for SkinCure or PatientsACT, (2) no potential proxy has brought a claim, and (3) SkinCure and PatientsACT are unable to become assignees of the potential proxies." *Id.* at 16. So, the Entity Plaintiffs assert that the *Illinois Council* exception applies and makes the Medicare Act's channeling provisions inapplicable to them. *See* Reply at 6.

The Court is not convinced. The parties do not dispute that the Entity Plaintiffs will not be denied claims for services, and accordingly will not have access to the Medicare review channels. Reply at 7; Opp'n at 20; 42 C.F.R. §§ 405.906(a), 405.912(a). SkinCure could not channel its claims because it "does not provide clinical care or bill for medical services" and instead operates through its dermatology practice partners. Compl. ¶ 58. Similarly, PatientsAct

---

[8] Plaintiffs do not assert that the *Illinois Council* exception to administrative channeling would apply to Patient Plaintiffs, who have not yet been denied reimbursement and thus have not presented any claim to the Secretary for review. *See* PI Mot. at 14–16; 42 U.S.C. § 1395ff(b)(1)(A) ("[A]ny individual dissatisfied with any initial determination . . . shall be entitled to reconsideration of the determination, and . . . a hearing thereon by the Secretary . . . ."); 42 C.F.R. §§ 405.904, 405.906.

could not directly channel its claims regarding the Treatment coverage for PatientsAct's members.  *Id.* ¶ 137.

But it is unclear to the Court why these dermatology practice partners and individual beneficiaries do not have aligned interests and would not be willing and able to pursue these claims through administrative channels, serving as adequate proxies to bring SkinCure and PatientAct's claims.  In fact, the dermatology practice partners' financial incentive to bring these claims appears to be almost equal to SkinCure's, as SkinCure alleges that it receives "approximately 54% of total reimbursements paid to practice partners."[9]  Compl. ¶ 139; *see RICU LLC v. U.S. Dep't of Health & Hum. Servs.*, 22 F.4th 1031, 1039 (D.C. Cir. 2022) (holding that the plaintiff's client hospitals were adequate proxies that were incentivized to pursue claims that plaintiff's services are eligible for Medicare reimbursement).  Further, the presence of individual patient beneficiaries in this litigation suggests that other beneficiaries would be willing to pursue claims through administrative channels.  Moreover, Plaintiffs allege that "SkinCure *and its hundreds of dermatology practice partners*, PatientsACT *and its members*, the individual Plaintiffs, and tens-of-thousands of Medicare beneficiaries nationwide *will suffer immediate and irreparable harm* due to the Agency's Action."  Compl. ¶ 136 (emphases added).  If these practice partners and patient members will all suffer immediate and irreparable harm, as Plaintiffs allege, it is unclear to the Court why they would not be adequately incentivized to bring their challenges through Medicare administrative channels.

Plaintiffs' reliance on *Council for Urological Interests* is unavailing.  *See* Reply at 7–8.  In that case, the D.C. Circuit found that hospitals were not adequate proxies for the plaintiff,

---

[9] At the April 1 hearing, Plaintiffs' counsel acknowledged that these dermatology practice partners "have a financial incentive of their own," but argued that SkinCure's interest is greater in the aggregate.  *See* Hr'g Tr. at 9:2–20.  Even so, their financial interests are aligned.

whose members were "physician-owned joint ventures formed to purchase specialized equipment for urologic laser surgery." *Council for Urological Ints.*, 668 F.3d at 706, 713.  Like this case, "the hospital bill[ed] Medicare for the technical fee for each surgical procedure performed and then passe[d] on a pre-negotiated portion of that fee to the joint venture on a per-procedure basis." *Id.* at 706.  The Secretary "promulgated new regulations prohibiting most such arrangements" based on concerns of "perceived overutilization of services by physicians who stood to profit by referring patients to facilities or entities in which they had a financial interest." *Id.* at 705–06.  In concluding that the hospitals were not adequate proxies, the court based its decision on "several unique characteristics of the hospitals' relationship to" the plaintiff "and to the challenged regulations." *Id.* at 713.  For example, the plaintiff alleged "that the hospitals had no incentive to challenge" the regulations because the hospitals wanted to reassert control over doctors and to limit their control over medical equipment purchases.  *Id.*  Moreover, the hospitals were financially benefitting from the regulations by purchasing equipment at reduced prices or contracting with unregulated entities.  *Id.*  Thus, the court concluded that the hospitals had "little incentive to pursue the [plaintiff's] challenge to the regulations."  *Id.*  As proving the point that the hospitals were not adequate proxies, the court noted that "not one hospital ha[d] challenged the regulations despite having had three years to do so."  *Id.*  Thus, the *Illinois Council* exception applied.  *Id.* at 703–14.

Here, Entity Plaintiffs' Complaint and arguments fail to provide any explanation why the dermatology practice partners or patients would not be adequate proxies.  Plaintiffs assert that providers and Medicare beneficiaries are "highly unlikely" to present these claims to the Agency because they "would take on enormous risk by administering and receiving the Treatment just to tee up a coverage determination claim."  Reply at 8.  Plaintiffs do not elaborate on what they

mean by "risk," but if these services are profitable to providers, then the Court sees no reason why they would not risk foregoing payment for a single service to preserve a revenue stream. And unlike in *Council for Urological Interests*, SkinCure and its provider partners are "not structurally adverse." *See Henry*, 518 F. Supp. 3d at 531. The only other argument Plaintiffs articulate regarding proxies is that because patients are "already fighting for their lives" they may not litigate fully and would likely settle for reimbursement of their own claims. Reply at 8. As mentioned above, the presence of Patient Plaintiffs in this case appears to refute that claim. And the fact that no proxy has brought a claim is uncompelling here, where the policy just became effective this year and where Plaintiffs fail to identify a claim that has been denied. *See Council for Urological Ints.*, 668 F.3d at 713. Thus, the *Illinois Council* exception does not apply to SkinCure or PatientAct's claims, and this Court lacks jurisdiction under 28 U.S.C. § 1331 to consider the claims brought by them in Counts 3 and 9.[10]

Even were the Court to find that the *Illinois Council* exception applied, these claims would still be barred to the extent they challenge the Final Rule's "determination of relative values and relative value units." 42 U.S.C. § 1395w-4(i)(1)(B). For the reasons discussed above, those challenges are precluded by the Medicare Act's plain text.

In Count 4, the Patient Plaintiffs allege that the LCDs arbitrarily and capriciously depart from Agency policy without a reasoned explanation by "requir[ing] RCTs as a prerequisite for Medicare coverage" and "impos[ing] a new definition of 'qualified physician' that precludes dermatologists from delivering the Treatment." Reply at 4. The Patient Plaintiffs argue that this

---

[10] In a footnote in their Reply brief, Plaintiffs suggest that this Court should deem Plaintiffs' claims exhausted on grounds of futility. *See* Reply at 8 n.1. The Court need not consider this argument, however, because Plaintiffs have not satisfied channeling's first and non-waivable requirement, presentment of their claim to the Secretary. *See Mathews v. Eldridge*, 424 U.S. 319, 328 (1976).

Court has jurisdiction over these claims under § 1395ff(f)(3) because "there are no material issues of fact in dispute" and "the only issue of law is . . . that a . . . determination . . . is invalid." 42 U.S.C. § 1395ff(f)(3)(A)–(B).  The Court agrees that these APA claims present purely legal issues that are appropriate for this Court to adjudicate.  *See Hays*, 583 F. Supp. 2d at 66.

The Patient Plaintiffs' first theory of this claim asserts that the MACs applied a "*de facto* RCT requirement*" in making the LCDs, an allegedly unexplained departure from agency guidelines and precedent that was arbitrary and capricious.  PI Mot. at 28–31.  Notably, Plaintiffs do not cite to any provision in the LCDs establishing an RCT requirement for IGSRT.  The portion of the LCDs that Plaintiffs quote appears to come from the "History/Background and General Information" portion, and provides that "there are no prospective or randomized clinical trials (RCTs) in the peer-reviewed literature that compare the outcomes in recurrence rates (long-term 5 years or more, short-term less than 2 years) between MMS [Mohs] or surgical excisions and SRT."  Final LCD at 9.  But the LCD goes on to find multiple conditions in which "the use of SRT is considered reasonable and necessary."  *Id.* at 10.  Thus, it is unclear what Plaintiffs mean when they characterize this language as creating a "*de facto* RCT requirement," especially with regard to IGSRT, as opposed to SRT.  And while Plaintiffs assert that the "MACs' sole justification" for deeming IGSRT not reasonable and necessary "was the absence of RCTs or prospective studies supporting the Treatment," in the section with the heading "Analysis of Evidence (Rationale for Determination)," the LCDs explained that:

> from the retrospective studies cited above, there is no evidence to support that the addition of HRUS to SRT is required for the treatment of low-risk BCC or low-risk SCC.  Comparing HRUS/SRT with prior older technology SRT does not provide additional meaningful comparisons since newer technology machines for delivering SRT have different energy settings and more recent published data with SRT shows nearly equivalent recurrence rates with longer periods of follow-up.  In addition, when comparisons were made to the SRT studies without HRUS, no corrections were made for the fact that the SRT studies without HRUS had also

34

included more aggressive lesions and histological subtypes and often larger cutaneous tumors. The smaller more favorable lesions were more preponderant in the retrospective IGSRT studies that were published. Therefore, the quality of evidence is low to support the use of HRUS with SRT.

Final LCD at 22 (footnotes omitted). Thus, the MACs' explanation of their concerns regarding the lack of quality evidence supporting the necessity of image guidance refutes Plaintiffs' contrary assertion that the MACs were simply imposing a new RCT requirement.[11]

The Patient Plaintiffs' second theory of this claim asserts that the MACs acted arbitrarily and capriciously by failing to supply a reasoned analysis for their definition of "qualified physician." PI Mot. at 31–33. The Court disagrees. In response to a comment that IGSRT "is a safe and effective treatment that should remain a covered Medicare benefit in dermatology practices," the MACs responded that "[t]he LCD does not prohibit dermatologists from performing SRT, it expects that any provider utilizing these services has the experience and training necessary to deliver SRT in a safe manner." LCD Responses to Comments at 10. Though brief, the idea that a person providing radiation therapy should have the experience and training to deliver radiation therapy in a safe manner does not require much explanation to be reasonable. Moreover, the LCD cited to a paper titled "Practice and Educational Gaps in Radiation Therapy in Dermatology" and noted that "most dermatology programs do not provide didactic or clinical experience in radiotherapy" when discussing best practices in residency education. *See* Final LCD at 14 (citing Cognetta AB Jr, Wolfe CM, Goldberg DJ, Hong HG. Practice and educational gaps in radiation therapy in dermatology. Dermatol Clin. 2016;34(3):319-333). Thus, the MACs' decision to attempt to address those gaps in their LCDs

---

[11] Dispelling the notion that the LCDs institute an RCT requirement also disposes of Plaintiffs' argument that the MACs acted arbitrarily by requiring RCTs for certain treatments but not others. *See* PI Mot. at 31.

by requiring providers to have training in radiation therapy in order to be reimbursed for providing radiation therapy is reasonable, even accepting that it will reduce the number of dermatologists who may be covered to perform SRT in the near term.[12]  For these reasons, the Court concludes that Plaintiff Patients are unlikely to succeed on the merits of their APA claims in Count 4.

In Count 9, the Patient Plaintiffs claim that the LCDs "eliminat[e] coverage for the Treatment," despite it being "reasonable and necessary," and that this constitutes Agency action "not in accordance with the law"—that is, the Medicare Act—and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  Reply at 5 (quoting 5 U.S.C. § 706(2)(A), (C)).  The Patient Plaintiffs argue that this Court has jurisdiction over this claim under § 1395ff(f)(3), *id.*, but the Court disagrees.

Material factual disputes preclude this Court from having jurisdiction over this claim under § 1395ff(f)(3).  Patient Plaintiffs' arguments make that evident.  For example, they argue that "the evidence presented to Defendants during the comment period clearly demonstrated the Treatment's efficacy as a Cancer treatment."  Reply at 5; *see also* PI Mot. at 41 (arguing that the LCD "conflicts with Agency guidance, ignores substantial peer-reviewed evidence, and flouts thirty QIC and ALJ decisions finding the Treatment medically reasonable and necessary").[13]

---

[12] To the extent Plaintiffs argue that "some dermatologists interpret the Agency's explanation of 'qualified physician' to mean that no dermatology residency programs provide the required experience and training," the LCDs acknowledgement that "most" programs do not provide the required experience implies that *some* programs do, negating "some dermatologists" interpretation.  *See* PI Mot. at 33; Final LCD at 14; LCD Responses to Comments at 10.

[13] As Defendants point out, the fact that 30 QICs and ALJs in previous individual claim disputes concluded that IGSRT was reasonable and necessary is not compelling because (1) those decisions were not precedential or binding on the MACs, and (2) the fact that those appeals occurred suggests that coverage for the Treatment was not as uniform as Plaintiffs suggest.  *See* Defs.' Opp'n at 32 n.3.

Thus, Patient Plaintiffs challenge the weight of evidence presented to the MACs when determining whether IGSRT was "reasonable and necessary." While Plaintiffs try to frame this issue as a legal, statutory interpretation question, their arguments are aimed at factual determinations; for example, Plaintiffs argue that "the Treatment is proven to be safe and effective." PI Mot. at 41. But that is the exact type of dispute that is better-suited for an ALJ who can "consult with appropriate scientific and clinical experts" in assessing the validity of an LCD. *See* 42 U.S.C. § 1395ff(f)(2)(A)(i)(II); Opp'n at 28. In this regard, the Court agrees with Defendants that the "factual disputes that Plaintiffs themselves identify prevent them from satisfying subsection (f)(3)(A)." Opp'n at 28. Unlike in *Greenwald*, where the court determined that additional facts or expert opinions were not needed to determine if the LCD and NCD at issue conflicted, here, the efficacy of a cancer treatment, particularly the necessity of additional imaging while providing a radiation treatment, is a quintessential factual dispute for which additional expert evidence would be illuminating. *See Greenwald*, 2022 WL 2046108, at *7.

And as a practical matter, if this claim presents a purely legal issue that is exempt from the Medicare Act's channeling and exhaustion requirements, then the Court sees no reason why every NCD or LCD that deems any treatment not "reasonable and necessary" would not be immediately reviewable in federal district court under § 1395ff(f)(3), removing the role of the Agency in exercising its expertise to weigh in on these science-driven decisions. Surely the exhaustion exception in § 1395ff(f)(3) was not meant to swallow the rule. Accordingly, the Court concludes that Patient Plaintiffs' claim in Count 9 involves disputed material facts, and that this Court lacks jurisdiction to consider it.

In sum, for Plaintiffs' arbitrary and capricious claims (Counts 3, 4, and 9), the Court concludes that it lacks subject matter jurisdiction over the Entity Plaintiffs' claims, and that the Patient Plaintiffs' claims are either similarly precluded or unlikely to succeed on the merits.

### 3.    Without-Required-Procedure Claims

Under the APA, courts can also set aside agency actions found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). In Counts 5 through 8, Patient Plaintiffs claim that the LCDs were implemented by "circumvent[ing] binding procedural requirements" on multiple theories. *See* Reply at 1–2, 5–6. For each theory, Patient Plaintiffs invoke this Court's jurisdiction under § 1395ff(f)(3). *Id.* at 5–6. These four related theories all characterize the local LCDs as national NCDs. *See* PI Mot. at 33–41. But Plaintiffs calling an LCD a national policy does not make it so. As discussed below, Patient Plaintiffs are unlikely to succeed on any of these claims.

In Count 5, the Patient Plaintiffs claim that the LCDs "establish a new substantive legal standard governing Medicare coverage and payment for the Treatment and therefore required formal notice and comment rulemaking under 42 U.S.C. § 1395hh(b)(1)." Reply at 5; *see* PI Mot. at 33. The Court agrees that it has jurisdiction to consider this purely legal challenge under § 1395ff(f)(3).

The Medicare statute provides that "[n]o rule, requirement, or other statement of policy (other than a national coverage determination) that *establishes or changes a substantive legal standard* governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary." 42 U.S.C. § 1395hh(a)(2) (emphasis added). Subject to certain exceptions, "before issuing in final form any regulation

under subsection (a), the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon." *Id.* § 1395hh(b)(1). These provisions specifically exclude NCDs, which have their own notice-and-comment process, including a shorter 30-day period for public comment. *See id.* § 1395y(l)(1)– (4). And the Medicare Act also prescribes a process for promulgating LCDs. *Id.* § 1395y(l)(5).

Plaintiffs argue that the MACs were required to go through notice-and-comment rulemaking because the LCDs established or changed a substantive legal standard. *See* PI Mot. at 33; 42 U.S.C. § 1395hh(a)(2). The Ninth Circuit, which Plaintiffs state is "the only appellate court to squarely address the issue," PI Mot. at 34, has rejected this argument, *Agendia, Inc. v. Becerra*, 4 F.4th 896, 897 (9th Cir. 2021). The Court agrees with the Ninth Circuit's reasoning.

The court in *Agendia* held "that § 1395hh's notice-and-comment requirement does not apply to local coverage determinations" because they "do not 'establish[] or change[] a substantive legal standard.'" 4 F.4th at 897, 900 (quoting 42 U.S.C. § 1395hh(a)(2)). The court explained that an LCD does not establish or change the "reasonable and necessary" standard, but rather "guides the application of that legal standard in a particular claim adjudication." *Id.* at 900. As the court emphasized, though LCDs are controlling on a particular MAC's claim determinations, they do not bind other agency adjudicators. *Id.* "A qualified independent contractor, an ALJ, and the Council all ultimately must apply the statutory reasonable and necessary standard to determine whether to approve a claim." *Id.* The court also based its decision on a structural aspect of the statute: since NCDs, which are nationally binding, are expressly exempt from § 1395hh(a)(2)'s more formal notice-and-comment rulemaking requirements and are subject to a shorter notice-and-comment process, it would make little sense

39

to subject LCDs, "which are not binding, to a more demanding procedure than their national, binding counterparts." *Id.*

The court also rejected Agendia's argument based on *Azar v. Allina Health Services*, 587 U.S. 566 (2019). *Id.* at 901–02. In *Allina*, the Supreme Court explained that "substantive legal standard" as used in § 1395hh(a)(2) is not equivalent to the term "substantive rule" in the APA, such that the APA's exemption of interpretive rules from notice and comment does not apply in the Medicare context. *See Allina*, 587 U.S. at 579. That holding was beside the point in *Agendia*, however, because regardless of whether the LCDs were interpretive, they merely guided application of the already-established "reasonable and necessary" standard, so they did not require notice and comment. *See Agendia*, 4 F.4th at 902.

Patient Plaintiffs reprise many of the arguments rejected in *Agendia*. *See* PI Mot. at 33–34. Though Plaintiffs suggest that the LCDs are somehow binding beyond the MACs, they back off that assertion and clarify that LCDs are only "afforded 'substantial deference' by QICs, ALJs, and the Appeals Council in later appeals." *Id.* at 33 (citing *Porzecanski v. Azar*, 943 F.3d 472, 480 (D.D.C. 2019)). The case they cite supports that LCDs are not binding and thus do not establish or change the "reasonable and necessary" standard. *See Porzecanski*, 943 F.3d at 480 ("An LCD is also binding only at the initial determination stage and does not dictate the qualified independent contractor's reconsideration decision." (citing 42 U.S.C. § 1395ff(c)(3)(B)(ii)(II))); *id.* ("Likewise, notwithstanding LCDs are afforded 'substantial deference . . . if they are applicable to a particular case,' ALJs and the Council are not bound to follow the determination made by the issuing contractor." (alteration in original) (quoting 42 C.F.R. § 405.1062(a))). Thus, the lack of ability to bind the Agency further supports the Court's conclusion that these

40

LCDs did not establish or change a substantive legal standard, and so did not require notice-and-comment. Thus, the Patient Plaintiffs are not likely to succeed on the merits of Count 5.

In Count 6, Patient Plaintiffs assert, in the alternative to Count 5, that the LCDs "operate as a de facto NCD without following the required procedures for promulgating an NCD." Reply at 5; *see* PI Mot. at 34–36. In Count 7, the Patient Plaintiffs further challenge the LCDs as "de facto NCDs issued without following the required [Coverage with Evidence Development] CED framework." Reply at 6; *see* PI Mot. at 36–37. The Court limits its analysis to the purely legal issues raised by these claims. *See* 42 U.S.C. § 1395ff(f)(3).

These claims both hinge on the casting of the LCDs as "de facto NCDs." This argument falls apart quickly. First, a "national coverage determination" is "a determination by the Secretary with respect to whether or not a particular item or service is covered nationally under this subchapter." *Id.* § 1395y(l)(6)(A). Here, the LCDs are determinations neither made by the Secretary nor regarding national coverage. While Plaintiffs assert that the LCDs "impact over 59% of Medicare claims, [and] 9 of the 12 Medicare MACs," PI Mot. at 35, that is not nationwide coverage. Further, the Court is not even persuaded that coordinated LCDs affecting every MAC would constitute NCDs just because they actually had nationwide applicability, because they would still not be determinations made "by the Secretary." *See* 42 U.S.C. § 1395y(l)(6)(A).

Though the statutory scheme explicitly provides for the Secretary to "evaluate new local coverage determinations to determine which determinations should be adopted nationally," *id.* § 1395y(l)(5)(A), the Secretary has made no such determination here. Similarly, the Agency may have had the authority to initiate a CED process, but Plaintiffs fail to identify any source of law requiring the Agency to do so. In fact, Plaintiffs cite no case law at all to support their CED

theory.  Even if the LCDs are the result of "a coordinated lobbying effort . . . to effectuate a change to national coverage policy," PI Mot. at 35–36, that too does not make them national coverage determinations of the Secretary.  Plaintiffs assert, without any citation, that "[w]hen multiple identical Final LCDs and Billing Articles act in tandem with an Agency MPFS Rule, a uniform national coverage policy is created." *Id.* at 36.  Again, Plaintiffs do not explain how the combination of these developments makes a non-binding local determination a binding national one.  Just as an agency's labeling of its actions is not conclusive, *cf. Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995), neither is Plaintiffs'.  Rather, the Court "must adhere to this plain language in the Medicare Act" and conclude that Patient Plaintiffs have not challenged an NCD, so their claims in Counts 6 and 7 related to procedures required for NCDs are unlikely to succeed.  *See Henry*, 518 F. Supp. 3d at 529.

In Count 8, the Patient Plaintiffs claim that the LCDs "extend[]" the Final Rule "in an arbitrary and capricious manner."[14]  Reply at 6.  Plaintiffs assert that the LCDs are arbitrary and capricious because "the MACs acted at the Agency's direction" and represent "a blatant Agency attempt to circumvent the APA."  PI Mot. at 37.  The Court concludes that it lacks jurisdiction to hear this claim.

Plaintiffs argue that "the Agency has made a policy determination to remove coverage," but do not explain what they mean by "remove coverage," and appear to refer to reasoning in the Final Rule, not the LCDs.  PI Mot. at 38.  But then, Plaintiffs all but admit that the Final Rule did not deny coverage when they assert that "the Agency had the MACs initiate the Final LCDs and the Billing Articles, rather than follow the proper process for effectuating billing changes." *Id.*

---

[14] The Court notes that Plaintiffs refer to this action as arbitrary and capricious, but group this claim with their other procedural claims. *See* Reply at 1–6.

Though Plaintiffs' arguments in this discussion lacks clarity, they appear to focus in substance on the Final Rule establishing new RVUs, which, as discussed above, this Court lacks jurisdiction to review.  *See id.* at 37–41; 42 U.S.C. § 1395w-4(i)(1)(B).

To the extent this claim challenges Agency action beyond the Final Rule's RVUs, the Court lacks jurisdiction under § 1395ff(f)(3).  First, the Court agrees with Defendants that § 1395ff(f)(3) provides jurisdiction to challenge only NCDs and LCDs, not any final rule.  *See* 42 U.S.C. § 1395ff(f)(3); Opp'n at 26.  Second, Patient Plaintiffs' allegations in this claim raise material factual disputes.  Plaintiffs' Complaint repeatedly alleges that the MACs acted "at the agency's direction" or that the "Agency directed the MACs to issue" the LCDs.  *See, e.g.*, Compl. ¶¶ 247–49, 251, 255.  But Plaintiffs offer nothing but conclusory allegations of coordination.  To refute those assertions, Defendants submitted a declaration[15] of a Contractor Medical Director for one of the MACs who oversaw the workgroup responsible for developing the LCDs.  Perez Decl. ¶ 11, ECF No. 17-2 ("Neither the Secretary of Health and Human Services nor CMS instructed us to issue the proposed or final local coverage determinations, the responses to comments, or the related billing and coding articles that implement the determinations.").  In addition to disputing that the Secretary directed the LCDs, his declaration also explains that two MACs "did not participate, nor, to date, have they issued any local coverage determinations regarding the use of high resolution ultrasound in connection with the

---

[15] Plaintiffs argue that the Court should not consider this declaration because it was not before the Agency when it made its decisions.  *See* Reply at 23–24.  "The D.C. Circuit has, however, endorsed review of extra-record materials 'in cases where relief is at issue, especially at the preliminary injunction stage.'"  *See Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 26-cv-317, 2026 WL 569034, at *19 n.7 (D.D.C. Mar. 1, 2026) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).  And because Plaintiffs put the question of Agency direction and coordination at issue before the Administrative Record has been prepared, the Court finds it appropriate to consider this declaration.

provision of superficial radiation therapy." *Id.* ¶ 8. Thus, there is a factual dispute as to whether these actions were coordinated or national in scope, which appears material based on Plaintiffs' theory that these actions were part of a conspiracy to thwart the procedural safeguards of the Medicare Act and APA. As a result, this Court lacks jurisdiction. In sum, the Court concludes that none of Patient Plaintiffs' procedural claims (Counts 5–8) is likely to succeed on the merits.

\* \* \*

Ultimately, the Court concludes that Plaintiffs have failed to show that they are likely to succeed on the merits of any of their claims. "[U]pon finding that a plaintiff has failed to show a likelihood of success on the merits, the Court may deny a motion for preliminary injunction without analyzing the remaining factors." *Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013); *see also Ark. Dairy Coop. Ass'n v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009) (explaining that the court "need not proceed to review the other three preliminary injunction factors" where plaintiffs had not shown a likelihood of success on the merits). The Court will accordingly deny Plaintiffs' motion on this ground without reaching the other factors.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Stay and Preliminary and Permanent Injunction (ECF Nos. 11, 14) is **DENIED**; and Plaintiffs' Sealed Motion for Leave to File Under Seal Portions of Plaintiffs' Motion and Select Exhibits (ECF No. 10) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  April 10, 2026                                          RUDOLPH CONTRERAS
                                                                          United States District Judge

44