UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SKINCURE ONCOLOGY, LLC, *et al.*,

Plaintiffs,

v.

ROBERT F. KENNEDY, JR., *et al.*,

Defendants.

Civil Action No. 26-0737 (RC)

**DEFENDANTS' MOTION TO DISMISS**
**AND MEMORANDUM IN SUPPORT THEREOF**

*Of Counsel:*

ROBERT FOX FOSTER
Acting General Counsel

ELIZABETH C. KELLEY
Deputy General Counsel
Chief Legal Officer for CMS

BETSY M. PELOVITZ
Associate General Counsel

JOCELYN S. BEER
Acting Deputy Associate General Counsel
for Litigation

JULLIA BRADLEY
LUCY C. LISIECKI
Attorneys, CMS Division
U.S. Department of Health and Human Services

JEANINE FERRIS PIRRO
United States Attorney

ANDREW J. VADEN
Assistant U.S. Attorney
D.C. Bar No. 1044860
601 D Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2500
Email: andrew.vaden@usdoj.gov

*Attorneys for the United States of America*

## TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

- A. The Medicare Program and Administrative Review Process ........ 2
- B. The 2026 Physician Fee Schedule Final Rule ........ 3
- C. "Reasonable and Necessary" Services and Local Coverage Determinations ........ 6
- D. The Five Challenged Local Coverage Determinations ........ 7
- E. Avenues for Review of Local Coverage Determinations ........ 12
- F. Factual Allegations and Procedural History ........ 13

LEGAL STANDARDS ........ 15

ARGUMENT ........ 16

I. Plaintiffs' *Ultra Vires* Claims Should Be Dismissed for Lack of Subject-Matter Jurisdiction and Failure to State a Claim (Counts One and Two). ........ 16

II. Plaintiffs' Challenges to the Final Rule Are Barred by the Medicare Statute's Preclusion and Channeling Provisions (Counts One, Three, and Nine). ........ 21

- A. The Medicare Statute Precludes Plaintiffs' Challenges to Relative Values and Relative Value Units. ........ 22
- B. The Medicare Statute Precludes Judicial Review of the Secretary's Collection and Use of Data. ........ 24
- C. If Any Count Involving the Final Rule Is Not Held to Be Precluded, It Should Be Dismissed for Failure to Present and Exhaust Administrative Remedies. ........ 26

III. Plaintiffs' Claims Related to the Local Coverage Determinations Should Be Dismissed (Counts Two and Counts Four through Nine). ........ 28

- A. Immediate Judicial Review of Local Coverage Determinations Is Only Available When No Material Issues of Fact Are in Dispute. ........ 28
- B. Plaintiffs' Claim that the Local Coverage Determinations Constitute an Unreasoned Departure from Prior Policy Should Be Dismissed. ........ 32
- C. Plaintiffs' Without-Required-Procedure Claims Should Be Dismissed. ........ 34
- D. Plaintiffs' Claims Related to the Billing Articles Are Deficient. ........ 39

IV. The Court Should Waive the Requirement to File a Certified List of the Contents of the Administrative Record. ........ 39

CONCLUSION ........ 40

Pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6), Defendants Robert F. Kennedy, Jr., in his capacity as Secretary of Health and Human Services (the "Secretary"); the U.S. Department of Health and Human Services ("HHS"); Dr. Mehmet Oz, in his capacity as Administrator, Centers for Medicare & Medicaid Services ("CMS"); and CMS respectfully move to dismiss Plaintiffs' Corrected Complaint (ECF No. 13-1, "Complaint" or "Compl.") for lack of jurisdiction and for failure to state a claim. A proposed order is attached.

## INTRODUCTION

Plaintiffs have failed to obtain provisional relief, and their Complaint should now be dismissed. Plaintiffs challenge the 2026 Physician Fee Schedule Final Rule (the "Final Rule") and five Local Coverage Determinations (the "LCDs") issued by Medicare contractors that limit Medicare reimbursement and coverage for ultrasound scans that can (but need not) be provided when superficial radiation therapy is used to treat non-melanoma skin cancers. They contend the Final Rule and LCDs were *ultra vires* and issued in violation of the Administrative Procedure Act.

Plaintiffs cannot proceed on any of the counts of their Complaint. Their challenges to the Final Rule are precluded because the Medicare statute bars claims relating to the determination of relative values and relative value units, and the underlying information collected and used to determine those relative values. 42 U.S.C. § 1395w-4(*i*)(1)(B), (F). Even if some part of Plaintiffs' claims regarding the Final Rule were not precluded on these grounds, those claims still should be dismissed for lack of subject-matter jurisdiction as none of the Plaintiffs or their potential proxies has presented a claim to the administrative agency or channeled a claim through administrative review. Similarly, Plaintiffs' challenges to the LCDs do not meet the criteria for direct judicial review of LCDs because they involve material disputes of fact, *id*. § 1395ff(f)(3), and rest on a series of mistaken legal propositions. For these reasons, and for others discussed below, this Court should dismiss the Complaint for lack of subject-matter jurisdiction or for failure to state a claim.

## BACKGROUND

### A. The Medicare Program and Administrative Review Process

This case concerns the Medicare program's rules for coverage and payment of claims under Part B, a voluntary insurance program providing payment for physician and other health services. Part B is financed by its enrollees' monthly premiums and by all federal taxpayers via Congressional appropriations. 42 U.S.C. § 1395j.

The Secretary has overall responsibility for the Medicare program and has broad authority to "prescribe such regulations as may be necessary to carry out [its] administration." 42 U.S.C. § 1395hh(a)(1). CMS contracts with private entities who assist in performing Medicare program activities. 42 U.S.C. §§ 1395u, 1395kk-1. The relevant contractors here are Medicare administrative contractors ("Medicare contractors" or "MACs"), who were previously known as carriers. Among their many responsibilities, Medicare contractors process and pay claims for services provided to Medicare beneficiaries. *Id.*; 42 C.F.R. Part 421, Subparts C, E.

Before any claim arising under the Medicare Act can be filed in federal court, it must first be presented to the agency and channeled through administrative review. *See* 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.904, 405.906; *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13 (2000). If the Medicare statute provides "both the standing and the substantive basis" for a claim, then the claim arises under it. *Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 456 (1999) (cleaned up). Even if another statute (or the Constitution) provides a substantive basis for a claim, "all aspects" of a claim arising under the Medicare statute must "be channeled first into the administrative process which Congress has provided for the determination of claims for benefits." *Heckler v. Ringer*, 466 U.S. 602 at 614, 622 (1984).

The Medicare statute provides four levels of administrative review. *First*, within 120 days of receiving an adverse initial determination, claimants must present their disputes to the agency

by requesting redetermination by a Medicare contractor. 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. §§ 405.940-405.958. An individual who was not involved in the initial determination decides timely requests, generally within 60 days of receipt. 42 C.F.R. §§ 405.948, 405.950. *Second*, claimants who are dissatisfied with a redetermination decision can request reconsideration by a qualified independent contractor. 42 U.S.C. § 1395ff(c); 42 C.F.R. §§ 405.960-405.978. *Third*, if that contractor cannot meet its deadline, or claimants are dissatisfied with the decision on reconsideration, they can request an administrative law judge ("ALJ") hearing. 42 C.F.R. § 405.1016. The ALJ generally issues a post-hearing decision within 90 days; otherwise, escalation to the fourth level may apply. *Id.* §§ 405.1016, 405.1020, 405.1046(d), 405.1104. *Fourth*, if claimants are still not satisfied, they can request review by the Medicare Appeals Council. 42 U.S.C. § 1395ff(d); 42 C.F.R. §§ 405.1100-405.1130. The Council's decision is final and binding, and becomes the Secretary's final decision. 42 C.F.R. §§ 405.1130, 405.1140. Only *after* administrative review is completed may a party file an action in federal district court. *Id.* §§ 405.1100-405.1130.

### B. The 2026 Physician Fee Schedule Final Rule

Each year, CMS engages in a massive rulemaking to develop the Physician Fee Schedule that sets the amounts that Medicare will pay for physician services and associated items. 42 U.S.C. § 1395w-4. The Calendar Year 2026 Physician Fee Schedule Final Rule (referred to above and herein as the "Final Rule") was on display on October 31, 2025, and appeared in print in the Federal Register on November 5, 2025. *Medicare and Medicaid Programs; CY 2026 Payment Policies Under the Physician Fee Schedule*, 90 Fed. Reg. 49266 (Nov. 5, 2025). The Final Rule went into effect on January 1, 2026.

Superficial radiation therapy and high-resolution ultrasound scans for certain types of skin cancer are among the thousands of procedures, ancillary services, and supplies within the

Physician Fee Schedule. The services paid for under the Physician Fee Schedule are defined and described by billing codes that are part of the Healthcare Common Procedure Coding System. Part I of that system is comprised of Current Procedural Terminology codes which are created by the American Medical Association.

Generally speaking, the payment for each service under the Physician Fee Schedule is calculated as a product of the relative value for the service, the conversion factor, and the geographic adjustment factor. 42 U.S.C. § 1395w-4(b)(1). The "relative" in relative value is a literal description of how the term operates within the fee schedule and statutory scheme. Under the statutory formula, a complicated, time-consuming, or difficult service with a relative value of 20, for example, will have a price 20 times that of a simpler service with a relative value of 1. In short, the payment for a resource-intensive procedure is relatively higher than the payment for a less resource-intensive procedure.

Relative values are relative in another sense: Congress said that changing the relative values may not significantly change the absolute amount that the Medicare program will pay in either an upward or downward direction except within a very small margin ($20 million nationwide out of roughly $500 billion in Part B reimbursements annually). 42 U.S.C. § 1395w-4(c)(2)(B)(II). In other words, the Physician Fee Schedule's relative values must ensure that the payment schedule remains budget neutral. *Id.* Thus, raising the number assigned as the relative value of some procedures will not significantly raise federal expenditures, but will instead lower the amounts paid for other procedures whose relative value numbers, even if unchanged, will be lower relative to the raised-value procedures.

This case concerns the calculation of the relative values assigned to radiation therapy and add-on ultrasound scans. *See, e.g.*, Compl. ¶¶ 162–166. In response to changes in clinical practice

and Current Procedural Terminology billing code revisions by the American Medical Association, CMS reevaluated the payment structure for superficial radiation therapy used to treat skin cancer, and for high-resolution ultrasound scans used in connection with that therapy. 90 Fed. Reg. 49266, at 49384, 49386-87. CMS examined claims data showing unusually high utilization of ultrasound scans and other information regarding how the services have been furnished in practice, including stakeholders' comments that ultrasound imaging functions, at best, as localization or treatment guidance that is ancillary to the provision of radiation therapy, rather than as a separate diagnostic service. *Id.* at 49380-81, 49386-88.

CMS accordingly determined that the resources associated with ultrasound scans should be reflected in the valuation of the radiation therapy services themselves, rather than paid separately in all circumstances. *Id.* at 49384-87. CMS noted that bundling the payment for the ultrasound scans into the payment for radiation therapy in this way would bring billing for these procedures into alignment with the Physician Fee Schedule payment of other radiation oncology services. *Id.* at 49386. CMS therefore revised the relative value units associated with the codes for radiation therapy and ultrasound, adjusting the work component, practice expense component, and malpractice component as necessary. *Id.* at 49380-81, 49386.

The usual four-step Medicare administrative process does not apply to the Secretary's "determination of relative values and relative value units." 42 U.S.C. § 1395w-4(*i*)(1)(B). Instead, consistent with several other Medicare payment schemes that are intended to be budget-neutral, Congress specified that "there shall be no administrative or judicial review under section 1395ff of this title or otherwise" of such determinations. *Id.* Congress further prohibited review of "the collection and use of information in the determination of relative values under subsection (c)(2)(M)." *Id.* § 1395w-4(*i*)(1)(F).

### C. "Reasonable and Necessary" Services and Local Coverage Determinations

Congress has given the Secretary broad authority to determine whether Medicare should cover items or services furnished to beneficiaries. 42 U.S.C. § 1395ff(a)(1)(C). The Medicare statute itself excludes coverage for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *Id.* § 1395y(a)(1)(A). Thus, claims for Medicare items and services must be reasonable and necessary to be eligible for Medicare coverage and reimbursement. *Id.*

To administer the "reasonable and necessary" coverage standard for more than a billion Part B claims per year, the Secretary employs a range of tools, including formal regulations and administrative appeals decisions. *See, e.g.*, *Heckler v. Ringer*, 466 U.S. 602, 614, 622 (1984) (discussing Secretary's discretion to promulgate rules and allow individual adjudications). The Secretary may also issue a national coverage determination "with respect to whether or not a particular item or service is covered nationally," which is legally binding on all contractors and adjudicators during the Medicare administrative claims and appeals process. 42 U.S.C. § 1395ff(f)(1)(B); 42 C.F.R. §§ 400.202, 405.1060(a)(4). In the absence of a binding policy such as a national coverage determination, Medicare contractors may implement the Secretary's coverage policies through individual determinations. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 405.920. A Medicare contractor also may develop a local coverage determination that specifies, for purposes of its own jurisdiction, whether a particular item or service is reasonable and necessary. 42 U.S.C. §§ 1395ff(f)(2)(B), 1395kk-1(a)(4), 1395y(*l*)(5), 1395y(*l*)(6)(B).

The process to develop and issue a new LCD is robust. *See* 42 U.S.C. § 1395y(*l*)(5)(D); Medicare Program Integrity Manual ("Manual"), *Chapter 13 — Local Coverage Determinations*, https://perma.cc/WPU5-F3TH. In developing an LCD, the Medicare contractor reviews research and other evidence, consults with experts (which may include use of a Contractor Advisory

Committee), issues a proposed LCD, conducts an open meeting, and provides the public a minimum of 45 days for comment. Manual, §§ 13.2.3-13.2.4.4. After considering and responding to comments, and revising its determination as needed, the Medicare contractor publishes the final LCD, providing another notice period of at least 45 days before it goes into effect. *Id.* §§ 13.1.1, 13.2.5-13.2.6; 42 U.S.C. § 1395y(*l*)(5)(D).

Specific content requirements govern proposed and final LCDs. 42 U.S.C. § 1395y(*l*)(5)(D); Manual, §§ 13.5.1–13.5.4. The Medicare contractor must include a bibliography of sources considered in drafting the LCD. Manual § 13.5.3. The Medicare contractor also must explain the rationale supporting its determination to cover or not cover an item or service. *Id.* The LCD must rely upon evidence of general acceptance by the medical community. *Id.* Such evidence includes published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements, and clinical guidelines. *Id.* CMS cautions Medicare contractors that: "Acceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community." *Id.* § 13.2.3.

When a Medicare contractor wishes to convey information to the provider community, but the information is not an LCD, the contractor may issue an article. For example, articles may convey information to health care providers about billing and coding. *Id.* § 13.5.3. Such information may help to implement an LCD. *Id.*

**D. The Five Challenged Local Coverage Determinations**

1. <u>Development and Issuance</u>

Five out of seven Medicare contractors, who cover different geographical jurisdictions, collaborated on the LCDs at issue in this case. The five LCDs are identical, though they list unique

contractor information. *Id.*[1] The LCDs do not cover the entire nation and do not constitute a national coverage determination, which is governed by a separate process as noted above. Two Medicare contractors, First Coast Service Options, Inc. and Novitas Solutions, Inc., did not participate in the preparation of the challenged LCDs and have not issued any such determinations themselves to date. ECF No. 17–2, ¶¶ 3, 8.

The five Medicare contractors issued the final LCDs in accordance with the thorough process set forth above. This process included a rigorous review of the evidence, meeting with subject matter experts who served on the Contractor Advisory Committee, issuing the proposed LCDs with comment periods (from May 15, 2025 through June 28, 2025), conducting an open meeting, publishing responses to comments (*see*, *e.g.*, ECF No. 17-4), revising the proposed LCDs, publishing the final LCDs, and providing another notice period (from January 15, 2026 through February 28, 2026) before the final LCDs became effective on March 1, 2026. ECF No. 17-2, ¶¶ 7–12. The Medicare contractors also issued identical Articles (the "Billing Articles"), which provide technical guidance on implementation of the LCDs. *Id.* at ¶ 10; *see*, *e.g.*, ECF No. 17-5 (WPS's Articles). The Billing Articles' effective date is March 1, 2026. ECF No. 17-5, at 16. Neither the Secretary nor CMS directed the Medicare contractors to issue the proposed or final LCDs, or the Articles. ECF No. 17-2, ¶ 11; ECF Nos. 17-3, 17-5.

WPS led the Medicare contractors' workgroup on the LCDs. ECF No. 17-2 ¶¶ 7–10. On October 17, 2024, the workgroup convened a Contractor Advisory Committee meeting. *Id.* ¶ 12;

---

[1] Each *proposed* LCD can be downloaded by entering its unique identification number on CMS's public Medicare Coverage Database at https://www.cms.gov/medicare-coverage-database/search.aspx. The unique identification numbers for each contractor are: CGS Administrators, LLC, DL40179; National Government Services, Inc., DL40168; Noridian Healthcare Solutions, LLC, DL40176; Palmetto GBA, DL40189; and WPS, DL40193. Entering the same number, minus the "D," allows access to each *final* LCD on the same CMS website. *Id.*

ECF No. 17-3, at 23. SkinCure's co-founder, Daniel Ladd, Jr., D.O., a leader in the Dermatology Association of Radiation Therapy ("DART") group that lobbies for coverage for ultrasound scans, participated in the meeting, as did another DART leader, Jacob Scott, M.D. *See* DART, About Us, https://perma.cc/K76C-84KV (listing Drs. Ladd and Scott as leadership). Drs. Ladd and Scott were the only two Committee members on the panel of twelve to vote in favor of covering every instance of ultrasound scans administered with superficial radiation therapy. *See* ECF No. 17-2 ¶ 12 (confirming Contractor Advisory Committee participation and votes of Drs. Ladd and Scott); ECF No. 17-3 at 23 (discussing Committee votes).

The Committee reached "a consensus" that superficial radiation therapy is "a well-established therapy for non-melanoma skin cancers" but the panelists, on the whole, believed that the literature presented questions and discrepancies regarding the use of "initial and daily" ultrasound scans performed with superficial radiation therapy. ECF No. 17-3 at 23. Many of the subject matter experts "questioned the value of the ultrasound image guidance because they thought it was based on highly flawed and conflicted literature that had been rushed through an inadequate review process." *Id.*

2. <u>"Reasonable and Necessary" Analysis for Superficial Radiation Therapy and Ultrasound Scans</u>

In the five Medicare contractor jurisdictions where the LCDs are in effect, Medicare will continue to cover superficial radiation therapy for appropriate patients, but will not cover all ultrasound scans used in connection with superficial radiation therapy because the LCDs conclude that such scans are not reasonable and necessary. *See* ECF No. 17-3 at 10, 14–15, 18–23; ECF No. 17-4 at 6–7, 11–12, 14–15. In preparing the LCDs, the Medicare contractors reviewed the published and recommended guidelines from leading organizations such as the National Comprehensive Cancer Network, the American Academy of Dermatology Association, and the

American Society of Radiation Oncology. ECF No. 17-3 at 8–15. The Medicare contractors also considered peer-reviewed literature and the opinions of a consortium of experts. *Id.* at 8–15, 22–23. These sources recommend using superficial radiation therapy to treat only certain types of skin cancer, such as smaller, less aggressive lesions or tumors, and using the therapy only for non-surgical candidates. *Id.*; *see also id.* at 10 (defining "non-surgical candidates"); ECF No. 17-2 ¶¶ 9, 14–17.

The Medicare contractors determined that the retrospective studies relied upon by advocates for ultrasound scans do *not* support adding the scans to superficial radiation therapy in treating skin cancer. The LCDs explained in relevant part:

> [F]rom the retrospective studies cited above, there is no evidence to support that the addition of HRUS [high resolution ultrasound] to SRT [superficial radiation therapy] is required for the treatment of low-risk BCC or low-risk SCC [basal cell carcinoma and squamous cell carcinoma, two non-melanoma skin cancers]. Comparing HRUS/SRT with prior older technology SRT does not provide additional meaningful comparisons since newer technology machines for delivering SRT have different energy settings and more recent published data with SRT shows nearly equivalent recurrence rates with longer periods of follow-up. In addition, when comparisons were made to the SRT studies without HRUS, no corrections were made for the fact that the SRT studies without HRUS had also included more aggressive lesions and histological subtypes and often larger cutaneous tumors. The smaller more favorable lesions were more preponderant in the retrospective IGSRT [image-guided superficial radiation therapy] studies that were published. Therefore, the quality of evidence is low to support the use of HRUS with SRT.

ECF No. 17-3 at 22. The Medicare contractors also observed that "no randomized clinical studies or prospective studies" show that "the additional use of high-resolution ultrasound guidance (HRUS) improves the short-term and long-term recurrence rates" of non-melanoma skin cancers treated with superficial radiation therapy. *Id.* at 9. In their responses to comments on the proposed LCDs, the Medicare contractors further explained that:

> [T]here is no evidence to support that the addition of HRUS to SRT is required for the treatment of low-risk BCC or low-risk SCC. HRUS IG-SRT's comparative safety and effectiveness cannot be determined because available comparison

> studies are at high risk of bias and provide indirect comparisons with standard care for NMSC [non-melanoma skin cancers], such as MMS [Mohs micrographic surgery]. Prospective comparison studies that directly compare HRUS IG-SRT and surgery in well-matched patient groups are needed to enable conclusions on comparative outcomes.

ECF No. 17-4 at 6–7. Another response to a comment explained that "no direct head-to-head trials" exist to compare outcomes between patients who received superficial radiation therapy with ultrasound scans and those who received superficial radiation therapy only, which itself is an effective treatment for appropriate cases. *Id*. at 12. The Medicare contractors explained, again, that "the quality of evidence" to support superficial radiation therapy with ultrasound scans is low. *Id.* In particular, studies touting a "99% cure rate" for superficial radiation therapy with ultrasound scans had a high risk of bias. *Id.* Importantly, the Medicare contractors noted that "there are no validated protocols for assessing tumor depth by ultrasound nor correlation of ultrasound tumor depth with microscopic tumor invasion." *Id.*; *see also* ECF No. 17-2 ¶¶ 15–17. As summarized in the response to comments, "there is insufficient evidence to demonstrate [high-resolution ultrasound scan] guidance improves outcomes of SRT treatment." ECF No. 17-4 at 9.

3. <u>March 2026 Amendment to the LCDs</u>

The LCDs also provide that to be eligible for reimbursement, superficial radiation therapy must be provided by a physician with appropriate training and experience. The original LCDs provided in pertinent part:

> A qualified physician for this service is defined as follows: training and expertise must have been acquired within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty (i.e., Radiation Oncology OR by a qualified dermatology program of training with didactic and clinical experience in radiation treatment).

ECF No. 17-3 at 11. In the responses to comments on this language, the Medicare contractors clarified that: "The LCD does not prohibit dermatologists from performing [superficial radiation therapy], it expects that any provider utilizing these services has the experience and training

necessary to deliver SRT in a safe manner and complies with all current guidelines for radiation therapy." *See, e.g.*, ECF No. 17-4 at 10.

Based on additional feedback, and prior to this lawsuit, WPS identified the need for a minor technical amendment to the LCDs; the five Medicare contractors issued the same amendment to the LCDs. *See* ECF No. 17-2 ¶ 13; ECF No. 17-6 at 11 (revised version). The revised version includes an updated discussion of the training and expertise required:

> A qualified physician for this service is defined as follows: training and expertise must have been acquired within the framework of an accredited residency and/or fellowship program in the applicable specialty/subspecialty (i.e., Radiation Oncology OR by a qualified dermatology program *and the dermatologist has didactic training and clinical experience in radiation treatment*).

ECF No. 17-6, at 11 (emphasis added). Plaintiffs have not amended their Complaint to challenge the revised LCDs.

**E. Avenues for Review of Local Coverage Determinations**

There are three avenues for adversely affected parties to seek administrative review of LCDs. *First,* as discussed in Background § A, when a Medicare contractor issues an adverse initial determination—*e.g.*, denying a claim for a service as not reasonable and necessary—claimants (such as Medicare beneficiaries or Medicare providers of services) have the right to challenge that determination through the administrative review scheme.

*Second*, a separate appeals process applies for an "aggrieved party" to seek review of an LCD before an ALJ, subject to certain statutory limitations. 42 U.S.C. § 1395ff(f)(2)(A)(i). Under rare circumstances not present here, aggrieved parties may bypass administrative review under § 1395ff(f)(3). Aggrieved parties are "individuals . . . enrolled under part B . . . who are in need of the items or services that are the subject of the coverage determination." *Id.* § 1395ff(f)(5). Under § 1395ff(f)(5), equipment suppliers like SkinCure and organizations like PatientsACT cannot challenge an LCD directly, because they are not considered aggrieved parties. *Id.*; 42

C.F.R. §§ 405.1062(c), 426.320(a). However, nothing prevents those adversely affected from assisting an aggrieved party who has standing to initiate the ALJ review process. *See* CMS, *Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations*, 68 Fed. Reg. 63692, 63695 (Nov. 7, 2003) (noting that "beneficiaries may seek assistance" from knowledgeable third parties in developing their request for review, but "the beneficiary may not assign his or her legal right to request a review of an LCD or an NCD [national coverage determination] to a third party."). None of the six Medicare beneficiary Plaintiffs allege that they have sought ALJ review of the LCDs.

*Third*, under the Medicare policy described in the Manual at § 13.3, an "interested party" may seek reconsideration of a final LCD. *Id.* §§ 13.3.1, 13.3.2. Indeed, SkinCure (through its attorneys in this litigation) requested reconsideration of the final LCD on March 2, 2026. ECF No. 17-2, ¶ 18. The Medicare contractor's reconsideration process does not provide for judicial review, but if an LCD is revised through the reconsideration process, the revised LCD can be challenged again, under the three avenues described above.

**F. Factual Allegations and Procedural History**

For purposes of this motion only, the following allegations from the Complaint are accepted as true. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1273 (D.C. Cir. 1994). The lead Plaintiff in this action is SkinCure Oncology, LLC ("SkinCure"), "the nation's leading provider of management and administrative services supporting dermatology practices that deliver the Treatment." Compl. ¶ 23. According to a declaration submitted by SkinCure's Chief Financial Officer, SkinCure's business model entails providing equipment and administrative support to dermatology practices, which in turn provide SkinCure with a share of reimbursements received by the practices for providing "Image-Guided Superficial Radiation Therapy," or IGSRT. ECF No. 11-6 ¶¶ 4, 15. The remaining Plaintiffs are PatientsACT, "a nonprofit organization which

educates and advocates for patients' safety rights and freedom of choice in treatment options," and six individual Plaintiffs (the "Patient Plaintiffs") who have received Image-Guided Superficial Radiation Treatment ("IGSRT") or were undergoing IGSRT at the time the Complaint was filed. Compl. ¶¶ 24–31.

The Complaint challenges various aspects of the Final Rule, the LCDs, and Billing Articles. Counts One and Two allege that the Final Rule, LCDs, and the Billing Articles were *ultra vires* agency actions. Counts Three and Four allege that the Final Rule, LCDs, and Billing Articles impermissibly change or depart from the agency's prior position without sufficient justification. Counts Five through Eight allege various procedural deficiencies associated with the Final Rule, LCDs, and Billing Articles. Count Five asserts that the LCDs and Billing Articles adopted "a new substantive legal standard" without notice and comment, and Count Six asserts the LCDs "collectively operate as a de facto [national coverage determination]." Compl. ¶¶ 227, 237. Count Seven asserts that "the Agency unlawfully circumvented the [Coverage with Evidence Development] process," and Count Eight advances a claim that the LCDs and Billing Articles "operate as extensions of the [Final Rule] and as an unlawful attempt to circumvent the APA." *Id.* ¶¶ 242, 248. Count 9 challenges the Final Rule, LCDs, and Billing Articles as "improperly den[ying] coverage for previously covered, life-saving Cancer therapies that are 'reasonable and necessary' for medical care, in violation of the Medicare Act and the APA." *Id.* ¶ 259.

Plaintiffs filed a motion for stay and preliminary and permanent injunction, asserting that SkinCure, PatientsACT, and the Patient Plaintiffs would suffer irreparable harm absent provisional relief. ECF No. 14. This Court denied the motion, ruling that Plaintiffs "failed to show that they are likely to succeed on the merits of any of their claims." Mem. Op. (ECF No. 21) at 44. The Court held that the *ultra vires* claims "fail on the merits, an unsurprising result given the high

standard to succeed on such claims." *Id.* at 16–17. Many of the remaining claims, the Court held, were either unreviewable or required administrative exhaustion. For others, Plaintiffs' claims for relief were conclusory or "f[ell] apart quickly," and this Court determined Plaintiffs were not likely to succeed on the merits. *Id.* at 41.

**LEGAL STANDARDS**

Under Rule 12(b)(1), "a claim must be dismissed if it fails to allege facts which, if true, would establish the Court's subject-matter jurisdiction." *Mahmood v. DHS*, Civ. A. No. 21-1262 (RC), 2021 WL 5998385, at *2 (D.D.C. Dec. 20, 2021). "Because the court has 'an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority,' however, the factual allegations in the complaint 'will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.'" *Davis v. U.S. Parole Comm'n*, Civ. A. No. 20-2897 (APM), 2021 WL 5758820, at *2 (D.D.C. Dec. 3, 2021). Where necessary to resolve a Rule 12(b)(1) motion, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

Under Rule 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible only when a plaintiff pleads factual content that enables the Court to "draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While the Court must assume the truth of "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth." *Id.* at 679.

## ARGUMENT

For many of the same reasons that Plaintiffs' motion for provisional relief failed to establish a likelihood of success on the merits, Plaintiffs' claims should be dismissed for lack of subject-matter jurisdiction or for failure to state a claim.[2]

### I. **Plaintiffs' *Ultra Vires* Claims Should Be Dismissed for Lack of Subject-Matter Jurisdiction and Failure to State a Claim (Counts One and Two).**

Plaintiffs' efforts to evade the express preclusion and channeling provisions of the Medicare statute with *ultra vires* causes of action should be rejected.

Plaintiffs' Complaint includes two causes of action that they style as "*ultra vires*" claims. Count One concerns the Final Rule and its determination of relative value units ("RVUs"), and alleges that Defendants "impermissibly tethered non-facility MPFS valuations for the Treatment to a hospital facility payment framework." Compl. ¶ 166. Count Two concerns the Final LCDs and Billing Articles, which it claims "constitute an *ultra vires* Agency Action because they are based on unauthorized criteria and a flawed application of federal law." *Id.* ¶ 168. To the extent these claims simply seek to invoke the Administrative Procedure Act's provisions relating to the review of agency action contrary to law, *see* Compl. at 41, 43 (headings for Count One and Count Two citing 5 U.S.C. § 706(2)), they are precluded or subject to dismissal for the reasons identified in subsequent sections of this motion. *See* Sections II and III.A, *infra*. To the extent one or both of these counts are construed to raise a nonstatutory *ultra vires* claim, they fail to do so for the reasons that follow immediately below.

---

[2] Defendants hereby adopt and incorporate by reference this Court's conclusions regarding the merits of Plaintiffs' claims, *see* Mem. Op. at 16–44, except to the extent they are inconsistent with the arguments advanced by Defendants in this motion.

"Because ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes," the Supreme Court has "strictly limited nonstatutory ultra vires review." *NRC v. Texas*, 605 U.S. 665, 681 (2025). *Ultra vires* review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Id.* *Ultra vires* review may be available where "the agency order at issue 'was an attempted exercise of power that had been specifically withheld,' and the agency's order violated a 'specific prohibition'" in the relevant statute. *Id.* (quoting *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958)). That exception, however, is a "narrow" one, and "does not apply simply because an agency has arguably reached 'a conclusion which does not comport with the law.'" *Id.* "To prevail on an ultra vires claim, the plaintiff must establish that (1) review is not expressly precluded by statute, (2) 'there is no alternative procedure for review of the statutory claim' and (3) the challenged action is 'plainly' in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (alteration in original) (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)). None of these three elements are met here, and so the *ultra vires* doctrine necessarily cannot provide subject-matter jurisdiction.

As to Count One, first, its challenges to the Final Rule and its Relative Value Units are expressly precluded by 42 U.S.C. § 1395w-4(*i*)(1), which provides that "[t]here shall be no administrative or judicial review under section 1395ff of this title or otherwise of . . . the determination of relative values and relative value units under subsection (c)." *Id.* § 1395w-4(*i*)(1)(B). Similarly, 5 U.S.C. § 1395w-4(*i*)(1)(F) precludes judicial review of "the collection and use of information in the determination of relative values under" section 1395w-4(c)(2)(M), which

in turn permits the Secretary to "use information collected or obtained . . . in the determination of relative values for services," and specifies that "at the Secretary's discretion," that information may include "[a]ny other element that would improve the valuation of services under this section." *Id.* §1 395w-4(c)(2)(M)(i)–(iii); *see* Mem. Op. at 18–19. As this Court noted, "the analysis of Count [One] could stop there." Mem. Op. at 21. The second element—availability of an alternative procedure for review—cannot apply because of the express preclusion of review. The second factor is also not met because a mandatory administrative review process exists, through which the Patient Plaintiffs or the proxies of SkinCure or PatientsACT could channel any non-precluded claims about the Final Rule (they have pled no such claims). Finally, as to the third element, Plaintiffs "point to no specific prohibition the defendants have violated to an extreme and nearly jurisdictional degree." *Global Health*, 153 F.4th at 20; *see also Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) ("*[U]ltra vires* claims are confined to 'extreme' agency error where the agency has 'stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.'" (alterations omitted)). The Medicare statute expressly grants broad authority to the Secretary to "collect and use information on physicians' services in the determination of relative values." 42 U.S.C. § 1395w-4(c)(2)(M); *see also id.* § 1395w-4(c)(2)(N) (detailing Secretary's broad authority to use and collect data to determine practice expense relative values).

For example, subsection (c)(2)(M)(i) allows the Secretary to "collect or obtain information on the resources directly or indirectly" and "from any eligible professional or any other source." *Id.* § 1395w-4(c)(2)(M)(i). It further provides that the Secretary may collect and use "[a]ny other element that would improve the valuation of services under this section." *Id.* § 1395w-4(c)(2)(M)(iii)(V). Additionally, the Secretary may collect or obtain information from many listed

sources, including "facility records" and "[a]ny other mechanism determined appropriate by the Secretary." *Id.* § 1395w-4(c)(2)(M)(iv)(II), (IV). And, with respect to practice expense relative values, subsection (c)(2)(N) provides explicitly that the "Secretary may establish or adjust" them "using cost, charge, or other *data from* suppliers or *providers of services*, including information collected or obtained under subparagraph (M)." *Id.* 1395w-4(c)(2)(N) (emphasis added). "Providers" of Medicare services include hospitals. *See* 42 U.S.C. § 1395x(u) ("The term 'provider of services' means a hospital[.]"). Thus, the use of hospital data is expressly allowed under the Medicare statute, and the challenged portions of the Final Rule cannot be *ultra vires*.

In other words, Plaintiffs' *ultra vires* challenge falls precisely within the scope of the preclusion on judicial review, and so this Court lacks jurisdiction to consider it. As the D.C. Circuit explained in *Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004):

> If a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective, but it must determine whether the challenged agency action is of the sort shielded from review. Otherwise, agencies could characterize reviewable or unauthorized action as falling within the scope of no-review provisions whose application to such action Congress did not intend. In such cases, the determination of whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action, and the court must address the merits to the extent necessary to determine whether the challenged agency action falls within the scope of the preclusion on judicial review.

*Id.* at 113. Just so in this case. At best, Plaintiffs' *ultra vires* argument is that the Secretary should have used only physician-specific data in the determination of relative values. Again, the Medicare statute allows the use of hospital data and explicitly precludes challenges to the Secretary's use of such data. Plaintiffs' *ultra vires* claim is thus "simply worlds away" from the "obvious violation of the clear statutory command" at issue in *Kyne*. *DCH*, 925 F.3d at 510; *Fla. Health Scis. Ctr. v. Sec'y of Health and Hum. Servs.*, 830 F.3d 515 (D.C. Cir. 2016) (a "'patent violation of agency

authority'" is required). There is no basis for Plaintiffs to evade the Medicare statute's preclusion of their challenges to the Final Rule.

As to Count Two, the gravamen of the claim is that the LCDs and Billing Articles "constitute an *ultra vires* Agency Action" because they "rest on unauthorized criteria and a flawed application of the 'reasonable and necessary' standard." Compl. ¶¶ 168, 172. The language of the Complaint suggests this is an APA challenge to the LCDs and Billing Articles under 5 U.S.C. § 706(2), and it should be dismissed for reasons described in Section III, *infra*. However, to the extent this is a nonstatutory *ultra vires* claim, *see* Mem. Op. at 21–22, it is deficient. First, the Patient Plaintiffs have "multiple avenues for challenging the LCDs," *id.*, and so there is an "alternative procedure for review" of the Plaintiffs' claims. *Global Health*, 153 F.4th at 20. Second, even were there any error in the LCDs and Billing Articles (there is not), any such error is not "extreme." *Fed. Express*, 39 F.4th at 764. Plaintiffs labor to interpret the LCDs as applying an "extra-statutory evidentiary requirement" that treatments be supported by randomized clinical trials, Compl. ¶ 176, but the LCDs themselves do not state or apply any *per se* rule, and in any event no provision of law prevents MACs from considering randomized clinical trials (or the lack thereof) when considering whether a service is reasonable and necessary. Mem. Op. at 22. Similarly unsupported is Plaintiffs' claim that the LCDs "attempt to define the scope of practice for qualified personnel permitted to perform the Treatment," Compl. ¶ 177, for the simple reason that the LCDs do not affect which doctors can perform the Treatment. Mem. Op. at 26. *See generally* Section III.B, *infra.*

Finally, Plaintiffs' claim that the LCDs are *ultra vires* because they are void for vagueness, Compl. ¶¶ 178–82, is moot and also deficient on its own terms. It is moot because the language to which Plaintiffs objected, *see id.* ¶ 181, has been supplanted by a revised LCD that simply

provides that dermatologists can be reimbursed for providing the service if they have training and expertise acquired from "a qualified dermatology program" and have "didactic and clinical experience in radiation treatment." *See* Background, § D.3; ECF No. 17-6, at 11; *see also Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990) ("A case is moot if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."); 42 C.F.R. § 426.325(b)(3) ("LCD . . . provisions that are no longer in effect due to revisions or reconsiderations" are "not reviewable under this part."). In any event, the original LCD language was not void for vagueness because even Plaintiffs knew what it meant—they have objected that since "approximately 96% of SRT and Treatment claims are submitted by dermatologists," and since the contested definition of qualified physician would not include those dermatologists because "no such dermatology program exists in practice," most current providers of the Treatment would not be eligible for reimbursement. ECF No. 11-1 at 25. That is a complaint about the substance of the LCDs, not their vagueness, and does not support Plaintiffs' *ultra vires* theory. *See* Mem. Op. at 25–26.

## II. <u>Plaintiffs' Challenges to the Final Rule Are Barred by the Medicare Statute's Preclusion and Channeling Provisions (Counts One, Three, and Nine).</u>

Plaintiffs' challenges to the Final Rule are barred by the Medicare statute's preclusion and exhaustion provisions, and Counts One and Three, and Count Nine to the extent it relates to the Final Rule, should be dismissed for that reason. *See* Mem. Op. at 20 (holding with respect to count 1 that "this Court is not at liberty to disregard the statute precluding judicial review"); *id.* at 33 (holding that Counts Three and Nine are barred from review to the extent they challenge the Final Rule's "determination of relative values and relative value units.").

Count One, as already addressed, alleges that Defendants "impermissibly tethered non-facility MPFS valuations for the Treatment to a hospital facility payment framework." Compl.

¶ 166. Count Three alleges that the Final Rule, by "reclassifying the Treatment into four new [billing] codes, . . . abruptly departed from this longstanding practice," *id.* ¶ 196; Plaintiffs object that "RVU values in both the Proposed and Final Rule were substantially below the reported survey median figures for the Treatment," *id.* ¶ 198. Count Nine mentions the Final Rule as an element of a putative "coordinated change to national coverage policy." *Id.* ¶ 259. Challenges like these to the Final Rule are barred for three independent reasons.

### A. The Medicare Statute Precludes Plaintiffs' Challenges to Relative Values and Relative Value Units.

First, the Medicare statute explicitly precludes Plaintiffs' challenges to the Final Rule, all of which involve the determination of relative values and RVUs for superficial radiation therapy and add-on ultrasound scans. The statute, under the heading "Restriction on Administrative and Judicial Review," provides that "[t]here shall be no administrative or judicial review under section 1395ff of this title or otherwise of . . . the determination of relative values and relative value units under subsection (c)." 42 U.S.C. § 1395w-4(*i*)(1)(B).

The D.C. Circuit has recognized that challenges to the Physician Fee Schedule like those raised here are barred. In a case attacking the Secretary's authority to set RVUs and establish a coding system under 42 U.S.C. § 1395w-4(c), the D.C. Circuit affirmed dismissal for lack of subject-matter jurisdiction for "substantially" the reasons stated by the district court. *Am. Soc'y of Dermatology v. Shalala,* 116 F.3d 941 (D.C. Cir. 1997). The district court had held that § 1395w-4(*i*)(1) "could not be a more clear prohibition of judicial review." *Am. Soc'y of Dermatology v. Shalala*, 962 F. Supp. 141, 146 (D.D.C. 1996); *accord Am. Soc'y of Cataract and Refractive Surg. v. Thompson*, 279 F.3d 447, 453 (7th Cir. 2002); *Painter v. Shalala,* 97 F.3d 1351, 1356 (10th Cir. 1996). By precluding judicial review, Congress sought to avoid precisely the type of chaotic disruption that Plaintiffs would introduce. *See Am. Soc'y of Dermatology,* 962 F.Supp. at 146

("Medicare program would be thrown into chaos" if CMS could not enforce the current Fee Schedule), *aff'd*, 116 F.3d 941 (D.C. Cir. 1997). Thus, the district court in *American Society of Dermatology* held: "Congress plainly intended to give the Secretary the authority to develop and implement" the Physician Fee Schedule "without being subjected to judicial scrutiny." 962 F. Supp. at 146.

In *American Society of Cataract and Refractive Surgery*, the Seventh Circuit also acknowledged that the yearly update to the Physicians Fee Schedule involves a "tight time frame" and "demands that the Secretary's decisions regarding the RVUs be made quickly and efficiently." 279 F.3d at 454. Further, the court recognized that the need for budget neutrality, "requiring increases for some services to be offset by decreases in others," means disruption to the Final Rule should be avoided and "finality" should be ensured, such that challenges to RVUs "must be precluded from judicial review." *Id.* Contrary to these principles, Plaintiffs' Prayer for Relief seeks to jeopardize finality and prevent "enforcement" of the RVUs, and it seeks a disruptive return to the prior year's Schedule involving the RVUs at issue, ignoring the need for budget neutrality across the updated Schedule. Compl. at 63–64.

Moreover, each of the relevant Counts falls squarely within the Medicare statute's preclusion of review. Count One objects to the Final Rule supposedly "importing hospital outpatient cost constructs to set physician office (non-facility) practice expense RVUs." Compl. ¶ 163; *see generally id.* ¶¶ 161–166. Specifically, Count One focuses on: (1) the alleged unlawfulness of CMS's determination of RVUs for superficial radiation therapy and related ultrasound scans pursuant to CMS's authority under 42 U.S.C. § 1395w-4(c), and (2) CMS's alleged improper use of information to calculate RVUs, including for the practice expense component. *Id.* Count Three objects that "the RVU values the Agency adopted in the [Final Rule]

are less aligned with the actual costs of furnishing the Treatment than the Agency's prior reimbursement policy." *Id.* ¶ 199; *see generally id.* ¶¶ 196–206. Count Three also alleges that the RVUs in the Final Rule represent a "change" in "position" or "policy," *id.* ¶¶ 191–192, 199, although the RVUs are not a position or policy. The release of the Physician Fee Schedule is an annual occurrence and the Medicare statute itself requires the Secretary to regularly update the RVUs used in the Schedule. 42 U.S.C. § 1395w-4(c)(2)(B)(i). Count Three further asserts that the Final Rule did not provide enough explanation about the updates to the RVUs. Compl. ¶¶ 191–192, 205. *But see* 90 Fed. Reg. at 49379-90 (detailing the rationale for the updates). Count Nine does not explicitly identify any specific aspect of the Final Rule that it challenges, *id.* ¶¶ 258–269, but any implied objection to the Final Rule presumably relates to the grounds in Counts One and Three related to RVUs. The Complaint's challenges to the Final Rule thus fall within the preclusion of challenges to relative values and relative value units, and are precluded for that reason.[3]

**B. The Medicare Statute Precludes Judicial Review of the Secretary's Collection and Use of Data.**

Second, Plaintiffs seek to evade preclusion by asking the Court to disregard their allegations involving the Secretary's determination of relative values and RVUs. They ask that their claims be viewed as challenging only what they allege is a flawed method that the Secretary used to arrive at the final RVUs, through reliance on data from the Outpatient Prospective Payment System for hospitals. Compl. ¶¶ 164–165, 200–201. As they characterize it, "Plaintiffs' claims challenge the source of the Agency's underlying data" used in the Final Rule. *Id.* ¶ 18.

[3] Other Counts in the Complaint, such as Counts Five and Eight, make passing reference to the Final Rule. *See, e.g.*, Compl. ¶¶ 227, 247. To the extent those Counts are deemed to advance a claim as to the Final Rule, any such claim is likewise precluded for the reasons described in this section.

Even if it were accurate to characterize Plaintiffs' claims as not challenging the determination of relative values and RVUs themselves (it is not), their claims are still not reviewable. Congress specifically barred judicial review not only of the Secretary's "determination of relative values," 42 U.S.C. § 1395w-4(*i*)(1)(B), but also of "the collection and use of information in the determination of relative values under subsection (c)(2)(M)." *Id.* § 1395w-4(*i*)(1)(F). Subsection (c)(2)(M) vests the Secretary with broad authority and discretion to collect and use information in the determination of RVUs. 42 U.S.C. § 1395w-4(c)(2)(M); *see also id*. § 1395-4(c)(2)(N) (detailing the Secretary's broad authority with respect to use of data to determine practice expense relative values).

Moreover, the D.C. Circuit has already rejected the same type of argument about underlying data that Plaintiffs make here in their attempt to avoid the Medicare bar on judicial review. *See Fla. Health*, 830 F.3d at 517-19. In *Florida Health*, plaintiffs argued that the Medicare statute's preclusion of review of the estimates that the Secretary created to set certain payment rates did not apply to their case because they were challenging only the data that the Secretary used to make the estimates. *Id.* at 517. The court rejected that distinction, declining to review the Secretary's "choice of data" and finding that a challenge to the data would "eviscerate the bar on judicial review." *Id.* at 518–19.

Similarly, in its decision involving the practice expense component for relative values and RVUs calculated under 42 U.S.C. § 1395w–4(c)(2)(C)(ii), the Seventh Circuit held that: "[T]he Medicare Act, by its express terms, precludes judicial review of the determination of relative values and relative value units," including, as relevant there, a challenge to a regulation implementing a formula to determine the practice expense component. *Am. Soc'y of Cataract and Refractive Surg.*, 279 F.3d at 452. Just as in *American Society of Cataract and Refractive Surgery*,

Plaintiffs here cannot evade Medicare's preclusion of judicial review by asserting that they do not seek review of the determination of relative values, but rather seek review of a precursor step (the collection and use of data) for the calculation of the practice expense component of the relative values. *Id.* at 453. The data used to calculate relative values is an "integral part of the relative value determination" and is precluded from review. *Id.*; *cf. Fisher v. Berwick*, 503 F. App'x 210, 213 (4th Cir. 2013) (plaintiffs' due process claim seeking to have RVUs determined "in a particular manner" was precluded from review under the Medicare statute).

Indeed, any claim that the ultimate determination of relative values is wrong necessarily involves some proximate argument that the method of getting there took one or more wrong turns. As Judge Shadur explained in the *Anesthesiologists* case: "[I]t simply will not do for [Plaintiffs] to say 'Oh, we're only challenging Secretary's 'decisions that must be made *before* the relative value and relative value unit determinations.'" *Am. Soc'y of Anesthesiologists v. Shalala*, 90 F. Supp. 2d 973, 976 (N.D. Ill. 2000) (emphasis in original); *see also Am. Soc'y of Cataract and Refractive Surg.*, 279 F.3d at 452 (rejecting view that statute "does not foreclose review of a systemic challenge to the Secretary's interpretation"); *Am. Coll. of Cardiology v. Sebelius*, No. 09-62034, 2010 WL 9463882 at *5 (S.D. Fla. Apr. 27, 2010) (rejecting challenge to information Secretary used in determining RVUs, which would render the bar on judicial review "virtually ineffectual.").

**C. If Any Count Involving the Final Rule Is Not Held to Be Precluded, It Should Be Dismissed for Failure to Present and Exhaust Administrative Remedies.**

Alternatively, even if some part of Plaintiffs' claims regarding the Final Rule could be construed as not precluded by the Medicare statute, those claims still should be dismissed for lack of subject-matter jurisdiction. None of the Plaintiffs or their potential proxies can proceed in federal court without first presenting their claims to CMS and exhausting their administrative

remedies. *See* Background § A; 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.904, 405.906*; Ill. Council*, 529 U.S. at 13; *Ringer*, 466 U.S. at 614–17, 622; *Porzecanski v. Azar*, 943 F.3d 472, 481 (D.C. Cir. 2019); Mem. Op. at 21, 28–33. Presentment is not waivable or excusable. *Illinois Council*, 529 U.S. at 15.

To be sure, there are narrow exceptions to the channeling requirement, in particular where application of the channeling requirement "would mean no review at all." *Ill. Council*, 529 U.S. at 13. Here, while SkinCure and PatientsACT are not Medicare providers or beneficiaries, and so will not have denied claims for services, it is well-established that these two Plaintiffs can work with proxies to raise claims on their behalf. *RICU LLC v. U.S. Dep't of Health and Hum. Servs.*, 22 F.4th 1031, 1039 (D.C. Cir. 2022) (holding RICU's client hospitals were "adequate proxies" to channel RICU's challenges through Medicare administrative review on a "concrete" payment claim); *Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1147 (D.C. Cir. 2024) ("record suggests there are adequate proxies for Appellant that have the incentive to seek administrative review"). For example, the Patient Plaintiffs, who are already in the case and challenge both the Final Rule and the LCDs, could serve as proxies who could present and channel claims through administrative review for SkinCure and PatientsACT, as required by 42 U.S.C. § 405(g). *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976); *Ill. Council*, 529 U.S. at 15, 24. Other potential proxies include SkinCure's "practice partners," and PatientsACT's "members," some of the latter of whom—like the Patient Plaintiffs—are Medicare beneficiaries. Compl. ¶¶ 64, 137; *see* Mem. Op. at 30–33. For this additional reason, this Court does not have subject-matter jurisdiction over Plaintiffs' claims regarding the Final Rule.

## III. Plaintiffs' Claims Related to the Local Coverage Determinations Should Be Dismissed (Counts Two and Counts Four through Nine).

Plaintiffs advance various claims related to the LCDs and Billing Articles in Count Two and Counts Four through Nine. As an initial matter, the statutory provision upon which Plaintiffs rely, 42 U.S.C. § 1395ff(f), limits review to Medicare enrollees (*i.e.*, the Patient Plaintiffs). That subsection also requires administrative exhaustion in most instances. 42 U.S.C. § 1395ff(f)(2), (5); *see also* 42 C.F.R. Part 426, Subparts C, D (setting forth requirements for LCD appeals under § 1395ff(f)). In addition, administrative review procedures are available for claim payment denials through which LCD challenges could also be channeled, but no Plaintiff nor proxy has satisfied the attendant presentment and exhaustion requirements. *See* Mem. Op. at 17, 21-22, 23, 28-33, 36-38, 42-44 (discussing Plaintiffs' failure to utilize administrative review). Nor have the Patient Plaintiffs met the narrow criteria that might allow them to bypass administrative review to proceed directly in federal court to challenge the validity of an LCD under 42 U.S.C. § 1395ff(f)(3). Each of these claims should be dismissed either for lack of subject-matter jurisdiction or failure to state a claim for the reasons that follow.

### A. Immediate Judicial Review of Local Coverage Determinations Is Only Available When No Material Issues of Fact Are in Dispute.

Plaintiffs' challenges to the Local Coverage Determinations are barred because they impermissibly seek direct judicial review on claims in which material facts are in dispute.

Subsection 1395ff(f) of Title 42, titled "Review of coverage determinations," establishes the framework for review of LCDs. Paragraph (2) addresses local coverage determinations, like those at issue here, and provides that "[u]pon the filing of a complaint by an aggrieved party, such a determination shall be reviewed by an administrative law judge." *Id.* § 1395ff(f)(2)(A)(*i*). Paragraph (3) then provides a very limited exception to the detailed requirements of Paragraph (2), and it has yet to be considered by the D.C. Circuit. The subsection states in pertinent part:

> **(3) No material issues of fact in dispute**
>
> In the case of a determination that may otherwise be subject to review under paragraph … (2)(A)(i), where the moving party alleges that—
>
> **(A)** there are no material issues of fact in dispute, and
>
> **(B)** the only issue of law is the constitutionality of a provision of this subchapter, or that a regulation, determination, or ruling by the Secretary is invalid,
>
> the moving party may seek review by a court of competent jurisdiction without filing a complaint under such paragraph and without otherwise exhausting other administrative remedies.

*Id*. § 1395ff(f)(3). Paragraph (3) thus eliminates the need for an ALJ to issue a decision that requires *only* a legal determination as to the validity of an LCD, *i.e.*, in cases when it is not necessary to develop a record, issue findings of fact, or consult with experts.

In other words, as soon as there is *even one* issue of law aside from whether the "determination" (the LCD) is invalid, or as soon as there is *even one* material fact in dispute with respect to the determination, then there is no federal court jurisdiction. *Id.* Section 1395ff(f)(3) requires the court to look at *the determination* to ascertain whether there are any disputes of material fact present, or whether there are any issues of law other than the purported invalidity of *the determination*. *Id.* Subsection (f)(3) does not require a federal court to parse each allegation of a multi-count complaint to determine if there is jurisdiction for some *counts* but not others. *Id.* Congress concluded that judicial review may be available for the *determination*, as a whole, only when the limited criteria in Section 1395ff(f)(3) are met.

Here, the Patient Plaintiffs' attempt to seek judicial review of the LCDs under subsection (f)(3), without any prior ALJ and Board review, must fail. The Patient Plaintiffs do not satisfy the criteria of subsection (f)(3). 42 U.S.C. § 1395ff(f)(3). First, subsection (f)(3) itself is titled "No material issues of fact in dispute," and Defendants submit it requires just that: a dispute that involves only whether an LCD is valid as a matter of law. *Id.* Subsection (f)(3)(A) also requires

that Plaintiffs "allege" that there are no material facts in dispute such that they "may seek" judicial review. *Id*. Here, Plaintiffs may *not* seek judicial review, because despite a bare allegation at paragraph 15 that "there are no material issues of fact in dispute" (which Defendants vigorously deny), the balance of the Complaint alleges *many* factual disputes. Plaintiffs have pled away the potential applicability of subsection (f)(3). *E.g.*, Compl. ¶¶ 124, 136-38, 171-72, 180-87, 247-48. To state the most obvious area of dispute, Plaintiffs' declarant, Dr. Ladd, raises numerous factual disputes about the bases for the rationale contained in the LCDs. *Compare* ECF No. 10-5 (Ladd Decl., Pls.' Mem. Ex. A) *with* ECF No. 17-2 (Schaening Perez Decl.). This is precisely the type of situation that requires ALJ and then Board review under subsection (f)(2)—to allow consultation with experts, fact-finding, and development of a record for judicial review. 42 U.S.C. § 1395ff(f)(2)(A)(i); *see also*, *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) (detailing the benefits of administrative review, including development of an administrative record).

Plaintiffs' own Complaint identifies numerous other factual disputes. For instance, they dispute that the Medicare contractors used proper criteria when they issued the LCDs, Compl. ¶¶ 171–172; they dispute that the LCDs are local (claiming that they are national in scope), *id*. ¶ 138; they dispute that superficial radiation therapy without scans remains covered for the Patient Plaintiffs, *id*. ¶¶ 136–137 (claiming that the Patient Plaintiffs will be forced to have surgery instead); they dispute that the Medicare contractors directed the process for establishing the LCDs, claiming that CMS did so, *id*. ¶¶ 247–248; they dispute the LCDs' evidence-based conclusions that superficial radiation therapy does not result in improved cancer cure rates when ultrasound scans are added, *id*. ¶ 124; and (though now moot) they disputed that the original LCDs allowed dermatologists with experience with radiation therapy to provide superficial radiation therapy, *id*.

¶¶ 180–187. The factual disputes that Plaintiffs themselves identify prevent them from satisfying subsection (f)(3)(A), and so they may not bypass administrative review.

Nor do the Patient Plaintiffs satisfy subsection (f)(3)(B): that the "only issue of law" is that a local coverage "determination" is "invalid." *Id.* § 1395ff(f)(3)(B). Indeed, their 65-page, nine count Complaint, as well as their motion for a stay, preliminary injunction, and permanent injunction, reveal that there are many issues of law in this matter, not "only" one involving validity of the LCDs.

Defendants acknowledge that this Court, in its Memorandum Opinion, adopted this view only in part. The Court indicated it was "not convinced that the existence of some factual issues entirely precludes its ability to review the validity of the LCDs here," in part because "the factual issues in some of Patient Plaintiffs' APA challenges to the LCDs may not be 'material to plaintiffs' primary challenge.'" Mem. Op. at 24. Consequently, the Court considered each aspect of Plaintiffs' claims separately, occasionally "limit[ing] its analysis to the purely legal issues raised by th[ose] claims." *Id.* at 41.

Respectfully, two important principles weigh against this interpretation of § 1395ff(f)(3). *First*, this interpretation of § 1395ff(f)(3) would lead to the bifurcation of Plaintiffs' claims, with some theories of the claim routed for administrative review while others would be immediately reviewed in district court. As another court observed in a different context, "bifurcated proceedings . . . would add another layer of complexity to an arena already straining under excess jurisdictional baggage and procedural weightiness." *Delaware Div. of Health & Soc. Servs. v. HHS*, 665 F. Supp. 1104, 1117 (D. Del. 1987). Other things equal, an interpretation of the statute that permits closely related claims with a common nucleus of operative facts to travel together is preferable to one that "split[s]" the case "into two parts." *Bowen v. Massachusetts*, 487 U.S. 879,

911 (1988). *Second*, "limiting" Plaintiffs' claims to "purely legal issues" and then reaching the merits of that narrowed claim, *see* Mem. Op. at 41, would mark a departure from the "principle of party presentation" by "decid[ing] 'a case different from the one [Plaintiffs] advanced.'" *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam). Plaintiffs have arrived in this Court not with pure questions of law, but with a series of factual disputes woven throughout their claims, many of which are catalogued earlier in this section. Because Plaintiffs' claims are laden with factual disputes, section 1395ff(f)(3)'s limited provision for immediate judicial review does not apply and Plaintiffs' challenges to the LCDs should be channeled through the administrative process described in section 1395ff(f)(2), which is applicable only to the Patient Plaintiffs. *See also* 42 C.F.R. Part 426, Subparts C, D (setting forth requirements for LCD appeals under § 1395ff(f)); Mem. Op. at 17, 21–22, 23, 28–33, 36–38, 42–44 (discussing Plaintiffs' failure to utilize administrative review).

**B. Plaintiffs' Claim that the Local Coverage Determinations Constitute an Unreasoned Departure from Prior Policy Should Be Dismissed.**

Plaintiffs' challenges to the LCDs also lack merit on their own terms. Consider Count Four, which alleges that the LCDs "for the first time, require support from [randomized clinical trials] for coverage of the Treatment, in direct conflict with past Agency guidance and precedent, and without acknowledging or explaining this change in Agency position." Compl. ¶ 209. This Count also takes issue with the LCDs' definition of "qualified physician." *Id.* ¶ 221.

Both of these theories of the claim take issue with something that is simply not there. The LCDs do not impose any kind of randomized clinical trial requirement, and the "qualified physician" language to which Plaintiffs object no longer appears in the operative versions of the LCDs.

Consider first Plaintiffs' claim that the LCDs "require support from RCTs for coverage of the Treatment." Compl. ¶ 209. Their Complaint (at ¶¶ 207–220) is devoid of any textual evidence of any such requirement, although they do aver that "the MACs' only explanation" for the coverage determination "is that the Treatment literature is not supported by RCTs or prospective studies." *Id.* ¶ 213. Their assertion in this regard, however, is contradicted by the LCDs themselves, which advance a careful and multi-faceted rationale for their conclusion that "the quality of evidence is low to support the use of [high-resolution ultrasound imaging] with [superficial radiation therapy]." ECF No. 17-6 at 22. That analysis does not state or apply a *per se* rule, but rather assesses the extent to which prior studies support the use of ultrasound scans in connection with superficial radiation therapy to treat certain skin cancers. *Id.* In reaching the conclusion that evidence does not support the use of scans, the LCDs noted "the fact that [non-IGSRT studies] included more aggressive lesions and histological subtypes and often larger cutaneous tumors," while "smaller more favorable lesions were more preponderant" in IGSRT studies. *Id.* The LCDs also identified other confounding factors, such as differences in "energy settings" of the relevant equipment, that weighed against the inference that non-image-guided SRT was less effective than IGSRT. *Id.* This Court thus correctly concluded that "the MACs' explanation of their concerns regarding the lack of quality evidence supporting the necessity of image guidance refutes Plaintiffs' contrary assertion that the MACs were simply imposing a new RCT requirement." Mem. Op. at 21. In Rule 12(b)(6) terms, the Complaint does not plausibly allege that the LCDs impose a RCT requirement, and the Complaint's conclusory assertion to the contrary is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

As to Plaintiffs' claim that the LCDs' definition of "qualified physician" is defective because it required training in a "qualified dermatology program" that "does not exist in practice,"

Compl. ¶ 222, that challenge should be dispatched for a different reason. As explained in the Background, § D.3, the language to which Plaintiffs object has been superseded in the currently operative version of the LCDs. Plaintiffs' challenge to that aspect of the LCDs is therefore moot. *Transwestern Pipeline*, 897 F.2d at 575; *see* 42 C.F.R. § 426.325(b)(3). In any event, this Court correctly concluded that the MACs sufficiently explained their requirement that "a person providing radiation therapy should have the experience and training to deliver radiation therapy in a safe manner." Mem. Op. at 35. Neither theory of the claim is plausible here, and Count Four should be dismissed.

**C. Plaintiffs' Without-Required-Procedure Claims Should Be Dismissed.**

Plaintiffs also press several theories alleging that the LCDs are procedurally deficient. For the reasons that follow, these claims belong in the administrative process because they are based on material disputes of fact, *see* 42 U.S.C. §1395ff(f)(2), (3), and they suffer from several other threshold issues that warrant dismissal.

1. Count Five

Count Five alleges that the LCDs established a "substantive legal standard" that should have gone through notice and comment rulemaking under 42 U.S.C. § 1395hh(b)(1). Compl. ¶¶ 226–232. As an initial matter, Plaintiffs do not appear to contest that the Medicare statute sets forth specific notice and comment procedures for LCDs, which the MACs followed to the letter. *See* Background §§ C, D; 42 U.S.C. § 1395y(*l*)(5)(D). Plaintiffs' assertion that different procedural requirements apply because the LCDs supposedly "establish[] or change[] a substantive legal standard," 42 U.S.C. § 1395hh(a)(2), does not hold water because "an LCD does not establish or change the 'reasonable and necessary' standard, but rather 'guides the application of that legal standard in a particular claim adjudication.'" Mem. Op. at 39 (quoting *Agendia, Inc. v. Becerra*, 4 F.4th 896, 900 (9th Cir. 2021)). For the reasons identified by this Court in its Memorandum

Opinion (at 39–42), the LCDs at issue here do not bind agency adjudicators other than the relevant MACs, the LCDs merely guide the application of an existing legal standard, and Plaintiffs' contrary view would "subject LCDs, 'which are not binding, to a more demanding procedure than their national, binding counterparts.'" Mem. Op. at 40.

More fundamentally, the Medicare statute provides no jurisdictional basis for Count Five because Plaintiffs (or their proxies) did not present or channel the issue raised in Count Five through mandatory administrative review. *See StimLabs, LLC v. Becerra*, 636 F. Supp. 3d 165, 171–72, 176 (D.D.C. 2022), *aff'd on reconsideration*, 651 F. Supp. 3d 56 (D.D.C. 2023) (dismissing claims involving purported § 1395hh violation because plaintiffs failed to exhaust administrative remedies under § 1395ff(b)(1)(A)); *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 192–93, 203 (D.D.C. 2005) (absent presentment and exhaustion of administrative remedies, no subject-matter jurisdiction existed for challenges to Interim Final Rule based on lack of notice and comment rulemaking under § 1395hh).

2. Counts Six and Seven

Counts Six and Seven rest squarely on Plaintiffs' unsupported assertion that the LCDs are "de facto" national coverage determinations or NCDs. Compl. ¶¶ 233–238, 239–245. This is a legal conclusion "not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 679, and the facts alleged in the Complaint conclusively demonstrate otherwise. In Count Six, Plaintiffs contend that the LCDs "are a product of a coordinated effort to change national Medicare coverage policy" and "affect coverage for SRT treatments in more than half of the country," and thus constitute national coverage determinations issued "without the required rulemaking." Compl. ¶¶ 236–237; *id.* at 56 (Count Six heading). In Count Seven, Plaintiffs contend that if the Agency "wished to limit coverage" for ultrasound scans provided with superficial radiation therapy, it "should have sought guidance from the Medicare Evidence Development & Coverage Advisory Committee and, if it

wished to limit coverage," should have "proceed[ed] by issuing a [Coverage with Evidence Development]-based NCD." Compl. ¶ 240; *see also* ECF No. 18 at 6 (challenging the LCDs as "de facto NCDs issued without following the required [Coverage with Evidence Development] framework").

As an initial matter, Plaintiffs' assertion in Count Six that the LCDs are "a product of a coordinated effort" to change national coverage policy brings this claim outside the limited section 1395ff(f)(3) exception to the Medicare statute's administrative review requirement. Defendants vigorously contest the premise that the LCDs are a product of a "coordinated effort" to change national coverage policy, as the briefing and declaration in opposition to Plaintiffs' motion for provisional relief indicates. *Compare* ECF No. 17-2, ¶ 11 (declaration in support of Defendants) *with* ECF No. 11-1, at 35–36 (asserting the existence of "a coordinated lobbying effort . . . to effectuate a change to national coverage policy"). Although the Court previously addressed Counts Six and Seven by "limit[ing] its analysis to the purely legal issues" raised by the claim, Mem. Op. at 41, Defendants respectfully submit that the presence of a "material issues of fact in dispute," 42 U.S.C. § 1395ff(f)(3)(A), means that this Court lacks jurisdiction over the claims. *See supra*, § III.A.

Even if this Court had subject-matter jurisdiction over these claims, they should be dismissed. There are significant differences between LCDs and NCDs, and calling an LCD an NCD does not make it so. A local coverage determination is issued by a MAC and specifies, for purposes of its own jurisdiction, whether a particular item or service is reasonable and necessary. 42 U.S.C. § 1395ff(f)(2)(B). By contrast, a national coverage determination is issued by the Secretary "with respect to whether or not a particular item or service is covered nationally," which is legally binding on all contractors and adjudicators during the Medicare administrative claims

and appeals process. *Id.* § 1395ff(f)(1)(B). Because the LCDs at issue here have all the characteristics of LCDs and none of the characteristics of NCDs, they are not NCDs. *See* Mem. Op. at 41–42. Plaintiffs' allegations are not plausible. Count Seven is deficient for the additional reason that Plaintiffs do not articulate a plausible theory of why the agency was required to—and not just "authorized" to—issue an NCD "under a Coverage with Evidence Development . . . framework." In this regard, in addition to being implausible, Count Seven fails to provide a "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

3. Count Eight

Count Eight, like Count Seven, lacks a clear conceptual basis. Plaintiffs allege that the Agency "arbitrarily and capriciously extended the [Final Rule] through the Final LCDs and Billing Articles." Compl. at 58 (Count Eight heading). They contend that "[a]cting at the Agency's direction, the MACs initiated the Final LCDs and Billing Articles," and so, in Plaintiffs' view, the LCDs and Billing Articles "operate as extensions of the Agency's [Final Rule] and as an unlawful attempt to circumvent the APA." *Id.* ¶ 248.

As a threshold matter, Plaintiffs' theory of the claim is not sufficiently clear to satisfy the requirements of Rule 8(a) as they do not articulate a jurisdictional basis or a theory of the cause of action that would entitle them to relief. In any event, this Court correctly concluded that however this cause of action is construed, the Court lacks subject-matter jurisdiction to consider it. Mem. Op. at 42–44. That is because to the extent Count Eight takes issue with determinations in the Final Rule, those challenges are precluded for the reasons identified in Section II, *supra*. *See* Compl. ¶¶ 253, 255. And to the extent it takes issue with the LCDs, *id.* ¶¶ 250, 257, those challenges are precluded because the (unsupported and implausible) allegations of a "coordinated

change to national coverage policy" or MACs "[a]cting at the Agency's direction," Compl. ¶ 247, raise issues of fact that make section 1395ff(f)(3) inapplicable. *See* Section III.A, *supra*.

4. Count Nine

Count Nine purports to be pled under the Medicare statute as well as the APA. Compl. ¶¶ 258-69. Count Nine merely re-states the same kinds of theories as in Counts Two and Four—that the LCDs are invalid because they do not apply the "reasonable and necessary" analysis correctly, rely on improper evidence, exceed the Medicare contractors' jurisdiction, and are "arbitrary and capricious." Like the others, Count Nine should be dismissed for lack of subject-matter jurisdiction. As this Court held: "Material factual disputes preclude this Court from having jurisdiction over this claim under § 1395ff(f)(3)." Mem. Op. at 36. Those disputes include the weight to be given scientific evidence, and the purported efficacy of the ultrasound scans when used in connection with superficial radiation therapy (*see* Mem. Op. at 37), which are pled in Counts Two and Four, including with respect to each count's "reasonable and necessary" challenges. Compl. ¶¶ 168, 173, 175, 209, 216-219. Further, as the Court concluded with respect to Count 9:

> [I]f this claim presents a purely legal issue that is exempt from the Medicare Act's channeling and exhaustion requirements, then the Court sees no reason why every NCD or LCD that deems any treatment not "reasonable and necessary" would not be immediately reviewable in federal district court under § 1395ff(f)(3), removing the role of the Agency in exercising its expertise to weigh in on these science-driven decisions. Surely the exhaustion exception in § 1395ff(f)(3) was not meant to swallow the rule.

Mem. Op. at 37.

The regulation at 42 C.F.R. § 426.900 supports the Court's view that the agency typically should review "reasonable and necessary" challenges in the first instance. To be valid, a complaint before an ALJ that challenges an LCD must meet defined criteria, including a written statement from the Medicare beneficiary's treating physician verifying that the beneficiary needs the service

that is the subject of the LCD. 42 C.F.R. § 426.400(c)(3). The complaint also must include a statement explaining "why" the beneficiary "thinks that the provision(s) of the LCD" are "not valid under the reasonableness standard." *Id.* § 426.400(c)(5). In support, the beneficiary must include "[c]opies of clinical or scientific evidence that support the complaint and an explanation for why the aggrieved party thinks that this evidence shows that the LCD is not reasonable." *Id.* § 426.400(c)(6)(i). These detailed regulatory requirements demonstrate that "reasonable and necessary" challenges should be heard by ALJs, and that the aggrieved party's complaint should set forth the evidence that supports its challenge at the outset. Plaintiffs' scattershot Complaint fails to meet these regulatory requirements to challenge the reasonableness of the LCDs, including with respect to Count Nine.

### D. Plaintiffs' Claims Related to the Billing Articles Are Deficient.

Finally, Counts Two and Counts Four through Nine purport to press challenges to the Billing Articles. However, Plaintiffs have acknowledged that the Billing Articles "do not create coverage policy" and instead merely "implement[] and operationalize[] the Final LCDs' coverage restrictions." ECF No. 11-1 at 11–12. For this reason, the Court correctly concluded that Plaintiffs "do not identify any legal infirmity in the Billing Articles that does not flow from the Final Rule or the LCDs," Mem. Op. at 14 n.5, and the claims should be dismissed for that reason.

## IV. The Court Should Waive the Requirement to File a Certified List of the Contents of the Administrative Record.

Local Civil Rule 7(n) generally requires that, "unless otherwise ordered by the Court," the agency file "a certified list of the contents of the administrative record . . . simultaneously with the filing of a dispositive motion." However, because the instant motion advances jurisdictional and other threshold issues, "the administrative record is not necessary to decide [the] motion to dismiss." *Abdullahi v. Blinken*, Civ. A. No. 23-3900 (RC), 2024 WL 4880423, at *9 (D.D.C. Nov.

25, 2024). Indeed, an administrative record has not been compiled to date, since Plaintiffs have not presented their claims to the agency and exhausted administrative remedies. For these reasons, the Court should waive the Local Rule 7(n) requirement in this case. *See Mdewakanton Sioux Indians of Minnesota v. Zinke*, 264 F. Supp. 3d 116, 123 (D.D.C. 2017) (Contreras, J.) ("construing Defendants' motion to dismiss as incorporating a motion to waive compliance with Local Civil Rule 7(n)" and granting the implied motion "because the administrative record is not necessary for its decision here"); *Janay v. Blinken*, 743 F. Supp. 3d 96, 105 (D.D.C. 2024) ("waiv[ing] compliance with Local Civil Rule 7(n)" where "the administrative record is unnecessary to decide the threshold legal questions presented by the pending motion to dismiss").

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Complaint.

Dated: June 24, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: *  /s/ Andrew J. Vaden*
ANDREW J. VADEN, D.C. Bar # 1044860
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2500
andrew.vaden@usdoj.gov

*Attorneys for the United States of America*